Barry I. Levy, Esq. (BL 2190)
Max S. Gershenoff, Esq.
Frank P. Tiscione, Esq.
Colleen A. O'Neil, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO*
*General Insurance Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY, and GEICO CASUALTY
COMPANY,

                         Plaintiffs,

        -against-

ALEXANDR ZAITSEV, M.D., METROPOLITAN
INTERVENTIONAL MEDICAL SERVICES, P.C.,
ANTHONY BENEVENGA, CHARLES G. NICOLA, D.C.,
RIDGEWOOD DIAGNOSTIC LABORATORY, L.L.C., TRI-
STATE MULTI-SPECIALTY MEDICAL SERVICES, P.C.,
RIVERSIDE MEDICAL SERVICES, P.C., KRISTAPPA
SANGAVARAM, M.D., ALLAN WEISSMAN, M.D.,
EUGENE GORMAN, M.D., BOGDAN NEGREA, M.D.,
ANTONIO CICCONE, D.O., STELLA AMANZE, P.A.,
FRIDA ISAKOV, P.A., LUCKNIE OVINCY, P.A., EMILY
BAKERMAN, N.P., MELISSA EVANS, N.P., MINI
MATHEW, N.P., ANGELA PULLOCK, N.P., LINDA
SANTA MARIA, N.P., RIVKA WEISS, N.P., CROSSTOWN
MEDICAL, P.C., and WILLIAM FOCAZIO, M.D.,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.: _____(    )

**Plaintiffs Demand a Trial
by Jury**

1

**COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

**NATURE OF THE ACTION**

1.     This action seeks to recover more than $4,500,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted (i) thousands of fraudulent no-fault insurance charges through Metropolitan Interventional Medical Services, P.C. ("Metropolitan"), Tri-State Multi-Specialty Medical Services, P.C. ("Tri-State"), Riverside Medical Services, P.C. ("Riverside"), and Crosstown Medical, P.C. ("Crosstown") (collectively the "PC Defendants") relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported examinations, diagnostic tests, pain management injections, and anesthesia services; and (ii) thousands of fraudulent no-fault insurance charges through Ridgewood Diagnostic Laboratory, L.L.C. ("Ridgewood")(collectively, with the PC Defendants, referred to as the "Entity Defendants") relating to medically unnecessary, illusory, and otherwise non-reimbursable drug testing (collectively, with the examinations, diagnostic tests, pain management injections, and anesthesia services, the "Fraudulent Services").

2.     The Fraudulent Services purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

3.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $35,000,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Defendants through the Entity Defendants because:

(i)     the Defendants were not in compliance with all significant laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    the billing codes used by the Defendants for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(v)     in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants, and therefore were non-reimbursable.

4.      The Defendants fall into the following categories:

(i)     Defendants Crosstown, Metropolitan, and Riverside are New York medical professional corporations through which many of the Fraudulent Services purportedly were provided and billed to automobile insurance companies in New York and New Jersey, including GEICO;

(ii)    Defendant Tri-State is a New Jersey medical professional corporation through which many of the Fraudulent Services purportedly were provided and billed to automobile insurance companies in New York and New Jersey, including GEICO;

(iii)   Defendant Ridgewood is a New Jersey limited liability company through which many of the Fraudulent Services purportedly were provided and were billed to automobile insurance companies in New York and New Jersey, including GEICO;

(iv)    Defendant Alexandr Zaitsev, M.D. ("Zaitsev") is a physician licensed to practice medicine in New York and New Jersey, owned and controlled Metropolitan and Ridgewood, secretly owned and controlled Crosstown, Riverside, and Tri-State, and purported to perform many of the Fraudulent Services.

(v)     Defendants Anthony Benevenga ("Benevenga") and Charles Nicola, D.C. ("Nicola") owned and controlled Ridgewood, together with Zaitsev.

(vi)     Defendant Allan Weissman, M.D. ("Weissman") is a physician licensed to practice medicine in New York and New Jersey, purported to own and control Riverside and Tri-State, and purported to perform many of the Fraudulent Services.

(vii)    Defendant Kristappa Sangavaram, M.D. ("Sangavaram") is a physician licensed to practice medicine in New York and New Jersey, purported to own and control Riverside and Tri-State, and purported to perform many of the Fraudulent Services.

(viii)   Defendant William Focazio, M.D. ("Focazio") is a physician licensed to practice medicine in New York and New Jersey, purported to own and control Crosstown, and purported to perform many of the Fraudulent Services.

(ix)     Defendants Bogdan Negrea, M.D. ("Negrea"), Antonio Ciccone, D.O. ("Ciccone"), and Eugene Gorman, M.D. ("Gorman") are physicians licensed to practice medicine in New York and New Jersey, were employed by or were associated with Metropolitan, Tri-State, and/or Riverside as set forth herein, and purported to perform many of the Fraudulent Services.

(x)      Defendants Stella Amanze, P.A. ("Amanze"), Emily Bakerman, N.P. ("Bakerman"), Melissa Evans, N.P., ("Evans"), Frida Isakov, P.A. ("Isakoff"), Linda Santa Maria, N.P. ("Santa Maria"), Mini Mathew, N.P. ("Mathew"), Lucknie Ovincy, P.A. ("Ovincy"), Angella Pullock, N.P. ("Pullock"), and Rivka Weiss, N.P. ("Weiss")(collectively the "NP-PA Defendants") are nurse practitioners and physician assistants, respectively, were employed by or were associated with the PC Defendants as set forth herein, and purported to perform many of the Fraudulent Services.

5.       As set forth herein, the Defendants at all relevant times have known that:

(i)      the Defendants were not in compliance with significant laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(i) the billing codes used by the Defendants for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(ii) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants, and therefore were non-reimbursable.

6. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Entity Defendants.

7. The charts annexed hereto as Exhibits "1" - "5" set forth a representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, through the Entity Defendants to GEICO.

8. The Defendants' fraudulent scheme began no later than 2016 and has continued uninterrupted since that time.

9. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $4,500,000.00.

## THE PARTIES

### I.  Plaintiffs

10. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

5

## II. <u>Defendants</u>

11.     Defendant Ridgewood is a New Jersey limited liability company with its principal place of business in New Jersey. Ridgewood was organized in New Jersey on July 22, 2014 and purported to be properly licensed as a clinical laboratory by the New Jersey Department of Health. Ridgewood has at all times been controlled by Zaitsev, Nicola, and Benevenga, had Zaitsev, Nicola, and Benevenga as its members, and was used by Zaitsev, Nicola, and Benevenga as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

12.     Defendant Metropolitan is a New York medical professional corporation with its principal place of business in New York. Metropolitan was incorporated in New York on January 22, 2016, at all relevant times has been owned by Defendant Zaitsev, and was used by Zaitsev as a vehicle to submit fraudulent billing to GEICO and other insurers in New York and New Jersey.

13.     Defendant Riverside is a New York medical professional corporation with its principal place of business in New York.  Riverside was incorporated in New York on August 9, 2018. Though Zaitsev held a secret ownership interest in Riverside, Weissman and Sangavaram falsely purported to be the sole owners of Riverside. Riverside also was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

14.     Defendant Tri-State is a New Jersey medical professional corporation with its principal place of business in New Jersey.  Tri-State was incorporated in New Jersey on April 13, 2018, and was never licensed or authorized to provide medical services or to operate as a medical practice in New York State. Though Zaitsev held a secret ownership interest in Tri-

State, Weissman and Sangavaram falsely purported to be the sole owners of Tri-State. Tri-State also was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

15.    Defendant Crosstown is a New York medical professional corporation with its principal place of business in New York. Crosstown was incorporated in New York on February 13, 2018. Though Zaitsev held a secret ownership interest in Crosstown, Focazio falsely purported to be the sole owner of Crosstown. Crosstown also was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

16.    Defendant Zaitsev resides in and is a citizen of New Jersey. Zaitsev was licensed to practice medicine in New York on December 21, 2001 and in New Jersey on April 10, 2002. Zaitsev at all relevant times has owned and controlled Ridgewood and Metropolitan, and been a member of Ridgewood. In addition, Zaitsev secretly owned and controlled Crosstown, Riverside, and Tri-State. Zaitsev purported to perform many of the Fraudulent Services billed to GEICO through Metropolitan. Furthermore, Zaitsev caused billing for the Fraudulent Services to be submitted through the Entity Defendants to GEICO and other insurers in New York and New Jersey.

17.    Defendant Benevenga resides in and is a citizen of New Jersey. Benevenga has at all relevant times been a member of Ridgewood. Benevenga used Ridgewood as a vehicle to submit fraudulent billing to GEICO and other insurers in New York and New Jersey.

18.    Defendant Nicola resides in and is a citizen of New Jersey. Though Nicola was licensed to practice chiropractic in New Jersey on March 3, 1995, his license is no longer active. Nicola at all relevant times has been a member of Ridgewood. Nicola used Ridgewood as a vehicle to submit fraudulent billing to GEICO and other insurers in New York and New Jersey.

19.     Defendant Focazio resides in and is a citizen of New Jersey. Focazio was licensed to practice medicine in New York on March 23, 2015 and in New Jersey on July 1, 1983. Focazio falsely purported to be the sole owner of Crosstown, and falsely purported to perform many of the Fraudulent Services billed through Crosstown to GEICO and other insurers in New York and New Jersey.

20.     Defendant Sangavaram resides in and is a citizen of New Jersey. Sangavaram was licensed to practice medicine in New York on March 17, 1978 and in New Jersey on January 21, 1991. Sangavaram falsely purported to be the sole owner of Riverside and Tri-State. Sangavaram also purported to perform many of the Fraudulent Services billed through Riverside and Tri-State to GEICO and other insurers in New York and New Jersey.

21.     Sangavaram has a history of professional misconduct that has resulted in discipline by the State of New Jersey Board of Medical Examiners (the "State Board").

22.     For instance, on April 19, 2007, the State Board suspended Sangavaram's license to practice medicine for three years, with the first six months as a period of active suspension and the balance as a period of probation. The Board imposed this discipline on Sangavaram after the New Jersey Attorney General charged Sangavaram with multiple violations of New Jersey law, based on allegations that Sangavaram had charged excessive fees under fraudulent circumstances, engaged in gross negligence, and violated the relevant New Jersey self-referral laws.

23.     Then, on July 23, 2014 – after the State Board found continued, serious deficiencies in Sangavaram's medical practice – the State Board ordered Sangavaram to pay for ongoing monitoring of his medical practice for the life of his medical license, among other things.

24.     Sangavaram's record of professional discipline – which can be located by prospective employers and referral sources via a simple internet search – has made it virtually impossible for Sangavaram to find employment as a legitimate physician, and contributed to his motive to participate in the fraudulent scheme described herein.

25.     Defendant Weissman resides in and is a citizen of New Jersey. Weissman was licensed to practice medicine in New York on January 3, 1994 and in New Jersey on December 4, 1998. Weissman falsely purported to be the sole owner of Riverside and Tri-State. Weissman also purported to perform many of the Fraudulent Services billed through Metropolitan, Riverside, and Tri-State to GEICO and other insurers in New York and New Jersey.

26.     Defendant Gorman resides in and is a citizen of New Jersey. Gorman was licensed to practice medicine in New York on November 3, 1986 and in New Jersey on December 11, 1987. Gorman was associated with Metropolitan, Riverside, and Tri-State, and purported to perform many of the Fraudulent Services billed through Metropolitan, Riverside, and Tri-State to GEICO and other insurers in New York and New Jersey.

27.     Defendant Negrea resides in and is a citizen of New York. Negrea was licensed to practice medicine in New York on May 19, 1997. Negrea was associated with Metropolitan and Tri-State, and purported to perform many of the Fraudulent Services billed through Metropolitan and Tri-State to GEICO and other insurers in New York and New Jersey.

28.     Defendant Ciccone resides in and is a citizen of New Jersey. Ciccone was licensed to practice medicine in New York on May 12, 1998 and in New Jersey on February 14, 1992. Ciccone was associated with Metropolitan, and purported to perform many of the Fraudulent Services billed through Metropolitan to GEICO and other insurers in New York and New Jersey.

29.     Defendant Amanze resides in and is a citizen of New Jersey. Amanze was licensed as a physician assistant in New York on March 14, 1996. Amanze was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

30.     Defendant Isakov resides in and is a citizen of New York. Isakov was licensed as a physician assistant in New York on August 3, 2017. Isakov was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

31.     Defendant Ovincy resides in and is a citizen of New Jersey. Ovincy was licensed as a physician assistant in in New York on February 23, 2015 and in New Jersey on November 15, 2012. Ovincy was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

32.     Defendant Bakerman resides in and is a citizen of New Jersey. Bakerman was licensed as a nurse practitioner in New York on November 9, 2012 and in New Jersey on November 8, 2012. Bakerman was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

33.     Defendant Evans resides in and is a citizen of New York. Evans was licensed as a nurse practitioner in New York on February 6, 2015 and in New Jersey on July 10, 2013. Evans was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

34.     Defendant Mathew resides in and is a citizen of New York. Mathew was licensed as a nurse practitioner in New York on July 14, 2009 and in New Jersey on December 27, 1995. Mathew was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

35.     Defendant Pullock resides in and is a citizen of New Jersey. Pullock was licensed as a nurse practitioner in New York on April 20, 2015 and in New Jersey on February 27, 1997. Pullock was associated with Riverside, Tri-State, and Crosstown, and purported to perform many of the Fraudulent Services billed through Riverside, Tri-State, and Crosstown to GEICO and other insurers in New York and New Jersey.

36.     Defendant Santa Maria resides in and is a citizen of New Jersey. Santa Maria was licensed as a nurse practitioner in New York on April 7, 2017. Santa Maria was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

37.     Defendant Weiss resides in and is a citizen of New York. Weiss was licensed as a nurse practitioner in New York on October 28, 2016 and in New Jersey on January 14, 2011. Weiss was associated with the PC Defendants, and purported to perform many of the Fraudulent Services billed through the PC Defendants to GEICO and other insurers in New York and New Jersey.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

39.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

40.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

41.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants resides and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

42.     For example, in the claims identified in Exhibits "1" – "5", the Defendants submitted or caused to be submitted a substantial amount of fraudulent billing to GEICO under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds. The Defendants knowingly caused this fraudulent billing to be submitted to a GEICO office in the Eastern District of New York. In reliance on the fraudulent claims, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

43.     What is more, and as set forth herein, the Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

44.     Moreover, and as set forth herein, the Defendants not only regularly committed tortious acts in New York, they also committed tortious acts in New Jersey that caused injury to GEICO in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

45.    GEICO underwrites automobile insurance in New York and New Jersey.

## I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

## A.    Pertinent New York Law Governing No-Fault Insurance Reimbursement

46.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

47.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively the "New York No-Fault Insurance Laws"), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Insureds.

48.    In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

49.    In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those services.

50.    In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

51.     Pursuant to the New York No-Fault Insurance Laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

52.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

53.     New York law prohibits licensed healthcare providers from paying or accepting compensation in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

54.     Additionally, New York law requires all of the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

55.     Therefore, under the New York No-Fault Insurance Laws, a healthcare provider is not eligible to receive PIP Benefits if it is fraudulently incorporated, fraudulently licensed, or if it pays or receives unlawful compensation in exchange for patient referrals.

56.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

57.     Pursuant to New York law, foreign professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. See, e.g., N.Y. Educ. Law §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

58.     Therefore, under the New York No-Fault Insurance Laws, a foreign professional entity operating in New York without the proper authority is not eligible to receive PIP Benefits.

59.     Pursuant to N.Y. Public Health Law § 238-a(1)(a), practitioners are prohibited from referring patients to a clinical laboratory where the practitioner or the practitioner's immediate family has a financial relationship with the clinical laboratory, subject to limited exceptions not applicable here.

60.     Concomitantly, N.Y. Public Health Law § 238-a(1)(b) prohibits clinical laboratories from submitting bills or claims to an insurer for services provided pursuant to an unlawful referral.

61.     More generally, New York law prohibits licensed healthcare services providers, including physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

62.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

63.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that:

(i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

64.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

### B.     Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement

65.     Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.)(collectively the "New Jersey No-Fault Insurance Laws"), which require automobile insurers to provide PIP Benefits to Insureds.

66.     As in New York, under the New Jersey No-Fault Insurance Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA-1500 form.

67.     In order for a healthcare provider to be eligible to receive PIP Benefits in New Jersey, it must comply with all significant laws and regulations governing healthcare practice.

68.     Thus, a healthcare provider in New Jersey is not entitled to receive PIP Benefits where it has failed to comply with significant statutory and regulatory requirements governing healthcare practice, whether or not the underlying services were medically necessary.

69.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement in New Jersey, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice.

70.     By extension, pursuant to the New Jersey No-Fault Insurance Laws, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare providers or for healthcare services that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice.

71.     Pursuant to N.J.A.C. 13:35-6.17, physicians in New Jersey are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

72.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. …

(Emphasis added).

73.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

74.     Therefore, physicians and medical practices that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

75.     In New Jersey, physicians generally may not refer patients to a healthcare provider in which they, or their immediate family, have a significant beneficial interest. Specifically, N.J.S.A. 45:9-22.5 (the "Codey Law") provides that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a healthcare service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . . .

76.     Pursuant to N.J.S.A. 45:9-22.4:

> Healthcare service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Healthcare service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home healthcare agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

77.     Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

78.     Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to self-referrals for procedures to be performed at an ambulatory care facility – such as an ambulatory surgery center – so long as certain conditions are met (the "ASC Exception").

79.     Specifically, at all relevant times, pursuant to the ASC Exception in N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient self-referrals did not apply to:

> ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

> (a)     the practitioner who provided the referral personally performs the procedure;

> (b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

> (c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

> (d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

80.     Physicians and medical practices which engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

81.     Pursuant to  N.J.S.A 14A:17-5, a foreign professional entity cannot offer medical professional services in the State of New Jersey without being properly organized or incorporated under New Jersey law.

82.     Therefore, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that unlawfully operate in New Jersey as foreign professional entities.

83.     Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare provider in New Jersey is only eligible to receive PIP Benefits for medically necessary services.

84.     Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

(1)     is not primarily for the convenience of the injured person or provider,

(2)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and

(3)     does not involve unnecessary diagnostic testing.

85.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

86.     When a healthcare provider submits a claim for PIP Benefits using the CPT codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

87.     The New Jersey No-Fault Insurance Laws specifically prohibit healthcare service providers from charging for services in amounts exceeding the amounts set forth in the NJ Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29:6.

88.     The New Jersey No-Fault Insurance Laws provide that the NJ Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

89.     Additionally, no-fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, *i.e.*,

unbundled.  The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

90.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations.  See N.J.A.C. 11:3-29.4.

91.     With respect to unbundling, N.J.A.C. 11:3-29.4 provides that:

Artificially separating or partitioning what is inherently one total procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

92.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the New Jersey Insurance Fraud Prevention Act (the "IFPA"), N.J.S.A. 17:33A-1 et seq.

93.     A healthcare provider violates the IFPA if, among other things, it:

(i)     Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(ii)    Prepares or makes any written or oral statement that is intended to be presented to any insurance company in connection with, or in support of, any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim;

(iii)   Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled;

(iv)    Knowingly assists, conspires with, or urges any person or practitioner to violate any of the above provisions; or

(v)     Knowingly benefits, directly or indirectly, from the proceeds derived from a violation of any of the above provisions due to the assistance, conspiracy or urging of any person or practitioner.

See N.J.S.A. 17:33A-4.

94.      Violators of the IFPA may be liable to an insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

95.      A person that engages in a pattern of fraudulent behavior under the IFPA may be liable to an insurer for treble damages. See N.J.S.A. 17:33A-7(b).

96.      The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or the same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

**II.      The Antecedents of the Defendants' Fraudulent Scheme**

97.      Zaitsev has a history of engaging in no-fault insurance fraud schemes.

98.      Prior to owning Ridgewood and Metropolitan and secretly owning Tri-State, Crosstown, and Riverside, Zaitsev owned Interstate Multi-Specialty Medical Group, P.C. ("Interstate") and Highland Medical Group, P.C. ("Highland"), two New Jersey medical professional corporations that were incorporated on or about August 27, 2013 and May 26, 2010, respectively.

99.      Between at least 2012 and 2015, Zaitsev used Interstate and Highland to submit massive amounts of fraudulent no-fault insurance billing to automobile insurers in New Jersey, including GEICO.

