**EXHIBIT "3"**

## AFFIRMATION OF ALLAN WEISSMAN, M.D.

STATE OF NEW JERSEY )
: ss.
COUNTY OF _____ )

Allan Weissman, M.D., hereby affirms, deposes and states that the following is true subject to the penalties of perjury:

1. I have personal knowledge of the statements that are made in this affirmation and would testify as to them in a court of law if called upon to do so.

2. I give this affirmation voluntarily and have had the opportunity to consult with my own personal counsel concerning its preparation and execution.

3. This affirmation summarizes my association with a New Jersey professional corporation known as Tri-State Multi-Specialty Medical Services, P.C. ("Tri-State") and a New York professional corporation known as Riverside Medical Services, P.C. ("Riverside"), as well as various other individuals and entities associated with these two entities. This affirmation is not intended to be an exhaustive account of my experiences.

4. I attended the Albert Einstein College of Medicine and graduated in 1990. In January 1995, following my completion of a residency, I was licensed to practice medicine in New York. In 1999, I also was licensed to practice medicine in New Jersey. From approximately 1998 through 2007, I practiced medicine in the state of New Jersey primarily through my own private practice, focusing on pain management.

5. In 2007, I started working at a pain management practice in New Jersey owned by Dr. Richard Lipsky ("Dr. Lipsky"), a physician whom I had come to know while practicing medicine in New Jersey. When I started working for Dr. Lipsky in 2007, I believe the name of Dr. Lipsky's pain management practice was Comprehensive Medicine Pain Management.

1

Thereafter, the name of Dr. Lipsky's pain management practice changed several times, and eventually it operated under the name Highland Medical Group, P.C. ("Highland"). Despite the name changes, Dr. Lipsky's pain management practice always remained substantially the same, and operated in substantially the same manner, throughout the entire period when I was associated with it.

6. During the period when I worked for Dr. Lipsky's pain management practice, a physician named Alexandr Zaitsev, M.D. ("Dr. Zaitsev") also worked for the pain management practice.

7. Highland, like Comprehensive Medicine Pain Management and the other professional entities through which Dr. Lipsky operated his pain management practice over the years – was a transient medical practice. When I worked for Dr. Lipsky's practice, Dr. Lipsky would send me around to multiple clinic locations in New Jersey where he had financial/lease arrangements. I then would provide examinations and pain management services to patients at the clinics as well as in Dr. Lipsky's offices. My duties also included providing the clinic patients with pain management injections and other pain management services under anesthesia at ambulatory surgery centers in New Jersey in which Dr. Lipsky had an ownership interest.

8. In 2012, Dr. Lipsky elected to stop practicing medicine and Dr. Zaitsev acquired Highland. Despite the change in ownership, I kept working for Highland, as did most, if not all, of Dr. Lipsky's employees, and my work at Highland remained substantially the same. While some additional clinic locations may have been added as the practice expanded, I continued to travel to many of the same clinics and surgery centers and continued to perform the same kinds of services and procedures at the clinics and surgery centers.

9. In 2013, Dr. Zaitsev incorporated Interstate Multi-Specialty Medical Group, P.C. ("Interstate"), and started to operate what had been the Lipsky/Highland pain management

2

practice under Interstate's name. As had been the case in the past when Dr. Lipsky changed the name of the practice, my work for the practice remained substantially the same, and the employees of Highland became employed by Interstate.

10. In early 2016, Dr. Zaitsev incorporated Metropolitan Interventional Medical Services, P.C. ("Metropolitan") in New York. My understanding at this time was that work performed in New York was to be billed through Metropolitan and work performed in New Jersey was to be billed through Interstate. However, the physicians (such as myself) and the other licensed professionals (physicians assistants, nurse practitioners, etc…) worked for both Interstate and Metropolitan once Metropolitan was created.

11. In August 2017, GEICO filed a federal racketeering civil lawsuit in the United States District Court for the District of New Jersey naming myself, Dr. Zaitsev, Interstate, and Highland, among others, as defendants.

12. In the complaint, Dr. Zaitsev was alleged, among other things, to have paid illegal kickbacks in exchange for patient referrals. In fact, the complaint alleged that in 2016, a New Jersey Chiropractor, Alexander Dimeo, pleaded guilty to several insurance fraud related crimes and as part of his plea allocution named Dr. Zaitsev as one of several practitioners who paid him kickbacks.

13. Sometime in early 2018, Dr. Zaitsev settled the lawsuit with GEICO and the case was dismissed. I was dismissed from the case as a result of Dr. Zaitsev's agreement to settle.

