

WWW.RIVKINRADLER.COM

926 RXR Plaza
Uniondale, NY 11556-0926
T 516.357.3000 F 516.357.3333

STEVEN T. HENESY
Partner
(516) 357-3308
Steven.henesy@rivkin.com

December 9, 2021

**VIA ECF**

Honorable Sanket J. Bulsara
United States Magistrate-Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *Government Employees Insurance Company, et al. v. Zaitsev, M.D. et al.*
Docket No. 20-cv-03495-FB-SJB

Dear Judge Bulsara:

We write on behalf of Plaintiffs in the above-referenced matter. Pursuant to Local Rule 37.3(c) and Section IV.B of Your Honor's Individual Practices, Plaintiffs respectfully submit this letter requesting an Order compelling non-parties Howard Fensterman, Esq., Jordan Fensterman, Esq., and Frank Carone, Esq. (collectively the "Non-Parties") to comply with subpoenas *duces tecum*.[1]

## BACKGROUND

As discussed below, the Non-Parties are, through holding companies, members of four separate accounts receivable advance – or "funding" – companies. Plaintiffs allege – and have obtained significant evidence demonstrating – that these funding companies were used by Defendant Alexandr Zaitsev, M.D. ("Zaitsev") – who was also a member of each funding company – to enter into lending agreements to facilitate and secrete Zaitsev's ownership of and control over Defendants Tri-State Multi-Specialty Medical Services, P.C. ("Tri-State") and Riverside Medical Services, P.C. ("Riverside")(collectively the "Provider Defendants"). Although each of the Non-Parties is an attorney – and although the Non-Parties seek to avoid compliance with the subject subpoenas *via* a blanket and conclusory assertion of the attorney-client privilege – Plaintiffs seek only those materials related to their business relationships with and the operations of the funding companies and Zaitsev, not legal advice.

In particular, at issue are three subpoenas seeking production of communications between and among the Non-Parties and/or between the Non-Parties and Zaitsev and/or an individual named Daniel Kandhorov ("Kandhorov")[2] regarding: (i) the Non-Parties' membership in three companies, namely FHJ Vision Partners L.L.C. ("FHJ Vision"), FBH Capital Group, L.L.C. ("FBH Capital"), and/or DMC Capital Group, L.L.C. ("DMC Capital")(collectively the "Holding Companies"); (ii) the Holding Companies' membership in four funding companies, namely Financial Vision Group, L.L.C. ("Financial Vision"), Financial Vision

---

[1] Copies of the subject subpoenas and corresponding affidavits of service are annexed hereto as Exhibit "1".
[2] As discussed *infra*, Kandharov is a member in the funding companies at issue in this case.

66 South Pearl Street, 11th Floor     25 Main Street                    477 Madison Avenue           2649 South Road
Albany, NY 12207-1533                 Court Plaza North, Suite 501      New York, NY 10022-5843       Poughkeepsie, NY 12601-6843
T 518.462.3000 F 518.462.4199         Hackensack, NJ 07601-7082         T 212.455.9555 F 212.687.9044 T 845.473.8100 F 845.473.8777
                                      T 201.287.2460 F 201.489.0495

Group II, L.L.C. d/b/a ADF Equities ("Financial Vision II"), Financial Vision Group III, L.L.C. ("Financial Vision III"), and Financial Vision Group IV, L.L.C. ("Financial Vision IV")(collectively the "Financial Vision Entities"); (iii) the operation and management of the Financial Vision Entities and/or the Holding Companies; (iv) any payments exchanged between the Non-Parties and the Financial Vision Entities, the Holding Companies, and/or Defendants Ridgewood Diagnostic Laboratory, L.L.C. ("Ridgewood"), Tri-State, Riverside, Kristappa Sangavaram, M.D., Zaitsev, and/or a former defendant in this case, Allan Weissman, M.D. (collectively the "Subject Medical Providers"); (v) any payments exchanged between the Financial Vision Entities and the Subject Medical Providers, Kandhorov, and/or Zaitsev; and/or (vi) any agreements between the Financial Vision Entities and the Subject Medical Providers.[3]

Pursuant to an agreement reached by counsel for the Non-Parties and Plaintiffs' counsel, the Non-Parties produced a privilege log identifying all identified communications responsive to the subject subpoena.[4] However, the Non-Parties have refused to produce any of these communications, and instead assert that all of them are privileged attorney-client communications and, apparently in the alternative, that these communications are not relevant to the claims and defenses in this case.