100.     Much like Metropolitan, Tri-State, and Riverside, Interstate and Highland purported to provide examinations, diagnostic tests, pain management injections, and anesthesia services to Insureds.

101.     However, Interstate and Highland's ability to bill GEICO and other New Jersey automobile insurers for medical services depended on Interstate and Highland's ability to gain access to Insureds.

102.     Accordingly, Interstate, Highland, and Zaitsev devised a fraudulent kickback and referral scheme whereby they would pay unlawful kickbacks to healthcare providers in exchange for patient referrals to Interstate and Highland.

103.     In keeping with the fact that Interstate, Highland, and Zaitsev paid illegal kickbacks in exchange for patient referrals, on or about May 20, 2016, in a criminal case entitled State of New Jersey v. Alexander Dimeo, Docket Nos. 16-05-000251 and 16-05-000252, a chiropractor named Alexander Dimeo, D.C. ("Dimeo") pleaded guilty to various insurance fraud-related crimes. As part of his plea agreement, Dimeo provided sworn testimony regarding his receipt of a massive amount of kickbacks from various healthcare providers in New Jersey, including Zaitsev.

104.     In particular, as part of Dimeo's plea allocution, Dimeo provided sworn testimony to the effect that Zaitsev – through an intermediary – paid him kickbacks in exchange for patient referrals to Highland. In particular, Dimeo testified that, beginning in 2012, Zaitsev directed an intermediary to provide between $150.00 to $250.00 per patient to Dimeo in exchange for patient referrals to Zaitsev and Highland.

105.     All told, Dimeo testified that he accepted more than $37,000.00 in kickbacks from Zaitsev in exchange for patient referrals to Zaitsev and Highland between 2012 and 2015.

106.     Then, in an April 2018 affidavit, Dimeo swore – among other things – that when he would refer patients to Highland pursuant to the kickbacks from Zaitsev, he would often

notice that the resulting healthcare services were performed through Interstate, which he understood was also owned by Zaitsev.

107.    In early 2016, Zaitsev grew concerned that his kickback payments to Dimeo and other healthcare providers would come to light, and would limit his ability to continue to submit fraudulent PIP billing through Interstate and Highland.

108.    Accordingly, Zaitsev sought out a means by which he could continue to submit a large volume of fraudulent and unlawful billing to GEICO and other insurers.

109.    Thereafter, and as set forth below, Zaitsev and his co-Defendants used the Entity Defendants – which Zaitsev also owned and controlled – as vehicles for the continued submission of a large amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

**III.    The Defendants' Fraudulent Scheme**

**A.    The Multidisciplinary Clinics and Kickbacks**

110.    Zaitsev and Metropolitan did not advertise or market Metropolitan's services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide most of the Fraudulent Services.

111.    Similarly, Zaitsev, Weissman, Sangavaram, Riverside, and Tri-State did not advertise or market Riverside or Tri-State's services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide most of the Fraudulent Services.

112.    Likewise, Zaitsev, Focazio, and Crosstown did not advertise or market Crosstown's services to the general public, did not maintain stand-alone practices, and were not

the owners of or leaseholders of the real property from which they purported to provide most of the Fraudulent Services.

113.     Instead, the PC Defendants operated on an itinerant basis from a large number of multidisciplinary clinics located throughout the New York metropolitan area (the "No-Fault Clinics") that purported to provide treatment to patients with no-fault insurance, including but not limited to No-Fault Clinics at the following locations:

(i)      108 Kenilworth Place, Brooklyn, New York;

(ii)     2510 Westchester Avenue, Bronx, New York;

(iii)    424 East 147th Street, Bronx, New York;

(iv)     28-18 31st Street, Astoria, New York;

(v)      2052 Richmond Road, Staten Island, New York;

(vi)     2426 Eastchester Road, Bronx, New York;

(vii)    488 Lafayette Avenue, Brooklyn, New York;

(viii)   1110 Pennsylvania Avenue, Brooklyn, New York;

(ix)     5037 Broadway, New York, New York;

(x)      219 Hempstead Turnpike, West Hempstead, New York;

(xi)     194-13 Northern Boulevard, Queens, New York;

(xii)    625 E. Fordham Road, Bronx, New York;

(xiii)   2598 Third Avenue, Bronx, New York; and

(xiv)    205-20 Jamaica Avenue, Queens, New York.

114.     Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these No-Fault Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

115.    Just as Zaitsev previously had done at Interstate and Highland, Zaitsev, Weissman, Sangavaram, Focazio, and the PC Defendants gained access to the No-Fault Clinics by paying kickbacks to other healthcare services providers (the "Referring Providers") who operated from the No-Fault Clinics and controlled access to the No-Fault Clinics.

116.    The kickbacks either were paid in the form of untraceable cash, or else were disguised as ostensibly legitimate fees to "lease" space or personnel at the No-Fault Clinics. In fact, these were "pay-to-play" arrangements that caused the Referring Providers at the No-Fault Clinics to provide access to Insureds and to refer the Insureds to the PC Defendants for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

**B.      Tri-State's Unlawful Operations in New York**

117.    As set forth above, Tri-State is a New Jersey medical professional corporation, not a New York medical professional corporation.

118.    As set forth above, pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), healthcare services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … ."

119.    Pursuant to the New York Education Law, medical professional corporations operating in New York must have a certificate of authority from the New York Department of Education, and must be properly incorporated in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

120.    Tri-State never obtained a certificate of authority from the New York Education Department and was never properly incorporated in New York.

121. For instance, searches of the New York Department of State Division of Corporations website indicate that Tri-State was never incorporated in New York and has never been authorized to do business in New York.

122. Likewise, searches of the New York Education Department's Office of the Professions website indicate that Tri-State never received any certificate of authority from the Education Department.

123. Even so, Zaitsev, Weissman, Sangavaram, and Tri-State routinely and unlawfully operated Tri-State as a medical practice in New York.

124. For example:

(i)     On or about May 10, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for range of motion and muscle strength testing purportedly provided through Tri-State to an Insured named JV at a No-Fault Clinic located at 424 East 147th Street, Bronx, New York, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative range of motion and muscle strength testing.

(ii)    On or about May 15, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for facet joint injections purportedly provided through Tri-State to an Insured named MG at Avicenna Surgery Center, 2522 Hughes Avenue, Bronx, New York, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative facet joint injections.

(iii)   On or about June 1, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for a follow-up examination purportedly provided through Tri-State to an Insured named GH at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(iv)    On or about July 12, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named MR at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(v)     On or about July 23, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for a follow-up examination purportedly provided through Tri-State to an Insured named AR at the 2052 Richmond Road, Staten Island, New York No-

Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(vi) On or about August 6, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named FG at the 108 Kenilworth Place, Brooklyn, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(vii) On or about September 7, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for activity limitation measurements purportedly provided through Tri-State to an Insured named EA at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative activity limitation measurements.

(viii) On or about September 13, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named MH at the 108 Kenilworth Place, Brooklyn, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(ix) On or about September 17, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named DY at the 2052 Richmond Road, Staten Island, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(x) On or about October 8, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named JSB at the 2052 Richmond Road, Staten Island, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xi) On or about October 16, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named JC at the 108 Kenilworth Place, Brooklyn, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xii) On or about November 15, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named BB at the 108 Kenilworth Place, Brooklyn, New York e No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xiii)  On or about November 27, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named MM at the 108 Kenilworth Place, Brooklyn, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xiv)  On or about December 31, 2018, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for a follow-up examination purportedly provided through Tri-State to an Insured named RC at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xv)  On or about January 8, 2019, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named LA at the 2426 Eastchester Road, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xvi)  On or about January 28, 2019, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named EC at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xvii)  On or about February 4, 2019, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named LM at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xviii)  On or about February 8, 2019, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for activity limitation measurements purportedly provided through Tri-State to an Insured named CS at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the activity limitation measurements.

(xix)  On or about April 3, 2019, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for an initial examination purportedly provided through Tri-State to an Insured named SD at the 2510 Westchester Avenue, Bronx, New York No-Fault Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

(xx)  On or about April 30, 2019, Zaitsev, Weissman, Sangavaram, and Tri-State billed GEICO for a follow-up examination purportedly provided through Tri-State to an Insured named MD at the 108 Kenilworth Place, Brooklyn, New York No-Fault

Clinic, despite the fact that Tri-State was ineligible to receive PIP Benefits in connection with the putative examination.

125.     These are only representative examples. All of the claims for Fraudulent Services identified in Exhibit "2" for services that purportedly were provided in New York were provided in violation of New York law, because Tri-State lacked the authority to operate as a medical practice in New York.

## C.     Metropolitan and Riverside's Unlawful Operations in New Jersey

126.     As set forth above, pursuant to N.J.S.A 14A:17-5, a foreign professional corporation cannot provide professional services in the State of New Jersey without being properly incorporated under New Jersey law.

127.     Metropolitan and Riverside were New York medical professional corporations, not New Jersey medical professional corporations. Metropolitan and Riverside were never incorporated as professional corporations under New Jersey law.

128.     Accordingly, Metropolitan and Riverside could not lawfully provide medical or other professional services in the State of New Jersey.

129.     Even so, in the claims identified in Exhibits "1" and "4", Zaitsev, Sangavaram, and Weissman routinely caused Metropolitan and Riverside to unlawfully provide purported medical services in New Jersey, which then were billed to GEICO.

130.      For example:

(i)     On or about June 12, 2017, Zaitsev, Weissman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an Insured named JC at Health Plus Surgery Center, located at 190 Midland Avenue, Saddle Brook, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(ii)     On or about June 21, 2017, Zaitsev, Weissman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an

Insured named PR at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(iii) On or about July 17, 2017, Zaitsev, Weissman, and Metropolitan billed GEICO for facet injections purportedly provided through Metropolitan to an Insured named JC at Dynamic Surgery Center, located at 321 Essex Street, Hackensack, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(iv) On or about December 20, 2017, Zaitsev, Weissman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an Insured named VS at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(v) On or about January 22, 2018, Zaitsev, Weissman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an Insured named MR at Dynamic Surgery Center, located at 321 Essex Street, Hackensack, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(vi) On or about March 12, 2018, Zaitsev, Weissman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an Insured named LB at Health Plus Surgery Center, located at 190 Midland Avenue, Saddle Brook, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(vii) On or about March 19, 2018, Zaitsev, Weissman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an Insured named OF at Health Plus Surgery Center, located at 190 Midland Avenue, Saddle Brook, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(viii) On or about August 30, 2018, Zaitsev, Weissman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an Insured named TS at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(ix)     On or about January 7, 2019, Zaitsev, Weissman, Sangavaram, and Riverside billed GEICO for pain management injections purportedly provided through Riverside to an Insured named EC at Dynamic Surgery Center, located at 321 Essex Street, Hackensack, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(x)      On or about January 7, 2019, Zaitsev, Weissman, Sangavaram, and Riverside billed GEICO for pain management injections purportedly provided through Riverside to an Insured named SD at Dynamic Surgery Center, located at 321 Essex Street, Hackensack, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(xi)     On or about January 9, 2019, Zaitsev, Weissman, Sangavaram, and Riverside billed GEICO for pain management injections purportedly provided through Riverside to an Insured named JJ at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(xii)    On or about January 16, 2019, Zaitsev, Weissman, Sangavaram, Gorman, and Riverside billed GEICO for facet injections purportedly provided through Riverside to an Insured named DY at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(xiii)   On or about January 30, 2019, Zaitsev, Weissman, Sangavaram, Gorman, and Riverside billed GEICO for pain management injections purportedly provided through Riverside to an Insured named RC at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(xiv)    On or about February 20, 2019, Zaitsev, Weissman, Sangavaram, and Riverside billed GEICO for facet injections purportedly provided through Riverside to an Insured named MH at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(xv)     On or about March 13, 2019, Zaitsev, Weissman, Sangavaram, and Riverside billed GEICO for facet injections purportedly provided through Riverside to an Insured named RB at Accelerated Surgical Center, located at 680 Broadway,

Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(xvi)   On or about March 13, 2019, Zaitsev, Weissman, Sangavaram, Gorman, and Riverside billed GEICO for facet injections purportedly provided through Riverside to an Insured named YA at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(xvii)   On or about March 20, 2019, Zaitsev, Weissman, Sangavaram, Gorman, and Riverside billed GEICO for pain management injections purportedly provided through Riverside to an Insured named SM at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey

(xviii)   On or about March 27, 2019, Zaitsev, Weissman, Sangavaram, and Riverside billed GEICO for pain management injections purportedly provided through Riverside to an Insured named ML at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(xix)   On or about May 8, 2019, Zaitsev, Weissman, Sangavaram, Gorman, and Riverside billed GEICO for facet injections purportedly provided through Riverside to an Insured named LM at Accelerated Surgical Center, located at 680 Broadway, Paterson, New Jersey, despite the fact that Riverside was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(xx)   On or about May 29, 2019, Zaitsev, Weissman, Gorman, and Metropolitan billed GEICO for pain management injections purportedly provided through Metropolitan to an Insured named LA at Health Plus Surgery Center, located at 190 Midland Avenue, Saddle Brook, New Jersey, despite the fact that Metropolitan was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

131.   These are only representative examples. All of the claims for Fraudulent Services identified in Exhibits "1" and "4" for services that purportedly were provided in New Jersey were

provided in violation of New Jersey law, because Metropolitan and Riverside lacked the ability to lawfully operate as a medical practice in New Jersey.

**D.      The Defendants' Interrelated Fraudulent Treatment and Billing Protocols**

132.    Almost all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

133.    Even so, the Defendants purported to subject virtually every Insured to a substantially identical, medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed to maximize the billing that they could submit through the Entity Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

134.    The Defendants purported to provide their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms, presentation, or – in most cases – the absence of any significant medical problems arising from any actual automobile accidents.

135.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

136.    No legitimate physician or other licensed healthcare provider or professional entity would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

137.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

## 1.    The PC Defendants' Fraudulent Charges for Initial Examinations

138.    Upon receiving a referral pursuant to the kickbacks that Zaitsev, Weissman, Sangavaram, Focazio, and the PC Defendants paid to the Referring Providers at the No-Fault Clinics, the PC Defendants purported to provide virtually every Insured in the claims identified in Exhibits "1" -"4" with an initial examination.

139.    The initial examinations were performed as a "gateway" in order to provide Insureds with phony, predetermined "diagnoses" to create a false basis for the Defendants to then purport to provide the other, medically unnecessary Fraudulent Services.

140.    Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants purported to perform most of the putative initial examinations at the No-Fault Clinics and at ambulatory surgery centers in New York and New Jersey, which were then billed to GEICO: (i) through Metropolitan, typically under CPT code 99203, resulting in a charge of $139.56 for each purported examination; or (ii) through Tri-State, Riverside, or Crosstown, typically under CPT code 99205, resulting in a charge of $200.68 for each purported examination.

141.    The charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that Zaitsev, Weissman, Sangavaram, Focazio, and

the PC Defendants paid to the Referring Providers at the No-Fault Clinics, not to treat or otherwise benefit the Insureds.

142.   The charges for the initial examination also were fraudulent in that they misrepresented the PC Defendants' eligibility to receive PIP Benefits in the first instance. In fact, the PC Defendants never were eligible to receive PIP Benefits in the first instance, because of the fraudulent and unlawful conduct described herein.

143.   In addition, the charges for the initial examinations were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**a.**     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

144.   In the claims for initial examinations that are identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely misrepresented the severity of the Insureds' presenting problems.

145.   Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY Fee Schedule and NJ Fee Schedule, the use of CPT code 99205 to bill for an initial patient examination typically requires that the Insured present with problems of moderate to high severity.

146.   The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99205 to bill for an initial patient examination.

147.   In particular, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99205 to bill for an initial patient examination:

(i)     Initial office evaluation of a 65-year-old female with exertional chest pain, Intermittent claudication, syncope and a murmur of aortic stenosis. (Cardiology)

    (ii)      Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, anti-hypertension. (Family Medicine)

    (iii)    Initial office visit for a 73-year-old male with an unexplained 20-pound weight loss. (Hematology/Oncology)

    (iv)    Initial office visit for a 24-year-old homosexual male who has a fever, a cough, and shortness of breath. (Infectious Disease)

    (v)     Initial office evaluation, patient with systemic lupus erythematosus, fever, seizures and profound thrombocytopenia. (Rheumatology)

    (vi)    Initial office evaluation and management of patient with systemic vasculitis and compromised circulation to the limbs. (Rheumatology)

148.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99205 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

149.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

150.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination. In particular:

    (i)      Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

    (ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

    (iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

    (iv)      Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

    (v)       Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

151.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

152.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" - "4" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

153.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" – "4" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in most of the claims identified in Exhibits "1" – "4", contemporaneous police reports indicated that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

154.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibits "1" – "4" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibits "1" – "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

155.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, contusion, or similar soft tissue injury diagnosis.

156.    Ordinary soft tissue injuries virtually always resolve after a short course of conservative treatment, or no treatment at all. By the time the insureds in the claims identified in Exhibits "1" – "4" presented to the PC Defendants for the purported examinations, they either had no presenting problems at all, or their presenting problems were of low or minimal severity.

157.    Even so, in the claims for initial examinations identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely billed for their putative initial examinations using CPT codes 99203 and/or 99205, and thereby falsely represented that the Insureds presented with problems of moderate, or moderate to high, severity.

158.    For example:

(i)     On September 24, 2017, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that MG was transported to Queens General Hospital with complaints of soldier and chest pain. In keeping with the fact that MG was not seriously injured in the accident, hospital records indicate that MG was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MG by Ovincy on January 19, 2018 – more than 3 months after the accident – Metropolitan, Zaitsev, and Ovincy billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved moderately severe presenting problems.

(ii)    On November 19, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was

not injured in the accident and did not complain of pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MR by Mathew on July 12, 2018 – over 7 months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Mathew billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(iii)    On January 18, 2018, an Insured named NJ was involved in an automobile accident. The contemporaneous police report indicated that NJ's vehicle was drivable following the accident. The police report further indicated that NJ was transported to Jacobi Medical Center with complaints of back pain. In keeping with the fact that NJ was not seriously injured in the accident, hospital records indicate that NJ was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that NJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of NJ by Mathew on January 22, 2018, Metropolitan, Zaitsev, and Mathew billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved moderately severe presenting problems.

(iv)    On March 24, 2018, an Insured named WA was involved in an automobile accident. The contemporaneous police report indicated that WA's vehicle was drivable following the accident. The police report further indicated that WA was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that WA was not seriously injured, WA did not visit any hospital emergency room following the accident. To the extent that WA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of WA by Mathew on March 29, 2018, Metropolitan, Zaitsev, and Mathew billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved moderately severe presenting problems.