14. Shortly after the settlement, Dr. Zaitsev approached me about what he characterized as an "opportunity". Dr. Zaitsev told me that he was developing a new venture, Ridgewood Diagnostic Laboratory, LLC ("Ridgewood"), which he said was becoming lucrative. Dr. Zaitsev indicated that his ownership of Interstate and Metropolitan was not in his best interest because (i) of the impact from the GEICO lawsuit, (ii) Ridgewood was a better financial

3

opportunity and taking up too much of his time, and (iii) his ownership of Interstate and Metropolitan limited the ability of Ridgewood to receive referrals for laboratory services from the two practices. Dr. Zaitsev asked if I would be interested in taking over Interstate and Metropolitan. At the time, I was aware that New York and New Jersey had laws against self-referrals and that Dr. Zaitsev would not be permitted to make or cause referrals from Interstate and Metropolitan to Ridgewood if he continued to hold an ownership interest in all three entities. I expressed to Dr. Zaitsev that, while I was potentially interested in the opportunity, I was not comfortable with referrals from Interstate and Metropolitan to Ridgewood if I became the owner of Interstate and Metropolitan. I was particularly concerned about the propriety of any such referrals, considering that Dr. Zaitsev would have a significant ongoing financial interest in Interstate and Metropolitan after I became the owner based on the way he described how the change in ownership would take place. Dr. Zaitsev assured me that the professional entities would not engage in referrals to Ridgewood. He then arranged for me to meet with an individual by the name of Mark Kaminar, who is an accountant and business advisor and practices out of an office in Wayne, New Jersey. I knew Mr. Kaminar to be Dr. Zaitsev's accountant, but never had any substantial dealings with him prior to this point.

15. I met with Mr. Kaminar at his office in Wayne, New Jersey where Mr. Kaminar explained to me how the transaction would be structured:

> (i) two new professional corporations would be incorporated in my name, Tri-State in New Jersey and Riverside in New York;
>
> (ii) Tri-State and Riverside would take over all of the operations of Interstate and Metropolitan, including all leases at the clinic locations in New York and New Jersey, and would retain all of Interstate and Metropolitan's physicians, physician assistants, nurse practitioners, and office staff;
>
> (iii) a company known as Financial Vision would provide funding for Tri-State and Riverside;

4

  (iv) a company named Greenbills would be engaged to do the billing for Tri-State and Riverside; and

  (v) a law firm by the name of Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP ("Abrams Fensterman") would be retained by Tri-State and Riverside and would handle all of the collections on unpaid receivables.

16. At the time, I did not consult with an attorney and was told by Mr. Kaminar that I did not need an attorney. I trusted Dr. Zaitsev since we had been working side by side for years. I did not really think about it since I was not paying Dr. Zaitsev or anyone else any money in exchange for the practices, and was told that I would not have personal liability on any of the funding that was being provided by Financial Vision. It was well after the companies were operating that I learned that Dr. Zaitsev was in control of the funding company. Mr. Kaminar handled all of the legal and financial issues associated with establishing the professional entities and the various operational and financial relationships, including the funding agreements, which I understood were supposed to provide short term funding until the practices could cover their expenses. That never occurred and both practices quickly became heavily indebted for millions of dollars.

17. Generally, on Wednesdays, when I was performing procedures at ambulatory surgery centers in New Jersey, Mr. Kaminar, or one of his employees, would bring various documents to the ambulatory surgery centers for me to sign, including documents relating to the incorporation of Tri-State and Riverside, various lease agreements, the funding agreement with Financial Vision, and other documents that I do not recall. I did not review any of these documents closely, as they were often presented to me in the middle of the work day between cases at the ambulatory surgical center when I had very little time, and I relied on Mr. Kaminar's representations as to what the documents were and what they represented.

18. Tri-State was incorporated in New Jersey on April 13, 2018 and Riverside was incorporated in New York on August 9, 2018. Based on documents I have reviewed, during the time when I was listed as the owner of the professional entities, Tri-State never filed for authority to practice in New York as a medical professional corporation and Riverside was never incorporated in New Jersey as a medical professional corporation, despite the fact that both Tri-State and Riverside treated patients in both states and submitted bills to insurance companies for services performed in both states.

19. Although I am aware that I signed a funding agreement with Financial Vision – whereby Financial Vision was supposed to provide some kind of funding to Tri-State and Riverside – I was not aware of the specific terms when it was signed, and to this day I have never been made aware of the specific terms of that agreement. I also have never been given a copy of the funding agreement despite repeated requests made to both Mr. Kaminar and Abrams Fensterman for a copy.