On November 17, 2021, the undersigned again conferred with counsel for the Non-Parties, this time regarding the assertion of privilege as to all responsive documents. In an effort to avoid the need for motion practice, Plaintiffs proposed that the responsive documents be submitted to Your Honor together with a joint request that the Court conduct an in-camera review of the communications to assess the efficacy of the Non-Parties' privilege assertions. The Non-Parties refused, and instead persisted in their assertion that every single one of the emails identified in their privilege log was a protected attorney-client communication. This simply cannot be so.

## ARGUMENT

### I.    The Subpoenaed Communications Are Highly Relevant to This Case

This case stems from the Defendants' alleged fraudulent scheme, whereby the Defendants defrauded Plaintiffs out of millions in no-fault insurance payments. Relevant to this motion, the Complaint alleges (i) the Defendants submitted massive amounts of charges to GEICO for medically unnecessary drug testing (see Docket No. 1 at ¶¶ 369-377); (ii) in many cases, the drug testing was the product of unlawful self-referrals from the Provider Defendants to Ridgewood – three entities owned and controlled by Zaitsev (id. at ¶¶ 378-393); (iii) to disguise the unlawful self-referrals, Zaitsev arranged for the straw "ownership" of the Provider Defendants (id.); and (iv) Zaitsev used Financial Vision as a vehicle to steer Tri-State's accounts receivable to Zaitsev (id.).[5]

---

[3] The subject subpoenas originally sought production of two additional categories of documents: (i) IRS Schedule K1s issued to the Non-Parties by the Holding Companies; and (ii) the Holding Companies' operating agreements. The Non-Party agreed to produce the operating agreements and, in exchange, Plaintiffs agreed to forego production of the schedule K1s.

[4] A copy of the Non-Parties' privilege log is attached hereto as Exhibit "2".

[5] As previously reported to the Court in Plaintiffs' February 10, 2021 motion to compel, Weissman – the purported owner of the Provider Defendants up until mid-2019 – has attested to facts describing Zaitsev's use of Financial Vision as a means to secretly retain ownership control of the Provider Defendants. In particular, in his December 20, 2020 affirmation, Weissman describes being told by Kaminar, at Zaitsev's direction, that under Weissman's straw "ownership", the Provider Defendants would receive funding from Financial Vision. Weissman goes on to describe how, after the Provider Defendants were up and running, he learned that, as collateralization of the funding received

2

Additionally, during discovery, Plaintiffs uncovered additional facts tending to corroborate the allegations set forth in the Complaint – in particular, that Zaitsev used the Financial Vision Entities as a means of maintaining ownership and control over the Provider Defendants after he supposedly divested himself of his interest in those entities. For example:

- The agreements between the Financial Vision Entities and the Provider Defendants contain onerous terms designed to funnel all profits from healthcare providers. For instance: (i) Financial Vision agreed to fund up to $2,600,000 to Tri-State; (ii) in order for Tri-State to receive funding, it was required to post its accounts receivable as collateral; and (iii) in the event that Tri-State received insurance reimbursement on collateralized insurance claims, it was required to pay back not only the principle "funded" amount it received from Financial Vision, but an additional 150% of that amount as a "receivable fee". In other words, if Tri-State received $100 in funding from Financial Vision, it would need to post $100 in insurance claims as collateral and, if those claims were paid by an insurer, Tri-State would not only need to pay the $100 back to Financial Vision, but also pay Financial Vision another $150.[6]