(v)    On August 16, 2018 an Insured named JSB was involved in an automobile accident. The contemporaneous police report indicated that JSB was transported to Richmond University Medical Center. In keeping with the fact that JSB was not seriously injured in the accident, hospital records indicate that JSB was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that JSB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so,

following a purported initial examination of JSB by Bakerman on January 9, 2019 – over 4 months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Bakerman billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(vi)     On August 20, 2018, an Insured named WG was involved in an automobile accident. The contemporaneous police report indicated that WG's vehicle was drivable following the accident. The police report further indicated that WG was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that WG was not seriously injured, WG did not visit any hospital emergency room following the accident. To the extent that WG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of WG by Evans on August 23, 2018, Crosstown, Zaitsev, Focazio, and Evans billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(vii)    On October 14, 2018, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC was not injured in the accident. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of JC by Evans on October 16, 2018, Tri-State, Zaitsev, Weissman, Sangavaram and Evans billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(viii)   On October 14, 2018, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that KC was not injured in the accident. In keeping with the fact that KC was not seriously injured, KC did not visit any hospital emergency room following the accident. To the extent that KC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of KC by Evans on October 16, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Evans billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(ix)     On October 20, 2018, an Insured named YA was involved in an automobile accident. The contemporaneous police report indicated that YA's vehicle was drivable following the accident. The police report further indicated that YA was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that YA was not seriously injured, YA did not visit any hospital

emergency room following the accident. To the extent that YA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YA by Santa Maria on February 28, 2019,- over four months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Santa Maria billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(x)     On November 2, 2018 an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that SD's vehicle was drivable following the accident. The police report further indicated that SD was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that SD was not seriously injured in the accident, hospital records indicate that SD was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of SD by Pullock on April 3, 2019 – over 5 months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(xi)    On November 10, 2018, an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that BB was not seriously injured in the accident. In keeping with the fact that BB was not seriously injured, BB did not visit any hospital emergency room following the accident. To the extent that BB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of BB by Mathew on February 25, 2019 – over 3 months after the accident – Riverside,  Zaitsev, Weissman, Sangavaram, and Mathew billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(xii)   On November 22, 2018, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured in the accident and did not complain of pain at the scene. The following day, on November 23, 2018, ST visited North Central Bronx Hospital, In keeping with the fact that ST was not seriously injured in the accident, hospital records indicate that ST was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that ST experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset,

and improved over time. Even so, following a purported initial examination of ST by Santa Maria on May 15, 2019 – over 5 months after the accident -- Riverside, Zaitsev, Weissman, Sangavaram, and Santa Maria billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(xiii)   On November 24, 2018, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MM by Pullock on March 6, 2019 – over 4 months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(xiv)   On November 30, 2018 an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that LM's vehicle was drivable following the accident. The police report further indicated that LM was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that LM was not seriously injured in the accident, hospital records indicate that LM was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that LM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of LM by Weiss on January 15, 2019 – almost 2 months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Weiss billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(xv)   On April 8, 2019, an Insured named RD was involved in an automobile accident. The contemporaneous police report indicated that RD's vehicle was drivable following the accident. The police report further indicated that RD was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that RD was not seriously injured, RD did not visit any hospital emergency room following the accident. To the extent that RD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of RD by Bakerman on April 17, 2019, Crosstown, Focazio, Zaitsev, and Bakerman billed GEICO for the initial examination using CPT code

99205, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

159.     These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

160.     In the claims for initial examinations identified in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for their charges for examinations under CPT codes 99203 and 99205, because examinations billable under CPT codes 99203 and 99205 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

161.     In the claims for initial examinations identified in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services the Defendants purported to provide to the Insureds, as described herein.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

162.     What is more, in every claim identified in Exhibits "1" - "4" for initial examinations under CPT codes 99203 and 99205, Zaitsev, Weissman, Sangavaram, Focazio,

Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants misrepresented and exaggerated the amount of face-to-face time that the examining physician, nurse practitioner, or physician assistant spent with the Insureds or the Insureds' families during the purported examinations.

163.    Pursuant to the NY Fee Schedule and NJ Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the healthcare professional who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

164.    Pursuant to the NY Fee Schedule and NJ Fee Schedule, the use of CPT code 99205 to bill for an initial examination represents that the healthcare professional who performed the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family.

165.    As set forth in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants submitted virtually all of their billing for initial examinations under either CPT code 99203 or CPT code 99205, and thereby represented that the physicians, physician assistants, or nurse practitioners who purported to perform the initial examinations spent between 30 and 60 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

166.    In fact, in the claims for initial examinations identified in Exhibits "1" - "4", neither Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, nor any other physician or licensed healthcare provider associated with the PC Defendants, ever spent 30 minutes – much less 60 minutes – of face-to-face time with the Insureds or their families when conducting the examinations.

167.   Rather, in the claims for initial examinations identified in Exhibits "1" - "4", the initial examinations did not entail more than 15 minutes of face-to-face time between the examining physicians, physician assistants, or nurse practitioners and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

168.   In keeping with the fact that the initial examinations did not last more than 15 minutes – to the extent that they were conducted at all – Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants used template forms in purporting to perform the initial examinations.

169.   The template forms that Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants used in conducting the initial examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

170.   All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds.

171.   These interviews and examinations did not require Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants to spend more than 15 minutes of face-to-face time with the Insureds or their families during the putative initial examinations.

172.   In the claims for initial examinations identified in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, and the PC Defendants routinely falsely represented that the putative examinations involved either 30 or 60 minutes of face-to-face time with the Insureds or their families, because examinations that entail either 30 of 60 minutes of face-to-face time with the patients or their families are reimbursable at higher rates than examinations that require less time to perform.

c.    **Misrepresentations Regarding the Performance of "Detailed" and "Comprehensive" Physical Examinations**

173.    Moreover, in virtually every claim identified in Exhibits "1" - "4" for initial examinations under CPT codes 99203 or 99205, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants falsely represented the extent of the underlying physical examinations.

174.    Pursuant to the NY Fee Schedule and NJ Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the healthcare professional who performed the examination performed a "detailed" physical examination.

175.    Pursuant to the NY Fee Schedule and NJ Fee Schedule, the use of CPT code 99205 to bill for a patient examination represents that the healthcare professional who performed the examination performed a "comprehensive" physical examination.

176.    As set forth in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants virtually always billed for their putative initial examinations using either CPT code 99203 or 99205, and thereby represented that the physicians, physician assistants, or nurse practitioners who purported to conduct the examinations – namely Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants – conducted detailed or comprehensive physical examinations of the Insureds who purportedly received the examinations.

177.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the healthcare professional conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

178.    To the extent that the Insureds in the claims identified in Exhibits "1" - "4" had any actual complaints at all as the result of their typically minor automobile accidents, the complaints were limited to musculoskeletal complaints.

179.    Pursuant to the CPT Assistant, in the context of patient examinations, a healthcare professional has not conducted an extended examination of a patient's musculoskeletal organ system unless the healthcare professional has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

180.    In the claims identified in Exhibits "1", when Zaitsev, Weissman, Gorman, Ciccone, Negrea, the NP-PA Defendants, and Metropolitan billed for the initial examinations under CPT code 99203, they falsely represented that the physicians, physician assistants, or

nurse practitioners who purported to conduct the examinations – namely Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

181.   In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", neither Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, nor any other physician or other healthcare provider associated with Metropolitan ever conducted an extended examination of the Insureds' musculoskeletal systems.

182.   For instance, in each of the claims under CPT code 99203 identified in Exhibit "1", neither Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, nor any other physician or other healthcare provider associated with Metropolitan ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)    examination of sensation.

183.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining healthcare professional either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

184.    Pursuant to the CPT Assistant, in the context of patient examinations, a healthcare professional has not conducted a general examination of multiple patient organ systems unless the healthcare professional has documented findings with respect to at least eight organ systems.

185.    The CPT Assistant recognizes the following organ systems:

(i)    constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)    respiratory;

(vi)    gastrointestinal;

(vii)    genitourinary;

(viii)    musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)    neurological;

(xi)    psychiatric;

(xii)    endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)   allergic/immunologic.

186.    Pursuant to the CPT Assistant, in the context of patient examinations, a healthcare professional has not conducted a complete examination of a patient's musculoskeletal organ system unless the healthcare professional has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

187.    In the claims for initial examinations identified in Exhibit "2" – "4", when Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, Tri-State, Riverside, and Crosstown billed for the initial examinations under CPT code 99205, they falsely represented that the physicians, physician assistants, or nurse practitioners who purported to conduct the examinations – namely Gorman, Ciccone, Negrea,

Weissman, and the NP-PA Defendants – performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

188.    In fact, with respect to the claims for initial examinations under CPT code 99205 that are identified in Exhibits "2" – "4", neither Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, nor any other physician or other healthcare provider associated with Tri-State, Riverside, or Crosstown, ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

189.    For instance, in each of the claims under CPT code 99205 identified in Exhibits "2" – "4", neither Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, nor any other physician or other healthcare provider associated with Tri-State, Riverside, or Crosstown ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

190.    Furthermore, although Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants often purported to provide an examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "2" – "4", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

191.    For example:

(i)    On or about June 6, 2016, Metropolitan, Zaitsev, and Ciccone billed GEICO under CPT code 99203 for an initial examination that Ciccone purported to perform on an Insured named MW, and thereby represented that they had provided a "detailed" physical examination to MW. However, Ciccone did not document an extended examination of MW's musculoskeletal system, despite the fact that – to the extent MW had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(ii)    On or about June 27, 2017, Metropolitan, Zaitsev, and Gorman billed GEICO under CPT code 99203 for an initial examination that Gorman purported to perform on an Insured named MJ, and thereby represented that they had provided a "detailed" physical examination to MJ. However, Gorman did not document an extended examination of MJ's musculoskeletal system, despite the fact that – to the extent MJ had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(iii)    On or about December 12, 2017, Metropolitan, Zaitsev, and Isakov billed GEICO under CPT code 99203 for an initial examination that Isakov purported to perform on an Insured named EH, and thereby represented that they had provided a "detailed" physical examination to EH. However, Isakov did not document an extended examination of EH's musculoskeletal system, despite the fact that – to the extent EH had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(iv)    On or about January 8, 2018, Metropolitan, Zaitsev, and Negrea billed GEICO under CPT code 99203 for an initial examination that Negrea purported to perform on an Insured named EL, and thereby represented that they had provided a "detailed" physical examination to EL. However, Negrea did not document an extended examination of EL's musculoskeletal system, despite the fact that – to

the extent EL had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(v)     On or about January 12, 2018, Metropolitan, Zaitsev, and Amanze billed GEICO under CPT code 99203 for an initial examination that Amanze purported to perform on an Insured named ST, and thereby represented that they had provided a "detailed" physical examination to ST. However, Amanze did not document an extended examination of ST's musculoskeletal system, despite the fact that – to the extent ST had any complaints at all as the result of the automobile accident – they were limited to minor musculoskeletal complaints.

(vi)    On or about July 5, 2018, Crosstown, Zaitsev, Focazio, and Santa Maria billed GEICO under CPT code 99205 for an initial examination that Santa Maria purported to perform on an Insured named SA, and thereby represented that they provided a "comprehensive" physical examination to SA. However, Santa Maria did not document findings with respect to at least eight of SA's organ systems, nor did she document a "complete" examination of SA's musculoskeletal system or any of SA's other organ systems.

(vii)   On or about September 11, 2018, Crosstown, Zaitsev, Focazio, and Ovincy billed GEICO under CPT code 99205 for an initial examination that Ovincy purported to perform on an Insured named PT, and thereby represented that they provided a "comprehensive" physical examination to PT. However, Ovincy did not document findings with respect to at least eight of PT's organ systems, nor did she document a "complete" examination of PT's musculoskeletal system or any of PT's other organ systems.

(viii)  On or about October 26, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Ovincy billed GEICO under CPT code 99205 for an initial examination that Ovincy purported to perform on an Insured named JV, and thereby represented that they provided a "comprehensive" physical examination to JV. However, Ovincy did not document findings with respect to at least eight of JV's organ systems, nor did he document a "complete" examination of JV's musculoskeletal system or any of JV's other organ systems.

(ix)    On or about November 26, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO under CPT code 99205 for an initial examination that Gorman purported to perform on an Insured named EO, and thereby represented that they provided a "comprehensive" physical examination to EO. However, Gorman did not document findings with respect to at least eight of EO's organ systems, nor did he document a "complete" examination of EO's musculoskeletal system or any of EO's other organ systems.

(x)     On or about December 19, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO under CPT code 99205 for an initial examination that Pullock purported to perform on an Insured named JB, and thereby represented

that they provided a "comprehensive" physical examination to JB. However, Pullock did not document findings with respect to at least eight of JB's organ systems, nor did he document a "complete" examination of JB's musculoskeletal system or any of JB's other organ systems.

(xi)     On or about January 3, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram billed GEICO under CPT code 99205 for an initial examination that Weissman purported to perform on an Insured named JM, and thereby represented that they provided a "comprehensive" physical examination to JM. However, Weissman did not document findings with respect to at least eight of JM's organ systems, nor did he document a "complete" examination of JM's musculoskeletal system or any of JM's other organ systems.

(xii)    On or about January 31, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Santa Maria billed GEICO under CPT code 99205 for an initial examination that Santa Maria purported to perform on an Insured named FS, and thereby represented that they provided a "comprehensive" physical examination to FS. However, Santa Maria did not document findings with respect to at least eight of FS's organ systems, nor did he document a "complete" examination of FS's musculoskeletal system or any of FS's other organ systems.

(xiii)   On or about February 15, 2019, Riverside, Zaitsev, Weissman, Sangavaram, and Isakov billed GEICO under CPT code 99205 for an initial examination that Isakov purported to perform on an Insured named RJ, and thereby represented that they provided a "comprehensive" physical examination to RJ. However, Isakov did not document findings with respect to at least eight of RJ's organ systems, nor did she document a "complete" examination of RJ's musculoskeletal system or any of RJ's other organ systems.

(xiv)    On or about March 20, 2019, Riverside, Zaitsev, Weissman, Sangavaram, and Mathew billed GEICO under CPT code 99205 for an initial examination that Mathew purported to perform on an Insured named NC, and thereby represented that they provided a "comprehensive" physical examination to NC. However, Mathew did not document findings with respect to at least eight of NC's organ systems, nor did she document a "complete" examination of NC's musculoskeletal system or any of NC's other organ systems.

(xv)     On or about March 30, 2019, Riverside, Zaitsev, Weissman, and Sangavaram billed GEICO under CPT code 99205 for an initial examination that Weissman purported to perform on an Insured named AM, and thereby represented that they provided a "comprehensive" physical examination to AM. However, Weissman did not document findings with respect to at least eight of AM's organ systems, nor did he document a "complete" examination of AM's musculoskeletal system or any of AM's other organ systems.

(xvi)   On or about May 15, 2019, Riverside, Zaitsev, Weissman, Sangavaram, and Evans billed GEICO under CPT code 99205 for an initial examination that Evans purported to perform on an Insured named SC, and thereby represented that they provided a "comprehensive" physical examination to SC. However, Evans did not document findings with respect to at least eight of SC's organ systems, nor did he document a "complete" examination of SC's musculoskeletal system or any of SC's other organ systems.

(xvii)   On or about June 3, 2019, Crosstown, Zaitsev, Focazio, and Amanze billed GEICO under CPT code 99205 for an initial examination that Amanze purported to perform on an Insured named RR, and thereby represented that they provided a "comprehensive" physical examination to RR. However, Amanze did not document findings with respect to at least eight of RR's organ systems, nor did she document a "complete" examination of RR's musculoskeletal system or any of RR's other organ systems.

(xviii)   On or about July 24, 2019, Crosstown, Zaitsev, Focazio, and Bakerman billed GEICO under CPT code 99205 for an initial examination that Bakerman purported to perform on an Insured named DM, and thereby represented that they provided a "comprehensive" physical examination to DM. However, Bakerman did not document findings with respect to at least eight of DM's organ systems, nor did she document a "complete" examination of DM's musculoskeletal system or any of DM's other organ systems.

(xix)   On or about July 31, 2019, Riverside, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO under CPT code 99205 for an initial examination that Pullock purported to perform on an Insured named AR, and thereby represented that they provided a "comprehensive" physical examination to AR. However, Pullock did not document findings with respect to at least eight of AR's organ systems, nor did she document a "complete" examination of AR's musculoskeletal system or any of AR's other organ systems.

(xx)   On or about September 5, 2019, Crosstown, Zaitsev, Focazio, and Weiss billed GEICO under CPT code 99205 for an initial examination that Weiss purported to perform on an Insured named RF, and thereby represented that they provided a "comprehensive" physical examination to RF. However, Weiss did not document findings with respect to at least eight of RF's organ systems, nor did she document a "complete" examination of RF's musculoskeletal system or any of RF's other organ systems.

192.    These are only representative examples. In the claims for initial examinations under CPT codes 99203 and 99205 that are identified in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants

virtually always falsely represented that they had provided "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99205, because examinations billable under CPT codes 99203 and 99205 are reimbursable at higher rates than examinations that do not require the examining healthcare professional to provide "detailed" or "comprehensive" physical examinations.

**d.     Misrepresentations Regarding the Extent of Medical Decision-Making**

193.    Pursuant to the NY Fee Schedule and NJ Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the healthcare professional who performed the examination engaged in medical decision-making of "low complexity".

194.    Furthermore, pursuant to the NY Fee Schedule and NJ Fee Schedule,, the use of CPT code 99205 to bill for a patient examination represents that the healthcare professional who performed the examination engaged in medical decision-making of "high complexity".

195.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

196.    Though Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely billed for their putative initial examinations using CPT codes 99203 and 99205 and thereby falsely represented that the initial examinations

involved medical decision-making of "low" or "high" complexity, in actuality the initial examinations did not involve any medical decision-making at all.

197.    The putative initial examinations identified in Exhibits "1" - "4" did not involve any actual medical decision-making at all because the outcomes of the putative initial examinations were pre-determined to result in substantially similar, phony "diagnoses" for most Insureds, and a substantially similar, medically unnecessary treatment plan for most Insureds, without regard for their true individual circumstances or presentation.

198.    First, in virtually every case, the initial examinations performed by Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information.

199.    When the Insureds in the claims identified in Exhibits "1" – "4", presented to the PC Defendants for "treatment", they almost never arrived with any significant amount of medical records.

200.    Furthermore, prior to the initial examinations, Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants neither requested any medical records from any other healthcare providers, nor conducted any diagnostic tests.

201.    Second, in the claims for initial examinations identified in Exhibits "1" - "4", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

202.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the procedures or treatment options provided by Zaitsev, Weissman, Sangavaram,

Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants – to the extent that they provided any legitimate procedures or treatment options in the first instance.

203.    In almost every instance, any diagnostic procedures and "treatments" that Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants actually provided were limited to a series of medically unnecessary follow-up examinations, diagnostic tests, pain management injections, and drug tests, none of which was health- or life-threatening if properly administered.

204.    Third, in Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants' claims for initial examinations identified in Exhibits "1" - "4", neither Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, nor any other healthcare professional associated with the PC Defendants, considered any significant number of diagnoses or treatment options for the Insureds during the purported initial examinations.

205.    Rather, to the extent that the initial examinations were conducted in the first instance, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants provided a pre-determined list of objectively-unverifiable, phony "diagnoses" for every Insured, and prescribed a substantially identical course of treatment for virtually every Insured, without regard for the Insureds' individual circumstances.

206.    Specifically, in almost every instance in the claims identified in Exhibits "1" - "4", during the initial examinations the Insureds did not present with any serious, continuing medical problems that legitimately could be traced to an underlying automobile accident.

207.    Even so, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants prepared initial examination reports in which they

provided substantially similar, phony, objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

208.    Then, based upon these phony "diagnoses", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants directed virtually every Insured to continue to return to the Entity Defendants on a regular basis for additional medically unnecessary Fraudulent Services, regardless of their individual circumstances or presentation.

209.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

210.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

211.    As set forth above, in the claims identified in Exhibits "1" - "4", most of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender–bender" accidents, to the extent that they were involved in any actual accidents at all.

212.    It is highly improbable that any two or more Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "1" - "4" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

213.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations at the PC Defendants with substantially identical injuries on or about the exact same dates, oftentimes many months after their accidents.