20. I recently learned that one of the documents that Mr. Kaminar had me sign was a conflict waiver with Abrams Fensterman because either the law firm or some of the law firm's attorneys may have had a financial interest in Financial Vision. At the time when I signed the funding agreement with Financial Vision, I was not aware of a potential conflict with Abrams Fensterman and no one explained that potential conflict to me.

21. Though I still do not know all of the specific terms of the funding agreement, my general understanding at the time when I signed the funding agreement, based on representations made to me by Mr. Kaminar, was that for the first few months while Tri-State and Riverside were getting up and running, Financial Vision would advance money to Riverside and Tri-State to cover the professional corporations' operational expenses and that collections from all insurance billing would be retained by the funding company and/or Abrams Fensterman. It was

not my understanding that this funding arrangement would be a long-term obligation. What I have since realized was that the funding agreement was designed to ensure that Dr. Zaitsev and potentially others had financial control over the professional entities.

22. After Tri-State was formed, Mr. Kaminar took me to Chase Bank in Wayne, New Jersey (the bank chosen by Mr. Kaminar), in order to open an account for Tri-State. Mr. Kaminar was familiar with the bank officer with whom we dealt. At Mr. Kaminar's direction, I made him an authorized user on the account with signatory authority and gave him my passcode so that he could have computerized access to the account. Although I received monthly statements from the bank, I never signed a check, initiated a wire transfer, or deposited any monies into the Tri-State account.

23. After Riverside was formed, Mr. Kaminar and I once again went to Chase Bank in Wayne, New Jersey to meet with the same bank officer in order to open an account for Riverside. Again, at Mr. Kaminar's direction, I made him an authorized user on the account with signatory authority and gave him my passcode so that he could have computerized access to the account. Although I received monthly statements from the bank, I never signed a check, initiated a wire transfer, or deposited any monies into the Riverside account.

24. Mr. Kaminar also had me open a Chase Visa card for both Tri-State and Riverside. The credit cards were opened in my name with Mr. Kaminar added as an "account manager", thereby giving him complete access to the accounts. Although monthly statements for each of these cards were sent to me, I did not actively use either card nor did I have responsibility for paying the monthly balances. That was handled by Mr. Kaminar.

25. Dr. Zaitsev introduced me to the Abrams Fensterman law firm and I do recall meeting Mr. Thomas Alfano, in passing. Mr. Kaminar provided me with retainer agreements with Abrams Fensterman for Tri-State and Riverside's collections. I did not read the retainer

agreement before I signed it. It was simply presented to me for signature and no attorney associated with Abrams Fensterman or Mr. Kaminar explained the retainer agreement to me. The only time I recall going to Abrams Fensterman was when I was to be prepared for an EUO.

26. Once Tri-State and Riverside were operational, my duties remained essentially the same as they had been at Interstate and Metropolitan, as did my compensation. Although I was listed as the owner of Tri-State and Riverside, in practice I continued to work for Dr. Zaitsev because he and Mr. Kaminar controlled all of the financial and operational decision-making with respect to Tri-State and Riverside. For example, I did not hire, fire, or set the salary of any of the professional or non-professional staff at Tri-State and Riverside, most of whom had been my co-workers at Interstate and Metropolitan. Although I received monthly statements from Chase bank, those statements only reflected money deposited into the accounts by Financial Vision and the payment of salaries and other operational expenses.

27. I had no knowledge as to the actual finances of Tri-State and Riverside. For example, I was not aware of (i) where the money came from to fund the ongoing operations of the professional entities and if the source of the funds was limited to Financial Vision or involved other sources, (ii) the amount of monthly billings and collections of the professional entities, or (iii) the expenses associated with the ongoing operations of the professional entities. In addition, I never saw the general ledgers (including account receivable or account payable ledgers) or any of the other books and records for either company and do not believe that I signed any federal or state tax returns for either of the professional entities. Initially, I also had no knowledge as to the amount of money Tri-State and Riverside were obligated to pay pursuant to their lease agreements, or whether the amounts were fair market value. I asked Mr. Kaminar and Dr. Zaitsev repeatedly for the books and records of the two companies but was never given access to them.

28. The first time I was even aware of the amount of rent or the lease locations from which Tristate and Riverside were operating was in preparation for an examination under oath of Tri-State. I was scheduled to testify in that proceeding (represented by Abrams Fensterman) and Mr. Kaminar provided me a "cheat sheet" that listed Tri-State's leases in the New York metropolitan area, including the location, amount of rent, and name of landlord. According to that list, among other rents, Tri-State paid at least $16,600.00 per month in rent at four addresses to a person named Lyubov Gatilova. Only recently have I learned that Lyubov Gatilova is Dr. Zaitsev's mother-in-law.