- Review of the Financial Vision Entities' bank records revealed, among other things: (i) routine transfers of large amounts of money into the Financial Vision Entities' bank accounts from accounts held in the name of the Non-Parties' law firm; (ii) routine transfers of large amounts of money between and among the different Financial Vision Entities; (iii) routine transfers of large amounts of money between the Financial Vision Entities' accounts and other accounts held in Zaitsev's name; and (iv) several transfers of large amounts of money from Financial Vision's account to accounts held by companies belonging to Zaitsev's 74 year-old mother-in-law, Lyubov Gatilova ("Gatilova").[7]

- However, Gatilova's sworn testimony[8] indicated that she has no knowledge of, or involvement in, any of the companies incorporated in her name - the companies were set up by and for Zaitsev.[9] In fact, during his deposition, Zaitsev admitted that, although Gatilova was listed as the "president" of a series of entities, it was Zaitsev who actually controlled those entities. In fact, Zaitsev testified that he had installed Gatilova as means of "protect[ing]" himself, but that he was the true owner of entities such as 2598 3rd Avenue, Inc. and 19413 Northern Boulevard, Inc. Each of these entities received tens of thousands of dollars from accounts held by the Financial Vision Entities.

- According to Kandhorov's sworn testimony on behalf of the Financial Vision Entities, Zaitsev needed to obtain permission from Financial Vision's membership (including Kandhorov and the Non-Parties) before Zaitsev could transfer money from Financial Vision's account into an account held in the name of his mother-in-law. Even so, when presented with evidence of a June

---

from Financial Vision, "collections from all [of the Provider Defendants'] insurance billing would be retained by [Financial Vision]." See Docket No. 90, Exhibit "3" at ¶¶ 14-15, 21.

[6] See Revolving Advance and Security Agreement, attached hereto as Exhibit "3" at § 2.03(a).

[7] See sample bank statements attached hereto as Exhibit "4".

[8] See the deposition transcript of Lyubov Gatilova, dated October 27, 2021, attached hereto as Exhibit "5" at 11:23-25; 12:2-25; 13:2-25; 14:2-20.

[9] See sample corporate filings for Gatilova-owned entities, attached hereto as Exhibit "6".

3

- 18, 2018 $10,000 transfer from Financial Vision's account to an account held by 2598 3rd Ave – a Zaitsev-controlled "Gatilova company"– Kandhorov was surprised and testified that Zaitsev never sought permission from him for the transfer.[10]

- More generally, Kandhorov – who was designated as the Financial Vision Entities' corporate representative – could not answer basic questions concerning the movement of money from accounts held by the Financial Vision Entities to accounts held or controlled by Zaitsev, Zaitsev's companies, or Zaitsev's 74 year-old mother-in-law.

- Membership in each of the Financial Vision Entities is as follows:[11]

  | Financial Vision Entity | Members |
  | --- | --- |
  | Financial Vision Group, LLC | Zaitsev, Kandhorov, FHJ Vision, and FBH Capital Group, LLC |
  | Financial Vision Group II, LLC | Zaitsev, Kandhorov, FHJ Vision, and FBH Capital Group, LLC |
  | Financial Vision Group III, LLC | Zaitsev, Kandhorov, FHJ Vision, and FBH Capital Group, LLC |
  | Financial Vision Group IV, LLC | Zaitsev, Kandhorov, DMC Capital Group, LLC, and FBH Capital Group, LLC |

- The Non-Parties are members and the managers of both FHJ Vision[12] and DMC Capital,[13] the holding companies serving as members of the Financial Vision Entities.

The subpoenaed communications are therefore manifestly relevant to this action. In this context, it is important to emphasize that Plaintiffs do not, through this application, accuse the Non-Parties of misconduct. Nor would it be Plaintiffs' burden on this motion to do so. See, e.g., Gov't Emps. Ins. Co. v. Mayzenberg, No. 17 CV 2802 (ILG)(LB), 2018 WL 10517074, at *3 (E.D.N.Y. June 29, 2018) (denying a nonparty motion to quash a Rule 45 subpoena, and noting that "it is not plaintiffs' burden to prove that the non-parties actually engaged in the alleged misconduct. …Plaintiffs only need to show that there is a nexus between the information they seek and the claims in this action.").