214.    Even so, in keeping with the fact that Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants' putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants frequently issued substantially identical "diagnoses", on or about the same date, oftentimes many months after the underlying accidents, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

215.    For example:

(i)     On December 15, 2016, two Insureds – DL and KSL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Metropolitan for initial examinations by Ovincy on the <u>exact same date</u>, April 10, 2017 – over three months after the accident. DL and KSL were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent DL and KSL suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Ovincy provided DL and KSL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)    On December 24, 2016, two Insureds – KD and EN – were involved in the same automobile accident. Thereafter both Insureds presented at Metropolitan for initial examinations by Ciccone on the <u>exact same date</u>, December 27, 2018. KD and EN were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent KD and EN suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Ciccone provided KD and EN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)   On June 14, 2017, two Insureds – LP and TP – were involved in the same automobile accident. Thereafter both Insureds presented at Metropolitan for initial examinations by Weissman on the <u>exact same date</u>, June 20, 2017. LP and TP were both different ages, in different physical condition, and experienced the

impact from different locations in the vehicle. To the extent LP and TP suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Weissman provided LP and TP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)     On July 25, 2017, three Insureds – CA, OP, and TG – were involved in the same automobile accident. Thereafter all three Insureds presented at Metropolitan for initial examinations by Gorman on the <u>exact same date</u>, July 28, 2017. CA, OP, and TG were all different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent CA, OP, and TG suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Gorman provided CA, OP, and TG with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(v)      On August 4, 2017, three Insureds – AG, EG, and MS – were involved in the same automobile accident. Thereafter all three Insureds presented at Metropolitan for initial examinations by Negrea on the <u>exact same date</u>, August 8, 2017. AG, EG, and MS were all different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent AG, EG, and MS suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Negrea provided AG, EG, and MS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(vi)     On January 29, 2018, two Insureds – RA and MRA – were involved in the same automobile accident. The next day both Insureds presented at Metropolitan for initial examinations by Mathew on January 30, 2018. RA and MRA were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent RA and MRA suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Mathew provided RA and MRA with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vii)    On February 22, 2018, two Insureds – SC and ER – were involved in the same automobile accident. Thereafter they both presented at Metropolitan for initial examinations by Negrea on the <u>exact same date</u>, February 27, 2018. SC and ER were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent SC and ER suffered any injuries at all in their accident, the injuries were different at the outset, and

resolved differently over time. Even so, at the conclusion of the putative initial examinations, Negrea provided SC and ER with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On May 4, 2018, two Insureds – JK and SK JK and SK – were involved in the same automobile accident. Thereafter – incredibly – they both presented at Tri-State for initial examinations by Weissman on the <u>exact same date</u>, July 6, 2018 – over two months after the accident. JK and SK were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent JK and SK suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Weissman provided JK and SK with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)   On May 24, 2018, two Insureds – RB and MP – were involved in the same automobile accident. Thereafter they both presented at Tri-State for initial examinations by Isakov on the <u>exact same date</u>, May 30, 2018. RB and MP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent RB and MP suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Isakov provided RB and MP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(x)   On May 16, 2018, three Insureds – KD, OD, and SD – were involved in the same automobile accident. Thereafter all three Insureds presented at Crosstown for initial examinations by Isakov on the <u>exact same date</u>, May 22, 2018. KD, OD, and SD were all different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent KD, OD, and SD suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Isakov provided KD, OD, and SD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(xi)   On May 26, 2018, two Insureds – MS and SS – were involved in the same automobile accident. Thereafter both Insureds presented at Tri-State for initial examinations by Evans on the <u>exact same date</u>, June 5, 2018. MS and SS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent MS and SS suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Evans provided MS and SS with substantially identical, phony

"diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xii)    On June 19, 2018, two Insureds – TC and TR – were involved in the same automobile accident. Thereafter both Insureds presented at Tri-State for initial examinations by Santa Maria on the exact same date, June 21, 2018. TC and TR were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent TC and TR suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Santa Maria provided TC and TR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiii)   On July 13, 2018, two Insureds – GM and JC – were involved in the same automobile accident. Thereafter both Insureds presented at Crosstown for initial examinations by Weiss on the exact same date, July 26, 2018. GM and JC were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent GM and JC suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Weiss provided GM and JC with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiv)    On June 28, 2018, two Insureds – MC and JM – were involved in the same automobile accident. That same day both Insureds presented at Tri-State for initial examinations by Bakerman. MC and JM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent MC and JM suffered any injuries at all in their accident, the injuries were different at the outset. Even so, at the conclusion of the putative initial examinations, Bakerman provided MC and JM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xv)     On September 19, 2018, two Insureds – AD and YD – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Riverside for initial examinations by Pullock on the exact same date, January 2, 2019 – over three months after the accident. AD and YD were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent AD and YD suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Pullock provided AD and YD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xvi)    On September 21, 2018, two Insureds – JG and MM – were involved in the same automobile accident. Thereafter both Insureds presented at Crosstown for initial examinations by Mathew on the <u>exact same date</u>, September 26, 2018. JG and MM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent JG and MM suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Mathew provided JG and MM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xvii)    On October 3, 2018, two Insureds – GD and JD – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Tri-State for initial examinations by Gorman on the <u>exact same date</u>, February 26, 2019 – over 4 months after the accident. GD and JD were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent GD and JD suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Gorman provided GD and JD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xviii)    On October 17, 2018, two Insureds – NC and NN – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Tri-State for initial examinations by Amanze on the <u>exact same date</u>, December 21, 2018 – over 2 months after the accident. NC and NN were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent NC and NN suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Amanze provided NC and NN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xix)    On November 16, 2018, two Insureds – TB and IH – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Riverside for initial examinations by Mathew on the <u>exact same date</u>, March 14, 2019 – four months after the accident. TB and IH were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent TB and IH suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Mathew provided TB and IH with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xx)    On November 17, 2018, two Insureds – EC and RM – were involved in the same automobile accident. Thereafter both Insureds presented at Tri-State for initial

examinations by Pullock on the <u>exact same date</u>, November 21, 2018. EC and RM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent EC and RM suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Pullock provided EC and RM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxi)     On November 18, 2018, two Insureds – EG and MK – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Riverside for initial examinations by Evans on the <u>exact same date</u>, January 17, 2019 – two months after the accident. EG and MK were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent EG and MK suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Evans provided EG and MK with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxii)    On December 13, 2018, two Insureds – PP and RP – were involved in the same automobile accident. Thereafter both Insureds presented at Crosstown for initial examinations by Weiss on the <u>exact same date</u>, December 18, 2018. PP and RP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent PP and RP suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Weiss provided PP and RP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxiii)   On January 17, 2019, two Insureds – MB and RS – were involved in the same automobile accident. The next day – January 18, 2019 –  both Insureds presented at Riverside for initial examinations by Ovincy. MB and RS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent MB and RS suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Ovincy provided MB and RS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxiv)   On March 12, 2019, two Insureds – TM and TW – were involved in the same automobile accident. The next day – March 12, 2019 – both Insureds presented at Riverside for initial examinations by Amanze. TM and TW were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent TM and TW suffered any injuries at all in

their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Amanze provided TM and TW with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxv)  On March 15, 2019, two Insureds – HS and JS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Riverside for initial examinations by Mathew on the <u>exact same date</u>, April 9, 2019. HS and JS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent HS and JS suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Mathew provided HS and JS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxvi)  On March 15, 2019, three Insureds – LB, AP, and RR – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Crosstown for initial examinations by Bakerman on the <u>exact same date</u>, March 20, 2019. LB, AP, and RR were all different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent LB, AP, and RR suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Bakerman provided LB, AP, and RR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(xxvii) On March 22, 2019, two Insureds – AR and BR – were involved in the same automobile accident. Thereafter both Insureds presented at Riverside for initial examinations by Weiss on the <u>exact same date</u>, March 25, 2019. AR and BR were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent AR and BR suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Weiss provided AR and BR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxviii) On August 7, 2019, three Insureds – MF, DD and DD – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Crosstown for initial examinations by Amanze on the <u>exact same date</u>, August 13, 2019. MF, DD and DD were all different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent MF, DD and DD suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Amanze provided MF, DD and

DD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(xxix) On August 30, 2019, two Insureds – SA and YJ – were involved in the same automobile accident. Thereafter both Insureds presented at Riverside for initial examinations by Santa Maria on the exact same date, September 3, 2019. SA and YJ were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent SA and YJ suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Santa Maria provided SA and YJ with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xxx) On September 13, 2019, three Insureds – AB, AG, and CP – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Crosstown for initial examinations by Amanze on the exact same date, October 7, 2019. AB, AG, and CP were all different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent AB, AG, and CP suffered any injuries at all in their accident, the injuries were different at the outset, and resolved differently over time. Even so, at the conclusion of the putative initial examinations, Amanze provided AB, AG, and CP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

216.    These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants frequently issued substantially identical "diagnoses", on or about the same date, oftentimes many months after the underlying accidents, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

217.    Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required

some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants later purported to provide to the Insureds.

218.    In the claims for initial examinations identified in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants also routinely falsely represented that the initial examinations involved "low complexity" or "moderate complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99205, because examinations billable under CPT codes 99203 and 99205 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

## 2.    The PC Defendants' Fraudulent Charges for Follow-Up Examinations

219.    In addition to their fraudulent initial examinations, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants often purported to subject the Insureds in the claims identified in Exhibits "1" – "4" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

220.    Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants purported to perform most of the putative follow-up examinations at the No-Fault Clinics and at ambulatory surgery centers in New York and New Jersey, which were then billed to GEICO: (i) through Metropolitan, typically under CPT code 99213, resulting in a charge pf between $64.07 and $85.01 for each putative follow-up examination; or (ii) through Tri-State, Riverside, or Crosstown, typically under CPT code 99215, resulting in a charge of $200.68 for each putative follow-up examination.

221.    Like the charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that Zaitsev, Weissman, Sangavaram, Focazio, and the PC Defendants paid to the Referring Providers at the No-Fault Clinics, not to treat or otherwise benefit the Insureds.

222.    The charges for the follow-up examination also were fraudulent in that they misrepresented the PC Defendants' eligibility to receive PIP Benefits in the first instance. In fact, the PC Defendants never were eligible to receive PIP Benefits in the first instance, because of the fraudulent and unlawful conduct described herein.

223.    In addition, the charges for the follow-up examinations were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

224.    Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

225.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99215 to bill for a follow-up patient examination. For example

(i)     Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)    Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)   Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)    Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)    Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient (Internal Medicine)

(vi)    Follow-up office visit for a 75-year-old patient with ALS (amyotropfuc lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)    Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

226.    Thus, the sort of presenting problems that justify a charge under CPT code 99215 typically are problems that pose a serious threat to the patient's health, or even the patient's life.

227.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

228.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination, specifically:

(i)    Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii) Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

229. Accordingly, pursuant to the CPT Assistant, even the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

230. By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "1" – "4" suffered any injuries at all in their minor automobile accidents, the injuries virtually always were ordinary soft tissue injuries such as sprains and strains, which were not severe at all.

231. Ordinary soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

232. By the time the Insureds in the claims identified in Exhibits "1" – "4" to the respective PC Defendants for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

233. Even so, in the claims for follow-up examinations identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, and the PC Defendants routinely billed for their putative follow-up examinations under CPT codes 99213 and 99215, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity at the time of the purported follow-up examinations.

234. For example:

(i)     On September 24, 2017, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that MG was transported to Queens General Hospital with complaints of soldier and chest pain. In keeping with the fact that MG was not seriously injured in the accident, hospital records indicate that MG was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of MG by Ovincy on June 12, 2018 – more than eight months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Ovincy billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(ii)    On November 19, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of MR by Mathew on May 14, 2018 – six months after the accident – Metropolitan, Zaitsev, and Mathew billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that the follow-up examination involved low to moderate severity presenting problems.

(iii)   On January 18, 2018, an Insured named NJ was involved in an automobile accident. The contemporaneous police report indicated that NJ's vehicle was drivable following the accident. The police report further indicated that NJ was transported to Jacobi Medical Center with complaints of back pain. In keeping with the fact that NJ was not seriously injured in the accident, hospital records indicate that NJ was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that NJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of NJ by Rashidah Garrett-Hall ("Garrett-Hall") on September 12, 2018 – eight months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Garrett-Hall billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(iv)     On August 20, 2018, an Insured named WG was involved in an automobile accident. The contemporaneous police report indicated that WG's vehicle was drivable following the accident. The police report further indicated that WG was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that WG was not seriously injured, WG did not visit any hospital emergency room following the accident. To the extent that WG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of WG by Bakerman on April 15, 2019 – eight months after the accident – Crosstown, Zaitsev, Focazio, and Bakerman billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(v)      On November 2, 2018 an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that SD's vehicle was drivable following the accident. The police report further indicated that SD was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that SD was not seriously injured in the accident, hospital records indicate that SD was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of SD by Pullock on May 8, 2019 – over seven months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(vi)     On November 10, 2018, an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that BB was not seriously injured in the accident. In keeping with the fact that BB was not seriously injured, BB did not visit any hospital emergency room following the accident. To the extent that BB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of BB by Evans on July 29, 2019 – over eight months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Evans billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(vii)    On November 14, 2018, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC was not injured in the accident. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC

experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of JC by Evans on July 9, 2019 – over seven months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Evans billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(viii)   On November 14, 2018, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that KC was not injured in the accident. In keeping with the fact that KC was not seriously injured, KC did not visit any hospital emergency room following the accident. To the extent that KC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of KC by Pullock on March 6, 2019 – over three months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(ix)   On November 17, 2018 an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that EC was transported to St. Barnabas Medical Center with complaints of neck pain. In keeping with the fact that EC was not seriously injured in the accident, hospital records indicate that EC was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that EC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of EC by Pullock on April 3, 2019 – over four months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(x)   On November 20, 2018, an Insured named YA was involved in an automobile accident. The contemporaneous police report indicated that YA's vehicle was drivable following the accident. The police report further indicated that YA was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that YA was not seriously injured, YA did not visit any hospital emergency room following the accident. To the extent that YA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of YA by Weiss on January 9, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Weiss billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(xi)     On November 22, 2018, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured in the accident and did not complain of pain at the scene. The following day, on November 23, 2018, ST visited North Central Bronx Hospital, In keeping with the fact that ST was not seriously injured in the accident, hospital records indicate that ST was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that ST experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of ST by Weiss on May 14, 2019 – over five months after the accident – Crosstown, Zaitsev, Focazio, and Weiss billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(xii)    On November 24, 2018, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of MM by Isakov on January 18, 2019 – nearly two months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Isakov billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(xiii)   On November 30, 2018 an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that LM's vehicle was drivable following the accident. The police report further indicated that LM was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that LM was not seriously injured in the accident, hospital records indicate that LM was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that LM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of LM by Weiss on May 8, 2019 – over five months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Weiss billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(xiv)   On March 2, 2019, an Insured named WA was involved in an automobile accident. The contemporaneous police report indicated that WA's vehicle was drivable following the accident. The police report further indicated that WA was transported to St. Johns Riverside Hospital with complaints of back pain. In keeping with the fact that WA was not seriously injured, hospital records indicate that WA was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that WA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of WA by Pullock on September 18, 2019 – over six months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Pullock billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

(xv)   On April 8, 2019, an Insured named RD was involved in an automobile accident. The contemporaneous police report indicated that RD's vehicle was drivable following the accident. The police report further indicated that RD was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that RD was not seriously injured, RD did not visit any hospital emergency room following the accident. To the extent that RD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of RD by Santa Maria on November 6, 2019 – seven months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Santa Maria billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the follow-up examination involved moderate to high severity presenting problems.

235.   These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99215, because follow-up examinations billable under CPT codes 99213 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

236.     In the claims for follow-up examinations identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, as described herein.

**b.     Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

237.     Furthermore, and pursuant to the NY Fee Schedule and NJ Fee Schedule, when Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, Tri-State, Crosstown, and Riverside billed for their putative follow-up examinations under CPT code 99215, they represented that they performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

238.     Similarly, pursuant to the Fee Schedule, when Zaitsev, Gorman, Ciccone, Negrea, Weissman, the NP-PA Defendants, and Metropolitan submitted charges for the follow-up examinations under CPT code 99213, they represented that they performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

239.     In actuality, however, in the claims for follow-up examinations identified in Exhibits "1" – "4", Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

240.    Rather, following their purported follow-up examinations, Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants simply reiterated the false, boilerplate "diagnoses" that they provided to the Insureds following their purported initial examinations, and recommended that the Insureds continue to return to the Entity Defendants for additional medically unnecessary Fraudulent Services.

241.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary Fraudulent Services by the Defendants, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely falsely reported that the Insureds continued to suffer from the effects of soft tissue injuries secondary to minor  automobile accidents, long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

242.    For example:

(i)    On September 24, 2017, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that MG was transported to Queens General Hospital with complaints of soldier and chest pain. In keeping with the fact that MG was not seriously injured in the accident, hospital records indicate that MG was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of MG by Ovincy on June 12, 2018 – more than eight months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Ovincy falsely reported that MG continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of MG's more than eight month-old accident.

(ii)    On November 19, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital

emergency room following the accident. To the extent that MR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of MR by Mathew on May 14, 2018 – six months after the accident – Metropolitan, Zaitsev, and Mathew falsely reported that MR continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of MR's six month-old accident.

(iii)   On January 18, 2018, an Insured named NJ was involved in an automobile accident. The contemporaneous police report indicated that NJ's vehicle was drivable following the accident. The police report further indicated that NJ was transported to Jacobi Medical Center with complaints of back pain. In keeping with the fact that NJ was not seriously injured in the accident, hospital records indicate that NJ was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that NJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of NJ by Garrett-Hall on September 12, 2018 – eight months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Garrett-Hall falsely reported that NJ continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of NJ's eight month-old accident.

(iv)   On August 20, 2018, an Insured named WG was involved in an automobile accident. The contemporaneous police report indicated that WG's vehicle was drivable following the accident. The police report further indicated that WG was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that WG was not seriously injured, WG did not visit any hospital emergency room following the accident. To the extent that WG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of WG by Bakerman on April 15, 2019 – eight months after the accident – Crosstown, Zaitsev, Focazio, and Bakerman falsely reported that WG continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of WG's eight month-old accident.

(v)   On November 2, 2018 an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that SD's vehicle was drivable following the accident. The police report further indicated that SD was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that SD was not seriously injured in the accident, hospital records indicate that SD was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of

SD by Pullock on May 8, 2019 – over six months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Pullock falsely reported that SD continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of SD's more than six month-old accident.

(vi)    On November 10, 2018, an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that BB was not seriously injured in the accident. In keeping with the fact that BB was not seriously injured, BB did not visit any hospital emergency room following the accident. To the extent that BB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of BB by Evans on July 29, 2019 – over eight months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Evans falsely reported that BB continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of BB's more than eight month-old accident.

(vii)   On November 14, 2018, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC was not injured in the accident. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of JC by Evans on July 9, 2019 – over seven months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Evans falsely reported that JC continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of JC's more than seven month-old accident.

(viii)  On November 14, 2018, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that KC was not injured in the accident. In keeping with the fact that KC was not seriously injured, KC did not visit any hospital emergency room following the accident. To the extent that KC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of KC by Pullock on March 6, 2019 – over three months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Pullock falsely reported that KC continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of KC's more than three month-old accident.

(ix)    On November 17, 2018 an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that EC was transported to St. Barnabas Medical Center with complaints of neck pain. In keeping with the fact that EC was not seriously injured in the accident, hospital records indicate that EC was briefly observed on an outpatient basis at the hospital, and then was

discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that EC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of EC by Pullock on April 3, 2019 – over four months after the accident – Tri-State, Zaitsev, Weissman, Sangavaram, and Pullock falsely reported that EC continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of EC's more than four month-old accident.

(x)     On November 20, 2018, an Insured named YA was involved in an automobile accident. The contemporaneous police report indicated that YA's vehicle was drivable following the accident. The police report further indicated that YA was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that YA was not seriously injured, YA did not visit any hospital emergency room following the accident. To the extent that YA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of YA by Santa Maria on February 28, 2019 – over three months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Santa Maria falsely reported that YA continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of YA's more than three month-old accident.

(xi)    On November 22, 2018, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured in the accident and did not complain of pain at the scene. The following day, on November 23, 2018, ST visited North Central Bronx Hospital, In keeping with the fact that ST was not seriously injured in the accident, hospital records indicate that ST was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that ST experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of ST by Weiss on May 14, 2019 – over five months after the accident – Crosstown, Zaitsev, Focazio, and Weiss falsely reported that ST continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of ST's more than five month-old accident.

(xii)   On November 24, 2018, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal

severity at the outset, and improved over time. Even so, following a purported follow-up examination of MM by Pullock on March 6, 2019 – over three months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Pullock falsely reported that MM continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of MM's more than three month-old accident.

(xiii)   On November 30, 2018 an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that LM's vehicle was drivable following the accident. The police report further indicated that LM was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that LM was not seriously injured in the accident, hospital records indicate that LM was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that LM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of LM by Weiss on May 8, 2019 – over five months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Weiss falsely reported that LM continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of LM's more than five month-old accident.

(xiv)   On March 2, 2019, an Insured named WA was involved in an automobile accident. The contemporaneous police report indicated that WA's vehicle was drivable following the accident. The police report further indicated that WA was transported to St. Johns Riverside Hospital with complaints of back pain. In keeping with the fact that WA was not seriously injured, hospital records indicate that WA was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that WA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of WA by Pullock on September 18, 2019 – over six months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Pullock falsely reported that WA continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of WA's more than six month-old accident.

(xv)   On April 8, 2019, an Insured named RD was involved in an automobile accident. The contemporaneous police report indicated that RD's vehicle was drivable following the accident. The police report further indicated that RD was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that RD was not seriously injured, RD did not visit any hospital emergency room following the accident. To the extent that RD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported follow-up examination of RD by Santa Maria on November 6, 2019 – seven

months after the accident – Riverside, Zaitsev, Weissman, Sangavaram, and Santa Maria falsely reported that RD continued to suffer from serious pain symptoms and functional deficits, all purportedly as a result of RD's seven month-old accident.