29. The only difference between Interstate and Metropolitan and Tri-State and Riverside was the use of Financial Vision as a funding company and the removal of Dr. Zaitsev from the paperwork relating to the ownership and operation of the companies. For all intents and purposes, Dr. Zaitsev controlled all material aspects of Tri-State and Riverside in the same manner as he had owned and controlled Interstate and Metropolitan. The way in which the operation of Tristate and Riverside were structured by Dr. Zaitsev and Mr. Kaminar allowed Dr. Zaitsev to do this because: (i) he controlled all of the billing and receivables, (ii) he controlled the leases and their terms, (iii) he selected all of the professionals relating to the professional entities, and (iv) he controlled how much money was to be placed into the professional entities' bank accounts and the expenses to be paid out of the accounts.

30. The reason for Dr. Zaitsev's need to control the operations of the professional entities became more obvious shortly after we began practicing under the Tristate and Riverside names. Though I had made clear to Dr. Zaitsev my objection to referrals for laboratory services going from Tri-State and Riverside to Ridgewood and was assured by him that it would not happen, I later realized that the referrals began a month or so after the companies began to operate. I also learned that, by the time that Tri-State and Riverside were operating for several

9

months, approximately 85%-90% of Tri-State and Riverside's lab referrals were being sent to Ridgewood as a result of Dr. Zaitsev's direction to the physician assistants and nurse practitioners at Tri-State and Riverside.

31. I also realized that the referrals being made from Tri-State and Riverside to Ridgewood for drug testing were pursuant to a protocol directed by Dr. Zaitsev unrelated to the medical necessity of the drug testing. There are generally two reasons that a pain management patient would require drug testing: (i) if the patient was being prescribed narcotics; or (ii) if the patient was undergoing a procedure under anesthesia and there were concerns about a potential negative interaction between unknown drugs and anesthesia. Dr. Gorman and I (the pain management physicians for Riverside and Tri-State) typically prescribed narcotics to a small percentage of our patients, and we generally employed point of service urine testing at the ambulatory surgical centers that provided results prior to performing the procedures. The protocols that Dr. Zaitsev employed had Riverside and Tri-State submit referrals for presumptive and definitive drug testing prior to virtually every procedure that was performed under anesthesia, regardless of whether (i) the patient had a simple pre-operative urinalysis performed (which was billed by Tristate and/or Riverside); (ii) there was any concern about a negative interaction, or (iii) a patient was undergoing a course of procedures spaced out over the course of several weeks and each of the prior drug tests had already come back negative. In connection with the preparation of this affirmation, I requested to be provided with a representative sample of tests that were submitted by Ridgewood to GEICO and received several examples in response. Although my name was identified as the prescribing/referring physician on the claims, I did not sign any of the requests for tests and therefore they were submitted without either my knowledge or consent. This confirmed my view about the unjustified nature of the referral protocols directed by Dr. Zaitsev. Any referral that lacks my personal signature is

similarly unjustified. When I felt certain tests were appropriate for my patients, I always signed the request for tests to be performed. Moreover, although Riverside and Tri-State submitted a referral to Ridgewood for a drug test prior to a procedure performed under anesthesia, my review of the reports indicates that the samples were often not tested and the results were not communicated until several days after the procedures were performed. For those claims I did not sign, I cannot justify the reason for such testing. Finally, I have recently learned that the billing for the drug tests consisted of as many as twenty or more separate codes for each lab test. These facts also confirm the conclusion that the referral and testing protocols employed by Dr. Zaitsev were improper as my understanding is that charges for these tests are not to be unbundled.

32. In addition, Dr. Zaitsev dictated the ambulatory surgical centers where Tri-State and Riverside would perform the vast majority of pain management procedures in order to ensure they were done at Accelerated Surgical Center and Barnert Surgical Center, in which he had ownership interests.

33. During my time at Tri-State and Riverside, in addition to consultations and pain management procedures, other services such as electrodiagnostic testing and physical performance tests were billed to insurance companies through the professional entities. These services, however, were not performed by the employees of Tri-State and Riverside. Rather, outside companies were brought in to perform the services and they were paid, I believe, on a per diem basis by Mr. Kaminar. I had no involvement in setting up any arrangements with the outside companies or in paying those outside companies. I do recall, when preparing for an examination under oath with an attorney by the name of Jordan Fensterman, that Mr. Fensterman told me that the outside companies who performed the diagnostic testing "had to be employees" and that "they were employees" and that that was how I needed to testify during the examination under oath. Because I did not handle the billing, I was not aware of what representations were

11

being made to insurance companies in regard to the diagnostic testing. To the extent that the billing indicated that the tests were performed by employees of the professional entities, I do not have any direct knowledge as to whether those people were employed by either Tristate or Riverside.