**II.   The Subpoenaed Communications Are Not Privileged**

Given the significant evidence already identified through discovery, it is clear that the funding companies provided funding to the Provider Defendants and that accounts receivable from those practices were used both to collateralize the advances provided by the funding companies, as well as to pay crippling fees for each advance.

Significantly, information obtained during discovery has revealed that the Non-Parties, each in their individual capacity, are members of FHJ Vision and DMC Capital and that through FHJ Vision and DMC

---

[10] See select portions of the deposition transcript of Daniel Kandhorov, dated October 20, 2021, attached hereto as Exhibit "7" at 148: 8-25; 149: 5-25; 150: 2-21.

[11] See operating agreements of Financial Vision I-IV, attached hereto as Exhibit "8".

[12] See Alexandr Zaitsev, M.D.'s Supplemental Responses to GEICO's Second Set of Interrogatories at pg. 4, attached hereto as Exhibit "9".

[13] See Operating Agreement of DMC Capital Group, LLC at pg. 23, attached hereto as Exhibit "10".

Capital, the Non-Parties possess ownership interests (along with Zaitsev and Kandhorov, among others) in each of the Financial Vision Entities. Accordingly, the subject subpoenas are narrowly tailored to seek communications from the Non-Parties pertaining strictly to their roles as Zaitsev's business partners in the Financial Vision Entities, and not pertaining to any role they played as attorneys. Such communications are not privileged. See, e.g., Matter of Bekins Record Storage Co., Inc., 62 N.Y.2d 324, 329 (1984)(recognizing that attorney-client privilege does not apply to communications relating to "business or personal advice" from an attorney).

Indeed, the Non-Parties' own privilege log indicates that the communications in question related to the business operations of the Financial Vision Entities, not legal advice. For instance, the Non-Parties categorize many of the communications as relating to "advanced monies", "business operation", "ownership interests", "fund advancement", "loans", and "claims intake", "funds", "financial reports", and "cash flow". These are precisely the sorts of communications that have routinely been held to fall outside the scope of the attorney-client privilege. See, e.g., Cuno, Inc. v. Pall Corp., 121 F.R.D. 198, 204 (E.D.N.Y. 1988) ("The attorney-client privilege does not protect nonlegal communications based on business advice given by a lawyer….Where a lawyer mixes legal and business advice the communication is not privileged unless the communication is designed to meet problems which can fairly be characterized as predominantly legal".)(internal citations and quotations omitted).

Moreover, even assuming the communications at issue were privileged, the Non-Parties' privilege log indicates that many of these communications were made both to Zaitsev and various third parties (including nonparty Mark Kaminar, who testified in a deposition in this action that neither he nor his company are represented by the Non-Parties' law firm), thereby defeating any potential claim of privilege. See, e.g., Ambac Assur. Corp. v. Countrywide Home Loans, Inc., 27 N.Y.3d 616, 624, 57 N.E.3d 30, 35 (2016) ("Generally, communications made in the presence of third parties, whose presence is known to the [client], are not privileged from disclosure because they are not deemed confidential.")(internal quotation omitted).

At bottom, in their Complaint, Plaintiffs explicitly allege that Zaitsev used the Financial Vision Entities as a means of facilitating and concealing his ownership of Tri-State and Riverside. These allegations have been borne out through discovery. And discovery has revealed the individuals and entities – including the Non-Parties – who were involved in the operation of the Financial Vision Entities. Communications between and among the Non-Parties and Zaitsev are highly relevant to the claims in this action, and Plaintiffs respectfully request that the Court compel the Non-Parties to comply with the subject subpoenas. In the alternative, as offered to the Non-Parties in advance of tis motion, Plaintiffs would consent to submission of the subpoenaed communications to the Court for in-camera review.

We appreciate the Court's time and continued attention to this matter.

                                              Respectfully submitted,

                                              RIVKIN RADLER LLP

                                              /s/ *Steven T. Henesy*
                                              Steven T. Henesy

Encl.
cc:      All counsel *via* ECF