243.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely falsely represented that the Insureds continued to suffer from serious pain and other symptoms as the result of their minor automobile accidents, often long after the minor accidents occurred.

244.    In the claims for follow-up examinations identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, the NP-PA Defendants, and the PC Defendants routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**3.    The PC Defendants' Fraudulent Charges for "Outcome Assessment Tests"**

245.    In many of the claims identified in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants fraudulently unbundled their charges for the initial and follow-up examinations, by submitting separate charges for medically-useless "outcome assessment tests" that supposedly were provided to Insureds at or around the same time as the examinations.

246.    As set forth in Exhibits "1" - "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants billed the "outcome assessment tests" through the PC Defendants to GEICO under CPT code 99358, generally resulting in charges of $204.41 for each round of purported testing.

247.    Zaitsev, Gorman, Weissman, Sangavaram, and Focazio falsely purported to personally conduct virtually all of the "outcome assessment tests" that were billed through the PC Defendants to GEICO.

248.    In fact, the "outcome assessment tests" that Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants purported to provide to Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing and the impact of those symptoms on their lives. The Insureds' responses to the questionnaires then were fed into a computer, which automatically generated a report that rated the Insureds' responses according to pre-set criteria.

249.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests"  that Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants purported to provide were nothing more than questionnaires regarding the Insureds' histories and physical conditions, the NY Fee Schedule and NJ Fee Schedule provide that these kinds of purported tests are to be reimbursed as an element of the initial examinations and follow-up examinations.

250.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for the type of contemporaneously-provided "outcome assessment tests" that Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants purported to provide.

251.    The information gained through the use of the "outcome assessment tests" that Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants purported to provide

was not significantly different from the information that the PC Defendants purported to obtain during virtually every Insured's initial examination and follow-up examinations.

252.   Under the circumstances employed by Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the virtually every Insured's initial examination and follow-up examination.

253.   The "outcome assessment tests" were part and parcel of the Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

254.   Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the nature and extent of the service that was provided.

255.   Pursuant to the CPT Assistant, the use of CPT code 99358 represents – among other things – that a physician actually has spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

256.   Though Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants routinely submitted billing for the "outcome assessment tests" under CPT code 99358, no physician or other licensed healthcare provider spent any time whatsoever reviewing or administering the purported tests, much less one hour. Nor did any physician or other licensed healthcare provider spend any time doing anything whatsoever with respect to the purported tests.

257.    Upon information and belief, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants' charges for the "outcome assessment tests" also misrepresented the identity of the individual who performed the tests.

258.    Pursuant to the CPT Assistant, the use of CPT code 99358 represents that the underlying service actually was performed by a physician or other licensed healthcare provider, and all of the PC Defendants' charges for "outcome assessment testing" represented that a licensed physician performed the underlying service.

259.    However, the "outcome assessment tests" did not require or entail any physician involvement whatsoever. Rather, the Insureds completed the pre-printed questionnaires, and a computer automatically generated a report that rated the Insureds' responses according to pre-set criteria.

260.    Zaitsev, Weissman, Sangavaram, Focazio, Gorman, and the PC Defendants misrepresented that licensed physicians had some legitimate role in the performance of the purported "outcome assessment tests" in order to support their charges under CPT code 99358, when in fact the charges for the "outcome assessment tests" were non-reimbursable under CPT code 99358 because the tests were not performed by physicians, or any other licensed healthcare providers.

**4.    The PC Defendants' Fraudulent Charges for Computerized Range of Motion and Muscle Strength Tests**

261.    In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants  also instructed many Insureds to present to the PC Defendants for one or more rounds of medically useless computerized range of motion and muscle strength tests.

262.    As set forth in Exhibits "1" – "4", Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants then purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, and the computerized muscle strength tests to GEICO under CPT code 95831, typically resulting in over $500.00 in charges for every Insured who supposedly received the tests.

263.    The charges for the computerized range of motion and muscle strength tests were fraudulent in that the computerized range of motion and muscle strength tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

**a.    Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

264.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

265.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

266.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's

range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

267.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

268.    Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

269.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the NY Fee Schedule and NJ Fee Schedule provide that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

270.    In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

b.      **The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

271.    To the extent that the PC Defendants actually provided initial examinations and follow-up examinations in the first instance, Gorman, Ciccone, Negrea, Weissman, and the NP-PA Defendants purported to conduct manual range of motion and manual muscle strength tests on virtually every Insured during each initial and/or follow-up examination.

272.    The charges for the manual range of motion and manual strength tests were part and parcel of the charges that were submitted through the PC Defendants for the purported initial examinations under CPT codes 99203 and 99205, and for the purported follow-up examinations under CPT codes 99213 and 99215.

273.    Despite the fact that virtually every Insured already purportedly had undergone manual range of motion and muscle strength testing during their initial examination and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle strength testing already had been paid by GEICO as a component of reimbursement for the initial examination and/or follow-up examinations, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants  billed for, and purported to provide, a series of computerized range of motion and muscle strength tests to many Insureds in the claims identified in Exhibits "1" – "4".

274.    Though the Insureds routinely visited the PC Defendants several times per month for follow-up examinations and other Fraudulent Services, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants often deliberately scheduled separate appointments for computerized range of motion and muscle strength tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the NY Fee Schedule and NJ Fee Schedule.

275.    Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants  purported to provide the computerized range of motion and muscle strength tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that purportedly was performed during each initial examination and follow-up examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

276.    Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants  purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

277.    The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

278.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that no healthcare provider associated with the PC

Defendants ever incorporated the results of computerized range of motion and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

279.    While computerized range of motion and muscle strength tests can be a medically useful tools as part of a research project, under the circumstances employed by Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants it unnecessarily duplicated the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial and follow-up examinations.

280.    The computerized range of motion and muscle strength tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**c.    The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests**

281.    Not only did Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests; they also unbundled their billing for the tests, which maximized the fraudulent charges that they could submit to GEICO.

282.    Pursuant to the CPT Assistant, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

283.    CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes", identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests include services such as extremity testing for strength, dexterity, or stamina, and

muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also include creation of a written report.

284.    CPT code 97750 is a "time-based" code that in the New York metropolitan area allows for a single charge of $45.71 for every 15 minutes of testing, and in New Jersey allows for a maximum charge of $55.79 for every 15 minutes of testing. Thus, if a provider performed 15 minutes of computerized range of motion and muscle strength testing, it would be permitted a single charge of $45.71 under CPT code 97750 in New York, and a maximum single charge of $55.79 in New Jersey. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code 97750 in New York, or two charges of $55.79 under CPT code 97750 in New Jersey, resulting in total charges of $91.42 or $111.58, and so forth.

285.    Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants virtually always purported to provide computerized range of motion and muscle strength tests to Insureds on the same dates of service.

286.    The computerized range of motion and muscle strength tests – together – did not take more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle strength tests that the Defendants purported to perform were medically necessary and actually performed, the PC Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 in New York, or a single, time-based charge of $55.79 under CPT code 97750 in New Jersey, for each date of service on which they performed computerized range of motion and muscle strength tests on an Insured.

287.    Nonetheless, to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone,

Negrea, and the PC Defendants routinely unbundled what should have been a single charge of $45.71 or 55.79 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $43.60 under CPT code 95831 (for the muscle strength tests); and (ii) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests).

288.    By unbundling what should be a single $45.71 or 55.79 charge under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants substantially increased the already-fraudulent charges for the computerized range of motion and muscle strength testing that they submitted, or caused to be submitted, to GEICO.

**d.    The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Computerized Range of Motion and Muscle Strength Tests**

289.    Not only were Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants' charges for the computerized range of motion and muscle strength tests fraudulent because the tests were duplicative, medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants  prepared written reports interpreting the test data.

290.    Pursuant to the NY Fee Schedule and NJ Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

291.    The CPT Assistant states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851 and 95852".

292.    The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle testing.

293.    Though Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95851 and 95831, Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants did not prepare written reports interpreting the data purportedly obtained from the tests.

294.    Zaitsev, Weissman, Sangavaram, Focazio, Gorman, Ciccone, Negrea, and the PC Defendants did not prepare written reports interpreting the data obtained from the tests because the tests were not actually meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were performed as part of the Defendants' predetermined fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

295.    Furthermore, to the extent that the computerized range of motion and muscle strength tests ever were performed in the first instance, they were performed – in their entirety – by unlicensed technicians whom the PC Defendants treated as independent contractors, with no physician involvement whatsoever.

5.    **The PC Defendants' Fraudulent Charges for "Activity Limitation Measurement" Tests**

296.    In addition to the fraudulent range of motion, muscle strength, and "outcome assessment" testing, Zaitsev, Weissman, Sangavaram, Focazio, Metropolitan, Tri-State, and Crosstown subjected many Insureds in the claims identified in Exhibits "1"- "3" to medically useless "activity limitation measurement" tests.

297.    Zaitsev, Weissman, and Focazio purported to perform virtually all of the "activity limitation measurement" tests performed on Insureds, which were then typically billed through the PC Defendants to GEICO under CPT code 97799 at a charge of $475.00 per test.

298.    As with the other Fraudulent Services, in the claims identified in Exhibits "1"- "3", the charges for the "activity limitation measurements" tests were fraudulent in that they misrepresented Zaitsev, Weissman, Sangavaram, Focazio, Metropolitan, Tri-State, and Crosstown's eligibility to collect PIP Benefits in the first instance.

299.    In fact, Zaitsev, Weissman, Sangavaram, Focazio, Metropolitan, Tri-State, and Crosstown never were eligible to collect PIP Benefits in connection with the "activity limitation measurement" test claims identified in Exhibits "1"- "3", because of the fraudulent and unlawful scheme described herein.

300.    Like Zaitsev, Weissman, Sangavaram, Focazio, Metropolitan, Tri-State, and Crosstown's charges for the other Fraudulent Services, the charges for the "activity limitation measurement" tests also were fraudulent in that the "service" was medically unnecessary and was performed as part of the Defendants' pre-determined fraudulent billing and treatment protocols, not to treat or otherwise benefit the Insureds who supposedly were subjected to the purported tests.

301.    In fact, the "activity limitation measurement" was not significantly different than the manual muscle strength tests that were performed during each Insured's initial examinations and/or follow-up examinations, and/or the computerized muscle strength tests that Metropolitan, Tri-State, and Crosstown also purported to provide.

302.    Under the circumstances employed by Zaitsev, Weissman, Sangavaram, Focazio, Metropolitan, Tri-State, and Crosstown, the "activity limitation measurement and training" represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during each Insured's initial and follow-up examinations, and also the medically unnecessary computerized range of motion and muscle testing that Metropolitan, Tri-State, and Crosstown purported to provide to the Insureds.

303.    Like the other tests discussed herein, the "activity limitation measurement" tests were not meant to impact any Insured's course of treatment. Rather, the "activity limitation measurement" tests were performed as part of the Defendants' pre-determined fraudulent billing and treatment protocols, designed to financially enrich the Defendants at the expense of GEICO, rather than to treat or benefit the Insureds who were subjected to them.

**6.     Metropolitan, Tri-State, and Riverside's Fraudulent Charges for Trigger Point Injections**

304.    Based upon the phony, boilerplate "diagnoses" from the Defendants' fraudulent initial and follow-up examinations, Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside purported to subject many of the Insured in the claims identified in Exhibits "1", "2", and "4" to a series of medically unnecessary trigger point injections.

305.    Typically, Zaitsev, Gorman, Sangavaram, and Weissman purported to perform the trigger point injections, which then were billed through Metropolitan, Tri-State, and Riverside to

GEICO using CPT codes 20552 and 20553, typically resulting in hundreds or thousands of dollars in charges for each Insured who supposedly received the injections.

306.     In the claims identified in Exhibits "1", "2", and "4", the charges for the trigger point injections were fraudulent in that they misrepresented Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside's eligibility to collect PIP Benefits in the first instance.

307.     In fact, Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside never were eligible to collect PIP Benefits in connection with claims for trigger point injections identified in Exhibits "1", "2", and "4", because of the fraudulent and unlawful activities described herein.

308.     What is more, like the charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were provided – to the extent that they were provided at all – in order to financially enrich the Defendants, not to treat or otherwise benefit the Insureds who were subjected to them.

**a.     Standards for the Legitimate Use of Trigger Point Injections**

309.     Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points, diagnosed as myofascial pain, can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

310.     Trigger point injections typically involve injections of local anesthetic medication into a taut muscle. Trigger point injections can relax the area of intense muscle spasm, improve

blood flow to the affected area, and thereby permit the washout of irritating metabolites and break the pain cycle.

311.    In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as patient education, time for natural healing to take place, rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic analgesics, such as acetaminophen and, non-steroidal, anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

312.    Moreover, in a legitimate clinical setting, trigger point injections should not be administered with excessive frequency, typically no more than once every two months, or more than six times in any given year.

313.    This is because: (i) properly administered trigger point injections should provide pain relief typically lasting for at least two months; (ii) a proper interval between trigger point injections is necessary to determine whether or not the initial trigger point injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**b.    The Medically Unnecessary Trigger Point Injections**

314.    Even so, in the claims for trigger point injections identified in Exhibits "1", "2", and "4", Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside routinely purported to provide multiple rounds of trigger point injections to the Insureds within a span of weeks, or even days, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

315.    For example:

(i)     On January 24, 2018, Metropolitan and Zaitsev purported to provide a trigger point injection to an Insured named MP. One week later, on January 31, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a <u>second</u> trigger point injection to MP.

(ii)    On February 12, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a trigger point injection to an Insured named MR. One week later, February 19, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a <u>second</u> trigger point injection MR. One week later, on February 26, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a <u>third</u> trigger point injection MR.

(iii)   On March 28, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a trigger point injection to an Insured named GB. One week later, on April 4, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a <u>second</u> trigger point injection to GB. One week later, on April 11, 2018, Metropolitan and Zaitsev purported to provide a <u>third</u> trigger point injection to GB. Four weeks later, on May 9, 2018, Metropolitan and Zaitsev purported to provide a <u>fourth</u> trigger point injection to GB. Four weeks later, on June 6, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fifth</u> trigger point injection to GB.

(iv)    On April 3, 2018, Metropolitan, Zaitsev, and Gorman purported to provide a trigger point injection to an Insured named JN. One week later, on Aril 10, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a <u>second</u> trigger point injection JN. One week later, on May 17, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a <u>third</u> trigger point injection JN.

(v)     On April 30, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a trigger point injection to an Insured named DR. Three weeks later, on May 21, 2018, Metropolitan, Zaitsev, and Gorman purported to provide a <u>second</u> trigger point injection to DR. One week later, on May 29, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a <u>third</u> trigger point injection to DR. Then, six weeks later, on July 9, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fourth</u> trigger point injection to DR.

(vi)    On May 15, 2018, Metropolitan, Zaitsev, and Gorman purported to provide a trigger point injection to an Insured named SA. One week later, on May 22, 2018, Metropolitan, Zaitsev, and Gorman purported to provide a <u>second</u> trigger point injection to SA. One week later, on May 29, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to SA.

(vii)   On May 30, 2018, Metropolitan, Zaitsev, and Weissman purported to provide a trigger point injection to an Insured named AA. Two weeks later, on June, 13, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to AA.

(viii)   On August 14, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named SR. One week later, on August 21, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to SR.  Three weeks later, on September 9, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to SR. Two weeks late, on September 18, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fourth</u> trigger point injection to SR. Three weeks later, on October 9, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fifth</u> trigger point injection to SR. Two weeks later, on October 23, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>sixth</u> trigger point injection to SR. Three weeks later, on November 13, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>seventh</u> trigger point injection to SR.

(ix)   On October 10, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a trigger point injection to an Insured named EA. Two weeks later, on October 24, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>second</u> trigger point injection to EA. Six weeks later, on November 7, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to EA. Two weeks later, on November 21, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fourth</u> trigger point injection to EA. Two weeks later, December 5, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fifth</u> trigger point injection to EA. Two weeks later, December 19, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>sixth</u> trigger point injection to EA.

(x)   On October 17, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named DY. One week later, on October 24, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide <u>second</u> trigger point injection to DY. Three weeks later, on November 7, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide <u>third</u> trigger point injection to DY. Two weeks later, on November 21, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide <u>fourth</u> trigger point injection to DY.

(xi)   On November 26, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named SA. Two weeks later, on December 12, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to SA. Two weeks later, on December 26, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>third</u> trigger point injection to SA. Two weeks later, on January 9, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fourth</u> trigger point injection to SA. One week later, on January 16,

2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fifth</u> trigger point injection to SA. Four weeks later, on February 13, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>sixth</u> trigger point injection to SA.  Two weeks later, on February 27, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>seventh</u> trigger point injection to SA. Four weeks later, on March 27, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide an <u>eighth</u> trigger point injection to SA. Three weeks later, on April 17, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>ninth</u> trigger point injection to SA

(xii)   On November 26, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a trigger point injection to an Insured named MT. One week later, on December 3, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>second</u> trigger point injection to MT.

(xiii)  On November 27, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named NR. Two weeks later, on December 11, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to NR. Five weeks later, on January 15, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to NR. Three weeks later, on February 6, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fourth</u> trigger point injection to NR. Two weeks later on February 20, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fifth</u> trigger point injection to NR. Three weeks later, on March 13, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>sixth</u> trigger point injection to NR. Three weeks later, on April 3, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>seventh</u> trigger point injection to NR. Two weeks later, on April 17, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide an <u>eighth</u> trigger point injection to NR.

(xiv)   On November 28, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named LM. Two weeks later, on December 12, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to LM. Two weeks later, on December 26, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>third</u> trigger point injection to LM. Two weeks later, on January 9, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fourth</u> trigger point injection to LM. One week later, on January 16, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fifth</u> trigger point injection to LM.  Four weeks later, on February 13, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>sixth</u> trigger point injection to LM. Two weeks later, on February 27, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>seventh</u> trigger point injection to LM. Four weeks later, on March 27, 2019, Riverside, Zaitsev,

Weissman, and Sangavaram purported to provide an <u>eighth</u> trigger point injection to LM. Four weeks later, on April 17, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>ninth</u> trigger point injection to LM.

(xv)     On December 19, 2018, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a trigger point injection to an Insured named JA. Two weeks later, on January 2, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to JA. Two weeks later on January 16, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to JA. Two weeks later on January 30, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fourth</u> trigger point injection to JA. Seven weeks later, on March 20, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fifth</u> trigger point injection to JA. Two weeks later, on April 3, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>sixth</u> trigger point injection to JA. Two weeks later, on April 17, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>seventh</u> trigger point injection to JA. Two weeks later, on May 1, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide an <u>eighth</u> trigger point injection to JA.

(xvi)    On December 26, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named DA. Four weeks later, on January 23, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>second</u> trigger point injection to DA. Two weeks later, on February 6, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to DA.

(xvii)   On December 26, 2018, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named GT. One week later, on January 2, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to GT. Two weeks later, on January 14, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to GT.

(xviii)  On January 30, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a trigger point injection to an Insured named IB. Two weeks late, on February 13, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to IB. Two weeks later, on February 27, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to IB. Three weeks later, on March 20, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fourth</u> trigger point injection to IB. Two weeks later, on April 3, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>fifth</u> trigger point injection to IB. Three weeks later, on April 24, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>sixth</u> trigger point injection to IB.

    (xix)    On March 13, 2019, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named RB. Six weeks later, on April 24, 2019, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to RB. Four weeks later, on May 22, 2019, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide a <u>third</u> trigger point injection to RB. Three weeks later, on June 12, 2019, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide a <u>fourth</u> trigger point injection to RB.

    (xx)    On March 25, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a trigger point injection to an Insured named NA. One week later, on April 1, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>second</u> trigger point injection to NA. One week later, on April 8, 2019, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide a <u>third</u> trigger point injection to NA.

316.    These are only representative examples. In the claims for trigger point injections identified in Exhibits "1", "2", and "4", Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside routinely purported to provide multiple rounds of trigger point injections to the Insureds within a span of weeks, or even days.

317.    Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside purported to provide a large amount of medically unnecessary trigger point injections to the Insureds in the claims identified in Exhibits "1", "2", and "4" despite the fact that such injections – to the extent that they actually occurred – placed the Insureds at risk.

318.    Even when performed correctly, the injections that Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside purported to provide can cause significant adverse events, including infection, bleeding, nerve injury, hypotension, anesthetic toxicity, or even death.