34. After several months of Tri-State and Riverside being operational, I was not comfortable with the way things were progressing. Among other things, I was concerned about: (i) Financial Vision and Abrams Fensterman still collecting all of Tri-State and Riverside's receivables when I had been told that would only be the case for a few months; (ii) the unwillingness of Mr. Kaminar or Dr. Zaitsev to give me access to the books and records of the companies; (iii) the volume of referrals flowing from Tri-State and Riverside to Ridgewood despite the fact that I had been told that those referrals would not be made; and (iv) being required to sign patient charts without seeing the corresponding bills to insurance companies.

35. In early 2019, I consulted with an attorney by the name of Bonnie Weir, Esq., who had represented me in the GEICO litigation. Ms. Weir reviewed the bank account statements for Riverside and Tri-State and was considering engaging a forensic accountant because of concerns she had. Ms. Weir also requested both Mr. Kaminar and Abrams Fensterman to provide her with copies of the books and records for the companies. The books and records were never turned over and it appeared from the bank statements that the arrangements established by Mr. Kaminar were simply designed to provide a minimum amount of revenue to run the medical practices and siphon off the rest of the profits for the benefit of others.

36. Based on my conversations with my counsel, I told Dr. Zaitsev that I was no longer interested in being listed as the owner of Tri-State and Riverside and that he needed to find someone else to take over ownership of the professional entities. Dr. Zaitsev told me that he

12

would look for someone else to take over my role, and about a month thereafter, Mr. Kaminar identified a "purchaser" by the name of Kristappa Sangavaram, M.D. ("Dr. Sangavaram"), a physician whom I did not know. Ms. Weir drafted the transaction documents which included an agreement for Dr. Sangavaram to take ownership of the shares of the professional entity and an indemnification and hold harmless from Dr. Zaitsev because of the potential liability arising from the transaction and what had transpired during the time in which I was listed as the owner of the professional entities. Dr. Sangavaram and Dr. Zaitsev did not initially sign the agreement but did so only after Ms. Weir told them that she was going to have me place the professional entities into bankruptcy if they did not. In connection with the transfer of ownership, there was no due diligence performed and I received no money from anyone. In fact, shortly after the transfer, Mr. Kaminar stopped making payments on Tri-State and Riverside's Chase Visa credit cards, despite there being large balances on both cards, and he did not pay me my compensation for the last 3 weeks that I worked.

37. Because the credit card company demanded payment from me for the balance on the cards, I went back and reviewed the statements. What I found was troubling. Between November 29, 2018 and June 17, 2019, the Tri-State Visa card had been charged for fifty $500.00 payments totaling $25,000.00 to the same unidentified Google Pay account. What is more, over $16,000.00 of those charges were made in the month and a half between when I left the practice and when the account was closed.

38. Though I was not aware of the billings to insurers from Riverside and Tri-State while I was identified as the owner of the professional entities, I have recently learned through discussions with various insurance companies that Tri-State and Riverside billed automobile insurers many millions of dollars during the time I was listed as the owner of the professional entities. For example, it is my understanding that between May 2018 and March 2019, Tri-State

billed GEICO more than $7,000,000, and that a large percentage of the payments made by GEICO have been deposited by Abrams Fensterman into their IOLA account.

39. Finally, I have no knowledge as to whether Tri-State or Riverside has ever filed a state or federal income tax return. I never signed one. In January of this year, I did receive notification from the State of New Jersey, Department of the Treasury, Division of Taxation that Tri-State had a $77,709.86 balance due reflecting deficient employer withholding of gross income tax. I immediately forwarded this notice to Mr. Kaminar

40. In September of 2020, Dr. Zaitsev reached out to me to offer that he would cover my legal expenses in this case, but only if I signed on to use the attorney that he was going to select. I declined his offer in part because our interests are clearly not aligned and because he already agreed (by agreement) to pay my counsel fees in connection with the defense of any claim, including this proceeding, which to date he has failed to do.

Allan Weissman, M.D.

Affirmed before me this
9 day of December, 2020.

Notary Public



NATIVIDAD URENA
NOTARY PUBLIC OF NEW JERSEY
COMM. # 50069576
MY COMMISSION EXPIRES 10/06/2022

14