319.    To the extent that Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside actually provided injections to Insureds with the frequency set forth in their billing, they increased these risks exponentially.

320.     The Defendants' pre-determined treatment protocol, including subjecting patients to multiple rounds of trigger point injections over the course of a few weeks and even days, was designed and employed by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections.

**7.     Metropolitan, Tri-State, and Riverside's Fraudulent Charges for Pain Management Injections Under Anesthesia**

321.     Based upon the phony, boilerplate "diagnoses" from the Defendants' fraudulent initial and follow-up examinations, Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside also purported to subject many of the Insureds in the claims identified in Exhibits "1", "2", and "4" to a series of pain management injections including, but not limited to, epidural injections, nerve root block injections, facet joint injections, and medial branch block injections, which often were performed under anesthesia.

322.     Zaitsev, Gorman, Weissman, and Sangavaram purported to perform virtually all of the pain management injections that were billed through Metropolitan, Tri-State, and Riverside to GEICO in the claims identified in Exhibits "1", "2", and "4".

323.     Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside then typically billed the injections to GEICO under CPT codes 62310, 62311, 62321, 62323, 64483, 64484, 64490, 64491, 64492, 64493, 64494, 64495, 72275, and/or 77003, and the accompanying anesthesia under 01992.

324.     Virtually all of the pain management injections billed through Metropolitan, Tri-State, and Riverside in the claims identified in Exhibits "1", "2", and "4" purportedly were performed at ambulatory surgery centers, which in most cases were located in New Jersey.

325.    In the claims identified in Exhibits "1", "2", and "4", the charges for the pain management injections and concomitant anesthesia services were fraudulent in that they misrepresented Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside's eligibility to collect PIP Benefits in the first instance.

326.    In fact, Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside never were eligible to collect PIP Benefits in connection with the claims for pain management injections and concomitant anesthesia services identified in Exhibits "1", "2", and "4", because of the fraudulent and unlawful conduct described herein.

327.    Moreover, the charges for the pain management injections and concomitant anesthesia services were fraudulent in that the injections and anesthesia were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to then.

**a.     Legitimate Use of Pain Management Injections**

328.    Generally, when a patient presents with a soft tissue injury, such as a sprain or strain, secondary to an automobile accident, the initial standard of care is conservative treatment comprised of patient education, expectation setting, rest, ice, compression, and – if applicable – elevation of the affected body part.

329.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as physical therapy and the use of pain management medication.

330.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

331.    In a legitimate clinical setting, pain management injections are not routinely administered until a patient has failed more conservative treatments.

332.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive pain management injections, and particularly spinal injections, entail a degree of risk to the patient that is absent in conservative forms of treatment.

333.    In a legitimate clinical setting, pain management injections typically should not be administered more than once every two months, and multiple varieties of pain management injections typically should not be administered at or around the same time.

334.    This is because: (i) properly administered pain management injections typically should provide relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something else or may be more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**b.    The Fraudulent Charges for Pain Management Injections**

335.    As set forth above, virtually all of the Insureds in the claims identified in Exhibits "1", "2", and "4", were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

336.    To the limited extent that the Insureds in the claims identified in Exhibits "1", "2", and "4" experienced any injuries at all in their minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

337.   By the time the Insureds in the claims identified in Exhibits "1", "2", and "4" presented to Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside for treatment, they either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

338.   Even so, in the claims for pain management injections identified in Exhibits "1", "2", and "4", Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside:

(i)   routinely provided pain management injections to Insureds who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury – months after the underlying accidents, and long after the Insureds' minor soft tissue injuries would have resolved; and

(ii)   routinely purported to administer multiple pain management injections, and multiple varieties of pain management injections, to Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

339.   For example:

(i)   On September 24, 2017, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that MG was transported to Queens General Hospital with complaints of soldier and chest pain. In keeping with the fact that MG was not seriously injured in the accident, hospital records indicate that MG was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Metropolitan, Zaitsev, and Gorman purported to provide MG with six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on May 15, 2018. In addition, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide MG with six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on May 29, 2018, and six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on June 12, 2018. These injections were purportedly provided to MG between seven and eight months after the accident – and long after any legitimate symptoms MG may have experienced as the result of the accident had resolved.

(ii)     On January 18, 2018, an Insured named NJ was involved in an automobile accident. The contemporaneous police report indicated that NJ's vehicle was drivable following the accident. The police report further indicated that NJ was transported to Jacobi Medical Center with complaints of back pain. In keeping with the fact that NJ was not seriously injured in the accident, hospital records indicate that NJ was briefly observed on an outpatient basis, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that NJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide NJ with one medically unnecessary epidural injection under CPT code 62311 on June 18, 2018, one medically unnecessary epidural injection under CPT code 62311 on July 23, 2018, six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on October 18, 2018, six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on November 12, 2018, and six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on December 24, 2018. In addition, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide NJ with one medically unnecessary epidural injection under CPT code 62311 on August 20, 2018 and one medically unnecessary epidural injection under CPT code 62310 on September 24, 2018. These injections were purportedly provided to NJ between five and 11 months after the accident – and long after any legitimate symptoms NJ may have experienced as the result of the accident had resolved.

(iii)    On August 16, 2018 an Insured named JSB was involved in an automobile accident. The contemporaneous police report indicated that JSB was transported to Richmond University Medical Center. In keeping with the fact that JSB was not seriously injured in the accident, hospital records indicate that JSB was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that JSB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide JSB with six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on January 9, 2019 – over four months after the accident – and long after any legitimate symptoms JSB may have experienced as the result of the accident had resolved.

(iv)     On August 20, 2018, an Insured named WG was involved in an automobile accident. The contemporaneous police report indicated that WG's vehicle was drivable following the accident. The police report further indicated that WG was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that WG was not seriously injured, WG did not visit any hospital emergency room following the accident. To the extent that WG experienced any health problems at all as the result of the accident, they were of low or minimal

severity at the outset, and had completely resolved within two to three months of the accident. Even so, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide WG with one medically unnecessary epidural injection under CPT code 62310 on November 21, 2018, one medically unnecessary epidural injection under CPT code 62311 on December 19, 2018, and six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on January 2, 2019. In addition, Tri-State, Zaitsev, Weissman, and Sangavaram purported to provide WG with one medically unnecessary epidural injection under CPT code 62310 on December 5, 2018. In addition, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide WG with six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on January 16, 2019. These injections were purportedly provided to WG between three and five months after the accident – and long after any legitimate symptoms WG may have experienced as the result of the accident had resolved.

(v)     On November 2, 2018 an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that SD's vehicle was drivable following the accident. The police report further indicated that SD was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that SD was not seriously injured in the accident, hospital records indicate that SD was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide SD with one medically unnecessary epidural injection under CPT code 62310 on February 11, 2019 and one medically unnecessary epidural injection under CPT code 62310 on April 17, 2019 – between three and five months after the accident – and long after any legitimate symptoms SD may have experienced as the result of the accident had resolved.

(vi)    On November 20, 2018, an Insured named YA was involved in an automobile accident. The contemporaneous police report indicated that YA's vehicle was drivable following the accident. The police report further indicated that YA was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that YA was not seriously injured, YA did not visit any hospital emergency room following the accident. To the extent that YA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide YA with six medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on March 13, 2019 – nearly four months after the accident – and long after any legitimate symptoms YA may have experienced as the result of the accident had resolved.

(vii)    On November 22, 2018, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured in the accident and did not complain of pain at the scene. The following day, on November 23, 2018, ST visited North Central Bronx Hospital, In keeping with the fact that ST was not seriously injured in the accident, hospital records indicate that ST was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that ST experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide ST with one medically unnecessary transforanimal epidural injection under CPT code 64483 on May 15, 2019 – over five months after the accident – and long after any legitimate symptoms ST may have experienced as the result of the accident had resolved.

(viii)    On Nov 30, 2018 an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that LM's vehicle was drivable following the accident. The police report further indicated that LM was transported to Montefiore Medical Center with complaints of neck pain. In keeping with the fact that LM was not seriously injured in the accident, hospital records indicate that LM was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that LM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide LM with three medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on May 8, 2019 – over five months after the accident – and long after any legitimate symptoms LM may have experienced as the result of the accident had resolved.

(ix)    On March 2, 2019, an Insured named WA was involved in an automobile accident. The contemporaneous police report indicated that WA's vehicle was drivable following the accident. The police report further indicated that WA was transported to St. Johns Riverside Hospital with complaints of back pain. In keeping with the fact that WA was not seriously injured, hospital records indicate that WA was briefly observed on an outpatient basis at the hospital, and then was discharged with nothing more serious than minor soft tissue injury diagnoses. To the extent that WA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide WA with three medically unnecessary facet joint injections under CPT codes 64493, 64494, and 64495 on September 18, 2019 and one transforanimal epidural injection under CPT code

64483 on October 19, 2019 – between six and seven months after the accident – and long after any legitimate symptoms WA may have experienced as the result of the accident had resolved.

(x)     On April 8, 2019, an Insured named RD was involved in an automobile accident. The contemporaneous police report indicated that RD's vehicle was drivable following the accident. The police report further indicated that RD was not injured in the accident and did not complain of pain at the scene. In keeping with the fact that RD was not seriously injured, RD did not visit any hospital emergency room following the accident. To the extent that RD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Riverside, Zaitsev, Weissman, and Sangavaram purported to provide RD with one medically unnecessary epidural injection under CPT code 62310 on July 13, 2019 and three medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on July 17, 2019. In addition, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman purported to provide RD with three medically unnecessary facet joint injections under CPT codes 64490, 64491, and 64492 on August 14, 2019 and one medically unnecessary epidural injection under CPT code 62310 on November 6, 2019. These injections were purportedly provided to RD between three and seven months after the accident – and long after any legitimate symptoms RD may have experienced as the result of the accident had resolved.

340.    These are only representative examples. In the claims for pain management injections in Exhibits "1", "2", and "4", Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside routinely submitted billing to GEICO for medically unnecessary pain management injections.

341.    Even when performed correctly, the injections that Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, or even death.

342.    To the extent that Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside actually administered injections to Insureds with the frequency set forth in their billing, they increased these risks exponentially.

112

343.    The Defendants' pre-determined treatment protocol, including subjecting patients to multiple, identical injections over the course of a few weeks or months was designed and employed by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**c.    The Medically Unnecessary Anesthesia Services**

344.    In the claims identified in Exhibits "1", "2", and "4", the pain management injections purportedly provided by Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside were virtually always administered using anesthesia, specifically sedation.

345.    As set forth in Exhibits "1", "2", and "4", the anesthesia services typically were billed through Metropolitan, Tri-State, and Riverside to GEICO under CPT code 01992, resulting in a charge of between $162.06.00 and $3,780.00, for each round of sedation that each Insured purportedly received.

346.    However, in a legitimate clinical setting, pain management injections typically do not require sedation.

347.    Indeed, according to a review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." See Smith, Howard, M.D., Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures, Pain Physician 2013.

348.    Along similar lines, the American Society of Anesthesiologists has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections,

epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, and occipital nerve block and facet joint injections." See American Society of Anesthesiologists, "Statement on Anesthetic Care during Interventional Pain Procedures for Adults", October 20, 2010.

349.    Sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

350.    Not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

351.    Even so, in the claims for pain management injections and anesthesia identified in Exhibits "1", "2", and "4", Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside routinely purported to provide the Insureds with unjustified, medically unnecessary, and indeed dangerous sedation.

352.    Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside were well-aware of the fact that sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

353.    Even so, Zaitsev, Weissman, Sangavaram, Gorman, Metropolitan, Tri-State, and Riverside routinely provided sedation to the Insureds in the claims identified in Exhibits "1", "2", and "4" in order to: (i) increase the amount of fraudulent billing that they could submit to GEICO and other insurers; and (ii) as discussed below, create the false appearance that the anesthesia and interventional pain management services qualified for the ASC Exception to the Codey Law.

354.     Each of the anesthesia services attendant to the pain management injections that are identified in Exhibits "1", "2", and "4" was medically unnecessary, in that the anesthesia services: (i) were provided, to the extent that they were provided at all, primarily for the benefit of the Defendants and not to treat or otherwise benefit the Insureds; and (ii) were not the most appropriate standard of level of service in accordance with standards of good practice and standard professional treatment protocols.

**d.     The Unlawful Self-Referrals for Pain Management Injections**

355.     In order to increase the amount of charges for medically unnecessary pain management injections that they could submit or cause to be submitted to GEICO, Zaitsev, Weissman, Sangavaram, Metropolitan, Tri-State, and Riverside also orchestrated patterns of unlawful self-referrals for pain management injections.

356.     Zaitsev, Weissman, and Sangavaram – as licensed physicians – were "practitioners" as defined by the Codey Law. See N.J.S.A. 45:9–22.4.

357.     Metropolitan, Tri-State, and Riverside were "healthcare services", in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ." Id.

358.     In the context of the Codey Law, Zaitsev – who owned Metropolitan – had a "significant beneficial interest" in Metropolitan. Id.

359.     What is more, though Weissman and Sangavaram falsely purported to be the sole owners of Tri-State and Riverside, in actuality Zaitsev had secret and undisclosed ownership interests in Tri-State and Riverside.

360.     For example:

(i)     Zaitsev provided all start-up costs and investment in Tri-State and Riverside. Weissman and Sangavaram did not incur any meaningful costs to establish Tri-

State and Riverside's practices, nor did they invest any significant money in the professional corporations they purportedly owned.

(ii)   Tri-State pledged its accounts receivable to an entity controlled by Zaitsev, called Financial Vision Group, L.L.C. ("Financial Vision").

(iii)  Sangavaram gave testimony during an October 2019 examination under oath, indicating that Zaitsev owned and controlled Tri-State.

(iv)  Zaitsev recruited Sangavaram to work as an employee at Riverside, and then arranged for Sangavaram to falsely hold himself out as an owner of Riverside, despite the fact that Sangavaram never paid any money for his purported "ownership" interests, and despite the fact that Zaitsev maintained control over Riverside despite Sangavaram's nominal "ownership" interest.

361.   Accordingly, in the context of the Codey Law, Zaitsev, Weissman, and Sangavaram all had "significant beneficial interests" in Tri-State and Riverside.

362.   Notwithstanding their respective significant beneficial interests in Metropolitan, Tri-State, and Riverside, Zaitsev, Weissman, and Sangavaram routinely self-referred – or directed their employees to self-refer – Insureds to Metropolitan, Tri-State, and Riverside for medically unnecessary pain management injections.

363.   These self-referrals violated the Codey Law, inasmuch as none of the exceptions to the Codey Law applied to these self-referrals.

364.   The exception in the Codey Law, for "medical treatment or a procedure that is provided at the practitioner's medical office", did not apply to the self-referrals for these injections because – as set forth above – virtually all of the pain management injections billed through Metropolitan, Tri-State, and Riverside in the claims identified in Exhibits "1", "2", and "4" purportedly were performed at ambulatory surgery centers, which in most cases were located in New Jersey, including Accelerated Surgical Center of North Jersey, L.L.C. ("Accelerated Surgical Center") in Patterson, New Jersey, Dynamic Surgery Center, L.L.C. ("Dynamic Surgery Center") in Hackensack, New Jersey, HealthPlus Surgery Center, L.L.C. ("HealthPlus Surgery

Center") in Saddle Brook, New Jersey, and Excel Surgery Center, L.L.C. ("Excel Surgery Center"), in Hackensack, New Jersey.

365.    Nor did the ASC Exception apply to these self-referrals, because the pain management injections did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". To the contrary, and as set forth above, all of the anesthesia services attendant to Metropolitan, Tri-State, and Riverside's pain management injections were medically unnecessary.

366.    What is more, the ASC Exception often did not apply to these self-referrals, because the resulting procedures often were performed by someone other than the practitioner who made the referrals.

367.    For example:

(i)      On or about August 9, 2017, Evans purported to conduct a follow-up examination of an Insured named LF at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for LF's examination was submitted to GEICO through Metropolitan. At the conclusion of LF's examination – and at Zaitsev's direction – Evans self–referred LF to Metropolitan for facet block injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Zaitsev on August 16, 2017 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Zaitsev or Metropolitan's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Metropolitan and Zaitsev billed GEICO for the injections, which were the product of an unlawful self–referral.

(ii)     On or about December 8, 2017, Weissman purported to conduct a follow-up examination of an Insured named VS at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for VS's examination was submitted to GEICO through Metropolitan. At the conclusion of VS's examination – and at Zaitsev's direction – Weissman self–referred VS to Metropolitan for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Zaitsev on December 20, 2017 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Zaitsev or Metropolitan's medical office, and therefore did not qualify for the Codey Law's exception for "medical

treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Metropolitan and Zaitsev billed GEICO for the injection, which was the product of an unlawful self–referral.

(iii)    On or about May 22, 2018, Bakerman purported to conduct an initial examination of an Insured named NJ at a No-Fault Clinic located at 2426 Eastchester Road, Bronx, New York. Billing for NJ's examination was submitted to GEICO through Tri-State. At the conclusion of NJ's examination – and at Zaitsev's direction – Bakerman self–referred NJ to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on June 6, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injection, which was the product of an unlawful self–referral.

(iv)    On or about June 5, 2018, Weiss purported to conduct a follow-up examination of an Insured named JA at a No-Fault Clinic located at 625 Fordham Road, Bronx, New York. Billing for JA's examination was submitted to GEICO through Crosstown. At the conclusion of that examination – and at Zaitsev's direction – Weiss self–referred JA to Tri-State for one epidural injection under CPT code 62311 that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Weissman on June 13, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Weissman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, and Sangavaram billed GEICO for the injection, which were the product of an unlawful self–referral.

(v)    On or about July 5, 2018, Mathew purported to conduct a follow-up examination of an Insured named IM at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for IM's examination was submitted to GEICO through Tri-State. At the conclusion of IM's examination – and at Zaitsev's direction – Mathew self–referred IM to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on July 18, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the

resulting procedure. Even so, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injection, which was the product of an unlawful self–referral.

(vi)     On or about September 17, 2018, and Ovincy purported to conduct an initial examination of an Insured named DY at a No-Fault Clinic located at 2052 Richmond Road, Staten Island, New York. Billing for DY's examination was submitted to GEICO through Tri-State. At the conclusion of DY's examination – and at Zaitsev's direction – Ovincy self–referred DY to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on October 17, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injection, which was the product of an unlawful self–referral.

(vii)    On or about September 18, 2018, Weiss purported to conduct a follow-up examination of an Insured named RG at a No-Fault Clinic located at 625 Fordham Road, Bronx, New York. Billing for RG's examination was submitted to GEICO through Crosstown. At the conclusion of RG's examination – and at Zaitsev's direction – Weiss self–referred RG to Tri-State for one epidural injection under CPT code 62311 that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on October 3, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman, or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injections, which were the product of an unlawful self–referral.

(viii)   On or about October 18, 2018, Bakerman purported to conduct an initial examination of an Insured named GH at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for GH's examination was submitted to GEICO through Tri-State. At the conclusion of GH's examination – and at Zaitsev's direction – Bakerman self–referred GH to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Weissman on November 14, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Weissman, or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-

119

State, Zaitsev, Weissman, and Sangavaram billed GEICO for the injection, which was the product of an unlawful self–referral.

(ix)     On or about October 22, 2018, Ovincy purported to conduct an initial examination of an Insured named JB at a No-Fault Clinic located at 2052 Richmond Road, Staten Island, New York. Billing for JB's examination was submitted to GEICO through Tri-State. At the conclusion of JB's examination – and at Zaitsev's direction – Ovincy self–referred JB to Tri-State for facet block injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Weissman on November 7, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Weissman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, and Sangavaram billed GEICO for the injections, which were the product of an unlawful self–referral.

(x)      On or about November 6, 2018, Bakerman purported to conduct a follow-up examination of an Insured named EA at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for EA's examination was submitted to GEICO through Tri-State. At the conclusion of EA's examination – and at Zaitsev's direction – Bakerman self–referred EA to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on November 21, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injection, which was the product of an unlawful self–referral.

(xi)     On or about December 12, 2018, Weiss purported to conduct an initial examination of an Insured named SV at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for SV's examination was submitted to GEICO through Tri-State. At the conclusion of SV's examination – and at Zaitsev's direction – Weiss self–referred SV to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Weissman on December 26, 2018 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Weissman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State,

Zaitsev, Weissman, and Sangavaram billed GEICO for the injection, which was the product of an unlawful self–referral.

(xii)    On or about January 18, 2019, Ovincy purported to conduct a follow-up examination of an Insured named JJ at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for JJ's examination was submitted to GEICO through Tri-State. At the conclusion of that examination – and at Zaitsev's direction – Ovincy self–referred JJ to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on January 30, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injection, which was the product of an unlawful self–referral.

(xiii)    On or about January 30, 2019, Mathew purported to conduct a follow-up examination of an Insured named SA at a No-Fault Clinic located at 2818 31st Street, Astoria, New York. Billing for SA's examination was submitted to GEICO through Tri-State. At the conclusion of SA's examination – and at Zaitsev's direction – Mathew self–referred SA to Tri-State for facet block injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Weissman on February 13, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Weissman or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, and Sangavaram billed GEICO for the injections, which were the product of an unlawful self–referral.

(xiv)    On or about January 31, 2019, Weiss purported to conduct a follow-up examination of an Insured named GA at a No-Fault Clinic located at 625 Fordham Road, Bronx, New York. Billing for GA's examination was submitted to GEICO through Crosstown. At the conclusion of GA's examination – and at Zaitsev's direction – Weiss self–referred GA to Riverside for one trigger point injection under CPT code 20552 and one epidural injection under CPT code 62311 neither of which legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Weissman on February 20, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Weissman or Riverside's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Riverside,

Zaitsev, Weissman, and Sangavaram billed GEICO for the injections, which were the product of an unlawful self–referral.

(xv)    On or about February 6, 2019, Mathew purported to conduct an initial examination of an Insured named MH at a No-Fault Clinic located at 108 Kenilworth Place, Brooklyn, New York. Billing for MH's examination was submitted to GEICO through Tri-State. At the conclusion of MH'sexamination – and at Zaitsev's direction – Mathew self–referred MH to Riverside for facet block injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Weissman on February 20, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Weissman, or Riverside's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Riverside, Zaitsev, Weissman, and Sangavaram billed GEICO for the injections, which were the product of an unlawful self–referral.

(xvi)   On or about February 13, 2019, Santa Maria purported to conduct an initial examination of an Insured named RC at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for RC's examination was submitted to GEICO through Tri-State. At the conclusion of RC's examination – and at Zaitsev's direction – Santa Maria self–referred RC to Tri-State for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Weissman on February 25, 2019 at Dynamic Surgery Center in Hackensack, New Jersey, rather than at Weissman, or Tri-State's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Tri-State, Zaitsev, Weissman, and Sangavaram billed GEICO for the injection, which was the product of an unlawful self–referral.

(xvii)  On or about February 14, 2019, Weiss purported to conduct a follow-up examination of an Insured named AF at a No-Fault Clinic located at 625 Fordham Road, Bronx, New York. Billing for AF's examination was submitted to GEICO through Crosstown. At the conclusion of AF'st examination – and at Zaitsev's direction – Weiss self–referred AF to Riverside for one trigger point injection under CPT code 20552 and one epidural injection under CPT code 62311 – neither of which legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Gorman on February 27, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman, or Riverside's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Riverside,

Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injections, which were the product of an unlawful self–referral.

(xviii)   On or about March 5, 2019, Santa Maria purported to conduct an initial examination of an Insured named SM at a No-Fault Clinic located at 5041 Broadway, New York, New York. Billing for SM's examination was submitted to GEICO through Riverside. At the conclusion of SM's examination – and at Zaitsev's direction – Santa Maria self–referred SM to Riverside for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on March 20, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman, or Riverside's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injection, which was the product of an unlawful self–referral.

(xix)   On or about April 10, 2019, Pullock purported to conduct an initial examination of an Insured named RB at a No-Fault Clinic located at 2510 Westchester Avenue, Bronx, New York. Billing for RB's examination was submitted to GEICO through Riverside. At the conclusion of RB's examination – and at Zaitsev's direction – Pullock self–referred RB to Riverside for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed by Gorman on April 24, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman or Riverside's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Riverside, Zaitsev, Weissman, Sangavaram, and Gorman billed GEICO for the injection, which was the product of an unlawful self–referral.

(xx)   On or about May 7, 2019, Weiss purported to conduct a follow-up examination of an Insured named JG at a No-Fault Clinic located at 625 Fordham Road, Bronx, New York. Billing for JG's examination was submitted to GEICO through Crosstown. At the conclusion of JG's examination – and at Zaitsev's direction – Weiss self–referred JG to Riverside for one trigger point injection under CPT code 20552 and one epidural injection under CPT code 62310 – neither of which legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Gorman on June 19, 2019 at Accelerated Surgical Center in Patterson, New Jersey, rather than at Gorman or Riverside's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". In addition, the practitioner who made the referral did not personally perform the resulting procedure. Even so, Riverside, Zaitsev, Weissman,

Sangavaram, and Gorman billed GEICO for the injections, which were the product of an unlawful self–referral.

368.     These are only representative examples of Zaitsev, Weissman, Sangavaram, Metropolitan, Tri-State, and Riverside's illegal self-referrals for pain management injections. The pain management injections in the claims identified in Exhibits "1", "2", and "4" were routinely the product of illegal self-referrals, inasmuch as none of the referrals qualified for the ASC Exception or any other exception to the Codey Law.

**8.    Ridgewood's Fraudulent Charges for Drug Testing**

369.     As a component of the Defendants' fraudulent treatment and billing scheme, Zaitsev, Nicola, Benevenga, and Ridgewood submitted a massive amount of fraudulent billing to GEICO for medically unnecessary drug testing.

370.     In a legitimate clinical setting, drug testing may be medically warranted to determine whether a patient is taking any unreported medications or illicit drugs that might be relevant to some aspect of the patient's treatment plan, such as prescription drugs or anesthesia.

371.     However, absent some indication that a patient is abusing drugs, or a legitimate question regarding the medications that a patient is taking, there generally will be no medical need to administer drug testing to patients.

372.     To the extent that there is some legitimate need for drug testing, the drug testing should be appropriately tailored to each patient's individual circumstances and presentation. It is inappropriate to routinely order a substantially identical, extensive series of drug tests for patients, without regard for their personal circumstances.

373.     In a legitimate clinical setting, "quantitative" drug screens – which can tell how much of a drug is in a patient's system – sometimes may be medically necessary to confirm the

results of "qualitative" drug screens, which can tell whether a patient is positive or negative for a given class of drug, but which do not set forth how much of a drug is in a patient's system.

374.    However, where a patient's qualitative drug screen comes up negative for a given class of drug, there will be no medical necessity to test for that same class of drug using a quantitative drug screen.

375.    In virtually all of the claims for drug tests identified in Exhibit "5", there was no indication that the Insureds were abusing drugs, and there was no legitimate question regarding the medications that the Insureds were taking.

376.    Nor was there any legitimate medical need to conduct both qualitative testing and quantitative testing on the Insureds in the claims identified in Exhibit "5", before the results of qualitative testing demonstrated a need for confirmatory quantitative testing.

377.    Even so, in the claims identified in Exhibit "5", Zaitsev, Nicola, Benevenga, and Ridgewood routinely purported to simultaneously provide a massive number of medically unnecessary qualitative and quantitative drug tests to individual Insureds.

378.    In order to bill GEICO for the medically unnecessary drug testing, Zaitsev, Nicola, Benevenga, and Ridgewood needed licensed healthcare providers to order the drug tests.

379.    However, because there was no medical necessity for the drug testing, no legitimate healthcare providers would refer their patients for the drug testing.

380.    Accordingly, to increase the amount of charges for medically unnecessary drug testing that they could submit or cause to be submitted to GEICO, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Focazio, Ridgewood, Tri-State, Riverside, and Crosstown orchestrated patterns of unlawful self-referrals to Ridgewood for medically unnecessary drug testing.

381.    As set forth above, though Weissman and Sangavaram falsely purported to be the sole owners of Tri-State and Riverside, Zaitsev also owned and controlled Tri-State and Riverside.

382.    In addition, though Focazio falsely purported to be the sole owner of Crosstown, in fact Zaitsev also owned and controlled Crosstown.

383.    For instance:

(i)    Zaitsev provided all start-up costs and investment in Crosstown. Focazio did not incur any meaningful costs to establish Crosstown's practice, nor did he invest any significant money in the professional corporation he purportedly owned.

(i)    During an October 2019 examination under oath, Focazio displayed a total lack of familiarity with Crosstown's operations, and Focazio – a gastroenterologist – never legitimately practiced medicine through Crosstown, which did not provide gastroenterology services.

(ii)    Crosstown pledged its accounts receivable to Financial Vision, the same Zaitsev-controlled entity that had an interest in Tri-State's accounts receivable.

384.    Because Zaitsev owned and controlled Tri-State, Riverside, Crosstown, and Ridgewood, he could not lawfully cause Insureds to be referred from Tri-State, Riverside, and Crosstown to Ridgewood for drug testing.

385.    Even so, in the claims identified in Exhibits "2" and "5", Zaitsev, Nicola, and Benevenga – with the assistance of Weissman and Sangavaram – routinely caused Insureds to be unlawfully self-referred from Tri-State to Ridgewood for medically unnecessary drug tests, which then were billed through Ridgewood to GEICO. These unlawful self-referrals include – but are not limited to – referrals of the following Insureds on the following dates:

| Name of Insured | Dates of Unlawful Self-Referrals from Tri-State to Ridgewood |
|---|---|
| TS | October 3, 2018 |
| NJ | October 9, 2018 |
| EA | October 10, 2018 and November 7, 2018 |
| AR | October 10, 2018 |
| DY | October 17, 2018, October 25, 2018, November 5, 2018, and |

|  | November 7, 2018 |
|---|---|
| SD | November 8, 2018 and December 19, 2018 |
| MD | November 8, 2018 and March 20, 2019 |
| ML | November 14, 2018 and December 19, 2018 |
| GH | November 14, 2018, November 29, 2018, and January 3, 2019 |
| JC | November 21, 2018 |
| OF | November 28, 2018 |
| LM | December 10, 2018, February 5, 2019 |
| KC | December 11, 2018 |
| EC | December 17, 2018 |
| VV | December 17, 2018 |
| RC | December 21, 2018 |
| CS | December 28, 2018 |
| LA | January 8, 2019 |
| MM | January 18, 2019 |
| MH | February 6, 2019 |

386.    Similarly, in the claims identified in Exhibits "4" and "5", Zaitsev, Nicola, and

Benevenga – with the assistance of Weissman and Sangavaram – routinely caused Insureds to be

unlawfully self-referred from Riverside to Ridgewood for medically unnecessary drug tests, which

then were billed through Ridgewood to GEICO. These unlawful self-referrals include – but are not

limited to – referrals of the following Insureds on the following dates:

| Name of Insured | Dates of Unlawful Self-Referrals from Riverside to Ridgewood |
|---|---|
| JB | January 2, 2019 |
| FG | January 3, 2019 |
| JB | January 9, 2019 |
| GN | January 16, 2019 |
| DY | January 16, 2019 |
| RC | January 30, 2019, March 25, 2019, and May 7, 2019 |
| ML | February 13, 2019 and March 27, 2019 |
| MH | February 20, 2019 |
| RB | March 13, 2019 and March 23, 2019 |
| YA | March 13, 2019 |

387.    Likewise, in the claims identified in Exhibits "3" and "5", Zaitsev, Nicola, and

Benevenga – with the assistance of Focazio – routinely caused Insureds to be unlawfully self-

referred from Crosstown to Ridgewood for medically unnecessary drug tests, which then were

billed through Ridgewood to GEICO. These unlawful self-referrals include – but are not limited to – referrals of the following Insureds on the following dates:

| Name of Insured | Dates of Unlawful Self-Referrals from Crosstown to Ridgewood |
|---|---|
| EO | November 20, 2018 |
| AB | February 14, 2019 |
| AP | March 7, 2019 |
| DI | April 8, 2019 |
| RD | April 17, 2019 |
| SH | May 22, 2019 |
| PY | June 3, 2019 |
| BC | June 19, 2019 |
| VA | July 3, 2019 |
| JV | July 22, 2019 |

388.    These are only representative examples. In the claims identified in Exhibits "2" – "5", Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Focazio, Ridgewood, Tri-State, Riverside, and Crosstown routinely orchestrated patterns of unlawful self-referrals to Ridgewood for medically unnecessary drug testing, while at the same time acting to conceal Zaitsev's ownership interests in Tri-State, Riverside, and Crosstown, so as to conceal the unlawful self-referrals.

389.    In keeping with the fact that Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Focazio, Ridgewood, Tri-State, Riverside, and Crosstown orchestrated a pattern of illegal self-referrals for medically unnecessary drug testing, many of the purported drug tests were performed too late to achieve their purported purpose.

390.    In particular, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Focazio, Ridgewood, Tri-State, Riverside, and Crosstown caused many GEICO Insureds to be unlawfully self-referred to Ridgewood for drug testing, ostensibly to determine whether the Insureds were taking any unreported medication or drugs that could adversely interact with anesthesia attendant to the Insureds' upcoming pain management procedures.

128

391.     However, by the time the drug tests were performed and the results of the tests were obtained, the Insureds already had received the pain management procedures and anesthesia.

392.     For example:

(i)     On October 4, 2018, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Tri-State, and Ridgewood caused an Insured named TS to be referred from Tri-State to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to TS at Accelerated on October 3, 2018. Not only were the drug tests medically unnecessary because there was no indication that TS might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug tests were ordered on October 4, 2018 and by the time the results of the drug screens arrived on October 8, 2018 – TS already had received the interventional pain management and anesthesia services.

(ii)    On October 18, 2018, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Tri-State, and Ridgewood caused an Insured named DY to be referred from Tri-State to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to DY at Accelerated on October 17, 2018. Not only were the drug tests medically unnecessary because there was no indication that DY might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug tests were ordered on October 18, 2018 and by the time the results of the drug screens arrived on October 19, 2018 – DY already had received the interventional pain management and anesthesia services.

(iii)   On November 1, 2018, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Tri-State, and Ridgewood caused an Insured named BO to be referred from Tri-State to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to BO at Accelerated on October 31, 2018. Not only were the drug tests medically unnecessary because there was no indication that BO might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug screens were ordered on November 1, 2018 and by the time the results of the drug tests arrived on November 5, 2018 – BO already had received the interventional pain management and anesthesia services.

(iv)    On November 8, 2018, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Tri-State, and Ridgewood caused an Insured named JSB to be referred from Tri-State

to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to JSB at Accelerated on November 7, 2018. Not only were the drug tests medically unnecessary because there was no indication that JSB might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug screens were ordered on November 8, 2018 and by the time the results of the drug tests arrived on November 12, 2018 – JSB already had received the interventional pain management and anesthesia services.

(v)     On November 29, 2018, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Tri-State, and Ridgewood caused an Insured named OF to be referred from Tri-State to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to OF at Accelerated on November 28, 2018. Not only were the drug tests medically unnecessary because there was no indication that OF might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug tests were ordered on November 29, 2018 and by the time the results of the drug screens arrived on December 3, 2018 – OF already had received the interventional pain management and anesthesia services.

(vi)    On January 16, 2019, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Riverside, and Ridgewood caused an Insured named LM to be referred from Riverside to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to LM at Avicenna Surgery Center, 2522 Hughes Avenue, Bronx, New York ("Avicenna") on January 15, 2019. Not only were the drug tests medically unnecessary because there was no indication that LM might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug screens were ordered on January 16, 2019 and by the time the results of the drug tests arrived on January 17, 2019 – LM already had received the interventional pain management and anesthesia services.

(vii)   On January 31, 2019, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Riverside, and Ridgewood caused an Insured named RC to be referred from Riverside to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to RC at Accelerated on January 30, 2019. Not only were the drug tests medically unnecessary because there was no indication that RC might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug screens were ordered on January 31, 2019 and by the time the results of the drug tests arrived on February 4, 2019 – RC already had received the interventional pain management and anesthesia services.

(viii)   On February 22, 2019, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Riverside, and Ridgewood caused an Insured named MH to be referred from Riverside to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to MH at Accelerated on February 20, 2019. Not only were the drug tests medically unnecessary because there was no indication that MH might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug tests were ordered on February 22, 2019 and by the time the results of the drug tests arrived on February 25, 2019 – MH already had received the interventional pain management and anesthesia services.

(ix)   On March 14, 2019, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Riverside, and Ridgewood caused an Insured named RB to be referred from Riverside to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to RB at Accelerated on March 13, 2019. Not only were the drug tests medically unnecessary because there was no indication that RB might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug tests were ordered on March 14, 2019 and by the time the results of the drug screens arrived on March 18, 2019 – RB already had received the interventional pain management and anesthesia services.

(x)   On March 28, 2019, Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Riverside, and Ridgewood caused an Insured named ML to be referred from Riverside to Ridgewood for drug tests, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to ML at Accelerated on March 27, 2019. Not only were the drug tests medically unnecessary because there was no indication that ML might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the drug screens were ordered on March 28, 2019 and by the time the results of the drug tests arrived on March 29, 2019 – ML already had received the interventional pain management and anesthesia services.

393.   These are only representative examples. In the claims identified in Exhibits "2" - "5", Zaitsev, Nicola, Benevenga, Weissman, Sangavaram, Focazio, Ridgewood, Tri-State, Riverside, and Crosstown routinely caused Insureds to be unlawfully self-referred to Ridgewood for medically useless drug tests.

**E.** **The PC Defendants' Fraudulent Billing for Independent Contractor Services and for Unsupervised Physician Assistants and Nurse Practitioners**

394.    The Defendants' scheme also included submission of fraudulent claims to GEICO seeking payment for services performed by independent contractors, and for services performed by unsupervised physician assistants and nurse practitioners.

**1.** **The PC Defendants' Fraudulent Billing for Independent Contractor Services**

395.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

396.    Since 2001, the New York State Department of Financial Services consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor

rule to hospitals); <u>See</u> <u>DOI Opinion Letter</u>, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

397.    Zaitsev was the only healthcare services provider employed by Metropolitan.

398.    Zaitsev, Weissman, and Sangavaram were the only healthcare services providers employed by Tri-State and Riverside.

399.    Zaitsev and Focazio were the only healthcare services providers employed by Crosstown.

400.    Even so, Zaitsev, Weissman, Sangavaram, Focazio, the NP-PA Defendants, and the PC Defendants routinely submitted charges to GEICO and other insurers, on behalf of the PC Defendants, under New York automobile insurance policies, for Fraudulent Services that purportedly were performed by individuals – including the NP-PA Defendants – whom the PC Defendants treated as independent contractors.

401.    For instance, the PC Defendants:

(i)      paid these individuals, including the NP-PA Defendants, on a 1099 basis;

(ii)     established an understanding with these individuals, including the NP-PA Defendants, that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to these individuals;

(iv)     failed to secure and maintain W-4 or I-9 forms for these individuals;

(v)      failed to withhold federal, state or city taxes on behalf of these individuals;

(vi)     compelled these individuals to pay for their own malpractice insurance at their own expense;

(vii)    permitted these individuals to set their own schedules and days on which they desired to perform services;

(viii)   permitted these individuals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)     failed to cover these individuals for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that these individuals were independent contractors.

402.    By electing to treat these individuals – including the NP-PA Defendants – as independent contractors, the PC Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)     avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the chiropractors and unlicensed technicians.

403.    Because these individuals – including the NP-PA Defendants – were independent contractors and performed the Fraudulent Services, the PC Defendants never had any right to bill for or collect PIP Benefits in connection with those services.

404.    Zaitsev, Weissman, Sangavaram, Focazio, the NP-PA Defendants, and the PC Defendants billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement.

405.    Zaitsev, Weissman, Sangavaram, Focazio, the NP-PA Defendants, and the PC Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

2.     **The PC Defendants' Fraudulent Billing for Unsupervised Physician Assistants and Nurse Practitioners**

406.     Pursuant to Education Law § 6542(1), a physician assistant may perform medical services but only when under the supervision of a licensed physician. The physician's supervision must be "continuous" pursuant to Education Law § 6542(2).

407.     Pursuant to Education Law § 6902, a nurse practitioner may diagnose illness and physical conditions and perform therapeutic and corrective measures, but only if such services are performed (i) in collaboration with a licensed physician qualified to collaborate in the specialty involved; and (ii) in accordance with a written practice agreement and written practice protocols, which protocols must be filed with the Department of Education within 90 days of the commencement of the practice.

408.     Furthermore, pursuant to General Ground Rule No. 11 of the NY Fee Schedule, any treatment rendered by a physician assistant or nurse practitioner must be rendered under the supervision of a physician who must be present at least in the same office suite and be immediately available to provide assistance and direction throughout the time the physician assistant or nurse practitioner is performing the services.

409.     As set forth above, the NP-PA Defendants purported to perform many of the initial examinations and follow-up examinations on behalf of the PC Defendants. In most cases, the NP-PA Defendants purported to perform these examinations at the No-Fault Clinics, and the examinations were then billed through the PC Defendants to GEICO under New York no-fault insurance policies.

410.     However, the NP-PA Defendants were not supervised by any licensed physician or other healthcare professional when they purported to perform the examinations in the claims identified in Exhibits "1" – "4". To the contrary, there typically was not even a licensed physician

present at any of the No-Fault Clinics when the NP-PA Defendants would purport to perform examinations on behalf of the PC Defendants.

411.    In the claims identified in Exhibits "1" – "4", all of the PC Defendants' billing for examinations that the NP-PA Defendants purported to perform misrepresented that the underlying services were lawfully performed and were eligible for PIP reimbursement, when in fact they were not.

### G.    Crosstown's Illegal Corporate Structure

412.    As set forth above, Focazio falsely purported to be the sole owner of Crosstown, a New York medical professional corporation.

413.    As set forth above, New York law requires all of the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

414.    However, Focazio never actually practiced medicine through Crosstown.

415.    For example, none of the massive number of PIP charges submitted through Crosstown to GEICO was for services that Focazio actually performed. Though Focazio falsely purported to personally perform some of the services billed through Crosstown – such as the "outcome assessment tests" – in actuality he had no legitimate involvement in these services at all.

416.    Indeed, during an October 2019 examination under oath, Focazio lacked basic knowledge regarding Crosstown's operations.

417.    Because Focazio failed to practice medicine through Crosstown, Crosstown was not lawfully incorporated as a medical professional corporation, and all of the billing submitted

through Crosstown falsely represented that Crosstown was eligible to receive PIP reimbursement, when in fact it was not.

## IV. The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

418. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through the Entity Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

419. The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and

regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

## V.      The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

420.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

421.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

422.     Specifically, they knowingly misrepresented and concealed facts related to the Entity Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

423.     Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal that fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

424.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent predetermined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

425.     In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the individual healthcare providers associated with the PC Defendants, in order to prevent GEICO from discovering that the individual healthcare providers performing most of the Fraudulent Services – to the extent that they were performed at all – were not employed by the PC Defendants. In many cases, the Defendants actually misrepresented the

identity of the individual who purportedly performed the Fraudulent Services, in order to conceal the fact that the services were performed by independent contractors.

426.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

427.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

428.    For example, in accordance with the New York no-fault insurance laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending New York claims for PIP Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for PIP Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

429.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

430.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the

fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $4,500,000.00 based upon the fraudulent charges.

431.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the Entity Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

432.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

433.    There is an actual case and controversy between GEICO and the Entity Defendants regarding more than $35,000,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

434.    The Entity Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined protocols that serve to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds.

435.    The Entity Defendants have no right to receive payment from GEICO on the unpaid billing because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

436.    The Entity Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were provided – to the extent that they were

provided at all – pursuant to illegal kickback and self-referral arrangements amongst Defendants and others.

437.     The PC Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were provided – to the extent that they were provided at all – in material violation of New York State licensing laws and by unsupervised physician assistants and nurse practitioners, whom the PC Defendants treated as independent contractors.

438.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Entity Defendants have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Zaitsev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

439.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

440.     Metropolitan is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

441.     Zaitsev knowingly has conducted and/or participated, directly or indirectly, in the conduct of Metropolitan's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Metropolitan was not eligible to receive under the New York or New Jersey no-fault insurance law because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that

comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

442.   Metropolitan's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zaitsev operated Metropolitan, insofar as Metropolitan is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Metropolitan to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Zaitsev continues to attempt to collect on the fraudulent billing submitted through Metropolitan to the present day.

443.   Metropolitan is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Metropolitan in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

444.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,675,000.00 pursuant to the fraudulent bills submitted through Metropolitan.

445.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans,**
**Mathew, Santa Maria, and Weiss**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

446.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

447.    Metropolitan is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

448.    Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Metropolitan's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Metropolitan was not entitled to receive under the New York or New Jersey no-fault laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

449.    Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

450.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,675,000.00 pursuant to the fraudulent bills submitted through Metropolitan.

451.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss
### (Common Law Fraud)

452.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

453.    Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

454.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Metropolitan and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Metropolitan and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary, actually performed, and eligible for PIP reimbursement, when in fact they were not.

     (iii)    In every claim for services not performed by Zaitsev, the representation that the billed-for services were performed by Metropolitan employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

455.    Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Metropolitan that were not compensable under New York and New Jersey no-fault insurance laws.

456.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,675,000.00 pursuant to the fraudulent bills submitted by Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss through Metropolitan.

457.    Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

458.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov,**
**Ovincy, Evans, Mathew, Santa Maria, and Weiss**
**(Unjust Enrichment)**

459.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

460.    As set forth above, Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

461.    When GEICO paid the bills and charges submitted by or on behalf of Metropolitan for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss's improper, unlawful, and/or unjust acts.

462.    Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

463.    Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

464.    By reason of the above, Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,675,000.00.

**SIXTH CAUSE OF ACTION**
**Against Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov,**
**Ovincy, Evans, Mathew, Santa Maria, and Weiss**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

465.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

466.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Defendants Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss knowingly submitted or caused to be submitted NF-3 forms, HCFA–1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports uniformly misrepresented to GEICO that the Defendants were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

467.    Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss's systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,675,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## SEVENTH CAUSE OF ACTION
### Against Zaitsev, Weissman, and Sangavaram
### (Violation of RICO, 18 U.S.C. § 1962(c))

468.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

469.    Tri-State is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

470.    Zaitsev, Weissman, and Sangavaram knowingly have conducted and/or participated, directly or indirectly, in the conduct of Tri-State's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two year seeking payments that Tri-State was not eligible to receive under the New York and New Jersey no-fault insurance law because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

471.     Tri-State's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zaitsev, Weissman, and Sangavaram operated Tri-State, insofar as Tri-State is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Tri-State to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Tri-State to the present day.

472.     Tri-State is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tri-State in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

473.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,107,000.00 pursuant to the fraudulent bills submitted through Tri-State.

474.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

475.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

476.    Tri-State is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

477.    Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants, knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Tri-State's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Tri-State was not entitled to receive under the New York and New Jersey no-fault laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

478.    Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

150

479.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,107,000.00 pursuant to the fraudulent bills submitted through Tri-State.

480.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants
### (Common Law Fraud)

481.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

482.    Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

483.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)    In every claim, the representation that Tri-State and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Tri-State and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary, actually performed, and eligible for PIP reimbursement, when in fact they were not.

(iii)  In every claim for services not performed by Zaitsev, Weissman, or Sangavaram, the representation that the billed-for services were performed by Tri-State employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

484.  Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tri-State that were not compensable under New York and New Jersey no-fault insurance laws.

485.  GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $2,107,000.00 pursuant to the fraudulent bills submitted by Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants.

486.  Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

487.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA**
**Defendants**
**(Unjust Enrichment)**

488.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

489.    As set forth above, Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

490.    When GEICO paid the bills and charges submitted by or on behalf of Tri-State for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants improper, unlawful, and/or unjust acts.

491.    Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

492.    Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

493.    By reason of the above, Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $2, 107,000.00.

### ELEVENTH CAUSE OF ACTION
**Against Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

494.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

495.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Defendants Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants knowingly submitted or caused to be submitted NF-3 forms, HCFA–1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports uniformly misrepresented to GEICO that the Defendants were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

496.     Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,107,000.00, but is also entitled to: (i) treble damages; (ii)

the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### TWELFTH CAUSE OF ACTION
**Against Zaitsev and Focazio**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

497.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

498.     Crosstown is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

499.     Zaitsev and Focazio knowingly have conducted and/or participated, directly or indirectly, in the conduct of Crosstown's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Crosstown was not eligible to receive under the New York and New Jersey no-fault insurance laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

500.     Crosstown's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zaitsev and Focazio operated Crosstown, insofar as Crosstown is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order

for Crosstown to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Crosstown to the present day.

501.    Crosstown is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Crosstown in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

502.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $678,000.00 pursuant to the fraudulent bills submitted through Crosstown.

503.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Zaitsev, Focazio, and the NP-PA Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

504.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

505.    Crosstown is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

506.    Zaitsev, Focazio, and the NP-PA Defendants are employed by and/or associated with the Crosstown enterprise.

507.    Zaitsev, Focazio, and the NP-PA Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Crosstown's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Crosstown was not entitled to receive under the New York and New Jersey no-fault insurance laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

508.    Zaitsev, Focazio, and the NP-PA Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

509.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $678,000.00 pursuant to the fraudulent bills submitted through Crosstown.

510.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Crosstown, Zaitsev, Focazio, and the NP-PA Defendants
### (Common Law Fraud)

511.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

512.    Crosstown, Zaitsev, Focazio, and the NP-PA Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Crosstown seeking payment for the Fraudulent Services.

513.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)    In every claim, the representation that Crosstown and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Crosstown and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary, actually performed, and eligible for PIP reimbursement, when in fact they were not.

(iii)    In every claim for services not performed by Zaitsev or Focazio the representation that the billed-for services were performed by Crosstown employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

514.    Crosstown, Zaitsev, Focazio, and the NP-PA Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Crosstown that were not compensable under the New York and New Jersey no-fault insurance laws.

515.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $678,000.00 pursuant to the fraudulent bills submitted by the Defendants through Crosstown.

516.     Crosstown, Zaitsev, Focazio, and the NP-PA Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

517.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Crosstown, Zaitsev, Focazio, and the NP-PA Defendants**
**(Unjust Enrichment)**

518.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

519.     As set forth above, Crosstown, Zaitsev, Focazio, and the NP-PA Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

520.     When GEICO paid the bills and charges submitted by or on behalf of Crosstown for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Crosstown, Zaitsev, Focazio, and the NP-PA Defendants' improper, unlawful, and/or unjust acts.

521.     Crosstown, Zaitsev, Focazio, and the NP-PA Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Crosstown, Zaitsev,

Focazio, and the NP-PA Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

522.    Crosstown, Zaitsev, Focazio, and the NP-PA Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

523.    By reason of the above, Crosstown, Zaitsev, Focazio, and the NP-PA Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $678,000.00.

### SIXTEENTH CAUSE OF ACTION
**Against Crosstown, Zaitsev, Focazio, and the NP-PA Defendants**
**(Violation of New Jersey Insurance Fraud Prevention Act – (<u>N.J.S.A.</u>17:33A-1 <u>et</u> <u>seq</u>.))**

524.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

525.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "3", Defendants Crosstown, Zaitsev, Focazio, and the NP-PA Defendants knowingly submitted or caused to be submitted NF-3 forms, HCFA–1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

     (iii)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

     (iv)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports uniformly misrepresented to GEICO that the Defendants were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

526.     Crosstown, Zaitsev, Focazio, and the NP-PA Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $678,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### SEVENTEENTH CAUSE OF ACTION
**Against Zaitsev, Weissman, and Sangavaram**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

527.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

528.     Riverside is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

529.     Zaitsev, Weissman, and Sangavaram knowingly have conducted and/or participated, directly or indirectly, in the conduct of Riverside's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted

thousands of fraudulent charges on a continuous basis for one year seeking payments that Riverside was not eligible to receive under the New York and New Jersey no-fault insurance laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

530.    Riverside's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zaitsev, Weissman, and Sangavaram operated Riverside, insofar as Riverside is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Riverside to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Riverside to the present day.

531.    Riverside is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Riverside in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

532.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills submitted through Riverside.

533.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

534.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

535.     Riverside is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

536.     Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Riverside's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for one year seeking payments that Riverside was not entitled to receive under the New York and New Jersey no-fault insurance laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

537.     Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO

163

and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

538.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills submitted through Riverside.

539.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants
(Common Law Fraud)**

540.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

541.     Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Riverside seeking payment for the Fraudulent Services.

542.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In every claim, the representation that Riverside and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Riverside and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)     In many claims, the representation that the Fraudulent Services were medically necessary, actually performed, and eligible for PIP reimbursement, when in fact they were not.

(iii)     In every claim for services not performed by Zaitsev, Weissman, or Sangavaram, the representation that the billed-for services were performed by Riverside employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

543.     Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Riverside that were not compensable under the New York and New Jersey no-fault insurance laws.

544.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills submitted by the Defendants through Riverside.

545.     Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

546.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants**
**(Unjust Enrichment)**

547.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

548. As set forth above, Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

549. When GEICO paid the bills and charges submitted by or on behalf of Riverside for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants' improper, unlawful, and/or unjust acts.

550. Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

551. Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants, retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

552. By reason of the above, Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $223,000.00.

### TWENTY-FIRST CAUSE OF ACTION
**Against Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants
(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

553. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

554. In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "4", Defendants Riverside,

Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants knowingly submitted or caused to be submitted NF-3 forms, HCFA–1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii) The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii) The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv) The NF-3 forms, HCFA-1500 forms, bills, and treatment reports uniformly misrepresented to GEICO that the Defendants were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

555. Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $223,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## TWENTY-SECOND CAUSE OF ACTION
### Against Zaitsev, Benevenga, and Nicola
### (Violation of RICO, 18 U.S.C. § 1962(c))

556.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

557.   Ridgewood is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

558.   Zaitsev, Benevenga, and Nicola knowingly have conducted and/or participated, directly or indirectly, in the conduct of Ridgewood's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Ridgewood was not eligible to receive under the New York or New Jersey no-fault insurance law because of the fraudulent and unlawful conduct described herein. A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

559.   Ridgewood's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zaitsev, Benevenga, and Nicola operated Ridgewood, insofar as Ridgewood is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Ridgewood to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal

activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Ridgewood to the present day.

560.    Ridgewood is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Ridgewood in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

561.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,233,000.00 pursuant to the fraudulent bills submitted through Ridgewood.

562.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Zaitsev, Benevenga, Nicola, Riverside, Tri-State, Crosstown, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

563.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

564.    Ridgewood is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

565.    Zaitsev, Benevenga, Nicola, Riverside, Tri-State, Crosstown, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Ridgewood's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or

cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Ridgewood was not entitled to receive under the New York and New Jersey no-fault laws because of the fraudulent and unlawful conduct described herein. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

566.    Zaitsev, Benevenga, Nicola, Riverside, Tri-State, Crosstown, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

567.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,233,000.00 pursuant to the fraudulent bills submitted through Ridgewood.

568.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Ridgewood, Zaitsev, Benevenga, and Nicola,**
**(Common Law Fraud)**

569.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

570.    Ridgewood, Zaitsev, Benevenga, and Nicola intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

571.   The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Ridgewood and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Ridgewood and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

572.   Ridgewood, Zaitsev, Benevenga, and Nicola intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Ridgewood that were not compensable under New York and New Jersey no-fault insurance laws.

573.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,233,000.00 pursuant to the fraudulent bills submitted by Ridgewood, Zaitsev, Benevenga, and Nicola through Ridgewood.

574.   Ridgewood, Zaitsev, Benevenga, and Nicola's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

575.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIFTH CAUSE OF ACTION**
**Against Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants**
**(Aiding and Abetting Fraud)**

576.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

577.    Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ridgewood, Zaitsev, Benevenga, and Nicola through Ridgewood.

578.    The acts of Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants in furtherance of the fraudulent scheme included knowingly providing the unlawful referrals for the Fraudulent Services by Ridgewood, Zaitsev, Benevenga, and Nicola, and causing billing to be submitted to GEICO and other insurers for the Fraudulent Services, despite their actual knowledge that the Fraudulent Services were medically unnecessary, and part of the Defendants' unlawful referral scheme, and falsely diagnosing Insureds with continuing injuries in order to create a false basis for continued testing by Ridgewood, Zaitsev, Benevenga, and Nicola.

579.    The conduct of Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Ridgewood,

Zaitsev, Benevenga, and Nicola to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Ridgewood.

580.     Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ridgewood for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

581.     The conduct of Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants caused GEICO to pay more than $1,233,000.00 pursuant to the fraudulent bills submitted through Ridgewood.

## TWENTY-SIXTH CAUSE OF ACTION
**Against Ridgewood, Zaitsev, Benevenga, and Nicola**
**(Unjust Enrichment)**

582.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

583.     As set forth above, Ridgewood, Zaitsev, Benevenga, and Nicola have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

584.     When GEICO paid the bills and charges submitted by or on behalf of Ridgewood for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Ridgewood, Zaitsev, Benevenga, and Nicola's improper, unlawful, and/or unjust acts.

585.     Ridgewood, Zaitsev, Benevenga, and Nicola have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Ridgewood, Zaitsev, Benevenga, and Nicola voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

586.    Ridgewood, Zaitsev, Benevenga, and Nicola retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

587.    By reason of the above, Ridgewood, Zaitsev, Benevenga, and Nicola have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,233,000.00.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Ridgewood, Zaitsev, Benevenga, and Nicola
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))

588.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 431 above.

589.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "5", Ridgewood, Zaitsev, Benevenga, and Nicola knowingly submitted or caused to be submitted NF-3 forms, HCFA–1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)   The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

590.    Ridgewood, Zaitsev, Benevenga, and Nicola's systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

591.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,233,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## JURY DEMAND

592.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Entity Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Entity Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Zaitsev, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,675,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss, for compensatory

damages in favor of GEICO an amount to be determined at trial but in excess of $1,675,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,675,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss, for more than $1,675,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Metropolitan, Zaitsev, Weissman, Gorman, Negrea, Ciccone, Amanze, Isakov, Ovincy, Evans, Mathew, Santa Maria, and Weiss, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $1,675,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

G.      On the Seventh Cause of Action against Zaitsev, Weissman, and Sangavaram, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,107,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,107,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea and the NP-PA Defendants, for compensatory damages in an amount to be determined at trial but in excess of $2,107,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants, for more than $2,107,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Tri-State, Zaitsev, Weissman, Sangavaram, Gorman, Negrea, and the NP-PA Defendants, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $2,107,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

L.      On the Twelfth Cause of Action against Zaitsev and Focazio, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $678,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Zaitsev, Focazio, and the NP-PA Defendants, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $678,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Crosstown, Zaitsev, Focazio, and the NP-PA Defendants, for compensatory damages in an amount to be determined at trial but in excess of $678,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Crosstown, Zaitsev, Focazio, and the NP-PA Defendants, for more than $678,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Crosstown, Zaitsev, Focazio, and the NP-PA Defendants, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $678,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

Q.      On the Seventeenth Cause of Action against Zaitsev, Weissman, and Sangavaram, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $223,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants, for compensatory damages in favor of GEICO in an

amount to be determined at trial but in excess of $223,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants, for compensatory damages in an amount to be determined at trial but in excess of $223,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants, for more than $223,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Riverside, Zaitsev, Weissman, Sangavaram, Gorman, and the NP-PA Defendants, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $223,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

V.      On the Twenty-Second Cause of Action against Zaitsev, Benevenga, and Nicola, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,233,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Zaitsev, Benevenga, Nicola, Tri-State, Crosstown, Riverside, Weissman, Sangavaram, Focazio, Gorman, and the NP-PA Defendants, for compensatory damages in favor of GEICO in an amount to be determined at trial

but in excess of $1,233,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Ridgewood, Zaitsev, Benevenga, and Nicola, for compensatory damages in an amount to be determined at trial but in excess of $1,233,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Tri-State, Crosstown, Riverside, Focazio, Weissman, Sangavaram, Gorman, and the NP-PA Defendants, for compensatory damages in an amount to be determined at trial but in excess of $1,233,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Z.      On the Twenty-Sixth Cause of Action against Ridgewood, Zaitsev, Benevenga, and Nicola, for more than $1,233,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper; and

AA.     On the Twenty-Seventh Cause of Action against Ridgewood, Zaitsev, Benevenga, and Nicola, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $1,233,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7.

Dated:  August 3, 2020

RIVKIN RADLER LLP


By:___/s/ Barry I. Levy_____
       Barry I. Levy (BL 2190)
       Max S. Gershenoff
       Frank P. Tiscione
       Colleen O'Neil
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co, GEICO General Insurance Company and GEICO Casualty Co.*