**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**FINANCIAL VISION GROUP LLC**

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of FINANCIAL VISION GROUP LLC (the "Company") is made and entered into as of the 14th day of May, 2018, by and among the Persons who have executed the signature page(s) hereof as Members and the Persons who from time to time hereafter execute a Joinder Agreement in the form attached hereto as Exhibit A.

**WHEREAS**, the parties have formed a limited liability company (together with any successor limited liability company, the "Company") under the Delaware Limited Liability Company Act (the "Act") and upon the terms and conditions of this Agreement; and

**WHEREAS**, the Members wish to set forth their agreement as to how the business and affairs of the Company shall be managed and their rights and obligations with respect to the Company.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this Agreement, the parties hereby agree as follows:

**1.   ORGANIZATION.**

**1.1   Formation**. The Company was organized on April 6, 2018, in accordance with and pursuant to the Act.

**1.2   Name**. The name of the Company shall be "FINANCIAL VISION GROUP LLC" or such other name as the Members shall from time to time determine.

**1.3   Principal Office**. The principal office of the Company shall be located at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey 07470 or at such other place as may be designated by the Members. The Members may provide additional offices for the Company within or outside of the State of Delaware if the same are deemed advisable for the conduct of the Company's business.

**1.4   Filings**.

(a)   The Certificate of Formation of the Company (the "Certificate") was filed with the Secretary of State of the State of Delaware on April 6, 2018; and the Managers shall execute such further documents and take such further action as shall be necessary or appropriate to comply with the requirements of law for the formation and operation of a limited liability company pursuant to the Act.

(b)   The Managers are authorized to execute, file and/or publish, or cause to be filed and/or published, with the proper authorities in each jurisdiction (or subdivision thereof) where the Company conducts business, such certificates or documents in connection with the conduct of business as may be required by applicable law.

(c)   The Members, from time to time, shall execute, acknowledge, verify, file,

1

record and/or publish, or cause to be executed, acknowledged, verified, filed, recorded and/or published, all such applications, certificates and other documents, and do or cause to be done all such other acts, as the Managers may deem necessary or appropriate to comply with the requirements of law for the formation, qualification and operation of the Company as a limited liability company in all jurisdictions in which the Company shall desire to conduct business.

      **1.5**    **Purpose**. The purpose of the Company is to conduct any lawful business or activity whatsoever as permitted by applicable law and as determined from time to time by the Managers. The Company may exercise all powers necessary to or reasonably connected with the Company's business from time to time, and may engage in all activities necessary, customary, related or incidental to any of the foregoing.

      **1.6**    **Term**. The term of the Company shall commence as of the date hereof and shall be of unlimited duration, unless the Company is earlier dissolved in accordance herewith and with the Act.

      **1.7**    **Names and Addresses of Members.**  The name, address, Capital Contribution, number of Units, and Percentage Interest of each of the Members of the Company are set forth on <u>Schedule A</u> annexed hereto.  If necessary, <u>Schedule A</u> shall be amended by the Managers from time to time to reflect any changes to the information set forth thereon.

## 2.    DEFINITIONS AND INTERPRETATION

      **2.1**    Definitions.  In addition to terms otherwise defined herein, the following terms shall have the following meanings:

      "<u>Accountants</u>" shall have the meaning set forth in <u>Section 7.4(b)</u> of this Agreement.

      "<u>Act</u>" shall have the meaning set forth in the Recitals.

      "<u>Adjusted Capital Account</u>" shall mean, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i)   Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and (ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations. The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

      "<u>Affiliate</u>" or "<u>Affiliated</u>" of a Person shall mean (i) any officer, partner, director, manager, trustee, member, general partner, or controlling shareholder of such Person; (ii) any Person controlling, controlled by or under common control with such Person; (iii) any officer, director, trustee, member, manager, controlling shareholder or general partner of any Person described in (ii) above and (iv) any Person in which such Person serves as an officer, director, trustee, member, manager, shareholder or partner.  For purposes of this definition, the term "control" shall mean the right or ability to elect the majority of the directors of a Person, to exercise more than fifty percent (50%) of the voting rights in the Person, the power to direct the management and policies of such Person, directly or indirectly, by or through stock ownership,

agency or otherwise, or pursuant to or in connection with an agreement, arrangement or understanding (written or oral) with one or more other Persons by or through stock ownership, agency or otherwise and the terms "affiliate," "controlling" and "controlled" shall have meanings correlative to the foregoing.

"Assignee" shall mean the holder of an Economic Interest who is not a Member.

"Available Cash" shall mean all Gross Receipts actually received by the Company, less the sum of the following, to the extent paid (in the order of priority listed below) from Gross Receipts received by or on behalf of the Company to third parties in arms-length transactions, or, if otherwise, then not in excess of what third parties would charge in arms-length transactions:

(1)     All principal, interest and other payments due and owing with respect to loans, mortgages and other indebtedness of the Company;

(2)     All cash expenditures then required to be made in connection with the operation of the business of the Company;

(3)     The Tax Distributions paid pursuant to Section 4.4 of this Agreement; and

(4)     Such cash Reserves as the Managers reasonably determine to be necessary or appropriate for the operation of the business of the Company.

"Bankruptcy" of a Member shall mean (a) the entry of an order for relief with respect to that Member in a proceeding under the United States Bankruptcy Code, as amended from time to time, (b) the Member's initiation, whether by filing a petition, beginning a proceeding or in answer to a proceeding commenced by another Person, of any action for liquidation, Dissolution, receivership or other similar relief, (c) the Member's application for, or consent to the appointment of, a trustee, receiver or custodian for its assets, (d) the Member's making of a general assignment for the benefit of creditors or (e) the Member's failure generally to pay its debts as such debts come due or admission in writing of its inability to pay its debts as they come due. For purposes of this definition, a Member's consent shall be deemed to have been given if an order appointing a trustee, receiver or custodian is entered by a court of competent jurisdiction and is not dismissed within ninety (90) days after its entry.

"Capital Account" shall have the meaning set forth in Section 3.8(a) of this Agreement.

"Capital Contribution" shall mean, with respect to any Member, the amount of money and the fair market value of property contributed by such Member to the Company. The Capital Contributions of each Member is set forth on Schedule A.

"Certificate" shall have the meaning set forth in Section 1.4(a) of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as the same has been or may be amended from time to time.

"Company Minimum Gain" shall mean the amount determined under Treasury Regulation Sections 1.704-2(d) and 1.704-2(i)(3), and shall be computed separately for each

3

Interest holder in a manner consistent with Code Section 704(b) and the Treasury Regulations thereunder.

"Control" or any derivative thereof, when used with respect to a specified Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person

"Dissolution" shall mean, with respect to a legal entity other than a natural person, that such entity has "dissolved" within the meaning of the partnership, corporation, limited liability company, trust or other statute under which such entity was organized.

"Economic Interest" shall mean an interest, as represented by one or more Units, in a holder's share of the Net Profits and Net Losses of, and the right to receive distributions from, the Company.

"Economic Interest Holder" shall mean any Person who holds an Economic Interest, whether as a Member's or an unadmitted Assignee of a Member's Units.

"Entity Member" shall have the meaning set forth in Section 6.1.

"Family Member" shall have the meaning set forth in the definition of Permitted Transferee.

"Gross Receipts" with respect to any period shall mean all gross cash receipts of the Company from any source whatsoever received by the Company during such period, including, without limitation, all payments of principal and interest made with respect to any advance made by the Company, interest income, any compromise or settlement payments (including good faith deposits or escrows when forfeited) received by the Company with respect to any advances, mortgage loans, cash proceeds of the sale or other disposition of any advance, mortgage loan or other asset held by the Company (including amounts paid by any Member in connection with the purchase by it of any asset of the Company), all payments received by the Company in reduction of the outstanding principal balance of any mortgage or other advances held by the Company (whether in the nature of standard amortization, prepayments or special payments of principal), all payments received by Company for the release of collateral from the lien of a mortgage held by Company, cash proceeds of the sale or other disposition of any real property, rental income of any and every nature, condemnation awards or hazard insurance proceeds received by Company and not applied by the Company toward the repayment and/or restoration of the properties which suffered the casualty or condemnation, the net proceeds of any loans borrowed by the Company for which the advances or mortgage loans or other assets of the Company pledged as collateral; but excluding (A) Capital Contributions, (B) Company borrowings and (C) any amounts received by the Company which constitute segregated escrow or similar accounts (until the same are released or forfeited to the Company).

"Interest" shall mean the ownership interest of a Member in the Company represented by one or more Units, consisting of (i) such Member's right to profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act and (iii) such Member's other rights and privileges as herein provided.

"Interested Member" shall mean any Member who is also a Manager or any Entity

Member in which a Manager is a member of such Entity Member or which a Family Member of a Manager is a member of such Entity Member.

"Managers" shall mean the persons appointed pursuant to Section 5.1(b) of this Agreement.

"Members" shall mean each Person who (a) executes a counterpart of this Agreement as a Member or (b) is admitted as a Member in accordance herewith.

"Member Nonrecourse Debt" shall mean nonrecourse debt of the Company under Treasury Regulation Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall have the meaning set forth in Section 4.2(b) of this Agreement.

"Negative Capital Account" shall mean a Capital Account with a balance less than zero and, where the context requires, the negative balance thereof, in each case as of the end of a fiscal year, after giving effect to the following:

(a)     a credit for any amount required to be restored under Treasury Regulation Section 1.704-1(b)(2)(ii)(c), as well as any amounts in addition thereto pursuant to Treasury Regulation Sections 1.704-2(g)(1) and (i)(5), after taking into account any changes during such fiscal year in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and

(b)     a debit of the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Net Losses" shall mean, with respect to any fiscal period of the Company, the net losses of the Company for such period for federal income tax purposes including as appropriate each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"Net Profits" shall mean with respect to any fiscal period of the Company, the net profits of the Company for such period for federal income tax purposes including, as appropriate, each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"Offered Interest" shall have the meaning set forth in Section 6.3(a) of this Agreement.

"Percentage Interest" of a Member shall mean the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth on Schedule A hereto bears to the total number of Units owned by all Members as of such date. The combined Percentage Interests of all Members shall at all times equal 100%.

"Permitted Transferee" shall mean (A) with respect to a Member who is an individual, such individual's spouse, children (including natural, adopted and/or step children) or grandchildren (natural, adopted and/or step) (a "Family Member"), a trust of which one or more Family Members are the sole beneficiaries; (B) with respect to a Member which is a partnership, corporation or limited liability company, such Member's current partners, shareholders, members,

directors and/or executive officers, as the case may be; (C) with respect to a Member which is a trust, the existing beneficiaries of such trust; (D) with respect to any Member, a corporation, partnership, limited liability company or other entity, all of which interests therein are owned by the transferring Member or his/her/its Family Members; or (E) with respect to any Member (or Person comprising such Member), any other Member (or Person comprising such Member).

"Person" shall mean an individual, corporation, limited liability company, limited partnership, general partnership, joint venture, company, trust, bank or other entity.

"Regulations" shall mean the Treasury Regulations promulgated under the Code as such regulations maybe amended from time to time (including the corresponding provisions of succeeding regulations).

"Reserves" shall mean, with respect to any fiscal year (or such shorter period as necessary to take into account the Members' varying interests in the Company), funds set aside or amounts allocated during such period to reserves which will be maintained in amounts deemed necessary, sufficient or appropriate by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transfer" shall mean any sale, assignment, transfer, gift, exchange, bequest or other disposition of an Interest, in any manner, voluntary or involuntary, by operation of law or otherwise, but shall not include a pledge, hypothecation or other contingent transfer of rights unless or until such contingency occurs.

"Transfer Date" shall have the meaning set forth in Section 4.1(b) of this Agreement.

"Transferor" shall have the meaning set forth in Section 6.3(a) of this Agreement.

"Treasury Regulations" shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

"Unit" shall mean a unit of ownership interest in the Company and shall represent an undivided interest in the holder's Capital Account balance.

"Withdrawn Member" shall have the meaning set forth in Section 9.1 of this Agreement.

"Withdrawal Event" with respect to any Member, shall mean his/her/its (a) death, revocation of its certificate of incorporation/articles of organization/certificate of formation, Dissolution, expulsion as a Member or adjudication of incompetency, as applicable; (b) Bankruptcy; (c) voluntary retirement or withdrawal from the Company; (d) except as otherwise provided herein, breach of any of his/her/its material obligations under this Agreement, or (e) any other event that terminates a Member's membership in the Company or otherwise causes the Dissolution of the Company under the Act.

"Wrongful Act" shall mean an act of fraud, deceit, gross negligence, willful misconduct, breach of fiduciary duty or a wrongful taking by any Manager.

**2.2    Captions**. The captions used in this Agreement are inserted for convenience and identification only and are in no way intended to define or limit the scope, extent or intent of this Agreement or any of the provisions hereof.

**2.3    Construction**. Whenever the singular number is used herein, the same shall include the plural, and the masculine, feminine and neuter genders shall include each other.  Unless the context clearly requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision hereof. If any language is stricken or deleted from this Agreement (or any prior draft thereof), such language shall be deemed never to have appeared herein and no other implication shall be drawn therefrom.

## 3.    CAPITAL; CAPITAL ACCOUNTS

**3.1    Capital Contributions; Interests.**

(a)    <u>Capital Accounts</u>.  The initial Capital Contributions that have been made by the Members to the Company are set forth on <u>Schedule A</u> annexed hereto.

(b)    <u>Percentage Interests</u>.  Notwithstanding each Member's initial Capital Contribution, each Member shall have the number of Units and the Percentage Interest set forth on <u>Schedule A</u> annexed hereto.

(c)    <u>Additional Contributions</u>.  There shall be no requirement of the Members to make additional capital contributions to the Company except upon the unanimous vote or written consent of the Members.

**3.2    No Withdrawal of Capital Contributions**.  Except upon Dissolution and liquidation of the Company or as otherwise set forth herein, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contributions, or any part thereof, or any distribution thereon. Except as otherwise provided herein, no Member shall have the right to receive assets other than cash in connection with a distribution or return of capital.

**3.3    Return of Capital Contributions.**

(a)    <u>No Fixed Time</u>.  Except upon Dissolution and liquidation of the Company, or pursuant to Section 6.8 of this Agreement, there is no agreement, nor time set, for the return of any Capital Contribution to any Member.

(b)    <u>No Personal Liability of Member</u>.  Except as otherwise required by the Act, the Members shall not be personally liable for the return or repayment of any Capital Contribution.

**3.4    Liability of Members and Their Affiliates.**  Except as otherwise provided by applicable law or herein, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; no Member or Person Affiliated with a Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or being a Person Affiliated with a Member.

**3.5    No Priority**.  Except as otherwise expressly provided for in this Agreement, no

Member shall have priority over another Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

**3.6     No Interest**.  Except as expressly provided for by this Agreement, no interest shall be paid on all or any part of a Member's Capital Account.

**3.7     No Obligation to Restore Negative Balances in Capital Accounts**.  No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

**3.8     Capital Accounts**.

(a)     The Company shall maintain a separate capital account ("Capital Account") for each Member and his/her/its legal representatives, successors and permitted assigns.

(b)     The Capital Account of each Member shall be maintained in accordance with Section 1.704-1(b) of the Regulations as in effect on the date of this Agreement and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with Regulation Section 1.704-1(b), the Managers may make such modifications, provided that such changes have no financial impact on the amount distributable to a Member under Sections 4.3 and 8.2.

(c)     The Capital Account of each Member shall consist of the amount of cash and the fair market value of the property (as determined in good faith by the Managers) contributed by such Member to the Company (net of liabilities securing such contributed property assumed by the Company or subject to which the Company takes the contributed property) increased by allocations of Net Profits, and of tax-exempt income, if any, and decreased by allocations of Net Losses, by distributions and withdrawals of cash and property (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property) and by expenditures defined in Section 705(a)(2)(B) of the Code (or which are treated as Section 705(a)(2)(B) expenditures under Regulation 1.704-1(b)(2)(iv)(i)).

(d)     In the event of a transfer of a Unit or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the person or entity so acquiring such Unit or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Unit, adjusted for distributions of Available Cash theretofore made and allocations of Net Profits and Net Losses through the effective date of the transfer.  The cost of computing such adjustment shall be borne by the Member disposing of such Unit.

# 4.     PROFITS, LOSSES AND DISTRIBUTIONS

**4.1     General**.

(a)     The Net Profits and Net Losses of the Company shall be determined for each fiscal year in accordance with the accounting method followed by the Company for federal income tax purposes. Except as otherwise provided herein, whenever a proportionate part of the Net Profit or Net Loss is credited or charged to a Member's Capital Account, every item of income,

gain, loss, deduction or credit entering into the computation of such Net Profit or Net Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Net Profit or Net Loss and applicable to the period during which such Net Profit or Net Loss was realized shall be allocated to such Member in the same proportion.

(b)     On the last day of the month in which a new Member is admitted to the Company, or a valid transfer of all or a portion of a Member's Units is consummated (the "Transfer Date"), the books of the Company shall be closed in accordance with Section 706(d) of the Code, and consistent therewith: (i) items of income, deduction, gain, loss and/or credit of the Company that are recognized prior to the Transfer Date shall be allocated among those Persons who were Members in the Company prior to the Transfer Date in accordance with their respective Interests prior to the Transfer Date; and (ii) items of income, deduction, gain, loss and/or credit of the Company that are recognized after the Transfer Date shall be allocated among the Persons who were Members in the Company after the Transfer Date.

**4.2     Allocation of Net Profits and Net Losses**.

(a)     After giving effect to the special and curative allocation provisions set forth in this Section 4.2, the Net Profits and Net Losses of the Company for each taxable year (or portion thereof) shall be allocated among the Members in such amounts as are necessary to cause the positive balance in each Member's Adjusted Capital Account to equal, to the greatest extent possible, the amount that would be distributed to each Member were the Company to dissolve and terminate at the end of the taxable year in question, assuming for this purpose that the Company's assets are liquidated for their fair market value and that the net proceeds of such liquidation, after the payment of all Company debts and liabilities, are distributed to the Members in accordance with Section 4.3 of this Agreement, taking into account Section 4.4 of this Agreement.

(b)     Special Allocation Provisions.

(i)     Notwithstanding anything to the contrary contained in Section 4.2 hereof, any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as such term is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Section 1.752-2(b) of the Regulations for such Member Nonrecourse Debt. If more than one Member bears such economic risk of loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such economic risk of loss. If more than one Member bears such economic risk of loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(ii)     Minimum Gain.

(A)     Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Company Minimum Gain (as such term is defined in Sections 1.704-2(b)(2) and (d) of the Regulations), there shall be allocated to each Member, before any other allocation pursuant to Section 4.2 hereof is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain.  A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)     Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as defined in Section 1.704-2(1)(2) of the Regulations), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such fiscal year before any other allocation pursuant to Section 4.2 hereof (other than an allocation required pursuant to Section 4.2(b)(ii)(A)) is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain.  The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations.  The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iii)  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Adjusted Capital Account in excess of the amount such Member is required to restore upon a liquidation of the Company (or of such Member's interest in the Company), then, after any allocations required by Section 4.2(b)(ii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible.  To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 4.2(b)(iii) shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Section 4.2, so that the net amount of any items so allocated and the subsequent Net Profits and Net Losses allocated to the Members pursuant to Section 4.2 shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of Section 4.2 if such unexpected adjustments, allocations or distributions had not been made.

10

(iv)   Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(v)   Notwithstanding the other provisions of this Section 4.2 to the contrary, Net Losses shall not be allocated to a Member to the extent the allocation would create or increase a negative balance in such Member's Capital Account if at that time any other Member has a positive Capital Account; in such event, Net Losses shall be allocated only to Members with positive Capital Accounts until all Members' Capital Accounts have been reduced to zero or are negative, and thereafter all Net Losses shall be allocated to the Members in the ratio of their Percentage Interests or as otherwise provided herein. Notwithstanding the other provisions of this Section 4.2, in the event that at any time any Net Loss has been allocated to any Member pursuant to this clause (v), all Net Profits arising thereafter shall first be specially allocated to the Members who received allocations of Net Losses pursuant to this clause(v) (in proportion to the maximum allocation to which each such Member is then entitled under this clause (v)) until the aggregate amount of Net Profits specially allocated to each such Member pursuant to this clause (v) equals the aggregate amount of Net Losses theretofore allocated to such Member pursuant to clause (v).

**4.3**   **Distributions of Available Cash**.  Except as otherwise provided in this Agreement, including without limitation as provided in Section 8.2 with respect to the liquidation of the Company, Distributions of Available Cash shall be made to the Members, at least annually, upon the unanimous consent of the Managers and FHJ Vision Partners, LLC, as follows:

(a)   *first,* to any Member who has made a loan to the Company, until such loan, together with all interest thereon, has been paid in full; and

(b)   *second,* pari passu, to the Members in accordance with their Percentage Interests.

**4.4**   **Tax Distribution.**

(a)   Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each fiscal year, an amount of cash equal to the product of the Tax Percentage (as defined below) for such fiscal year and such Member's allocated share of the Company's net taxable income and gain for such fiscal year as shown on the Company's federal income tax return (the "Tax Distribution"). If the Company is not required to file a federal income tax return for a fiscal year or the Company's federal income tax return for such fiscal year has not been completed by the close of business on the 85th day after the close of such fiscal year, the amounts to be shown on such return for purposes of this Section 4.4(a) shall be determined in good faith by the Managers.

(b)     For purposes of this Section 4.4, "Tax Percentage" shall equal the highest marginal effective rate of federal, state and local income tax in effect for the fiscal year in respect of which the Tax Distribution is made applicable to individuals resident in Delaware or New York, whichever is higher, taking account of any difference in rates applicable to ordinary income and capital gains and any allowable deductions in respect of such state and local taxes in computing the Members' liability for U.S. federal income tax purposes, and assuming that the items of income, gain, deduction, loss and credit in respect of the Company were the only items entering into the computation of tax liability of the Members for the fiscal year in respect of which the Tax Distribution is made.

(c)     For purposes of determining whether the Company has satisfied its distribution obligation under Section 4.4(a), all cash distributions made during a fiscal year shall be treated as distributions made to satisfy Section 4.4(a) in respect of such fiscal year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 4.4(a) in respect of one or more prior fiscal periods, in which case such distributions shall be treated as having been made pursuant to Section 4.4(a) in respect of such prior fiscal period or periods).

(d)     No distribution shall be required to be made pursuant to this Section 4.4 to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(e)     The Company shall not make a distribution under this Section 4.4 to a Member to the extent such Member's Interest is being redeemed or in connection with a liquidation of the Company.

**4.5     Incorrect Distributions**. To the extent distributions pursuant to this Section 4 were incorrectly made or were in violation of any applicable law, as determined by the Managers in good faith and based upon financial statements of the Company or such other relevant information, the recipients shall promptly repay all incorrect payments and/or the Company shall have the right to set off any current or future amounts owing to such recipients against any such incorrectly paid amounts.

**4.6     Distributions in Kind**. In the event any proceeds available for distribution consist of items other than cash (including, but not limited to notes, mortgages and payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amounts of proceeds due them, respectively. In determining the Capital Accounts of the Members for purposes of Section 3.8, the amount by which the fair market value of any property to be distributed to the Members exceeds or is less than the tax basis of such assets, to the extent not otherwise recognized by the Company shall be taken into account as if such gain or loss were recognized by the Company.

**4.7     Limitation on Distributions**.  No distribution shall be declared and/or paid unless, after giving effect thereto, the assets of the Company exceed the Company's liabilities.

**4.8     Additional Allocations**.  Notwithstanding anything in this Agreement to the contrary, the Managers may, in their reasonable discretion, allocate Net Profits and Net Losses for any fiscal year in a manner that the Managers deem necessary or appropriate in order to effectuate

any intended economic sharing arrangement or understanding of the Members.

     **4.9**    **Reserves**.    The Managers shall establish and set aside such Reserves as the Managers deem to be in the best interests of the Company.

## 5.    MANAGEMENT OF THE COMPANY; MEMBERS

    **5.1**    **Management Powers of the Managers; Managers.**

        (a)    Except as set forth in Section 5.8 below, and except as expressly limited by the provisions of this Agreement or by the Act, the management and control of the business of the Company shall rest exclusively with the Managers, who shall have the full, exclusive and absolute right, power and authority to manage and control each and every aspect of the business of the Company and its property, assets and affairs. The scope of the Managers' power and authority shall encompass all matters connected or incident to the business of the Company. The Managers shall be agents of the Company for its business purposes and the Managers may bind the Company in the ordinary course, provided that the Managers have approved such action in accordance with this Agreement or the Act. Unless otherwise expressly authorized by this Agreement or the Members as set forth herein, any acts of the Managers that are not apparently for carrying on the Company's business in the ordinary course shall not bind the Company. All decisions made by the Managers, pursuant to this Agreement, shall be made upon the unanimous written consent of the Managers.

        (b)    The Company shall have two (2) managers who may, but need not be, Members of the Company. The initial Managers shall be Alexandr Zaitsev and Daniel Kandhorov. Alexandr Zaitsev and Daniel Kandhorov shall serve as Managers until their death, resignation or removal in accordance with this Agreement. Should Alexandr Zaitsev and/or Daniel Kandhorov die, resign or be removed as a Manager pursuant to this Agreement, the Members will appoint a successor Manager in accordance with Section 5.8(b) below.

        (c)    The Managers shall be entitled to receive, solely out of the Company's positive net proceeds, reimbursements of all reasonable costs and expenses incurred in connection with the business of the Company.

    **5.2**    **Resignation**. A Manager of the Company may only resign upon the unanimous written consent of the Members. The resignation of a Manager who is also a Member will not affect his/her/its rights as a Member.

    **5.3**    **Removal**. A Manager may be removed by the Members in accordance with Section 5.8 below if such Manager (a) commits a Wrongful Act; or (b) suffers a Permanent Disability (which shall mean a disability that causes the inability of such Manager to provide services to the Company for 90 consecutive days). The removal of a Manager who is also a Member will not affect his/her/its rights as a Member except as otherwise set forth herein.

    **5.4**    **Liability for Certain Acts**. Each Manager shall perform his duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs his/her/its duties shall not have any liability by reason of being or having been a Manager. A Manager shall not be liable to the Company or to any Member for any loss or damage unless a judgment or other final adjudication adverse to such Manager establishes that such loss or damage was the result of fraud, gross negligence, willful

misconduct, bad faith or a wrongful taking by such Manager.

**5.5    Delegation to Agents and Officers**.  The Managers may delegate functions relating to the day-to-day operations of the Company to such officers, agents, consultants or employees as they may from time to time designate.  Such officers, agents, consultants and employees need not be Members, and shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Managers and may be removed at any time, with or without cause, by the Managers.

**5.6    Other Duties of the Managers**.  In addition to their other duties set forth herein, the Managers:

(a)    may make, on behalf of the Company, the election permitted by Code Section 754 with respect to adjustments to the basis of the Company property,

(b)    shall, promptly following receipt thereof, give notice to the Members of any proposed audit or adjustments of any Company tax returns; and

(c)    shall serve as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

**5.7    No Other Management Powers by Members**. Except as expressly provided in this Agreement or as otherwise required by law, no Member, by reason of his/her/its status as such, shall have any voice or participation in the management of the Company's business or to act for or bind the Company but shall have only the right to vote on or approve the actions, if any, specified herein to be voted on or approved by the Members.

**5.8    Member Rights of Approval**.

(a)    The Members will have such rights with respect to the management of the property, business and affairs of the Company, and such other powers, as are expressly set forth in this Agreement or under the Act.

(b)    Notwithstanding anything herein to the contrary, the Members, acting independently of the Managers, shall take and/or authorize the following acts or transactions by the unanimous vote or written consent of the Members; provided, however, with respect to the removal of a Manager (as provided in Section 5.8(b)(iii)), and with respect to the election of a successor Manager (as provided in Section 5.8(b)(ii) following such Manager's removal pursuant to Section 5.3), or with respect to any matters specified in 5.8(x), the vote or written consent of sixty-five percent (65%) of the Members shall be required (not unanimous) and such sixty-five percent (65%) vote or written consent of the Members shall exclude the vote or written consent of any Interested Member and the relative Percentage Interests of the remaining Members for voting purposes only shall be determined as though the Interested Member's Percentage Interest were zero:

(i)    the sale, exchange or other disposition of all or substantially all of the Company's assets, whether in a single transaction or series of related transactions, or the merger or consolidation of the Company with or into another Person;

(ii) the election of a Manager;

(iii) the removal of a Manager pursuant to Section 5.3;

(iv) the amendment of the Certificate or this Agreement in any respect, except as provided in Sections 11.6 and 11.7;

(v) voting to dissolve, wind up and liquidate the Company;

(vi) to require the Members to make additional capital contributions to the Company pursuant to Section 3.1(b);

(vii) entering into any agreement or series of related agreements, including any agreement to borrow money that, either individually or collectively, (1) creates a monetary obligation of the Company equal to or greater than $10,000, or (2) grants a mortgage on, a security interest in, or otherwise encumbers any material asset of the Company;

(viii) entering into any agreement or series of related agreements, including any agreement to advance money from the Company to any Person, either individually or collectively, equal to or greater than $10,000;

(ix) capital expenditures by the Company in excess of $10,000, whether in a single transaction or series of related transactions;

(x) the making of any decisions concerning matters where a Manager has a direct or indirect economic interest.

**5.9    Meetings of Members**.  Except as otherwise provided in this Agreement, there shall be no requirement of annual or periodic meetings of the Members.

**5.10    Transactions between Company and Members**.  Each Member, including a Manager, has the right to engage in business transactions with the Company, including, but not limited to, providing goods and\or services to the Company, and be compensated accordingly, provided that any such transaction be entered into in good faith and at arms length.  Any such transaction will not affect such Member's Capital Account.  If a Member loans any monies to the Company pursuant to a debenture or other lending agreement or arrangement, the Managers shall use commercially reasonable efforts to ensure that the Company shall abide by the terms and obligations of the Company under such debenture or other lending agreement or arrangement.

**5.11    Outside Interests; Conflicts.**  Subject to Section 11.16 of this Agreement, any Member, Manager or Affiliate of any Member or Manager shall have the right to engage in and/or possess an interest in any other business of every kind, nature and description, independently or with other Persons, irrespective of whether competitive with any property or business directly or indirectly owned or engaged in by the Company. Neither the Company nor any Member or Manager shall have or be entitled to any rights, solely by virtue of this Agreement, in and to such independent ventures or to the income and profits derived therefrom, nor shall any such Member, Manager or such Affiliated Person have any obligation whatsoever to offer, share or offer to share any business opportunity of any kind to or with the Company or any other Member or Manager.

The Members hereby waive any and all rights and claims which they may otherwise have against such other Member, Manager and their Affiliated Person.

**5.12    Indemnification.** To the fullest extent permitted by applicable law from time to time in effect:

(a)     The Company shall indemnify and hold harmless the Managers, Members, officers, agents and employees of the Company and their respective directors, trustees, shareholders, members, partners, officers, employees, agents and other Affiliates, against all costs, liabilities, claims, expenses, including reasonable attorneys' fees and disbursements, and damages (collectively, "Losses") paid or incurred by any such Person in connection with the conduct of the Company's business; and

(b)     The Company shall indemnify, defend and hold the Managers harmless from and against, and may indemnify, defend and hold the Company's and the Managers' respective Affiliates, agents, employees, consultants and other independent contractors (collectively, "Indemnitees"), harmless from and against, all Losses arising from any demands, claims or lawsuits against any of the Indemnitees in connection with or resulting from their acts or omissions in their capacities as the Managers, or as such an Affiliate, agent, employee, consultant or other independent contractor of the Company or the Managers, or in connection with, arising from or relating to, business or activities undertaken on behalf of the Company, including, without limitation, any demands, claims or lawsuits initiated by a Member, unless a judgment or other final adjudication adverse to such Indemnitee establishes that (i) such acts or omissions were committed in bad faith, or were the result of active and deliberate dishonesty, (ii) such Indemnitee personally gained a financial profit or other advantage to which he or she was not legally entitled or (iii) such acts or omissions violated such lesser standard of conduct as under applicable law affirmatively prevents indemnification hereunder.   The termination of any action, suit or proceeding by judgment, order, settlement, plea of nolo contendere or its equivalent or conviction shall not, of itself, create a presumption that an Indemnitee shall not be entitled to indemnification hereunder or that the Indemnitee did not act in good faith and in a manner which it reasonably believed to be in or not opposed to the best interests of the Company.

(c)     The rights of an Indemnitee set forth in this Section 5.12 shall not be exclusive of any other rights to which it may be entitled, whether by separate agreement or otherwise, nor shall such rights limit or affect any other such rights.  All rights of an Indemnitee under this Section 5.12 shall survive the Dissolution of the Company and any Withdrawal Event with respect to such Indemnitee, and shall inure to the benefit of his/her/its heirs, personal representatives, successors and assigns.

(d)     Notwithstanding anything contained herein to the contrary, any amount to which an Indemnitee may be entitled under this Section 5.12 shall be paid only out of the assets of the Company and any insurance proceeds available to the Company for such purposes.  No Member shall be personally liable for any amount payable pursuant to this Section 5.12, or to make any Capital Contribution, return any distribution made to it by the Company, or restore any Negative Capital Account balance to enable the Company to make any such payment.

# 6.    RESTRICTIONS ON THE DISPOSITION OF AN INTEREST

**6.1    Generally**. Except as otherwise expressly provided for in this Agreement, no

Member may, directly or indirectly, Transfer all or any portion of his/her/its Units or Interests in the Company without the prior written consent of the Managers, which consent shall not be unreasonably withheld, conditioned or delayed. Any attempt to Transfer in violation of this Agreement shall be of no force or effect and shall not be recognized by the Company. For the purposes hereof, a direct or indirect Transfer by a Member shall include a Transfer of interests (including any interest as a trustee) in any entity which is a Member (each, an "Entity Member") other than a redemption or repurchase of interests by such Entity Member of one or more of its member's interests or transfers of interests among the members of such Entity Member. Notwithstanding anything herein to the contrary, any transfers or assignments of the membership interests within FHJ Vision Partners, LLC ("FHJ") whether among the members of FHJ or to non-members of FHJ are hereby expressly permitted by the Company and the Managers, and are subject solely to the requirements set forth in the Operating Agreement of FHJ.

6.2     **Permitted Transfers**. After compliance with Section 6.4 below only, a Member may Transfer all or a portion of his/her/its Units or Interests or allow the Transfer of direct or indirect ownership interests in such Member or in the partners, members or shareholders thereof, as follows, in each case, without the consent of the Managers:

(a)     if the proposed transferor is a natural Person, by succession or testamentary disposition upon his/her death, provided that such Transfer is to a Person that is otherwise a Permitted Transferee; or

(b)     to any Permitted Transferee.

6.3     **Right of First Refusal**.

(a)     Except as otherwise provided herein, and for all Transfers that are not to a Permitted Transferee, and subject in all events to Sections 6.4, 6.5, 6.6 and 6.7 below, no Member may Transfer any Units or Interests in the Company unless the Member desiring to make the Transfer (the "Transferor") first obtains a bona fide written offer from a third party to purchase all, or portion, of such Member's Interest in the Company and first offers to sell such Interests (the "Offered Interest") to the Company and the other Members in accordance with this Section 6.3. The offer to the Company and the other Members, must include all of the Offered Interest held by the Transferor. The bona fide offer must state (x) the name and address of the transferee, (y) the consideration that will be received by the Transferor for the transfer and (z) the payment terms of the consideration and other material terms and conditions of the proposed Transfer.

(b)     Within ten (10) days of the receipt of the bona fide offer, the Transferor shall furnish the Company and the non-transferring Members with a copy of such offer. Within sixty (60) days of the receipt of the offer by the Company and the non-transferring Members, each non-transferring Member may elect to purchase all, but not less than all, of a portion of the Offered Interest in proportion to such non-transferring Member's Percentage Interests in the Company (excluding for purposes of this Section 6.3 any Units or Interests being sold) on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within such sixty (60) day period. If the non-transferring Members, in the aggregate, do not elect to purchase all of the Offered Interest within such sixty (60) day period, the Company may elect, in the reasonable discretion of the Managers, to purchase all, but not less than all, of the remaining Offered Interest on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within thirty (30) days following the

expiration of such sixty (60) day period.

(c)      In the event the Company or the non-transferring Members, as applicable, elect to purchase, in the aggregate, all of the Offered Interest, the closing of the purchase will take place on the first business day following the end of a period of ninety (90) days after exercise of the Company's or the Members' options to purchase, as applicable, by delivery of the last written notice thereof to the Transferor, or on such other date as mutually agreed upon by the parties.

(d)      In the event neither the Company nor the non-transferring Members elect to purchase, in the aggregate, all of the Offered Interest, the Transferor may transfer the remaining Offered Interest to the transferee named in, and on the terms and conditions set forth in, the notice. If the Transferor fails to conclude such sale of the Offered Interest within fifteen (15) days after the expiration of all applicable time periods set forth herein, the Offered Interest will again become subject to all of the restrictions of this Section 6.

(e)      A Member who has assigned such Member's entire Interest in the Company pursuant to this Section 6.3, whether or not the assignee has become a substituted Member, shall not thereafter be entitled to exercise any of the rights of a Member with respect to such transferred Interest (and the Units associated therewith) nor have any other rights as a Member with respect to such transferred Interest except as otherwise provided by the Act.

(f)      Any Interest transferred pursuant to this Section 6.3 will remain subject to all of the provisions of this Agreement.  Any Member that Transfers its Interest in accordance with this <u>Section 6.3</u> to an Assignee or transferee which is not a Member may grant to that Assignee or transferee the right to become a Member; provided, however, that such Assignee or transferee will not become a substitute Member unless and until the admission of such Assignee or transferee is consented to by the unanimous vote or written consent of the Members.

**6.4      Other Conditions to Permitted Transfers.**

(a)      As conditions to recognizing the effectiveness of any Transfer permitted under this Section 6, and the admission of a transferee as a new Member, the Transferor and the proposed transferee shall execute, acknowledge and deliver to the Company, at the Transferor's (and/or the transferee's) expense, such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all other acts necessary or desirable, in the opinion of counsel to the Company, to:

(i)      constitute such transferee a Member, if applicable;

(ii)      confirm that the Person desiring to be admitted as a Member, has accepted, assumed, and agreed to be bound by, all of the terms, obligations and conditions of this Agreement, as in effect at the time of the Transfer;

(iii)      preserve the Company after such Transfer under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(iv)      assure compliance with all applicable state and Federal laws, including, without limitation, securities laws; and

(v)     constitute the Company a third-party beneficiary of the rights of the Transferor and the obligations of the transferee under any arrangements or agreements to Transfer an Interest hereunder, with full power to enforce such rights and obligations directly against the transferee.

(b)     All transferees hereunder shall execute the Joinder Agreement in the form attached hereto as **Exhibit A** agreeing to be bound by the terms of this Agreement in the same manner as the transferors and any Units so transferred shall continue to be subject to the restrictions, liabilities and benefits associated therewith.

(c)     Notwithstanding compliance with the other provisions of this Section 6, no Transfer of a Unit or Interest may be made to a minor or incompetent individual except by will, intestate succession or gift under applicable uniform transfers to minors acts or pursuant to the terms of an inter vivos trust.

**6.5     Effective Date**.

(a)     Any Transfer of a Unit or Interest or admission of a Member in accordance with this Agreement shall be effective as of the last day of the calendar month in which all of the conditions thereto were satisfied.  No Transfer of a Unit or Interest shall be effective unless and until the Company has received notice of the name and address of the transferee and the date of such Transfer, and shall then be effective only to the extent set forth in this Agreement.

(b)     No new Member shall be entitled to any retroactive allocation of Net Profits or Net Losses or other allocable items incurred by the Company.  The Managers may, in their discretion, at the time a new Member obtains a Unit or Interest, close the Company books (as though the fiscal year had ended) or make pro rata allocations of such items to a new Unit or Interest holder for that portion of the fiscal year in which it holds a Unit or Interest, in accordance with Code Section 706(d) and the Regulations promulgated thereunder.

**6.6     Pledge or Encumbrance of Interests**.  No Member may pledge or encumber a Unit or Interest, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise, without the consent of the Managers.

**6.7     Restrictions on Transfers/Impermissible Transferees**.

(a)     All Transfers, directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company, including without limitation Transfers to Permitted Transferees or pursuant to the procedures in <u>Section 6.3</u>, shall be subject to the following restrictions:  (i) no Transfer shall be made to any Person who is not reputable and financially able to perform the obligations of a Member hereunder (including any indemnity obligations contained herein); (ii) no Transfer of Units or Interests shall be made which results, or would result upon a foreclosure of any security interest or in a termination of the Company within the meaning of the Act; (iii) no Transfer of Units or Interests shall be made which violates any provision of this Agreement; and (iv) no change in ownership of any Units or Interests shall be binding against the other Member unless approved in accordance with this Agreement.  All Transfers, whether directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company in contravention of this Agreement shall be void.

(b)     In the event any Member shall Transfer any of its Units or Interests in the Company in contravention of the express terms of this Agreement, the Member Transferring any such Units or Interests shall indemnify and hold the Company and other Members harmless from and against any and all loss, cost, claim, liability, damage or expense which it or they may incur or suffer (including attorneys' fees and disbursements) in enforcing or attempting to enforce the provisions hereof. Any Member who makes a Transfer in contravention of the express terms of this Agreement, shall have no right to vote on any matters that may be brought before the Members nor shall such persons be counted for purposes of a quorum.

**6.8     Redemption.**

(a)     No later than thirty (30) days following the twelve (12) month anniversary of the date hereof,  FBH Capital Group, LLC ("FBH") may require the Company to redeem all, but not less than all, of the Units then held by FBH in one (1) installment on a date no later than ninety (90) days following the request for redemption (the "Redemption Date").  The Company shall effect such redemption on the Redemption Date by paying in cash, in exchange for the Units to be redeemed, a sum equal to any unreturned Capital Contribution of FBH, plus any accrued but unpaid interest thereon, at a rate per annum of thirteen percent (13%) (collectively, the "Redemption Price").  Notwithstanding anything herein to the contrary, the foregoing redemption right shall be limited to the aforementioned time frame and will not be an ongoing option.

(b)     From and after the Redemption Date, unless there shall have been a default in payment of the Redemption Price or the Company is unable to pay the Redemption Price due to not having sufficient legally available funds, all rights of FBH as a Member of the Company shall cease and terminate; provided, however, in the event that FBH's Units are not redeemed due to a default in payment by the Company or because the Company does not have sufficient legally available funds, such Units shall remain outstanding and FBH shall be entitled to all of its rights as a Member until such Units are redeemed.

## 7.     BOOKS, RECORDS AND REPORTS

**7.1     Books and Records**. The Company shall keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records shall be otherwise kept in accordance with the provisions of the Act.  Any Member or its designated representative shall have the right, at any reasonable time and upon reasonable notice, to have access to and to inspect and copy the contents of such books or records.

**7.2     Financial Books**. The Managers shall keep or cause to be kept complete and accurate financial books with respect to the Company's business.

**7.3     Bank Accounts**. The funds of the Company shall be deposited in such amounts in such bank account or accounts as shall be designated by the Managers.  All withdrawals from any account established by the Managers may be made by the Managers (or a specific designee(s) of the Managers which designation has been made in writing and provided to the Members).  The funds of the Company shall be maintained in a segregated account(s) and shall not be commingled with the funds of any other Person, including, without limitation, the Managers, and, if not immediately required for Company business, may be temporarily invested in such liquid, non-equity assets as the Managers shall determine.  The Managers shall promptly provide each Member

with written notice of any investment of the Company funds into such liquid, non-equity assets.

**7.4    Reports**. The Managers, at the expense of the Company, shall use commercially reasonable efforts to cause to be prepared and distributed to each Person who was a Member or Economic Interest Holder during any fiscal year of the Company:

(a)    within one hundred-twenty (120) days after the end of each fiscal year of the Company, all information relating to the Company that is necessary for the preparation of the Member's federal, state and local income tax returns;

(b)    within sixty-five (65) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a quarterly unaudited financial statement of the Company prepared on a federal income tax basis or reviewed by independent public accountants selected by the Managers (the "Accountants");

(c)    within one hundred-twenty (120) days after the end of each fiscal year of the Company, an annual unaudited financial statement of the Company prepared on a federal income tax basis compiled or reviewed by the Accountants; and

(d)    any other information that may be reasonably requested by any Member.

**7.5    Tax Returns**. The Managers shall, at the expense of the Company, retain the Accountants and cause to be prepared all tax returns for the Company and shall further cause such returns to be timely filed with the appropriate authorities.  It is contemplated that the Company will be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, and as determined by the Managers, including the amendment of this Agreement to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

**7.6    Fiscal Year and Accounting Method**. The Company shall adopt a fiscal year ending on the last day of such month of each year and a method of accounting selected by the Managers with the advice of the Accountants for the Company; provided, however, that the Managers in their reasonable discretion may, subject to any approval required by the Internal Revenue Service and the applicable state taxing authorities, at any time change the Company's method of accounting.

**7.7    Tax Elections**. The Tax Matters Partner shall have the authority to cause the Company to make any election required or permitted to be made for income tax purposes.  The Tax Matters Partner may cause the Company to make, in accordance with Section 754 of the Code, a timely election to adjust the basis of Company property as described in Sections 734 and 743 of the Code in the sole discretion of the Tax Matters Partner.

**7.8    Title to Company Assets**.  Title to, and all right and interest in, the Company's assets, shall be acquired in the name of and held by the Company, or, if acquired in any other name, be held for the benefit of the Company.

## 8.    DISSOLUTION AND TERMINATION OF THE COMPANY

**8.1    Dissolution**.  The Company shall be dissolved and terminated and its affairs shall be wound up upon the earliest to occur of the following:

(a)      the unanimous vote or written consent of the Members;

(b)      the sale or other disposition of all or substantially all of the business or assets of the Company; or

(c)      the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**8.2    Winding up of the Company**.

(a)      If the Company is to be dissolved in accordance with Section 8.1, then the Managers or other Person selected by the Managers (the "Liquidator") shall wind up the affairs of the Company, including by selling or otherwise liquidating the Company assets in a bona fide sale or sales to third Persons at such prices and upon such terms as they may determine.  If the Liquidator determines that an immediate sale would be financially inadvisable, it may defer sale of the Company assets for a reasonable time, or distribute the assets in kind.  During the winding up period, the Liquidator may exercise all powers granted to the Managers under this Agreement, and may adopt such plan, method or procedure as may be reasonable to effect an orderly winding up.

(b)      The proceeds of any liquidation of the Company shall be distributed in the following order of priority (to the extent that such order of priority is consistent with the laws of the State of Delaware):

(i)     first, to the payment of the debts and liabilities of the Company and the expenses of Dissolution and liquidation;

(ii)    then, to the establishment of any Reserves which the Liquidator shall deem reasonably necessary for payment of such other debts and liabilities of the Company (contingent or otherwise), as are specified by the Liquidator, such Reserves to be held in escrow by a bank or trust company selected by the Liquidator and to be disbursed as directed by the Liquidator in payment of any of the specified debts and liabilities or, at the expiration of such period as the Liquidator may deem advisable, to be distributed in the manner hereinafter provided; and

(iii)   then, to the Members in accordance with their Percentage Interests.

(c)      If any assets are distributed in kind, they shall be distributed on the basis of the fair market value thereof, and shall be deemed to have been sold at fair market value for purposes of the allocations under Section 4.

(d)      The Company shall terminate when all assets of the Company have been sold and/or distributed and all affairs of the Company have been wound up.

**8.3    Termination**.  Upon the completion of the distribution of Company assets as provided in Section 8.2, the Company shall be terminated, and the Managers or other Person acting as liquidator shall cause the Certificate of the Company to be canceled and shall take such other actions as may be necessary to terminate the existence of the Company.

9.      **WITHDRAWAL OF A MEMBER**

**9.1     Right to Withdraw**.  The withdrawal of a Member (the "Withdrawn Member") upon the occurrence of a Withdrawal Event, shall only be permitted upon the unanimous written consent of the Members (excluding the vote of the Withdrawn Member); provided that upon the (i) death of a Member, if an individual (ii) Permanent Disability of a Member, if an individual, (iii) Bankruptcy, or (iv) Dissolution of a Member, the Company will permit the withdrawal of such Member without requiring consent.

**9.2     Effect of Withdrawal.**

(a)     Except as otherwise provided in this Agreement, unless the remaining Members elect to dissolve the Company in accordance with this Agreement, the Withdrawn Member shall not be entitled to receive any amount in liquidation of his/her/its Interest until the Dissolution and winding up of the Company, but shall, on and as of the date of Withdrawal Event, become an Assignee of the Economic Interest associated with its former Interest, with no right to participate in the management of the business of the Company or otherwise exercise any of the rights or privileges of a Member hereunder or under the Act.  After any such Withdrawal Event, the relative Percentage Interests of the remaining Members for voting purposes only shall be determined as though the Withdrawn Member's Percentage Interest were zero.

(b)     If the remaining Members do elect to dissolve the Company in accordance with this Agreement after a Withdrawal Event, the Withdrawn Member shall be entitled to receive an amount in liquidation of its Interest determined as set forth in this Agreement.

(c)     If a Withdrawal Event results in the Dissolution of the Company, the Withdrawn Member shall be treated as any other Member in the liquidation of the Company's assets pursuant to Section 8.2.

(d)     Upon the occurrence of any Withdrawal Event, the Company shall have no further obligation or liability to any Assignee of the Withdrawn Member.

**9.3     Rights of a Withdrawn Member**.  In the event of a Withdrawal Event pursuant to Section 9.1(i) or (ii) above prior to the expiration of the Company's term (as set forth in Section 1.6 of this Agreement) the successor in interest to such Withdrawn Member ("Successor in Interest") shall be an Assignee of the Economic Interest of the Withdrawn Member.  In such event, the Successor in Interest shall not become a Member unless and until the admission of the Successor in Interest as a Member is consented to in writing by the unanimous vote or written consent of the Members, and provided further that the Successor in Interest executes and delivers such documents as the Managers may reasonably require to make the Successor in Interest a party to this Agreement.

**9.4     Company to Continue Upon a Withdrawal Event**.  The Company shall not dissolve upon the withdrawal of a Member, but shall continue until dissolved in accordance with Section 8.

**9.5     No Right to Receive Distributions Upon a Withdrawal Event**. No Member shall have the right to receive any distribution, other than pursuant to the express terms of this Agreement, prior to the Company's Dissolution pursuant to Section 8 of this Agreement.

## 10. APPLICABLE LAW

**10.1 Governing Law; Consent to Jurisdiction.** This Agreement and the rights and obligations of the parties hereto shall be interpreted in accordance with the laws of the State of Delaware without giving effect to principles of conflict of laws. Each Member hereby consents to the jurisdiction of any state or federal court located in the Counties of Kings or Nassau, New York for purposes of the enforcement of this Agreement. Each Member hereby waives in advance any objection to venue of any action constituted under this Section 10.1.

## 11. MISCELLANEOUS PROVISIONS

**11.1 No Third Party Beneficiaries.** The covenants, obligations and rights set forth in this Agreement are not intended to benefit any creditor of the Company or of any Member, or any other third Person, and except as permitted by applicable law after the obligation to make an additional Capital Contribution has been fixed, or in connection with certain wrongful distributions, no such creditor or other third Person shall, under any circumstances, have any right to compel any actions or payments by the Managers and/or the Members or shall, by reason of any provision contained herein, be entitled to make any claim in respect of any debt, liability, obligation or otherwise against the Company or any Member.

**11.2 Notices.** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

If to the Company:

FINANCIAL VISION GROUP LLC



Attention: Managers

If to the Managers:

c/o Alexandr Zaitsev

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five (5) days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer, if sent during

normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (iv) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

**11.3    Severability**. If any covenant, condition, term, or provision of this Agreement is illegal, or if the application thereof to any Person or in any circumstance be judicially determined to be invalid or unenforceable, the remainder of this Agreement, or the application of such covenant, condition, term, or provision to Persons or in circumstances other than with respect to which it is held invalid or unenforceable, shall not be affected thereby, and each covenant, condition, term, and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**11.4    Counterparts; Faxed or E-Mailed Signatures**.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  Any executed signature page delivered by facsimile or e-mail transmission shall be binding to the same extent as an original executed signature page, with regard to any agreement subject to the terms hereof or any amendment thereto.

**11.5    Entire Agreement**. This Agreement, together with the Certificate,  constitute the entire agreement of the parties relating to the subject matter hereof, and together they supersede and replace any prior agreement or understanding between some or all of the parties pertaining thereto.  To the extent the Act addresses a matter not otherwise addressed by this Agreement, it is the intention of the Members that the provisions of the Act shall apply, but no such application shall otherwise affect any provision of this Agreement.

**11.6    Amendments**.

(a)    Except as otherwise required by this Agreement or the Act, this Agreement may be amended by the unanimous vote or written consent of the Members.

(b)    Notwithstanding anything to the contrary contained in Section 11.6(a), the Managers may modify the provisions of this Agreement without the consent of the Members if, upon advice of counsel to the Company, the modification is necessary to cause (i) the Company to be or to continue to be classified as a partnership for federal income tax purposes or (ii) the allocations under Section 4 to have substantial economic effect or to be in accordance with the Members' interests under Section 704 of the Code and the Regulations thereunder.  No modification hereunder may alter the limited liability of the Members or have a material effect on amounts distributable to any Member pursuant to this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Section 11.6, any amendment to this Agreement that would adversely affect (i) the federal income tax treatment to be afforded a Member, (ii) the liabilities of a Member, or (iii) the consent and approval rights reserved by the Members, or which would otherwise change the method of calculating allocations or distributions under Section 4, shall require the consent of each Member affected.

**11.7    Amendment by Agreement of Merger**.  Notwithstanding anything to the contrary contained in this Agreement, in accordance with the Act, an agreement of merger or consolidation

approved by the Members as required by this Agreement may effect (a) amendments to this Agreement contained in the agreement of merger or consolidation or necessitated thereby or (b) the adoption of a new limited liability company agreement for the Company if it is the surviving or resulting entity, in each case without further action by the Members.

**11.8   Further Assurances**. The Members will execute and deliver such further instruments and do such further acts and things as may be reasonably required to carry out the intent and purposes of this Agreement, including, without limitation, such amendments to this Agreement as the Managers may determine to be reasonably necessary or advisable to ensure that the Company will be classified and treated as a partnership for federal, state and local income tax purposes.

**11.9   Successors and Assigns**. Subject in all respects to the limitations on transferability contained herein, this Agreement shall be binding upon, and shall inure to the benefit of, the heirs, administrators, personal representatives, successors, and permitted assigns of the respective parties hereto.

**11.10   Waiver of Action for Partition**. Each of the parties hereto irrevocably waives, during the term of the Company and during the period of liquidation following any Dissolution, any right that it may have to maintain any action for partition with respect to any of the assets of the Company.

**11.11   Waivers; Rights and Remedies Cumulative**. The failure of any party to pursue any remedy for breach, or to insist upon the strict performance, of any covenant or condition contained in this Agreement shall not constitute a waiver of any such right with respect to any subsequent breach. Except as otherwise expressly set forth herein, rights and remedies under this Agreement are cumulative, and the pursuit of any one right or remedy by any party shall not preclude, or constitute a waiver of, the right to pursue any or all other remedies. All rights and remedies provided under this Agreement are in addition to any other rights the parties may have by law, in equity or otherwise.

**11.12   Agreement Drafted by Counsel**. Each Member and Manager acknowledges that (i) Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, counsel for the Company, has prepared this Agreement on behalf of and in the course of its representation of the Company and not as counsel for any Member or Manager, (ii) each Member and Manager has been advised of potential conflicts of interest that may exist, now or in the future, between such Member or Manager and those of the Company and the other Members or Managers, and (iii) the Members and Managers have been advised by such law firm to seek independent counsel.

**11.13   Investment Representations**. Each Member hereby represents and warrants to the Company and each other Member as follows:

     (a)     Such Member acknowledges that:

          (i)     the Interest owned by it has not been registered under the Securities Act of 1933, the Delaware State securities laws or any other state securities laws (collectively, the "Securities Acts") because the Company is issuing (or an Member has Transferred) such Interest in reliance upon exemptions from the registration requirements contained in the Securities Acts for issuances not involving a public

offering;

     (ii) the Company (or the Transferor) has relied upon the fact that the Interest is to be held by such Member for investment purposes only, and not with a view to any resale or distribution thereof; and

     (iii) the Company is under no obligation to register or qualify the Interest or to assist any Interest Holder in complying with any exemption from registration under the Securities Acts if such Member wishes to dispose of the Interest.

  (b) Each Member is acquiring the Interest for his/her/its own account, for investment purposes only, and not with a view to the resale or distribution thereof, unless there are effective registrations or other qualifications relating thereto under applicable Securities Acts.

  (c) Before acquiring the Interest, each Member investigated the Company and its business, and the Company made available to it all information necessary to make an informed decision to acquire the Interest.

**11.14 Managers as Attorney-in-Fact for Members**.

  (a) Each Member hereby irrevocably constitutes and appoints, with full power of substitution, the Managers as its/his/her true and lawful attorney-in-fact, with full power and authority in its/his/her name, place and stead, to execute, certify, acknowledge, deliver, file and record at the appropriate public offices:

     (i) all certificates and other instruments, and any amendment thereto, which the Managers deems appropriate to form, qualify or continue the business of the Company as a limited liability company;

     (ii) any other instrument or document which may be required to be filed by the Company under the laws of any state, or which the Managers deem advisable to file; and

     (iii) any instrument or document required to continue the business of the Company or dissolve and liquidate the Company (provided that such continuation or Dissolution are consented to in accordance with this Agreement).

  (b) Each Member's appointment of the Managers as its/his/her attorney-in-fact shall be deemed to be a power coupled with an interest and shall survive the incompetency, Bankruptcy or Dissolution of the Member giving such power, except that, in the event of a Member's Transfer of an Interest in accordance with this Agreement, this power of attorney shall survive such Transfer only until such time, if any, as the assignee shall have been admitted to the Company as a Member and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution.

11.15   **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the parties hereto, arising out of or relating to this Agreement or its breach, the prevailing party shall be entitled, in addition to any other relief, to recover reasonable attorneys' fees, expenses, and costs, whether or not the controversy, claim, or dispute results in litigation or arbitration between the parties.

11.16   **Covenant Not To Compete**.  Each Manager, Member and any managers, officers, employees, consultants or agents of such Manager or Member, and any Affiliate of such Manager or Member, covenants and agrees that, so long as such Manager is a manager of the Company or such Member is a Member of the Company, in each case, as applicable, and for a period of one (1) year thereafter, such Manager and/or Member and each of their respective Affiliates, will not, without the unanimous prior written consent of the Members, directly or indirectly, and whether as a principal, agent, officer, manager, employee, consultant, corporation or other business organization: (i) be engaged in, concerned, take part in, render services to, own, share in the earnings of, or invest in the stock, bonds or other securities of any person, firm, corporation or other business organization engaged in a business located in any jurisdiction in which the Company performs its business which is the same, similar to or in competition with any of the business and operations of the Company then or theretofore carried on by the Company, or (ii) directly or indirectly hire, solicit, or recruit employees of the Company to leave employment with the Company, nor contact any employee of the Company, or cause an employee of the Company to be contacted, for the purpose of leaving employment with the Company, or (iii) interfere with the Company's relationship with, or endeavor to entice away from the Company any person, firm, corporation or other business organization who or which, at any time during the term of such Member's membership and/or Manager's engagement by the Company, was an employee, consultant, agent, franchisee, joint venture, supplier, vendor, contractor, supplier or customer of, or in the habit of dealing with, the Company.  Notwithstanding the foregoing, if any provision of this Section 11.16 is held by any court of competent jurisdiction to be unenforceable because of the scope, duration or area of its applicability, the Company shall have the right to modify such scope, duration or area or all of them so as to render them enforceable, and such provision shall then be applicable in such modified form.  If a Manager, Member, or an Affiliate of such Manager or Member, violates this Section 11.16, such Manager, Member and its Affiliates, as applicable, hereby consent to an injunction stopping such Manager's and/or Member's and/or its Affiliates' actions, as applicable.

11.17   **Scope and Duration; Equitable Relief**.   The Managers and Members acknowledge that the restrictions contained in Section 11.16 are reasonable in scope and in duration under the circumstances.  The Managers and Members further acknowledge and agree that such restrictions are necessary to protect the legitimate business interests of the Company and that any violation thereof would result in irreparable harm to the Company.  Accordingly, each Member and Manager agrees that upon the violation or threatened violation by him/her/it of any of the restrictions contained in Section 11.16, the Company shall be entitled to obtain from any court of competent jurisdiction a preliminary and permanent injunction (without the necessity of posting a bond or other security) as well as any other relief provided at law or equity, under this Agreement or otherwise.  In the event any of the foregoing restrictions are adjudged unreasonable in any proceeding, then the parties agree that the period of time or scope of such restrictions (or both) shall be adjusted in such a manner or for such a time (or both) as is adjudged to be reasonable.

11.18  **Confidentiality.**  The Members and Managers acknowledge and agree that all information provided to them by or on behalf of the Company concerning the business or assets of the Company (collectively, the "Confidential Information") shall be deemed strictly confidential and the Members and Managers shall not, without the prior written consent of the Company, use for himself/herself/itself, publish, disclose or otherwise reveal or divulge, any Confidential Information (other than to a person or entity bound by confidentiality obligations similar to those contained herein).  Each Member shall (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as they use for their personal confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the Company, and (3) refrain from using or allowing to be used any Confidential Information for their own benefit or for the benefit of any third party, except that disclosure of Confidential Information will be permitted: (a) to the Company; (b) if such Confidential Information has previously become available to the public through no fault of such Member or Manager; (c) is already known to such Member or Manager, on a non-confidential basis at the time of disclosure by the Company, as shown by competent evidence; (d) becomes known to such Member or Manager from a source other than the Company; provided, that, such source has not entered into a confidentiality agreement with the Company with respect to such information or obtained the information from an entity or person who is a party to a confidentiality agreement with the Company, and without a breach of this Agreement or without a breach of duty owed by any other person or entity to the Company; (e) is proven by competent evidence by such Member or Manager that it was independently conceived or discovered by such Member or Manager without reference to or use of the Confidential Information; (f) if required by law or any court or governmental agency or body; provided that in any such case covered by this clause (f) such Member or Manager shall provide the Company, in advance of any such disclosure, with prompt notice of such requirement(s) and shall cooperate fully with the Company to the extent it may seek to limit such disclosure; (g) if necessary to establish or assert the rights of such Member or Manager hereunder; (h) if expressly consented to in writing by the Company.

[*Remainder of Page Blank*]

Counterpart signature page for the Limited Liability Company Agreement of

## FINANCIAL VISION GROUP LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP LLC as of the date first above written.

MEMBER: _____

Alexandr Zaitsev

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP LLC as of the date first above written.

MEMBER:

_Daniel_

Daniel Kandhorov

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP LLC as of the date first above written.

MEMBER:

FHJ VISION PARTNERS, LLC

By: _____
          Howard Fensterman, Manager

By: _____
          Frank Carone, Manager

By: _____
          Jordan Fensterman, Manager

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP LLC as of the date first above written.

MEMBER:

_____

FBH Capital Group, LLC, Member

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP LLC

    IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP LLC as of the date first above written.

MANAGERS:

_____
Alexandr Zaitsev

_____
Daniel Kandhorov

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP LLC as of the date first above written.

MANAGERS:

_____

Alexandr Zaitsev

_____

Daniel Kandhorov

31

## FINANCIAL VISION GROUP LLC

## LIMITED LIABILITY COMPANY AGREEMENT

### SCHEDULE A

| Name of Member | Capital Contribution | Number of Units | Percentage Interest |
|---|---|---|---|
| Alexandr Zaitsev ██████ | $ | 33.375 | 33.375% |
| Daniel Kandhorov ██████ | $ | 33.375 | 33.375% |
| FHJ Vision Partners, LLC ██████ | $ | 22.25 | 22.25% |
| FBH Capital Group, LLC ██████ | $ | 11 | 11% |
| **TOTAL** | **$** | **100** | **100%** |

**EXHIBIT A**

**JOINDER AGREEMENT**

**FINANCIAL VISION GROUP LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

The undersigned has read and hereby joins in and agrees to be bound by all of the terms and provisions of that certain Limited Liability Company Agreement of FINANCIAL VISION GROUP LLC (the "Company"), dated as of May 14, 2018, by and among the Members of the Company (as, or as the same may be, amended, modified, supplemented or restated, the "Agreement"), and shall for all purposes be deemed to be a Member (as such term is contemplated by the Agreement) of the Company, and shall be entitled to all of the rights and entitlements, and subject to and liable for all of the obligations, liabilities and undertakings, of a Member as set forth in or contemplated by the Agreement.

MEMBER:

_____                    _____
Signature                                           Date

_____
Print Name

_____
Social Security Number

_____
Number of Units

_____
Percentage Interest

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## FINANCIAL VISION GROUP II LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of FINANCIAL VISION GROUP II LLC (the "Company") is made and entered into as of the 26th day of September, 2018, by and among the Persons who have executed the signature page(s) hereof as Members and the Persons who from time to time hereafter execute a Joinder Agreement in the form attached hereto as <u>Exhibit A</u>.

**WHEREAS**, the parties have formed a limited liability company (together with any successor limited liability company, the "Company") under the Delaware Limited Liability Company Act (the "Act") and upon the terms and conditions of this Agreement; and

**WHEREAS**, the Members wish to set forth their agreement as to how the business and affairs of the Company shall be managed and their rights and obligations with respect to the Company.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this Agreement, the parties hereby agree as follows:

## 1.   ORGANIZATION.

**1.1   Formation**. The Company was organized on August 8, 2018, in accordance with and pursuant to the Act under the name of ADF Equities LLC. A Certificate of Amendment changing the Company name to Financial Vision Group II LLC was filed on September 26, 2018.

**1.2   Name**. The name of the Company shall be "FINANCIAL VISION GROUP II LLC" or such other name as the Members shall from time to time determine.

**1.3   Principal Office**. The principal office of the Company shall be located at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey 07470 or at such other place as may be designated by the Members. The Members may provide additional offices for the Company within or outside of the State of Delaware if the same are deemed advisable for the conduct of the Company's business.

**1.4   Filings**.

(a)   The Certificate of Formation of the Company (the "<u>Certificate</u>") was filed with the Secretary of State of the State of Delaware on August 8, 2018 and a Certificate of Amendment was filed with the Secretary of State of the State of Delaware on September 26, 2018; and the Managers shall execute such further documents and take such further action as shall be necessary or appropriate to comply with the requirements of law for the formation and operation of a limited liability company pursuant to the Act.

(b)   The Managers are authorized to execute, file and/or publish, or cause to be filed and/or published, with the proper authorities in each jurisdiction (or subdivision thereof) where the Company conducts business, such certificates or documents in connection with the conduct of business as may be required by applicable law.

1

(c)     The Members, from time to time, shall execute, acknowledge, verify, file, record and/or publish, or cause to be executed, acknowledged, verified, filed, recorded and/or published, all such applications, certificates and other documents, and do or cause to be done all such other acts, as the Managers may deem necessary or appropriate to comply with the requirements of law for the formation, qualification and operation of the Company as a limited liability company in all jurisdictions in which the Company shall desire to conduct business.

**1.5     Purpose**. The purpose of the Company is to conduct any lawful business or activity whatsoever as permitted by applicable law and as determined from time to time by the Managers. The Company may exercise all powers necessary to or reasonably connected with the Company's business from time to time, and may engage in all activities necessary, customary, related or incidental to any of the foregoing.

**1.6     Term**. The term of the Company shall commence as of the date hereof and shall be of unlimited duration, unless the Company is earlier dissolved in accordance herewith and with the Act.

**1.7     Names and Addresses of Members.** The name, address, Capital Contribution, number of Units, and Percentage Interest of each of the Members of the Company are set forth on Schedule A annexed hereto. If necessary, Schedule A shall be amended by the Managers from time to time to reflect any changes to the information set forth thereon.

## 2.     DEFINITIONS AND INTERPRETATION

**2.1**     Definitions. In addition to terms otherwise defined herein, the following terms shall have the following meanings:

"Accountants" shall have the meaning set forth in Section 7.4(b) of this Agreement.

"Act" shall have the meaning set forth in the Recitals.

"Adjusted Capital Account" shall mean, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i)   Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and (ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations. The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" or "Affiliated" of a Person shall mean (i) any officer, partner, director, manager, trustee, member, general partner, or controlling shareholder of such Person; (ii) any Person controlling, controlled by or under common control with such Person; (iii) any officer, director, trustee, member, manager, controlling shareholder or general partner of any Person described in (ii) above and (iv) any Person in which such Person serves as an officer, director, trustee, member, manager, shareholder or partner. For purposes of this definition, the term "control" shall mean the right or ability to elect the majority of the directors of a Person, to exercise more than fifty percent (50%) of the voting rights in the Person, the power to direct the

2

management and policies of such Person, directly or indirectly, by or through stock ownership, agency or otherwise, or pursuant to or in connection with an agreement, arrangement or understanding (written or oral) with one or more other Persons by or through stock ownership, agency or otherwise and the terms "affiliate," "controlling" and "controlled" shall have meanings correlative to the foregoing.

"Assignee" shall mean the holder of an Economic Interest who is not a Member.

"Available Cash" shall mean all Gross Receipts actually received by the Company, less the sum of the following, to the extent paid (in the order of priority listed below) from Gross Receipts received by or on behalf of the Company to third parties in arms-length transactions, or, if otherwise, then not in excess of what third parties would charge in arms-length transactions:

(1)     All principal, interest and other payments due and owing with respect to loans, mortgages and other indebtedness of the Company;

(2)     All cash expenditures then required to be made in connection with the operation of the business of the Company;

(3)     The Tax Distributions paid pursuant to Section 4.4 of this Agreement; and

(4)     Such cash Reserves as the Managers reasonably determine to be necessary or appropriate for the operation of the business of the Company.

"Bankruptcy" of a Member shall mean (a) the entry of an order for relief with respect to that Member in a proceeding under the United States Bankruptcy Code, as amended from time to time, (b) the Member's initiation, whether by filing a petition, beginning a proceeding or in answer to a proceeding commenced by another Person, of any action for liquidation, Dissolution, receivership or other similar relief, (c) the Member's application for, or consent to the appointment of, a trustee, receiver or custodian for its assets, (d) the Member's making of a general assignment for the benefit of creditors or (e) the Member's failure generally to pay its debts as such debts come due or admission in writing of its inability to pay its debts as they come due. For purposes of this definition, a Member's consent shall be deemed to have been given if an order appointing a trustee, receiver or custodian is entered by a court of competent jurisdiction and is not dismissed within ninety (90) days after its entry.

"Capital Account" shall have the meaning set forth in Section 3.8(a) of this Agreement.

"Capital Contribution" shall mean, with respect to any Member, the amount of money and the fair market value of property contributed by such Member to the Company. The Capital Contributions of each Member is set forth on Schedule A.

"Certificate" shall have the meaning set forth in Section 1.4(a) of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as the same has been or may be amended from time to time.

"Company Minimum Gain" shall mean the amount determined under Treasury

3

Regulation Sections 1.704-2(d) and 1.704-2(i)(3), and shall be computed separately for each Interest holder in a manner consistent with Code Section 704(b) and the Treasury Regulations thereunder.

"Control" or any derivative thereof, when used with respect to a specified Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person

"Dissolution" shall mean, with respect to a legal entity other than a natural person, that such entity has "dissolved" within the meaning of the partnership, corporation, limited liability company, trust or other statute under which such entity was organized.

"Economic Interest" shall mean an interest, as represented by one or more Units, in a holder's share of the Net Profits and Net Losses of, and the right to receive distributions from, the Company.

"Economic Interest Holder" shall mean any Person who holds an Economic Interest, whether as a Member's or an unadmitted Assignee of a Member's Units.

"Entity Member" shall have the meaning set forth in Section 6.1.

"Family Member" shall have the meaning set forth in the definition of Permitted Transferee.

"Gross Receipts" with respect to any period shall mean all gross cash receipts of the Company from any source whatsoever received by the Company during such period, including, without limitation, all payments of principal and interest made with respect to any advance made by the Company, interest income, any compromise or settlement payments (including good faith deposits or escrows when forfeited) received by the Company with respect to any advances, mortgage loans, cash proceeds of the sale or other disposition of any advance, mortgage loan or other asset held by the Company (including amounts paid by any Member in connection with the purchase by it of any asset of the Company), all payments received by the Company in reduction of the outstanding principal balance of any mortgage or other advances held by the Company (whether in the nature of standard amortization, prepayments or special payments of principal), all payments received by Company for the release of collateral from the lien of a mortgage held by Company, cash proceeds of the sale or other disposition of any real property, rental income of any and every nature, condemnation awards or hazard insurance proceeds received by Company and not applied by the Company toward the repayment and/or restoration of the properties which suffered the casualty or condemnation, the net proceeds of any loans borrowed by the Company for which the advances or mortgage loans or other assets of the Company pledged as collateral; but excluding (A) Capital Contributions, (B) Company borrowings and (C) any amounts received by the Company which constitute segregated escrow or similar accounts (until the same are released or forfeited to the Company).

"Interest" shall mean the ownership interest of a Member in the Company represented by one or more Units, consisting of (i) such Member's right to profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act and (iii) such Member's other rights and privileges as herein provided.

"Interested Member" shall mean any Member who is also a Manager or any Entity Member in which a Manager is a member of such Entity Member or which a Family Member of a Manager is a member of such Entity Member.

"Managers" shall mean the persons appointed pursuant to Section 5.1(b) of this Agreement.

"Members" shall mean each Person who (a) executes a counterpart of this Agreement as a Member or (b) is admitted as a Member in accordance herewith.

"Member Nonrecourse Debt" shall mean nonrecourse debt of the Company under Treasury Regulation Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall have the meaning set forth in Section 4.2(b) of this Agreement.

"Negative Capital Account" shall mean a Capital Account with a balance less than zero and, where the context requires, the negative balance thereof, in each case as of the end of a fiscal year, after giving effect to the following:

(a)     a credit for any amount required to be restored under Treasury Regulation Section 1.704-1(b)(2)(ii)(c), as well as any amounts in addition thereto pursuant to Treasury Regulation Sections 1.704-2(g)(1) and (i)(5), after taking into account any changes during such fiscal year in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and

(b)     a debit of the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Net Losses" shall mean, with respect to any fiscal period of the Company, the net losses of the Company for such period for federal income tax purposes including as appropriate each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"Net Profits" shall mean with respect to any fiscal period of the Company, the net profits of the Company for such period for federal income tax purposes including, as appropriate, each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"Offered Interest" shall have the meaning set forth in Section 6.3(a) of this Agreement.

"Percentage Interest" of a Member shall mean the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth on Schedule A hereto bears to the total number of Units owned by all Members as of such date. The combined Percentage Interests of all Members shall at all times equal 100%.

"Permitted Transferee" shall mean (A) with respect to a Member who is an individual, such individual's spouse, children (including natural, adopted and/or step children) or grandchildren (natural, adopted and/or step) (a "Family Member"), a trust of which one or more Family Members are the sole beneficiaries; (B) with respect to a Member which is a partnership,

corporation or limited liability company, such Member's current partners, shareholders, members, directors and/or executive officers, as the case may be; (C) with respect to a Member which is a trust, the existing beneficiaries of such trust; (D) with respect to any Member, a corporation, partnership, limited liability company or other entity, all of which interests therein are owned by the transferring Member or his/her/its Family Members; or (E) with respect to any Member (or Person comprising such Member), any other Member (or Person comprising such Member).

"Person" shall mean an individual, corporation, limited liability company, limited partnership, general partnership, joint venture, company, trust, bank or other entity.

"Regulations" shall mean the Treasury Regulations promulgated under the Code as such regulations maybe amended from time to time (including the corresponding provisions of succeeding regulations).

"Reserves" shall mean, with respect to any fiscal year (or such shorter period as necessary to take into account the Members' varying interests in the Company), funds set aside or amounts allocated during such period to reserves which will be maintained in amounts deemed necessary, sufficient or appropriate by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transfer" shall mean any sale, assignment, transfer, gift, exchange, bequest or other disposition of an Interest, in any manner, voluntary or involuntary, by operation of law or otherwise, but shall not include a pledge, hypothecation or other contingent transfer of rights unless or until such contingency occurs.

"Transfer Date" shall have the meaning set forth in Section 4.1(b) of this Agreement.

"Transferor" shall have the meaning set forth in Section 6.3(a) of this Agreement.

"Treasury Regulations" shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

"Unit" shall mean a unit of ownership interest in the Company and shall represent an undivided interest in the holder's Capital Account balance.

"Withdrawn Member" shall have the meaning set forth in Section 9.1 of this Agreement.

"Withdrawal Event" with respect to any Member, shall mean his/her/its (a) death, revocation of its certificate of incorporation/articles of organization/certificate of formation, Dissolution, expulsion as a Member or adjudication of incompetency, as applicable; (b) Bankruptcy; (c) voluntary retirement or withdrawal from the Company; (d) except as otherwise provided herein, breach of any of his/her/its material obligations under this Agreement, or (e) any other event that terminates a Member's membership in the Company or otherwise causes the Dissolution of the Company under the Act.

"Wrongful Act" shall mean an act of fraud, deceit, gross negligence, willful misconduct, breach of fiduciary duty or a wrongful taking by any Manager.

**2.2    Captions**. The captions used in this Agreement are inserted for convenience and identification only and are in no way intended to define or limit the scope, extent or intent of this Agreement or any of the provisions hereof.

**2.3    Construction**. Whenever the singular number is used herein, the same shall include the plural, and the masculine, feminine and neuter genders shall include each other. Unless the context clearly requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision hereof. If any language is stricken or deleted from this Agreement (or any prior draft thereof), such language shall be deemed never to have appeared herein and no other implication shall be drawn therefrom.

## 3.    CAPITAL; CAPITAL ACCOUNTS

**3.1    Capital Contributions; Interests.**

(a)    <u>Capital Accounts</u>. The initial Capital Contributions that have been made by the Members to the Company are set forth on <u>Schedule A</u> annexed hereto.

(b)    <u>Percentage Interests</u>. Notwithstanding each Member's initial Capital Contribution, each Member shall have the number of Units and the Percentage Interest set forth on <u>Schedule A</u> annexed hereto.

(c)    <u>Additional Contributions</u>. There shall be no requirement of the Members to make additional capital contributions to the Company except upon the unanimous vote or written consent of the Members.

**3.2    No Withdrawal of Capital Contributions**. Except upon Dissolution and liquidation of the Company or as otherwise set forth herein, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contributions, or any part thereof, or any distribution thereon. Except as otherwise provided herein, no Member shall have the right to receive assets other than cash in connection with a distribution or return of capital.

**3.3    Return of Capital Contributions.**

(a)    <u>No Fixed Time</u>. Except upon Dissolution and liquidation of the Company, or pursuant to Section 6.8 of this Agreement, there is no agreement, nor time set, for the return of any Capital Contribution to any Member.

(b)    <u>No Personal Liability of Member</u>. Except as otherwise required by the Act, the Members shall not be personally liable for the return or repayment of any Capital Contribution.

**3.4    Liability of Members and Their Affiliates.** Except as otherwise provided by applicable law or herein, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; no Member or Person Affiliated with a Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or being a Person Affiliated with a Member.

**3.5    No Priority**. Except as otherwise expressly provided for in this Agreement, no

Member shall have priority over another Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

**3.6    No Interest**.  Except as expressly provided for by this Agreement, no interest shall be paid on all or any part of a Member's Capital Account.

**3.7    No Obligation to Restore Negative Balances in Capital Accounts**.  No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

**3.8    Capital Accounts**.

(a)    The Company shall maintain a separate capital account ("Capital Account") for each Member and his/her/its legal representatives, successors and permitted assigns.

(b)    The Capital Account of each Member shall be maintained in accordance with Section 1.704-1(b) of the Regulations as in effect on the date of this Agreement and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with Regulation Section 1.704-1(b), the Managers may make such modifications, provided that such changes have no financial impact on the amount distributable to a Member under Sections 4.3 and 8.2.

(c)    The Capital Account of each Member shall consist of the amount of cash and the fair market value of the property (as determined in good faith by the Managers) contributed by such Member to the Company (net of liabilities securing such contributed property assumed by the Company or subject to which the Company takes the contributed property) increased by allocations of Net Profits, and of tax-exempt income, if any, and decreased by allocations of Net Losses, by distributions and withdrawals of cash and property (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property) and by expenditures defined in Section 705(a)(2)(B) of the Code (or which are treated as Section 705(a)(2)(B) expenditures under Regulation 1.704-1(b)(2)(iv)(i)).

(d)    In the event of a transfer of a Unit or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the person or entity so acquiring such Unit or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Unit, adjusted for distributions of Available Cash theretofore made and allocations of Net Profits and Net Losses through the effective date of the transfer.  The cost of computing such adjustment shall be borne by the Member disposing of such Unit.

## 4.    PROFITS, LOSSES AND DISTRIBUTIONS

**4.1    General**.

(a)    The Net Profits and Net Losses of the Company shall be determined for each fiscal year in accordance with the accounting method followed by the Company for federal income tax purposes. Except as otherwise provided herein, whenever a proportionate part of the Net Profit or Net Loss is credited or charged to a Member's Capital Account, every item of income,

8

gain, loss, deduction or credit entering into the computation of such Net Profit or Net Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Net Profit or Net Loss and applicable to the period during which such Net Profit or Net Loss was realized shall be allocated to such Member in the same proportion.

(b)     On the last day of the month in which a new Member is admitted to the Company, or a valid transfer of all or a portion of a Member's Units is consummated (the "Transfer Date"), the books of the Company shall be closed in accordance with Section 706(d) of the Code, and consistent therewith: (i) items of income, deduction, gain, loss and/or credit of the Company that are recognized prior to the Transfer Date shall be allocated among those Persons who were Members in the Company prior to the Transfer Date in accordance with their respective Interests prior to the Transfer Date; and (ii) items of income, deduction, gain, loss and/or credit of the Company that are recognized after the Transfer Date shall be allocated among the Persons who were Members in the Company after the Transfer Date.

**4.2     Allocation of Net Profits and Net Losses**.

(a)     After giving effect to the special and curative allocation provisions set forth in this Section 4.2, the Net Profits and Net Losses of the Company for each taxable year (or portion thereof) shall be allocated among the Members in such amounts as are necessary to cause the positive balance in each Member's Adjusted Capital Account to equal, to the greatest extent possible, the amount that would be distributed to each Member were the Company to dissolve and terminate at the end of the taxable year in question, assuming for this purpose that the Company's assets are liquidated for their fair market value and that the net proceeds of such liquidation, after the payment of all Company debts and liabilities, are distributed to the Members in accordance with Section 4.3 of this Agreement, taking into account Section 4.4 of this Agreement.

(b)     Special Allocation Provisions.

(i)     Notwithstanding anything to the contrary contained in Section 4.2 hereof, any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as such term is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Section 1.752-2(b) of the Regulations for such Member Nonrecourse Debt. If more than one Member bears such economic risk of loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such economic risk of loss. If more than one Member bears such economic risk of loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(ii)     Minimum Gain.

(A)      Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Company Minimum Gain (as such term is defined in Sections 1.704-2(b)(2) and (d) of the Regulations), there shall be allocated to each Member, before any other allocation pursuant to Section 4.2 hereof is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain.  A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)      Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as defined in Section 1.704-2(1)(2) of the Regulations), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such fiscal year before any other allocation pursuant to Section 4.2 hereof (other than an allocation required pursuant to Section 4.2(b)(ii)(A)) is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain.  The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations.  The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iii)  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Adjusted Capital Account in excess of the amount such Member is required to restore upon a liquidation of the Company (or of such Member's interest in the Company), then, after any allocations required by Section 4.2(b)(ii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible.  To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 4.2(b)(iii) shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Section 4.2, so that the net amount of any items so allocated and the subsequent Net Profits and Net Losses allocated to the Members pursuant to Section 4.2 shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of Section 4.2 if such unexpected adjustments, allocations or distributions had not been made.

(iv)   Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(v)   Notwithstanding the other provisions of this Section 4.2 to the contrary, Net Losses shall not be allocated to a Member to the extent the allocation would create or increase a negative balance in such Member's Capital Account if at that time any other Member has a positive Capital Account; in such event, Net Losses shall be allocated only to Members with positive Capital Accounts until all Members' Capital Accounts have been reduced to zero or are negative, and thereafter all Net Losses shall be allocated to the Members in the ratio of their Percentage Interests or as otherwise provided herein. Notwithstanding the other provisions of this Section 4.2, in the event that at any time any Net Loss has been allocated to any Member pursuant to this clause (v), all Net Profits arising thereafter shall first be specially allocated to the Members who received allocations of Net Losses pursuant to this clause (v) (in proportion to the maximum allocation to which each such Member is then entitled under this clause (v)) until the aggregate amount of Net Profits specially allocated to each such Member pursuant to this clause (v) equals the aggregate amount of Net Losses theretofore allocated to such Member pursuant to clause (v).

**4.3**   **Distributions of Available Cash**.  Except as otherwise provided in this Agreement, including without limitation as provided in Section 8.2 with respect to the liquidation of the Company, Distributions of Available Cash shall be made to the Members, at least annually, upon the unanimous consent of the Managers and FHJ Vision Partners, LLC, as follows:

(a)   *first,* to any Member who has made a loan to the Company, until such loan, together with all interest thereon, has been paid in full; and

(b)   *second,* pari passu, to the Members in accordance with their Percentage Interests.

**4.4**   **Tax Distribution.**

(a)   Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each fiscal year, an amount of cash equal to the product of the Tax Percentage (as defined below) for such fiscal year and such Member's allocated share of the Company's net taxable income and gain for such fiscal year as shown on the Company's federal income tax return (the "Tax Distribution").  If the Company is not required to file a federal income tax return for a fiscal year or the Company's federal income tax return for such fiscal year has not been completed by the close of business on the 85th day after the close of such fiscal year, the amounts to be shown on such return for purposes of this Section 4.4(a) shall be determined in good faith by the Managers.

11

(b)     For purposes of this Section 4.4, "Tax Percentage" shall equal the highest marginal effective rate of federal, state and local income tax in effect for the fiscal year in respect of which the Tax Distribution is made applicable to individuals resident in Delaware or New York, whichever is higher, taking account of any difference in rates applicable to ordinary income and capital gains and any allowable deductions in respect of such state and local taxes in computing the Members' liability for U.S. federal income tax purposes, and assuming that the items of income, gain, deduction, loss and credit in respect of the Company were the only items entering into the computation of tax liability of the Members for the fiscal year in respect of which the Tax Distribution is made.

(c)     For purposes of determining whether the Company has satisfied its distribution obligation under Section 4.4(a), all cash distributions made during a fiscal year shall be treated as distributions made to satisfy Section 4.4(a) in respect of such fiscal year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 4.4(a) in respect of one or more prior fiscal periods, in which case such distributions shall be treated as having been made pursuant to Section 4.4(a) in respect of such prior fiscal period or periods).

(d)     No distribution shall be required to be made pursuant to this Section 4.4 to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(e)     The Company shall not make a distribution under this Section 4.4 to a Member to the extent such Member's Interest is being redeemed or in connection with a liquidation of the Company.

**4.5     Incorrect Distributions**. To the extent distributions pursuant to this Section 4 were incorrectly made or were in violation of any applicable law, as determined by the Managers in good faith and based upon financial statements of the Company or such other relevant information, the recipients shall promptly repay all incorrect payments and/or the Company shall have the right to set off any current or future amounts owing to such recipients against any such incorrectly paid amounts.

**4.6     Distributions in Kind**. In the event any proceeds available for distribution consist of items other than cash (including, but not limited to notes, mortgages and payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amounts of proceeds due them, respectively. In determining the Capital Accounts of the Members for purposes of Section 3.8, the amount by which the fair market value of any property to be distributed to the Members exceeds or is less than the tax basis of such assets, to the extent not otherwise recognized by the Company shall be taken into account as if such gain or loss were recognized by the Company.

**4.7     Limitation on Distributions**.  No distribution shall be declared and/or paid unless, after giving effect thereto, the assets of the Company exceed the Company's liabilities.

**4.8     Additional Allocations**.  Notwithstanding anything in this Agreement to the contrary, the Managers may, in their reasonable discretion, allocate Net Profits and Net Losses for any fiscal year in a manner that the Managers deem necessary or appropriate in order to effectuate

any intended economic sharing arrangement or understanding of the Members.

**4.9    Reserves**.    The Managers shall establish and set aside such Reserves as the Managers deem to be in the best interests of the Company.

5.    **MANAGEMENT OF THE COMPANY; MEMBERS**

**5.1    Management Powers of the Managers; Managers.**

(a)    Except as set forth in Section 5.8 below, and except as expressly limited by the provisions of this Agreement or by the Act, the management and control of the business of the Company shall rest exclusively with the Managers, who shall have the full, exclusive and absolute right, power and authority to manage and control each and every aspect of the business of the Company and its property, assets and affairs.   The scope of the Managers' power and authority shall encompass all matters connected or incident to the business of the Company.   The Managers shall be agents of the Company for its business purposes and the Managers may bind the Company in the ordinary course, provided that the Managers have approved such action in accordance with this Agreement or the Act.   Unless otherwise expressly authorized by this Agreement or the Members as set forth herein, any acts of the Managers that are not apparently for carrying on the Company's business in the ordinary course shall not bind the Company.   All decisions made by the Managers, pursuant to this Agreement, shall be made upon the unanimous written consent of the Managers.

(b)    The Company shall have two (2) managers who may, but need not be, Members of the Company.   The initial Managers shall be Alexandr Zaitsev and Daniel Kandhorov.   Alexandr Zaitsev and Daniel Kandhorov shall serve as Managers until their death, resignation or removal in accordance with this Agreement.   Should Alexandr Zaitsev and/or Daniel Kandhorov die, resign or be removed as a Manager pursuant to this Agreement, the Members will appoint a successor Manager in accordance with Section 5.8(b) below.

(c)    The Managers shall be entitled to receive, solely out of the Company's positive net proceeds, reimbursements of all reasonable costs and expenses incurred in connection with the business of the Company.

**5.2    Resignation.** A Manager of the Company may only resign upon the unanimous written consent of the Members. The resignation of a Manager who is also a Member will not affect his/her/its rights as a Member.

**5.3    Removal**.  A Manager may be removed by the Members in accordance with Section 5.8 below if such Manager (a) commits a Wrongful Act; or (b) suffers a Permanent Disability (which shall mean a disability that causes the inability of such Manager to provide services to the Company for 90 consecutive days).   The removal of a Manager who is also a Member will not affect his/her/its rights as a Member except as otherwise set forth herein.

**5.4    Liability for Certain Acts**. Each Manager shall perform his duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.  A Manager who so performs his/her/its duties shall not have any liability by reason of being or having been a Manager.  A Manager shall not be liable to the Company or to any Member for any loss or damage unless a judgment or other final adjudication adverse to such Manager establishes that such loss or damage was the result of fraud, gross negligence, willful

misconduct, bad faith or a wrongful taking by such Manager.

**5.5     Delegation to Agents and Officers**.  The Managers may delegate functions relating to the day-to-day operations of the Company to such officers, agents, consultants or employees as they may from time to time designate.  Such officers, agents, consultants and employees need not be Members, and shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Managers and may be removed at any time, with or without cause, by the Managers.

**5.6     Other Duties of the Managers**.  In addition to their other duties set forth herein, the Managers:

(a)     may make, on behalf of the Company, the election permitted by Code Section 754 with respect to adjustments to the basis of the Company property,

(b)     shall, promptly following receipt thereof, give notice to the Members of any proposed audit or adjustments of any Company tax returns; and

(c)     shall serve as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

**5.7     No Other Management Powers by Members**.  Except as expressly provided in this Agreement or as otherwise required by law, no Member, by reason of his/her/its status as such, shall have any voice or participation in the management of the Company's business or to act for or bind the Company but shall have only the right to vote on or approve the actions, if any, specified herein to be voted on or approved by the Members.

**5.8     Member Rights of Approval**.

(a)     The Members will have such rights with respect to the management of the property, business and affairs of the Company, and such other powers, as are expressly set forth in this Agreement or under the Act.

(b)     Notwithstanding anything herein to the contrary, the Members, acting independently of the Managers, shall take and/or authorize the following acts or transactions by the unanimous vote or written consent of the Members; provided, however, with respect to the removal of a Manager (as provided in Section 5.8(b)(iii)), and with respect to the election of a successor Manager (as provided in Section 5.8(b)(ii) following such Manager's removal pursuant to Section 5.3), or with respect to any matters specified in 5.8(x), the vote or written consent of sixty-five percent (65%) of the Members shall be required (not unanimous) and such sixty-five percent (65%) vote or written consent of the Members shall exclude the vote or written consent of any Interested Member and the relative Percentage Interests of the remaining Members for voting purposes only shall be determined as though the Interested Member's Percentage Interest were zero:

(i)     the sale, exchange or other disposition of all or substantially all of the Company's assets, whether in a single transaction or series of related transactions, or the merger or consolidation of the Company with or into another Person;

    (ii)  the election of a Manager;

    (iii)  the removal of a Manager pursuant to Section 5.3;

    (iv)  the amendment of the Certificate or this Agreement in any respect, except as provided in Sections 11.6 and 11.7;

    (v)  voting to dissolve, wind up and liquidate the Company;

    (vi)  to require the Members to make additional capital contributions to the Company pursuant to Section 3.1(b);

    (vii)  entering into any agreement or series of related agreements, including any agreement to borrow money that, either individually or collectively, (1) creates a monetary obligation of the Company equal to or greater than $10,000, or (2) grants a mortgage on, a security interest in, or otherwise encumbers any material asset of the Company;

    (viii)  entering into any agreement or series of related agreements, including any agreement to advance money from the Company to any Person, either individually or collectively, equal to or greater than $10,000;

    (ix)  capital expenditures by the Company in excess of $10,000, whether in a single transaction or series of related transactions;

    (x)  the making of any decisions concerning matters where a Manager has a direct or indirect economic interest.

  **5.9**  **Meetings of Members**.  Except as otherwise provided in this Agreement, there shall be no requirement of annual or periodic meetings of the Members.

  **5.10**  **Transactions between Company and Members**.  Each Member, including a Manager, has the right to engage in business transactions with the Company, including, but not limited to, providing goods and\or services to the Company, and be compensated accordingly, provided that any such transaction be entered into in good faith and at arms length.  Any such transaction will not affect such Member's Capital Account.  If a Member loans any monies to the Company pursuant to a debenture or other lending agreement or arrangement, the Managers shall use commercially reasonable efforts to ensure that the Company shall abide by the terms and obligations of the Company under such debenture or other lending agreement or arrangement.

  **5.11**  **Outside Interests; Conflicts.**  Subject to Section 11.16 of this Agreement, any Member, Manager or Affiliate of any Member or Manager shall have the right to engage in and/or possess an interest in any other business of every kind, nature and description, independently or with other Persons, irrespective of whether competitive with any property or business directly or indirectly owned or engaged in by the Company. Neither the Company nor any Member or Manager shall have or be entitled to any rights, solely by virtue of this Agreement, in and to such independent ventures or to the income and profits derived therefrom, nor shall any such Member, Manager or such Affiliated Person have any obligation whatsoever to offer, share or offer to share any business opportunity of any kind to or with the Company or any other Member or Manager.

The Members hereby waive any and all rights and claims which they may otherwise have against such other Member, Manager and their Affiliated Person.

**5.12    Indemnification.** To the fullest extent permitted by applicable law from time to time in effect:

(a)    The Company shall indemnify and hold harmless the Managers, Members, officers, agents and employees of the Company and their respective directors, trustees, shareholders, members, partners, officers, employees, agents and other Affiliates, against all costs, liabilities, claims, expenses, including reasonable attorneys' fees and disbursements, and damages (collectively, "Losses") paid or incurred by any such Person in connection with the conduct of the Company's business; and

(b)    The Company shall indemnify, defend and hold the Managers harmless from and against, and may indemnify, defend and hold the Company's and the Managers' respective Affiliates, agents, employees, consultants and other independent contractors (collectively, "Indemnitees"), harmless from and against, all Losses arising from any demands, claims or lawsuits against any of the Indemnitees in connection with or resulting from their acts or omissions in their capacities as the Managers, or as such an Affiliate, agent, employee, consultant or other independent contractor of the Company or the Managers, or in connection with, arising from or relating to, business or activities undertaken on behalf of the Company, including, without limitation, any demands, claims or lawsuits initiated by a Member, unless a judgment or other final adjudication adverse to such Indemnitee establishes that (i) such acts or omissions were committed in bad faith, or were the result of active and deliberate dishonesty, (ii) such Indemnitee personally gained a financial profit or other advantage to which he or she was not legally entitled or (iii) such acts or omissions violated such lesser standard of conduct as under applicable law affirmatively prevents indemnification hereunder.   The termination of any action, suit or proceeding by judgment, order, settlement, plea of nolo contendere or its equivalent or conviction shall not, of itself, create a presumption that an Indemnitee shall not be entitled to indemnification hereunder or that the Indemnitee did not act in good faith and in a manner which it reasonably believed to be in or not opposed to the best interests of the Company.

(c)    The rights of an Indemnitee set forth in this Section 5.12 shall not be exclusive of any other rights to which it may be entitled, whether by separate agreement or otherwise, nor shall such rights limit or affect any other such rights.  All rights of an Indemnitee under this Section 5.12 shall survive the Dissolution of the Company and any Withdrawal Event with respect to such Indemnitee, and shall inure to the benefit of his/her/its heirs, personal representatives, successors and assigns.

(d)    Notwithstanding anything contained herein to the contrary, any amount to which an Indemnitee may be entitled under this Section 5.12 shall be paid only out of the assets of the Company and any insurance proceeds available to the Company for such purposes.  No Member shall be personally liable for any amount payable pursuant to this Section 5.12, or to make any Capital Contribution, return any distribution made to it by the Company, or restore any Negative Capital Account balance to enable the Company to make any such payment.

# 6.    RESTRICTIONS ON THE DISPOSITION OF AN INTEREST

**6.1    Generally**. Except as otherwise expressly provided for in this Agreement, no

16

Member may, directly or indirectly, Transfer all or any portion of his/her/its Units or Interests in the Company without the prior written consent of the Managers, which consent shall not be unreasonably withheld, conditioned or delayed. Any attempt to Transfer in violation of this Agreement shall be of no force or effect and shall not be recognized by the Company. For the purposes hereof, a direct or indirect Transfer by a Member shall include a Transfer of interests (including any interest as a trustee) in any entity which is a Member (each, an "Entity Member") other than a redemption or repurchase of interests by such Entity Member of one or more of its member's interests or transfers of interests among the members of such Entity Member. Notwithstanding anything herein to the contrary, any transfers or assignments of the membership interests within FHJ Vision Partners, LLC ("FHJ") whether among the members of FHJ or to non-members of FHJ are hereby expressly permitted by the Company and the Managers, and are subject solely to the requirements set forth in the Operating Agreement of FHJ.

      **6.2**    **Permitted Transfers**. After compliance with Section 6.4 below only, a Member may Transfer all or a portion of his/her/its Units or Interests or allow the Transfer of direct or indirect ownership interests in such Member or in the partners, members or shareholders thereof, as follows, in each case, without the consent of the Managers:

          (a)     if the proposed transferor is a natural Person, by succession or testamentary disposition upon his/her death, provided that such Transfer is to a Person that is otherwise a Permitted Transferee; or

          (b)     to any Permitted Transferee.

      **6.3**    **Right of First Refusal**.

          (a)     Except as otherwise provided herein, and for all Transfers that are not to a Permitted Transferee, and subject in all events to Sections 6.4, 6.5, 6.6 and 6.7 below, no Member may Transfer any Units or Interests in the Company unless the Member desiring to make the Transfer (the "Transferor") first obtains a bona fide written offer from a third party to purchase all, or portion, of such Member's Interest in the Company and first offers to sell such Interests (the "Offered Interest") to the Company and the other Members in accordance with this Section 6.3. The offer to the Company and the other Members, must include all of the Offered Interest held by the Transferor. The bona fide offer must state (x) the name and address of the transferee, (y) the consideration that will be received by the Transferor for the transfer and (z) the payment terms of the consideration and other material terms and conditions of the proposed Transfer.

          (b)     Within ten (10) days of the receipt of the bona fide offer, the Transferor shall furnish the Company and the non-transferring Members with a copy of such offer. Within sixty (60) days of the receipt of the offer by the Company and the non-transferring Members, each non-transferring Member may elect to purchase all, but not less than all, of a portion of the Offered Interest in proportion to such non-transferring Member's Percentage Interests in the Company (excluding for purposes of this Section 6.3 any Units or Interests being sold) on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within such sixty (60) day period. If the non-transferring Members, in the aggregate, do not elect to purchase all of the Offered Interest within such sixty (60) day period, the Company may elect, in the reasonable discretion of the Managers, to purchase all, but not less than all, of the remaining Offered Interest on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within thirty (30) days following the

expiration of such sixty (60) day period.

(c)      In the event the Company or the non-transferring Members, as applicable, elect to purchase, in the aggregate, all of the Offered Interest, the closing of the purchase will take place on the first business day following the end of a period of ninety (90) days after exercise of the Company's or the Members' options to purchase, as applicable, by delivery of the last written notice thereof to the Transferor, or on such other date as mutually agreed upon by the parties.

(d)      In the event neither the Company nor the non-transferring Members elect to purchase, in the aggregate, all of the Offered Interest, the Transferor may transfer the remaining Offered Interest to the transferee named in, and on the terms and conditions set forth in, the notice. If the Transferor fails to conclude such sale of the Offered Interest within fifteen (15) days after the expiration of all applicable time periods set forth herein, the Offered Interest will again become subject to all of the restrictions of this Section 6.

(e)      A Member who has assigned such Member's entire Interest in the Company pursuant to this Section 6.3, whether or not the assignee has become a substituted Member, shall not thereafter be entitled to exercise any of the rights of a Member with respect to such transferred Interest (and the Units associated therewith) nor have any other rights as a Member with respect to such transferred Interest except as otherwise provided by the Act.

(f)      Any Interest transferred pursuant to this Section 6.3 will remain subject to all of the provisions of this Agreement.  Any Member that Transfers its Interest in accordance with this <u>Section 6.3</u> to an Assignee or transferee which is not a Member may grant to that Assignee or transferee the right to become a Member; provided, however, that such Assignee or transferee will not become a substitute Member unless and until the admission of such Assignee or transferee is consented to by the unanimous vote or written consent of the Members.

**6.4    Other Conditions to Permitted Transfers**.

(a)      As conditions to recognizing the effectiveness of any Transfer permitted under this Section 6, and the admission of a transferee as a new Member, the Transferor and the proposed transferee shall execute, acknowledge and deliver to the Company, at the Transferor's (and/or the transferee's) expense, such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all other acts necessary or desirable, in the opinion of counsel to the Company, to:

(i)      constitute such transferee a Member, if applicable;

(ii)      confirm that the Person desiring to be admitted as a Member, has accepted, assumed, and agreed to be bound by, all of the terms, obligations and conditions of this Agreement, as in effect at the time of the Transfer;

(iii)      preserve the Company after such Transfer under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(iv)      assure compliance with all applicable state and Federal laws, including, without limitation, securities laws; and

(v)     constitute the Company a third-party beneficiary of the rights of the Transferor and the obligations of the transferee under any arrangements or agreements to Transfer an Interest hereunder, with full power to enforce such rights and obligations directly against the transferee.

(b)     All transferees hereunder shall execute the Joinder Agreement in the form attached hereto as **Exhibit A** agreeing to be bound by the terms of this Agreement in the same manner as the transferors and any Units so transferred shall continue to be subject to the restrictions, liabilities and benefits associated therewith.

(c)     Notwithstanding compliance with the other provisions of this Section 6, no Transfer of a Unit or Interest may be made to a minor or incompetent individual except by will, intestate succession or gift under applicable uniform transfers to minors acts or pursuant to the terms of an inter vivos trust.

### 6.5   **Effective Date**.

(a)     Any Transfer of a Unit or Interest or admission of a Member in accordance with this Agreement shall be effective as of the last day of the calendar month in which all of the conditions thereto were satisfied.  No Transfer of a Unit or Interest shall be effective unless and until the Company has received notice of the name and address of the transferee and the date of such Transfer, and shall then be effective only to the extent set forth in this Agreement.

(b)     No new Member shall be entitled to any retroactive allocation of Net Profits or Net Losses or other allocable items incurred by the Company.  The Managers may, in their discretion, at the time a new Member obtains a Unit or Interest, close the Company books (as though the fiscal year had ended) or make pro rata allocations of such items to a new Unit or Interest holder for that portion of the fiscal year in which it holds a Unit or Interest, in accordance with Code Section 706(d) and the Regulations promulgated thereunder.

### 6.6   **Pledge or Encumbrance of Interests**.  No Member may pledge or encumber a Unit or Interest, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise, without the consent of the Managers.

### 6.7   **Restrictions on Transfers/Impermissible Transferees.**

(a)     All Transfers, directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company, including without limitation Transfers to Permitted Transferees or pursuant to the procedures in Section 6.3, shall be subject to the following restrictions:  (i) no Transfer shall be made to any Person who is not reputable and financially able to perform the obligations of a Member hereunder (including any indemnity obligations contained herein); (ii) no Transfer of Units or Interests shall be made which results, or would result upon a foreclosure of any security interest or in a termination of the Company within the meaning of the Act; (iii) no Transfer of Units or Interests shall be made which violates any provision of this Agreement; and (iv) no change in ownership of any Units or Interests shall be binding against the other Member unless approved in accordance with this Agreement.  All Transfers, whether directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company in contravention of this Agreement shall be void.

(b)    In the event any Member shall Transfer any of its Units or Interests in the Company in contravention of the express terms of this Agreement, the Member Transferring any such Units or Interests shall indemnify and hold the Company and other Members harmless from and against any and all loss, cost, claim, liability, damage or expense which it or they may incur or suffer (including attorneys' fees and disbursements) in enforcing or attempting to enforce the provisions hereof. Any Member who makes a Transfer in contravention of the express terms of this Agreement, shall have no right to vote on any matters that may be brought before the Members nor shall such persons be counted for purposes of a quorum.

### 6.8    Redemption.

(a)    No later than thirty (30) days following the twelve (12) month anniversary of the date hereof, FBH Capital Group, LLC ("FBH") may require the Company to redeem all, but not less than all, of the Units then held by FBH in one (1) installment on a date no later than ninety (90) days following the request for redemption (the "Redemption Date"). The Company shall effect such redemption on the Redemption Date by paying in cash, in exchange for the Units to be redeemed, a sum equal to any unreturned Capital Contribution of FBH, plus any accrued but unpaid interest thereon, at a rate per annum of thirteen percent (13%) (collectively, the "Redemption Price"). Notwithstanding anything herein to the contrary, the foregoing redemption right shall be limited to the aforementioned time frame and will not be an ongoing option.

(b)    From and after the Redemption Date, unless there shall have been a default in payment of the Redemption Price or the Company is unable to pay the Redemption Price due to not having sufficient legally available funds, all rights of FBH as a Member of the Company shall cease and terminate; provided, however, in the event that FBH's Units are not redeemed due to a default in payment by the Company or because the Company does not have sufficient legally available funds, such Units shall remain outstanding and FBH shall be entitled to all of its rights as a Member until such Units are redeemed.

## 7.    BOOKS, RECORDS AND REPORTS

**7.1    Books and Records**. The Company shall keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records shall be otherwise kept in accordance with the provisions of the Act. Any Member or its designated representative shall have the right, at any reasonable time and upon reasonable notice, to have access to and to inspect and copy the contents of such books or records.

**7.2    Financial Books**. The Managers shall keep or cause to be kept complete and accurate financial books with respect to the Company's business.

**7.3    Bank Accounts**. The funds of the Company shall be deposited in such amounts in such bank account or accounts as shall be designated by the Managers. All withdrawals from any account established by the Managers may be made by the Managers (or a specific designee(s) of the Managers which designation has been made in writing and provided to the Members). The funds of the Company shall be maintained in a segregated account(s) and shall not be commingled with the funds of any other Person, including, without limitation, the Managers, and, if not immediately required for Company business, may be temporarily invested in such liquid, non-equity assets as the Managers shall determine. The Managers shall promptly provide each Member

with written notice of any investment of the Company funds into such liquid, non-equity assets.

**7.4    Reports**. The Managers, at the expense of the Company, shall use commercially reasonable efforts to cause to be prepared and distributed to each Person who was a Member or Economic Interest Holder during any fiscal year of the Company:

(a)    within one hundred-twenty (120) days after the end of each fiscal year of the Company, all information relating to the Company that is necessary for the preparation of the Member's federal, state and local income tax returns;

(b)    within sixty-five (65) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a quarterly unaudited financial statement of the Company prepared on a federal income tax basis or reviewed by independent public accountants selected by the Managers (the "Accountants");

(c)    within one hundred-twenty (120) days after the end of each fiscal year of the Company, an annual unaudited financial statement of the Company prepared on a federal income tax basis compiled or reviewed by the Accountants; and

(d)    any other information that may be reasonably requested by any Member.

**7.5    Tax Returns**. The Managers shall, at the expense of the Company, retain the Accountants and cause to be prepared all tax returns for the Company and shall further cause such returns to be timely filed with the appropriate authorities.  It is contemplated that the Company will be classified as a "partnership" for federal, state and local income tax purposes.  The Company and its Members will take such reasonable action as may be necessary or advisable, and as determined by the Managers, including the amendment of this Agreement to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

**7.6    Fiscal Year and Accounting Method**. The Company shall adopt a fiscal year ending on the last day of such month of each year and a method of accounting selected by the Managers with the advice of the Accountants for the Company; provided, however, that the Managers in their reasonable discretion may, subject to any approval required by the Internal Revenue Service and the applicable state taxing authorities, at any time change the Company's method of accounting.

**7.7    Tax Elections**. The Tax Matters Partner shall have the authority to cause the Company to make any election required or permitted to be made for income tax purposes.  The Tax Matters Partner may cause the Company to make, in accordance with Section 754 of the Code, a timely election to adjust the basis of Company property as described in Sections 734 and 743 of the Code in the sole discretion of the Tax Matters Partner.

**7.8    Title to Company Assets**.  Title to, and all right and interest in, the Company's assets, shall be acquired in the name of and held by the Company, or, if acquired in any other name, be held for the benefit of the Company.

## 8.    DISSOLUTION AND TERMINATION OF THE COMPANY

**8.1    Dissolution**.  The Company shall be dissolved and terminated and its affairs shall be wound up upon the earliest to occur of the following:

(a)      the unanimous vote or written consent of the Members;

(b)      the sale or other disposition of all or substantially all of the business or assets of the Company; or

(c)      the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**8.2      Winding up of the Company**.

(a)      If the Company is to be dissolved in accordance with Section 8.1, then the Managers or other Person selected by the Managers (the "Liquidator") shall wind up the affairs of the Company, including by selling or otherwise liquidating the Company assets in a bona fide sale or sales to third Persons at such prices and upon such terms as they may determine.  If the Liquidator determines that an immediate sale would be financially inadvisable, it may defer sale of the Company assets for a reasonable time, or distribute the assets in kind.  During the winding up period, the Liquidator may exercise all powers granted to the Managers under this Agreement, and may adopt such plan, method or procedure as may be reasonable to effect an orderly winding up.

(b)      The proceeds of any liquidation of the Company shall be distributed in the following order of priority (to the extent that such order of priority is consistent with the laws of the State of Delaware):

(i)      first, to the payment of the debts and liabilities of the Company and the expenses of Dissolution and liquidation;

(ii)      then, to the establishment of any Reserves which the Liquidator shall deem reasonably necessary for payment of such other debts and liabilities of the Company (contingent or otherwise), as are specified by the Liquidator, such Reserves to be held in escrow by a bank or trust company selected by the Liquidator and to be disbursed as directed by the Liquidator in payment of any of the specified debts and liabilities or, at the expiration of such period as the Liquidator may deem advisable, to be distributed in the manner hereinafter provided; and

(iii)      then, to the Members in accordance with their Percentage Interests.

(c)      If any assets are distributed in kind, they shall be distributed on the basis of the fair market value thereof, and shall be deemed to have been sold at fair market value for purposes of the allocations under Section 4.

(d)      The Company shall terminate when all assets of the Company have been sold and/or distributed and all affairs of the Company have been wound up.

**8.3      Termination**.  Upon the completion of the distribution of Company assets as provided in Section 8.2, the Company shall be terminated, and the Managers or other Person acting as liquidator shall cause the Certificate of the Company to be canceled and shall take such other actions as may be necessary to terminate the existence of the Company.

## 9.   WITHDRAWAL OF A MEMBER

**9.1   Right to Withdraw**.  The withdrawal of a Member (the "Withdrawn Member") upon the occurrence of a Withdrawal Event, shall only be permitted upon the unanimous written consent of the Members (excluding the vote of the Withdrawn Member); provided that upon the (i) death of a Member, if an individual (ii) Permanent Disability of a Member, if an individual, (iii) Bankruptcy, or (iv) Dissolution of a Member, the Company will permit the withdrawal of such Member without requiring consent.

**9.2   Effect of Withdrawal.**

(a)   Except as otherwise provided in this Agreement, unless the remaining Members elect to dissolve the Company in accordance with this Agreement, the Withdrawn Member shall not be entitled to receive any amount in liquidation of his/her/its Interest until the Dissolution and winding up of the Company, but shall, on and as of the date of Withdrawal Event, become an Assignee of the Economic Interest associated with its former Interest, with no right to participate in the management of the business of the Company or otherwise exercise any of the rights or privileges of a Member hereunder or under the Act.  After any such Withdrawal Event, the relative Percentage Interests of the remaining Members for voting purposes only shall be determined as though the Withdrawn Member's Percentage Interest were zero.

(b)   If the remaining Members do elect to dissolve the Company in accordance with this Agreement after a Withdrawal Event, the Withdrawn Member shall be entitled to receive an amount in liquidation of its Interest determined as set forth in this Agreement.

(c)   If a Withdrawal Event results in the Dissolution of the Company, the Withdrawn Member shall be treated as any other Member in the liquidation of the Company's assets pursuant to Section 8.2.

(d)   Upon the occurrence of any Withdrawal Event, the Company shall have no further obligation or liability to any Assignee of the Withdrawn Member.

**9.3   Rights of a Withdrawn Member**.  In the event of a Withdrawal Event pursuant to Section 9.1(i) or (ii) above prior to the expiration of the Company's term (as set forth in Section 1.6 of this Agreement) the successor in interest to such Withdrawn Member ("Successor in Interest") shall be an Assignee of the Economic Interest of the Withdrawn Member.  In such event, the Successor in Interest shall not become a Member unless and until the admission of the Successor in Interest as a Member is consented to in writing by the unanimous vote or written consent of the Members, and provided further that the Successor in Interest executes and delivers such documents as the Managers may reasonably require to make the Successor in Interest a party to this Agreement.

**9.4   Company to Continue Upon a Withdrawal Event**.  The Company shall not dissolve upon the withdrawal of a Member, but shall continue until dissolved in accordance with Section 8.

**9.5   No Right to Receive Distributions Upon a Withdrawal Event**. No Member shall have the right to receive any distribution, other than pursuant to the express terms of this Agreement, prior to the Company's Dissolution pursuant to Section 8 of this Agreement.

**10.    APPLICABLE LAW**

**10.1    Governing Law; Consent to Jurisdiction**. This Agreement and the rights and obligations of the parties hereto shall be interpreted in accordance with the laws of the State of Delaware without giving effect to principles of conflict of laws. Each Member hereby consents to the jurisdiction of any state or federal court located in the Counties of Kings or Nassau, New York for purposes of the enforcement of this Agreement. Each Member hereby waives in advance any objection to venue of any action constituted under this Section 10.1.

**11.    MISCELLANEOUS PROVISIONS**

**11.1    No Third Party Beneficiaries**. The covenants, obligations and rights set forth in this Agreement are not intended to benefit any creditor of the Company or of any Member, or any other third Person, and except as permitted by applicable law after the obligation to make an additional Capital Contribution has been fixed, or in connection with certain wrongful distributions, no such creditor or other third Person shall, under any circumstances, have any right to compel any actions or payments by the Managers and/or the Members or shall, by reason of any provision contained herein, be entitled to make any claim in respect of any debt, liability, obligation or otherwise against the Company or any Member.

**11.2    Notices**. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

If to the Company:

FINANCIAL VISION GROUP II LLC



Attention: Managers

If to the Managers:

c/o Alexandr Zaitsev

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five (5) days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer, if sent during

24

normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (iv) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

**11.3    Severability**. If any covenant, condition, term, or provision of this Agreement is illegal, or if the application thereof to any Person or in any circumstance be judicially determined to be invalid or unenforceable, the remainder of this Agreement, or the application of such covenant, condition, term, or provision to Persons or in circumstances other than with respect to which it is held invalid or unenforceable, shall not be affected thereby, and each covenant, condition, term, and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**11.4    Counterparts; Faxed or E-Mailed Signatures**.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  Any executed signature page delivered by facsimile or e-mail transmission shall be binding to the same extent as an original executed signature page, with regard to any agreement subject to the terms hereof or any amendment thereto.

**11.5    Entire Agreement**. This Agreement, together with the Certificate,  constitute the entire agreement of the parties relating to the subject matter hereof, and together they supersede and replace any prior agreement or understanding between some or all of the parties pertaining thereto.  To the extent the Act addresses a matter not otherwise addressed by this Agreement, it is the intention of the Members that the provisions of the Act shall apply, but no such application shall otherwise affect any provision of this Agreement.

**11.6    Amendments**.

(a)    Except as otherwise required by this Agreement or the Act, this Agreement may be amended by the unanimous vote or written consent of the Members.

(b)    Notwithstanding anything to the contrary contained in Section 11.6(a), the Managers may modify the provisions of this Agreement without the consent of the Members if, upon advice of counsel to the Company, the modification is necessary to cause (i) the Company to be or to continue to be classified as a partnership for federal income tax purposes or (ii) the allocations under Section 4 to have substantial economic effect or to be in accordance with the Members' interests under Section 704 of the Code and the Regulations thereunder.  No modification hereunder may alter the limited liability of the Members or have a material effect on amounts distributable to any Member pursuant to this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Section 11.6, any amendment to this Agreement that would adversely affect (i) the federal income tax treatment to be afforded a Member, (ii) the liabilities of a Member, or (iii) the consent and approval rights reserved by the Members, or which would otherwise change the method of calculating allocations or distributions under Section 4, shall require the consent of each Member affected.

**11.7    Amendment by Agreement of Merger**.  Notwithstanding anything to the contrary contained in this Agreement, in accordance with the Act, an agreement of merger or consolidation

approved by the Members as required by this Agreement may effect (a) amendments to this Agreement contained in the agreement of merger or consolidation or necessitated thereby or (b) the adoption of a new limited liability company agreement for the Company if it is the surviving or resulting entity, in each case without further action by the Members.

**11.8    Further Assurances**. The Members will execute and deliver such further instruments and do such further acts and things as may be reasonably required to carry out the intent and purposes of this Agreement, including, without limitation, such amendments to this Agreement as the Managers may determine to be reasonably necessary or advisable to ensure that the Company will be classified and treated as a partnership for federal, state and local income tax purposes.

**11.9    Successors and Assigns**. Subject in all respects to the limitations on transferability contained herein, this Agreement shall be binding upon, and shall inure to the benefit of, the heirs, administrators, personal representatives, successors, and permitted assigns of the respective parties hereto.

**11.10   Waiver of Action for Partition**. Each of the parties hereto irrevocably waives, during the term of the Company and during the period of liquidation following any Dissolution, any right that it may have to maintain any action for partition with respect to any of the assets of the Company.

**11.11   Waivers; Rights and Remedies Cumulative**. The failure of any party to pursue any remedy for breach, or to insist upon the strict performance, of any covenant or condition contained in this Agreement shall not constitute a waiver of any such right with respect to any subsequent breach. Except as otherwise expressly set forth herein, rights and remedies under this Agreement are cumulative, and the pursuit of any one right or remedy by any party shall not preclude, or constitute a waiver of, the right to pursue any or all other remedies. All rights and remedies provided under this Agreement are in addition to any other rights the parties may have by law, in equity or otherwise.

**11.12   Agreement Drafted by Counsel**. Each Member and Manager acknowledges that (i) Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, counsel for the Company, has prepared this Agreement on behalf of and in the course of its representation of the Company and not as counsel for any Member or Manager, (ii) each Member and Manager has been advised of potential conflicts of interest that may exist, now or in the future, between such Member or Manager and those of the Company and the other Members or Managers, and (iii) the Members and Managers have been advised by such law firm to seek independent counsel.

**11.13   Investment Representations**. Each Member hereby represents and warrants to the Company and each other Member as follows:

(a)    Such Member acknowledges that:

(i)    the Interest owned by it has not been registered under the Securities Act of 1933, the Delaware State securities laws or any other state securities laws (collectively, the "Securities Acts") because the Company is issuing (or an Member has Transferred) such Interest in reliance upon exemptions from the registration requirements contained in the Securities Acts for issuances not involving a public

26

offering;

> > (ii)   the Company (or the Transferor) has relied upon the fact that the Interest is to be held by such Member for investment purposes only, and not with a view to any resale or distribution thereof; and

> > (iii)   the Company is under no obligation to register or qualify the Interest or to assist any Interest Holder in complying with any exemption from registration under the Securities Acts if such Member wishes to dispose of the Interest.

> (b)   Each Member is acquiring the Interest for his/her/its own account, for investment purposes only, and not with a view to the resale or distribution thereof, unless there are effective registrations or other qualifications relating thereto under applicable Securities Acts.

> (c)   Before acquiring the Interest, each Member investigated the Company and its business, and the Company made available to it all information necessary to make an informed decision to acquire the Interest.

### 11.14   Managers as Attorney-in-Fact for Members.

> (a)   Each Member hereby irrevocably constitutes and appoints, with full power of substitution, the Managers as its/his/her true and lawful attorney-in-fact, with full power and authority in its/his/her name, place and stead, to execute, certify, acknowledge, deliver, file and record at the appropriate public offices:

> > (i)   all certificates and other instruments, and any amendment thereto, which the Managers deems appropriate to form, qualify or continue the business of the Company as a limited liability company;

> > (ii)   any other instrument or document which may be required to be filed by the Company under the laws of any state, or which the Managers deem advisable to file; and

> > (iii)   any instrument or document required to continue the business of the Company or dissolve and liquidate the Company (provided that such continuation or Dissolution are consented to in accordance with this Agreement).

> (b)   Each Member's appointment of the Managers as its/his/her attorney-in-fact shall be deemed to be a power coupled with an interest and shall survive the incompetency, Bankruptcy or Dissolution of the Member giving such power, except that, in the event of a Member's Transfer of an Interest in accordance with this Agreement, this power of attorney shall survive such Transfer only until such time, if any, as the assignee shall have been admitted to the Company as a Member and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution.

11.15   **Attorneys' Fees.**  In the event of any controversy, claim, or dispute between the parties hereto, arising out of or relating to this Agreement or its breach, the prevailing party shall be entitled, in addition to any other relief, to recover reasonable attorneys' fees, expenses, and costs, whether or not the controversy, claim, or dispute results in litigation or arbitration between the parties.

11.16   **Covenant Not To Compete.**  Each Manager, Member and any managers, officers, employees, consultants or agents of such Manager or Member, and any Affiliate of such Manager or Member, covenants and agrees that, so long as such Manager is a manager of the Company or such Member is a Member of the Company, in each case, as applicable, and for a period of one (1) year thereafter, such Manager and/or Member and each of their respective Affiliates, will not, without the unanimous prior written consent of the Members, directly or indirectly, and whether as a principal, agent, officer, manager, employee, consultant, corporation or other business organization: (i) be engaged in, concerned, take part in, render services to, own, share in the earnings of, or invest in the stock, bonds or other securities of any person, firm, corporation or other business organization engaged in a business located in any jurisdiction in which the Company performs its business which is the same, similar to or in competition with any of the business and operations of the Company then or theretofore carried on by the Company, or (ii) directly or indirectly hire, solicit, or recruit employees of the Company to leave employment with the Company, nor contact any employee of the Company, or cause an employee of the Company to be contacted, for the purpose of leaving employment with the Company, or (iii) interfere with the Company's relationship with, or endeavor to entice away from the Company any person, firm, corporation or other business organization who or which, at any time during the term of such Member's membership and/or Manager's engagement by the Company, was an employee, consultant, agent, franchisee, joint venture, supplier, vendor, contractor, supplier or customer of, or in the habit of dealing with, the Company.  Notwithstanding the foregoing, if any provision of this Section 11.16 is held by any court of competent jurisdiction to be unenforceable because of the scope, duration or area of its applicability, the Company shall have the right to modify such scope, duration or area or all of them so as to render them enforceable, and such provision shall then be applicable in such modified form.  If a Manager, Member, or an Affiliate of such Manager or Member, violates this Section 11.16, such Manager, Member and its Affiliates, as applicable, hereby consent to an injunction stopping such Manager's and/or Member's and/or its Affiliates' actions, as applicable.

11.17   **Scope and Duration; Equitable Relief.**   The Managers and Members acknowledge that the restrictions contained in Section 11.16 are reasonable in scope and in duration under the circumstances.  The Managers and Members further acknowledge and agree that such restrictions are necessary to protect the legitimate business interests of the Company and that any violation thereof would result in irreparable harm to the Company.  Accordingly, each Member and Manager agrees that upon the violation or threatened violation by him/her/it of any of the restrictions contained in Section 11.16, the Company shall be entitled to obtain from any court of competent jurisdiction a preliminary and permanent injunction (without the necessity of posting a bond or other security) as well as any other relief provided at law or equity, under this Agreement or otherwise.  In the event any of the foregoing restrictions are adjudged unreasonable in any proceeding, then the parties agree that the period of time or scope of such restrictions (or both) shall be adjusted in such manner or for such time (or both) as is adjudged to be reasonable.

11.18  **Confidentiality.**  The Members and Managers acknowledge and agree that all information provided to them by or on behalf of the Company concerning the business or assets of the Company (collectively, the "Confidential Information") shall be deemed strictly confidential and the Members and Managers shall not, without the prior written consent of the Company, use for himself/herself/itself, publish, disclose or otherwise reveal or divulge, any Confidential Information (other than to a person or entity bound by confidentiality obligations similar to those contained herein).  Each Member shall (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as they use for their personal confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the Company, and (3) refrain from using or allowing to be used any Confidential Information for their own benefit or for the benefit of any third party, except that disclosure of Confidential Information will be permitted: (a) to the Company; (b) if such Confidential Information has previously become available to the public through no fault of such Member or Manager; (c) is already known to such Member or Manager, on a non-confidential basis at the time of disclosure by the Company, as shown by competent evidence; (d) becomes known to such Member or Manager from a source other than the Company; provided, that, such source has not entered into a confidentiality agreement with the Company with respect to such information or obtained the information from an entity or person who is a party to a confidentiality agreement with the Company, and without a breach of this Agreement or without a breach of duty owed by any other person or entity to the Company; (e) is proven by competent evidence by such Member or Manager that it was independently conceived or discovered by such Member or Manager without reference to or use of the Confidential Information; (f) if required by law or any court or governmental agency or body; provided that in any such case covered by this clause (f) such Member or Manager shall provide the Company, in advance of any such disclosure, with prompt notice of such requirement(s) and shall cooperate fully with the Company to the extent it may seek to limit such disclosure; (g) if necessary to establish or assert the rights of such Member or Manager hereunder; (h) if expressly consented to in writing by the Company.

*[Remainder of Page Blank]*

Counterpart signature page for the Limited Liability Company Agreement of

## FINANCIAL VISION GROUP II LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP II LLC as of the date first above written.

MEMBER:

Alexandr Zaitsev

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP II LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP II LLC as of the date first above written.

MEMBER:

_Daniel_

Daniel Kandhorov

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP II LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP II LLC as of the date first above written.

MEMBER:

FHJ VISION PARTNERS, LLC

By: _____
Howard Fensterman, Manager

By: _____
Frank Carone, Manager

By: _____
Jordan Fensterman, Manager

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP II  LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP III LLC as of the date first above written.

MEMBER:

_____

FBH Capital Group, LLC, Member

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP II LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP II LLC as of the date first above written.

MANAGERS:

Alexandr Zaitsev

Daniel Kandhorov

31

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP II LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP II LLC as of the date first above written.

MANAGERS:

_____
Alexandr Zaitsev

_____
Daniel Kandhorov

31

**FINANCIAL VISION GROUP II LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

| Name of Member | Capital Contribution | Number of Units | Percentage Interest |
|---|---|---|---|
| Alexandr Zaitsev | $ | 33.375 | 33.375% |
| Daniel Kandhorov | $ | 33.375 | 33.375% |
| FHJ Vision Partners, LLC | $ | 22.25 | 22.25% |
| FBH Capital Group, LLC | $ | 11 | 11% |
| **TOTAL** | **$** | **100** | **100%** |

## EXHIBIT A

### JOINDER AGREEMENT

### FINANCIAL VISION GROUP II LLC

### LIMITED LIABILITY COMPANY AGREEMENT

The undersigned has read and hereby joins in and agrees to be bound by all of the terms and provisions of that certain Limited Liability Company Agreement of FINANCIAL VISION GROUP II LLC (the "Company"), dated as of September 26, 2018, by and among the Members of the Company (as, or as the same may be, amended, modified, supplemented or restated, the "Agreement"), and shall for all purposes be deemed to be a Member (as such term is contemplated by the Agreement) of the Company, and shall be entitled to all of the rights and entitlements, and subject to and liable for all of the obligations, liabilities and undertakings, of a Member as set forth in or contemplated by the Agreement.

MEMBER:

_____                    _____
Signature                                                          Date

_____
Print Name

_____
Social Security Number

_____
Number of Units

_____
Percentage Interest

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## FINANCIAL VISION GROUP III LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of FINANCIAL VISION GROUP III LLC (the "Company") is made and entered into as of the 24th day of September, 2018, by and among the Persons who have executed the signature page(s) hereof as Members and the Persons who from time to time hereafter execute a Joinder Agreement in the form attached hereto as <u>Exhibit A</u>.

**WHEREAS**, the parties have formed a limited liability company (together with any successor limited liability company, the "Company") under the Delaware Limited Liability Company Act (the "Act") and upon the terms and conditions of this Agreement; and

**WHEREAS**, the Members wish to set forth their agreement as to how the business and affairs of the Company shall be managed and their rights and obligations with respect to the Company.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this Agreement, the parties hereby agree as follows:

## 1.    ORGANIZATION.

**1.1    Formation**. The Company was organized on September 24, 2018, in accordance with and pursuant to the Act.

**1.2    Name**. The name of the Company shall be "FINANCIAL VISION GROUP III LLC" or such other name as the Members shall from time to time determine.

**1.3    Principal Office**. The principal office of the Company shall be located at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey 07470 or at such other place as may be designated by the Members. The Members may provide additional offices for the Company within or outside of the State of Delaware if the same are deemed advisable for the conduct of the Company's business.

**1.4    Filings**.

(a)    The Certificate of Formation of the Company (the "<u>Certificate</u>") was filed with the Secretary of State of the State of Delaware on September 24, 2018; and the Managers shall execute such further documents and take such further action as shall be necessary or appropriate to comply with the requirements of law for the formation and operation of a limited liability company pursuant to the Act.

(b)    The Managers are authorized to execute, file and/or publish, or cause to be filed and/or published, with the proper authorities in each jurisdiction (or subdivision thereof) where the Company conducts business, such certificates or documents in connection with the conduct of business as may be required by applicable law.

(c)    The Members, from time to time, shall execute, acknowledge, verify, file,

record and/or publish, or cause to be executed, acknowledged, verified, filed, recorded and/or published, all such applications, certificates and other documents, and do or cause to be done all such other acts, as the Managers may deem necessary or appropriate to comply with the requirements of law for the formation, qualification and operation of the Company as a limited liability company in all jurisdictions in which the Company shall desire to conduct business.

      **1.5**    **Purpose**. The purpose of the Company is to conduct any lawful business or activity whatsoever as permitted by applicable law and as determined from time to time by the Managers. The Company may exercise all powers necessary to or reasonably connected with the Company's business from time to time, and may engage in all activities necessary, customary, related or incidental to any of the foregoing.

      **1.6**    **Term**. The term of the Company shall commence as of the date hereof and shall be of unlimited duration, unless the Company is earlier dissolved in accordance herewith and with the Act.

      **1.7**    **Names and Addresses of Members.**  The name, address, Capital Contribution, number of Units, and Percentage Interest of each of the Members of the Company are set forth on Schedule A annexed hereto.  If necessary, Schedule A shall be amended by the Managers from time to time to reflect any changes to the information set forth thereon.

## 2.    DEFINITIONS AND INTERPRETATION

      **2.1**    Definitions.  In addition to terms otherwise defined herein, the following terms shall have the following meanings:

      "Accountants" shall have the meaning set forth in Section 7.4(b) of this Agreement.

      "Act" shall have the meaning set forth in the Recitals.

      "Adjusted Capital Account" shall mean, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i)   Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and (ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations. The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

      "Affiliate" or "Affiliated" of a Person shall mean (i) any officer, partner, director, manager, trustee, member, general partner, or controlling shareholder of such Person; (ii) any Person controlling, controlled by or under common control with such Person; (iii) any officer, director, trustee, member, manager, controlling shareholder or general partner of any Person described in (ii) above and (iv) any Person in which such Person serves as an officer, director, trustee, member, manager, shareholder or partner.  For purposes of this definition, the term "control" shall mean the right or ability to elect the majority of the directors of a Person, to exercise more than fifty percent (50%) of the voting rights in the Person, the power to direct the management and policies of such Person, directly or indirectly, by or through stock ownership,

2

agency or otherwise, or pursuant to or in connection with an agreement, arrangement or understanding (written or oral) with one or more other Persons by or through stock ownership, agency or otherwise and the terms "affiliate," "controlling" and "controlled" shall have meanings correlative to the foregoing.

"Assignee" shall mean the holder of an Economic Interest who is not a Member.

"Available Cash" shall mean all Gross Receipts actually received by the Company, less the sum of the following, to the extent paid (in the order of priority listed below) from Gross Receipts received by or on behalf of the Company to third parties in arms-length transactions, or, if otherwise, then not in excess of what third parties would charge in arms-length transactions:

(1)    All principal, interest and other payments due and owing with respect to loans, mortgages and other indebtedness of the Company;

(2)    All cash expenditures then required to be made in connection with the operation of the business of the Company;

(3)    The Tax Distributions paid pursuant to Section 4.4 of this Agreement; and

(4)    Such cash Reserves as the Managers reasonably determine to be necessary or appropriate for the operation of the business of the Company.

"Bankruptcy" of a Member shall mean (a) the entry of an order for relief with respect to that Member in a proceeding under the United States Bankruptcy Code, as amended from time to time, (b) the Member's initiation, whether by filing a petition, beginning a proceeding or in answer to a proceeding commenced by another Person, of any action for liquidation, Dissolution, receivership or other similar relief, (c) the Member's application for, or consent to the appointment of, a trustee, receiver or custodian for its assets, (d) the Member's making of a general assignment for the benefit of creditors or (e) the Member's failure generally to pay its debts as such debts come due or admission in writing of its inability to pay its debts as they come due.  For purposes of this definition, a Member's consent shall be deemed to have been given if an order appointing a trustee, receiver or custodian is entered by a court of competent jurisdiction and is not dismissed within ninety (90) days after its entry.

"Capital Account" shall have the meaning set forth in Section 3.8(a) of this Agreement.

"Capital Contribution" shall mean, with respect to any Member, the amount of money and the fair market value of property contributed by such Member to the Company. The Capital Contributions of each Member is set forth on Schedule A.

"Certificate" shall have the meaning set forth in Section 1.4(a) of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as the same has been or may be amended from time to time.

"Company Minimum Gain" shall mean the amount determined under Treasury Regulation Sections 1.704-2(d) and 1.704-2(i)(3), and shall be computed separately for each

3

Interest holder in a manner consistent with Code Section 704(b) and the Treasury Regulations thereunder.

"Control" or any derivative thereof, when used with respect to a specified Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person

"Dissolution" shall mean, with respect to a legal entity other than a natural person, that such entity has "dissolved" within the meaning of the partnership, corporation, limited liability company, trust or other statute under which such entity was organized.

"Economic Interest" shall mean an interest, as represented by one or more Units, in a holder's share of the Net Profits and Net Losses of, and the right to receive distributions from, the Company.

"Economic Interest Holder" shall mean any Person who holds an Economic Interest, whether as a Member's or an unadmitted Assignee of a Member's Units.

"Entity Member" shall have the meaning set forth in Section 6.1.

"Family Member" shall have the meaning set forth in the definition of Permitted Transferee.

"Gross Receipts" with respect to any period shall mean all gross cash receipts of the Company from any source whatsoever received by the Company during such period, including, without limitation, all payments of principal and interest made with respect to any advance made by the Company, interest income, any compromise or settlement payments (including good faith deposits or escrows when forfeited) received by the Company with respect to any advances, mortgage loans, cash proceeds of the sale or other disposition of any advance, mortgage loan or other asset held by the Company (including amounts paid by any Member in connection with the purchase by it of any asset of the Company), all payments received by the Company in reduction of the outstanding principal balance of any mortgage or other advances held by the Company (whether in the nature of standard amortization, prepayments or special payments of principal), all payments received by Company for the release of collateral from the lien of a mortgage held by Company, cash proceeds of the sale or other disposition of any real property, rental income of any and every nature, condemnation awards or hazard insurance proceeds received by Company and not applied by the Company toward the repayment and/or restoration of the properties which suffered the casualty or condemnation, the net proceeds of any loans borrowed by the Company for which the advances or mortgage loans or other assets of the Company pledged as collateral; but excluding (A) Capital Contributions, (B) Company borrowings and (C) any amounts received by the Company which constitute segregated escrow or similar accounts (until the same are released or forfeited to the Company).

"Interest" shall mean the ownership interest of a Member in the Company represented by one or more Units, consisting of (i) such Member's right to profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act and (iii) such Member's other rights and privileges as herein provided.

"Interested Member" shall mean any Member who is also a Manager or any Entity

4

Member in which a Manager is a member of such Entity Member or which a Family Member of a Manager is a member of such Entity Member.

"<u>Managers</u>" shall mean the persons appointed pursuant to <u>Section 5.1(b)</u> of this Agreement.

"<u>Members</u>" shall mean each Person who (a) executes a counterpart of this Agreement as a Member or (b) is admitted as a Member in accordance herewith.

"<u>Member Nonrecourse Debt</u>" shall mean nonrecourse debt of the Company under Treasury Regulation Section 1.704-2(b)(4).

"<u>Member Nonrecourse Deductions</u>" shall have the meaning set forth in <u>Section 4.2(b)</u> of this Agreement.

"<u>Negative Capital Account</u>" shall mean a Capital Account with a balance less than zero and, where the context requires, the negative balance thereof, in each case as of the end of a fiscal year, after giving effect to the following:

(a)     a credit for any amount required to be restored under Treasury Regulation Section 1.704-1(b)(2)(ii)(c), as well as any amounts in addition thereto pursuant to Treasury Regulation Sections 1.704-2(g)(1) and (i)(5), after taking into account any changes during such fiscal year in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and

(b)     a debit of the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"<u>Net Losses</u>" shall mean, with respect to any fiscal period of the Company, the net losses of the Company for such period for federal income tax purposes including as appropriate each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"<u>Net Profits</u>" shall mean with respect to any fiscal period of the Company, the net profits of the Company for such period for federal income tax purposes including, as appropriate, each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"<u>Offered Interest</u>" shall have the meaning set forth in <u>Section 6.3(a)</u> of this Agreement.

"<u>Percentage Interest</u>" of a Member shall mean the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth on <u>Schedule A</u> hereto bears to the total number of Units owned by all Members as of such date. The combined Percentage Interests of all Members shall at all times equal 100%.

"<u>Permitted Transferee</u>" shall mean (A) with respect to a Member who is an individual, such individual's spouse, children (including natural, adopted and/or step children) or grandchildren (natural, adopted and/or step) (a "<u>Family Member</u>"), a trust of which one or more Family Members are the sole beneficiaries; (B) with respect to a Member which is a partnership, corporation or limited liability company, such Member's current partners, shareholders, members,

directors and/or executive officers, as the case may be; (C) with respect to a Member which is a trust, the existing beneficiaries of such trust; (D) with respect to any Member, a corporation, partnership, limited liability company or other entity, all of which interests therein are owned by the transferring Member or his/her/its Family Members; or (E) with respect to any Member (or Person comprising such Member), any other Member (or Person comprising such Member).

"Person" shall mean an individual, corporation, limited liability company, limited partnership, general partnership, joint venture, company, trust, bank or other entity.

"Regulations" shall mean the Treasury Regulations promulgated under the Code as such regulations maybe amended from time to time (including the corresponding provisions of succeeding regulations).

"Reserves" shall mean, with respect to any fiscal year (or such shorter period as necessary to take into account the Members' varying interests in the Company), funds set aside or amounts allocated during such period to reserves which will be maintained in amounts deemed necessary, sufficient or appropriate by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transfer" shall mean any sale, assignment, transfer, gift, exchange, bequest or other disposition of an Interest, in any manner, voluntary or involuntary, by operation of law or otherwise, but shall not include a pledge, hypothecation or other contingent transfer of rights unless or until such contingency occurs.

"Transfer Date" shall have the meaning set forth in Section 4.1(b) of this Agreement.

"Transferor" shall have the meaning set forth in Section 6.3(a) of this Agreement.

"Treasury Regulations" shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

"Unit" shall mean a unit of ownership interest in the Company and shall represent an undivided interest in the holder's Capital Account balance.

"Withdrawn Member" shall have the meaning set forth in Section 9.1 of this Agreement.

"Withdrawal Event" with respect to any Member, shall mean his/her/its (a) death, revocation of its certificate of incorporation/articles of organization/certificate of formation, Dissolution, expulsion as a Member or adjudication of incompetency, as applicable; (b) Bankruptcy; (c) voluntary retirement or withdrawal from the Company; (d) except as otherwise provided herein, breach of any of his/her/its material obligations under this Agreement, or (e) any other event that terminates a Member's membership in the Company or otherwise causes the Dissolution of the Company under the Act.

"Wrongful Act" shall mean an act of fraud, deceit, gross negligence, willful misconduct, breach of fiduciary duty or a wrongful taking by any Manager.

**2.2   Captions**. The captions used in this Agreement are inserted for convenience and identification only and are in no way intended to define or limit the scope, extent or intent of this Agreement or any of the provisions hereof.

**2.3   Construction**. Whenever the singular number is used herein, the same shall include the plural, and the masculine, feminine and neuter genders shall include each other.  Unless the context clearly requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision hereof. If any language is stricken or deleted from this Agreement (or any prior draft thereof), such language shall be deemed never to have appeared herein and no other implication shall be drawn therefrom.

## 3.   CAPITAL; CAPITAL ACCOUNTS

**3.1   Capital Contributions; Interests.**

(a)   <u>Capital Accounts</u>.  The initial Capital Contributions that have been made by the Members to the Company are set forth on <u>Schedule A</u> annexed hereto.

(b)   <u>Percentage Interests</u>.   Notwithstanding each Member's initial Capital Contribution, each Member shall have the number of Units and the Percentage Interest set forth on <u>Schedule A</u> annexed hereto.

(c)   <u>Additional Contributions</u>.  There shall be no requirement of the Members to make additional capital contributions to the Company except upon the unanimous vote or written consent of the Members.

**3.2   No Withdrawal of Capital Contributions**.   Except upon Dissolution and liquidation of the Company or as otherwise set forth herein, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contributions, or any part thereof, or any distribution thereon. Except as otherwise provided herein, no Member shall have the right to receive assets other than cash in connection with a distribution or return of capital.

**3.3   Return of Capital Contributions.**

(a)   <u>No Fixed Time</u>.  Except upon Dissolution and liquidation of the Company, or pursuant to Section 6.8 of this Agreement, there is no agreement, nor time set, for the return of any Capital Contribution to any Member.

(b)   <u>No Personal Liability of Member</u>.  Except as otherwise required by the Act, the Members shall not be personally liable for the return or repayment of any Capital Contribution.

**3.4   Liability of Members and Their Affiliates.**  Except as otherwise provided by applicable law or herein, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; no Member or Person Affiliated with a Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or being a Person Affiliated with a Member.

**3.5   No Priority**.  Except as otherwise expressly provided for in this Agreement, no

Member shall have priority over another Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

**3.6     No Interest**.  Except as expressly provided for by this Agreement, no interest shall be paid on all or any part of a Member's Capital Account.

**3.7     No Obligation to Restore Negative Balances in Capital Accounts**.  No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

**3.8     Capital Accounts**.

(a)     The Company shall maintain a separate capital account ("Capital Account") for each Member and his/her/its legal representatives, successors and permitted assigns.

(b)     The Capital Account of each Member shall be maintained in accordance with Section 1.704-1(b) of the Regulations as in effect on the date of this Agreement and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with Regulation Section 1.704-1(b), the Managers may make such modifications, provided that such changes have no financial impact on the amount distributable to a Member under Sections 4.3 and 8.2.

(c)     The Capital Account of each Member shall consist of the amount of cash and the fair market value of the property (as determined in good faith by the Managers) contributed by such Member to the Company (net of liabilities securing such contributed property assumed by the Company or subject to which the Company takes the contributed property) increased by allocations of Net Profits, and of tax-exempt income, if any, and decreased by allocations of Net Losses, by distributions and withdrawals of cash and property (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property) and by expenditures defined in Section 705(a)(2)(B) of the Code (or which are treated as Section 705(a)(2)(B) expenditures under Regulation 1.704-1(b)(2)(iv)(i)).

(d)     In the event of a transfer of a Unit or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the person or entity so acquiring such Unit or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Unit, adjusted for distributions of Available Cash theretofore made and allocations of Net Profits and Net Losses through the effective date of the transfer.  The cost of computing such adjustment shall be borne by the Member disposing of such Unit.

# 4.     PROFITS, LOSSES AND DISTRIBUTIONS

**4.1     General**.

(a)     The Net Profits and Net Losses of the Company shall be determined for each fiscal year in accordance with the accounting method followed by the Company for federal income tax purposes. Except as otherwise provided herein, whenever a proportionate part of the Net Profit or Net Loss is credited or charged to a Member's Capital Account, every item of income,

gain, loss, deduction or credit entering into the computation of such Net Profit or Net Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Net Profit or Net Loss and applicable to the period during which such Net Profit or Net Loss was realized shall be allocated to such Member in the same proportion.

(b)     On the last day of the month in which a new Member is admitted to the Company, or a valid transfer of all or a portion of a Member's Units is consummated (the "Transfer Date"), the books of the Company shall be closed in accordance with Section 706(d) of the Code, and consistent therewith: (i) items of income, deduction, gain, loss and/or credit of the Company that are recognized prior to the Transfer Date shall be allocated among those Persons who were Members in the Company prior to the Transfer Date in accordance with their respective Interests prior to the Transfer Date; and (ii) items of income, deduction, gain, loss and/or credit of the Company that are recognized after the Transfer Date shall be allocated among the Persons who were Members in the Company after the Transfer Date.

**4.2     Allocation of Net Profits and Net Losses**.

(a)     After giving effect to the special and curative allocation provisions set forth in this Section 4.2, the Net Profits and Net Losses of the Company for each taxable year (or portion thereof) shall be allocated among the Members in such amounts as are necessary to cause the positive balance in each Member's Adjusted Capital Account to equal, to the greatest extent possible, the amount that would be distributed to each Member were the Company to dissolve and terminate at the end of the taxable year in question, assuming for this purpose that the Company's assets are liquidated for their fair market value and that the net proceeds of such liquidation, after the payment of all Company debts and liabilities, are distributed to the Members in accordance with Section 4.3 of this Agreement, taking into account Section 4.4 of this Agreement.

(b)     Special Allocation Provisions.

(i)     Notwithstanding anything to the contrary contained in Section 4.2 hereof, any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as such term is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Section 1.752-2(b) of the Regulations for such Member Nonrecourse Debt. If more than one Member bears such economic risk of loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such economic risk of loss. If more than one Member bears such economic risk of loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(ii)     Minimum Gain.

(A)       Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Company Minimum Gain (as such term is defined in Sections 1.704-2(b)(2) and (d) of the Regulations), there shall be allocated to each Member, before any other allocation pursuant to Section 4.2 hereof is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain.  A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)       Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as defined in Section 1.704-2(1)(2) of the Regulations), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such fiscal year before any other allocation pursuant to Section 4.2 hereof (other than an allocation required pursuant to Section 4.2(b)(ii)(A)) is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain.  The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations.  The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iii)  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Adjusted Capital Account in excess of the amount such Member is required to restore upon a liquidation of the Company (or of such Member's interest in the Company), then, after any allocations required by Section 4.2(b)(ii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible.  To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 4.2(b)(iii) shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Section 4.2, so that the net amount of any items so allocated and the subsequent Net Profits and Net Losses allocated to the Members pursuant to Section 4.2 shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of Section 4.2 if such unexpected adjustments, allocations or distributions had not been made.

10

(iv)   Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(v)   Notwithstanding the other provisions of this Section 4.2 to the contrary, Net Losses shall not be allocated to a Member to the extent the allocation would create or increase a negative balance in such Member's Capital Account if at that time any other Member has a positive Capital Account; in such event, Net Losses shall be allocated only to Members with positive Capital Accounts until all Members' Capital Accounts have been reduced to zero or are negative, and thereafter all Net Losses shall be allocated to the Members in the ratio of their Percentage Interests or as otherwise provided herein. Notwithstanding the other provisions of this Section 4.2, in the event that at any time any Net Loss has been allocated to any Member pursuant to this clause (v), all Net Profits arising thereafter shall first be specially allocated to the Members who received allocations of Net Losses pursuant to this clause(v) (in proportion to the maximum allocation to which each such Member is then entitled under this clause (v)) until the aggregate amount of Net Profits specially allocated to each such Member pursuant to this clause (v) equals the aggregate amount of Net Losses theretofore allocated to such Member pursuant to clause (v).

**4.3**   **Distributions of Available Cash**.  Except as otherwise provided in this Agreement, including without limitation as provided in Section 8.2 with respect to the liquidation of the Company, Distributions of Available Cash shall be made to the Members, at least annually, upon the unanimous consent of the Managers and FHJ Vision Partners, LLC, as follows:

(a)   *first,* to any Member who has made a loan to the Company, until such loan, together with all interest thereon, has been paid in full; and

(b)   *second,* pari passu, to the Members in accordance with their Percentage Interests.

**4.4**   **Tax Distribution.**

(a)   Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each fiscal year, an amount of cash equal to the product of the Tax Percentage (as defined below) for such fiscal year and such Member's allocated share of the Company's net taxable income and gain for such fiscal year as shown on the Company's federal income tax return (the "Tax Distribution").  If the Company is not required to file a federal income tax return for a fiscal year or the Company's federal income tax return for such fiscal year has not been completed by the close of business on the 85th day after the close of such fiscal year, the amounts to be shown on such return for purposes of this Section 4.4(a) shall be determined in good faith by the Managers.

11

(b)      For purposes of this Section 4.4, "Tax Percentage" shall equal the highest marginal effective rate of federal, state and local income tax in effect for the fiscal year in respect of which the Tax Distribution is made applicable to individuals resident in Delaware or New York, whichever is higher, taking account of any difference in rates applicable to ordinary income and capital gains and any allowable deductions in respect of such state and local taxes in computing the Members' liability for U.S. federal income tax purposes, and assuming that the items of income, gain, deduction, loss and credit in respect of the Company were the only items entering into the computation of tax liability of the Members for the fiscal year in respect of which the Tax Distribution is made.

(c)      For purposes of determining whether the Company has satisfied its distribution obligation under Section 4.4(a), all cash distributions made during a fiscal year shall be treated as distributions made to satisfy Section 4.4(a) in respect of such fiscal year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 4.4(a) in respect of one or more prior fiscal periods, in which case such distributions shall be treated as having been made pursuant to Section 4.4(a) in respect of such prior fiscal period or periods).

(d)      No distribution shall be required to be made pursuant to this Section 4.4 to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(e)      The Company shall not make a distribution under this Section 4.4 to a Member to the extent such Member's Interest is being redeemed or in connection with a liquidation of the Company.

**4.5      Incorrect Distributions**. To the extent distributions pursuant to this <u>Section 4</u> were incorrectly made or were in violation of any applicable law, as determined by the Managers in good faith and based upon financial statements of the Company or such other relevant information, the recipients shall promptly repay all incorrect payments and/or the Company shall have the right to set off any current or future amounts owing to such recipients against any such incorrectly paid amounts.

**4.6      Distributions in Kind**. In the event any proceeds available for distribution consist of items other than cash (including, but not limited to notes, mortgages and payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amounts of proceeds due them, respectively. In determining the Capital Accounts of the Members for purposes of <u>Section 3.8</u>, the amount by which the fair market value of any property to be distributed to the Members exceeds or is less than the tax basis of such assets, to the extent not otherwise recognized by the Company shall be taken into account as if such gain or loss were recognized by the Company.

**4.7      Limitation on Distributions**.  No distribution shall be declared and/or paid unless, after giving effect thereto, the assets of the Company exceed the Company's liabilities.

**4.8      Additional Allocations**.  Notwithstanding anything in this Agreement to the contrary, the Managers may, in their reasonable discretion, allocate Net Profits and Net Losses for any fiscal year in a manner that the Managers deem necessary or appropriate in order to effectuate

any intended economic sharing arrangement or understanding of the Members.

**4.9    Reserves**.    The Managers shall establish and set aside such Reserves as the Managers deem to be in the best interests of the Company.

## 5.    MANAGEMENT OF THE COMPANY; MEMBERS

**5.1    Management Powers of the Managers; Managers.**

(a)    Except as set forth in Section 5.8 below, and except as expressly limited by the provisions of this Agreement or by the Act, the management and control of the business of the Company shall rest exclusively with the Managers, who shall have the full, exclusive and absolute right, power and authority to manage and control each and every aspect of the business of the Company and its property, assets and affairs.  The scope of the Managers' power and authority shall encompass all matters connected or incident to the business of the Company.  The Managers shall be agents of the Company for its business purposes and the Managers may bind the Company in the ordinary course, provided that the Managers have approved such action in accordance with this Agreement or the Act.  Unless otherwise expressly authorized by this Agreement or the Members as set forth herein, any acts of the Managers that are not apparently for carrying on the Company's business in the ordinary course shall not bind the Company.  All decisions made by the Managers, pursuant to this Agreement, shall be made upon the unanimous written consent of the Managers.

(b)    The Company shall have two (2) managers who may, but need not be, Members of the Company.  The initial Managers shall be Alexandr Zaitsev and Daniel Kandhorov.  Alexandr Zaitsev and Daniel Kandhorov shall serve as Managers until their death, resignation or removal in accordance with this Agreement.  Should Alexandr Zaitsev and/or Daniel Kandhorov die, resign or be removed as a Manager pursuant to this Agreement, the Members will appoint a successor Manager in accordance with Section 5.8(b) below.

(c)    The Managers shall be entitled to receive, solely out of the Company's positive net proceeds, reimbursements of all reasonable costs and expenses incurred in connection with the business of the Company.

**5.2    Resignation.** A Manager of the Company may only resign upon the unanimous written consent of the Members. The resignation of a Manager who is also a Member will not affect his/her/its rights as a Member.

**5.3    Removal**.  A Manager may be removed by the Members in accordance with Section 5.8 below if such Manager (a) commits a Wrongful Act; or (b) suffers a Permanent Disability (which shall mean a disability that causes the inability of such Manager to provide services to the Company for 90 consecutive days).  The removal of a Manager who is also a Member will not affect his/her/its rights as a Member except as otherwise set forth herein.

**5.4    Liability for Certain Acts**.  Each Manager shall perform his duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.  A Manager who so performs his/her/its duties shall not have any liability by reason of being or having been a Manager.  A Manager shall not be liable to the Company or to any Member for any loss or damage unless a judgment or other final adjudication adverse to such Manager establishes that such loss or damage was the result of fraud, gross negligence, willful

misconduct, bad faith or a wrongful taking by such Manager.

**5.5    Delegation to Agents and Officers**.  The Managers may delegate functions relating to the day-to-day operations of the Company to such officers, agents, consultants or employees as they may from time to time designate.  Such officers, agents, consultants and employees need not be Members, and shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Managers and may be removed at any time, with or without cause, by the Managers.

**5.6    Other Duties of the Managers**.  In addition to their other duties set forth herein, the Managers:

(a)    may make, on behalf of the Company, the election permitted by Code Section 754 with respect to adjustments to the basis of the Company property,

(b)    shall, promptly following receipt thereof, give notice to the Members of any proposed audit or adjustments of any Company tax returns; and

(c)    shall serve as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

**5.7    No Other Management Powers by Members**. Except as expressly provided in this Agreement or as otherwise required by law, no Member, by reason of his/her/its status as such, shall have any voice or participation in the management of the Company's business or to act for or bind the Company but shall have only the right to vote on or approve the actions, if any, specified herein to be voted on or approved by the Members.

**5.8    Member Rights of Approval**.

(a)    The Members will have such rights with respect to the management of the property, business and affairs of the Company, and such other powers, as are expressly set forth in this Agreement or under the Act.

(b)    Notwithstanding anything herein to the contrary, the Members, acting independently of the Managers, shall take and/or authorize the following acts or transactions by the unanimous vote or written consent of the Members; provided, however, with respect to the removal of a Manager (as provided in Section 5.8(b)(iii)), and with respect to the election of a successor Manager (as provided in Section 5.8(b)(ii) following such Manager's removal pursuant to Section 5.3), or with respect to any matters specified in 5.8(x), the vote or written consent of sixty-five percent (65%) of the Members shall be required (not unanimous) and such sixty-five percent (65%) vote or written consent of the Members shall exclude the vote or written consent of any Interested Member and the relative Percentage Interests of the remaining Members for voting purposes only shall be determined as though the Interested Member's Percentage Interest were zero:

(i)    the sale, exchange or other disposition of all or substantially all of the Company's assets, whether in a single transaction or series of related transactions, or the merger or consolidation of the Company with or into another Person;

(ii) the election of a Manager;

(iii) the removal of a Manager pursuant to Section 5.3;

(iv) the amendment of the Certificate or this Agreement in any respect, except as provided in Sections 11.6 and 11.7;

(v) voting to dissolve, wind up and liquidate the Company;

(vi) to require the Members to make additional capital contributions to the Company pursuant to Section 3.1(b);

(vii) entering into any agreement or series of related agreements, including any agreement to borrow money that, either individually or collectively, (1) creates a monetary obligation of the Company equal to or greater than $10,000, or (2) grants a mortgage on, a security interest in, or otherwise encumbers any material asset of the Company;

(viii) entering into any agreement or series of related agreements, including any agreement to advance money from the Company to any Person, either individually or collectively, equal to or greater than $10,000;

(ix) capital expenditures by the Company in excess of $10,000, whether in a single transaction or series of related transactions;

(x) the making of any decisions concerning matters where a Manager has a direct or indirect economic interest.

**5.9 Meetings of Members**.  Except as otherwise provided in this Agreement, there shall be no requirement of annual or periodic meetings of the Members.

**5.10 Transactions between Company and Members**.  Each Member, including a Manager, has the right to engage in business transactions with the Company, including, but not limited to, providing goods and\or services to the Company, and be compensated accordingly, provided that any such transaction be entered into in good faith and at arms length.  Any such transaction will not affect such Member's Capital Account.  If a Member loans any monies to the Company pursuant to a debenture or other lending agreement or arrangement, the Managers shall use commercially reasonable efforts to ensure that the Company shall abide by the terms and obligations of the Company under such debenture or other lending agreement or arrangement.

**5.11 Outside Interests; Conflicts.**  Subject to Section 11.16 of this Agreement, any Member, Manager or Affiliate of any Member or Manager shall have the right to engage in and/or possess an interest in any other business of every kind, nature and description, independently or with other Persons, irrespective of whether competitive with any property or business directly or indirectly owned or engaged in by the Company. Neither the Company nor any Member or Manager shall have or be entitled to any rights, solely by virtue of this Agreement, in and to such independent ventures or to the income and profits derived therefrom, nor shall any such Member, Manager or such Affiliated Person have any obligation whatsoever to offer, share or offer to share any business opportunity of any kind to or with the Company or any other Member or Manager.

15

The Members hereby waive any and all rights and claims which they may otherwise have against such other Member, Manager and their Affiliated Person.

**5.12    Indemnification.** To the fullest extent permitted by applicable law from time to time in effect:

(a)    The Company shall indemnify and hold harmless the Managers, Members, officers, agents and employees of the Company and their respective directors, trustees, shareholders, members, partners, officers, employees, agents and other Affiliates, against all costs, liabilities, claims, expenses, including reasonable attorneys' fees and disbursements, and damages (collectively, "Losses") paid or incurred by any such Person in connection with the conduct of the Company's business; and

(b)    The Company shall indemnify, defend and hold the Managers harmless from and against, and may indemnify, defend and hold the Company's and the Managers' respective Affiliates, agents, employees, consultants and other independent contractors (collectively, "Indemnitees"), harmless from and against, all Losses arising from any demands, claims or lawsuits against any of the Indemnitees in connection with or resulting from their acts or omissions in their capacities as the Managers, or as such an Affiliate, agent, employee, consultant or other independent contractor of the Company or the Managers, or in connection with, arising from or relating to, business or activities undertaken on behalf of the Company, including, without limitation, any demands, claims or lawsuits initiated by a Member, unless a judgment or other final adjudication adverse to such Indemnitee establishes that (i) such acts or omissions were committed in bad faith, or were the result of active and deliberate dishonesty, (ii) such Indemnitee personally gained a financial profit or other advantage to which he or she was not legally entitled or (iii) such acts or omissions violated such lesser standard of conduct as under applicable law affirmatively prevents indemnification hereunder.   The termination of any action, suit or proceeding by judgment, order, settlement, plea of nolo contendere or its equivalent or conviction shall not, of itself, create a presumption that an Indemnitee shall not be entitled to indemnification hereunder or that the Indemnitee did not act in good faith and in a manner which it reasonably believed to be in or not opposed to the best interests of the Company.

(c)    The rights of an Indemnitee set forth in this Section 5.12 shall not be exclusive of any other rights to which it may be entitled, whether by separate agreement or otherwise, nor shall such rights limit or affect any other such rights.  All rights of an Indemnitee under this Section 5.12 shall survive the Dissolution of the Company and any Withdrawal Event with respect to such Indemnitee, and shall inure to the benefit of his/her/its heirs, personal representatives, successors and assigns.

(d)    Notwithstanding anything contained herein to the contrary, any amount to which an Indemnitee may be entitled under this Section 5.12 shall be paid only out of the assets of the Company and any insurance proceeds available to the Company for such purposes.  No Member shall be personally liable for any amount payable pursuant to this Section 5.12, or to make any Capital Contribution, return any distribution made to it by the Company, or restore any Negative Capital Account balance to enable the Company to make any such payment.

# 6.    RESTRICTIONS ON THE DISPOSITION OF AN INTEREST

**6.1    Generally**. Except as otherwise expressly provided for in this Agreement, no

Member may, directly or indirectly, Transfer all or any portion of his/her/its Units or Interests in the Company without the prior written consent of the Managers, which consent shall not be unreasonably withheld, conditioned or delayed. Any attempt to Transfer in violation of this Agreement shall be of no force or effect and shall not be recognized by the Company.  For the purposes hereof, a direct or indirect Transfer by a Member shall include a Transfer of interests (including any interest as a trustee) in any entity which is a Member (each, an "Entity Member") other than a redemption or repurchase of interests by such Entity Member of one or more of its member's interests or transfers of interests among the members of such Entity Member.  Notwithstanding anything herein to the contrary, any transfers or assignments of the membership interests within FHJ Vision Partners, LLC ("FHJ") whether among the members of FHJ or to non-members of FHJ are hereby expressly permitted by the Company and the Managers, and are subject solely to the requirements set forth in the Operating Agreement of FHJ.

**6.2    Permitted Transfers**.  After compliance with Section 6.4 below only, a Member may Transfer all or a portion of his/her/its Units or Interests or allow the Transfer of direct or indirect ownership interests in such Member or in the partners, members or shareholders thereof, as follows, in each case, without the consent of the Managers:

(a)    if the proposed transferor is a natural Person, by succession or testamentary disposition upon his/her death, provided that such Transfer is to a Person that is otherwise a Permitted Transferee; or

(b)    to any Permitted Transferee.

**6.3    Right of First Refusal**.

(a)    Except as otherwise provided herein, and for all Transfers that are not to a Permitted Transferee, and subject in all events to Sections 6.4, 6.5, 6.6 and 6.7 below, no Member may Transfer any Units or Interests in the Company unless the Member desiring to make the Transfer (the "Transferor") first obtains a bona fide written offer from a third party to purchase all, or portion, of such Member's Interest in the Company and first offers to sell such Interests (the "Offered Interest") to the Company and the other Members in accordance with this Section 6.3. The offer to the Company and the other Members, must include all of the Offered Interest held by the Transferor.  The bona fide offer must state (x) the name and address of the transferee, (y) the consideration that will be received by the Transferor for the transfer and (z) the payment terms of the consideration and other material terms and conditions of the proposed Transfer.

(b)    Within ten (10) days of the receipt of the bona fide offer, the Transferor shall furnish the Company and the non-transferring Members with a copy of such offer.  Within sixty (60) days of the receipt of the offer by the Company and the non-transferring Members, each non-transferring Member may elect to purchase all, but not less than all, of a portion of the Offered Interest in proportion to such non-transferring Member's Percentage Interests in the Company (excluding for purposes of this Section 6.3 any Units or Interests being sold) on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within such sixty (60) day period.  If the non-transferring Members, in the aggregate, do not elect to purchase all of the Offered Interest within such sixty (60) day period, the Company may elect, in the reasonable discretion of the Managers, to purchase all, but not less than all, of the remaining Offered Interest on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within thirty (30) days following the

expiration of such sixty (60) day period.

(c)     In the event the Company or the non-transferring Members, as applicable, elect to purchase, in the aggregate, all of the Offered Interest, the closing of the purchase will take place on the first business day following the end of a period of ninety (90) days after exercise of the Company's or the Members' options to purchase, as applicable, by delivery of the last written notice thereof to the Transferor, or on such other date as mutually agreed upon by the parties.

(d)     In the event neither the Company nor the non-transferring Members elect to purchase, in the aggregate, all of the Offered Interest, the Transferor may transfer the remaining Offered Interest to the transferee named in, and on the terms and conditions set forth in, the notice. If the Transferor fails to conclude such sale of the Offered Interest within fifteen (15) days after the expiration of all applicable time periods set forth herein, the Offered Interest will again become subject to all of the restrictions of this Section 6.

(e)     A Member who has assigned such Member's entire Interest in the Company pursuant to this Section 6.3, whether or not the assignee has become a substituted Member, shall not thereafter be entitled to exercise any of the rights of a Member with respect to such transferred Interest (and the Units associated therewith) nor have any other rights as a Member with respect to such transferred Interest except as otherwise provided by the Act.

(f)     Any Interest transferred pursuant to this Section 6.3 will remain subject to all of the provisions of this Agreement.  Any Member that Transfers its Interest in accordance with this Section 6.3 to an Assignee or transferee which is not a Member may grant to that Assignee or transferee the right to become a Member; provided, however, that such Assignee or transferee will not become a substitute Member unless and until the admission of such Assignee or transferee is consented to by the unanimous vote or written consent of the Members.

**6.4     Other Conditions to Permitted Transfers**.

(a)     As conditions to recognizing the effectiveness of any Transfer permitted under this Section 6, and the admission of a transferee as a new Member, the Transferor and the proposed transferee shall execute, acknowledge and deliver to the Company, at the Transferor's (and/or the transferee's) expense, such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all other acts necessary or desirable, in the opinion of counsel to the Company, to:

(i)     constitute such transferee a Member, if applicable;

(ii)     confirm that the Person desiring to be admitted as a Member, has accepted, assumed, and agreed to be bound by, all of the terms, obligations and conditions of this Agreement, as in effect at the time of the Transfer;

(iii)     preserve the Company after such Transfer under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(iv)     assure compliance with all applicable state and Federal laws, including, without limitation, securities laws; and

(v)     constitute the Company a third-party beneficiary of the rights of the Transferor and the obligations of the transferee under any arrangements or agreements to Transfer an Interest hereunder, with full power to enforce such rights and obligations directly against the transferee.

(b)     All transferees hereunder shall execute the Joinder Agreement in the form attached hereto as **Exhibit A** agreeing to be bound by the terms of this Agreement in the same manner as the transferors and any Units so transferred shall continue to be subject to the restrictions, liabilities and benefits associated therewith.

(c)     Notwithstanding compliance with the other provisions of this Section 6, no Transfer of a Unit or Interest may be made to a minor or incompetent individual except by will, intestate succession or gift under applicable uniform transfers to minors acts or pursuant to the terms of an inter vivos trust.

**6.5    Effective Date**.

(a)     Any Transfer of a Unit or Interest or admission of a Member in accordance with this Agreement shall be effective as of the last day of the calendar month in which all of the conditions thereto were satisfied.  No Transfer of a Unit or Interest shall be effective unless and until the Company has received notice of the name and address of the transferee and the date of such Transfer, and shall then be effective only to the extent set forth in this Agreement.

(b)     No new Member shall be entitled to any retroactive allocation of Net Profits or Net Losses or other allocable items incurred by the Company.  The Managers may, in their discretion, at the time a new Member obtains a Unit or Interest, close the Company books (as though the fiscal year had ended) or make pro rata allocations of such items to a new Unit or Interest holder for that portion of the fiscal year in which it holds a Unit or Interest, in accordance with Code Section 706(d) and the Regulations promulgated thereunder.

**6.6    Pledge or Encumbrance of Interests**.  No Member may pledge or encumber a Unit or Interest, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise, without the consent of the Managers.

**6.7    Restrictions on Transfers/Impermissible Transferees**.

(a)     All Transfers, directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company, including without limitation Transfers to Permitted Transferees or pursuant to the procedures in <u>Section 6.3</u>, shall be subject to the following restrictions: (i) no Transfer shall be made to any Person who is not reputable and financially able to perform the obligations of a Member hereunder (including any indemnity obligations contained herein); (ii) no Transfer of Units or Interests shall be made which results, or would result upon a foreclosure of any security interest or in a termination of the Company within the meaning of the Act; (iii) no Transfer of Units or Interests shall be made which violates any provision of this Agreement; and (iv) no change in ownership of any Units or Interests shall be binding against the other Member unless approved in accordance with this Agreement.  All Transfers, whether directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company in contravention of this Agreement shall be void.

(b)     In the event any Member shall Transfer any of its Units or Interests in the Company in contravention of the express terms of this Agreement, the Member Transferring any such Units or Interests shall indemnify and hold the Company and other Members harmless from and against any and all loss, cost, claim, liability, damage or expense which it or they may incur or suffer (including attorneys' fees and disbursements) in enforcing or attempting to enforce the provisions hereof. Any Member who makes a Transfer in contravention of the express terms of this Agreement, shall have no right to vote on any matters that may be brought before the Members nor shall such persons be counted for purposes of a quorum.

**6.8     Redemption.**

(a)     No later than thirty (30) days following the twelve (12) month anniversary of the date hereof,  FBH Capital Group, LLC ("FBH") may require the Company to redeem all, but not less than all, of the Units then held by FBH in one (1) installment on a date no later than ninety (90) days following the request for redemption (the "Redemption Date").  The Company shall effect such redemption on the Redemption Date by paying in cash, in exchange for the Units to be redeemed, a sum equal to any unreturned Capital Contribution of FBH, plus any accrued but unpaid interest thereon, at a rate per annum of thirteen percent (13%) (collectively, the "Redemption Price").  Notwithstanding anything herein to the contrary, the foregoing redemption right shall be limited to the aforementioned time frame and will not be an ongoing option.

(b)     From and after the Redemption Date, unless there shall have been a default in payment of the Redemption Price or the Company is unable to pay the Redemption Price due to not having sufficient legally available funds, all rights of FBH as a Member of the Company shall cease and terminate; provided, however, in the event that FBH's Units are not redeemed due to a default in payment by the Company or because the Company does not have sufficient legally available funds, such Units shall remain outstanding and FBH shall be entitled to all of its rights as a Member until such Units are redeemed.

## 7.     BOOKS, RECORDS AND REPORTS

**7.1     Books and Records**. The Company shall keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records shall be otherwise kept in accordance with the provisions of the Act.  Any Member or its designated representative shall have the right, at any reasonable time and upon reasonable notice, to have access to and to inspect and copy the contents of such books or records.

**7.2     Financial Books**. The Managers shall keep or cause to be kept complete and accurate financial books with respect to the Company's business.

**7.3     Bank Accounts**. The funds of the Company shall be deposited in such amounts in such bank account or accounts as shall be designated by the Managers.  All withdrawals from any account established by the Managers may be made by the Managers (or a specific designee(s) of the Managers which designation has been made in writing and provided to the Members).  The funds of the Company shall be maintained in a segregated account(s) and shall not be commingled with the funds of any other Person, including, without limitation, the Managers, and, if not immediately required for Company business, may be temporarily invested in such liquid, non-equity assets as the Managers shall determine.  The Managers shall promptly provide each Member

with written notice of any investment of the Company funds into such liquid, non-equity assets.

**7.4     Reports**. The Managers, at the expense of the Company, shall use commercially reasonable efforts to cause to be prepared and distributed to each Person who was a Member or Economic Interest Holder during any fiscal year of the Company:

(a)     within one hundred-twenty (120) days after the end of each fiscal year of the Company, all information relating to the Company that is necessary for the preparation of the Member's federal, state and local income tax returns;

(b)     within sixty-five (65) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a quarterly unaudited financial statement of the Company prepared on a federal income tax basis or reviewed by independent public accountants selected by the Managers (the "Accountants");

(c)     within one hundred-twenty (120) days after the end of each fiscal year of the Company, an annual unaudited financial statement of the Company prepared on a federal income tax basis compiled or reviewed by the Accountants; and

(d)     any other information that may be reasonably requested by any Member.

**7.5     Tax Returns**. The Managers shall, at the expense of the Company, retain the Accountants and cause to be prepared all tax returns for the Company and shall further cause such returns to be timely filed with the appropriate authorities.  It is contemplated that the Company will be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, and as determined by the Managers, including the amendment of this Agreement to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

**7.6     Fiscal Year and Accounting Method**. The Company shall adopt a fiscal year ending on the last day of such month of each year and a method of accounting selected by the Managers with the advice of the Accountants for the Company; provided, however, that the Managers in their reasonable discretion may, subject to any approval required by the Internal Revenue Service and the applicable state taxing authorities, at any time change the Company's method of accounting.

**7.7     Tax Elections**. The Tax Matters Partner shall have the authority to cause the Company to make any election required or permitted to be made for income tax purposes.  The Tax Matters Partner may cause the Company to make, in accordance with Section 754 of the Code, a timely election to adjust the basis of Company property as described in Sections 734 and 743 of the Code in the sole discretion of the Tax Matters Partner.

**7.8     Title to Company Assets**.  Title to, and all right and interest in, the Company's assets, shall be acquired in the name of and held by the Company, or, if acquired in any other name, be held for the benefit of the Company.

## 8.     DISSOLUTION AND TERMINATION OF THE COMPANY

**8.1     Dissolution**.  The Company shall be dissolved and terminated and its affairs shall be wound up upon the earliest to occur of the following:

(a)     the unanimous vote or written consent of the Members;

(b)     the sale or other disposition of all or substantially all of the business or assets of the Company; or

(c)     the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**8.2     Winding up of the Company**.

(a)     If the Company is to be dissolved in accordance with Section 8.1, then the Managers or other Person selected by the Managers (the "Liquidator") shall wind up the affairs of the Company, including by selling or otherwise liquidating the Company assets in a bona fide sale or sales to third Persons at such prices and upon such terms as they may determine.  If the Liquidator determines that an immediate sale would be financially inadvisable, it may defer sale of the Company assets for a reasonable time, or distribute the assets in kind.  During the winding up period, the Liquidator may exercise all powers granted to the Managers under this Agreement, and may adopt such plan, method or procedure as may be reasonable to effect an orderly winding up.

(b)     The proceeds of any liquidation of the Company shall be distributed in the following order of priority (to the extent that such order of priority is consistent with the laws of the State of Delaware):

(i)     first, to the payment of the debts and liabilities of the Company and the expenses of Dissolution and liquidation;

(ii)     then, to the establishment of any Reserves which the Liquidator shall deem reasonably necessary for payment of such other debts and liabilities of the Company (contingent or otherwise), as are specified by the Liquidator, such Reserves to be held in escrow by a bank or trust company selected by the Liquidator and to be disbursed as directed by the Liquidator in payment of any of the specified debts and liabilities or, at the expiration of such period as the Liquidator may deem advisable, to be distributed in the manner hereinafter provided; and

(iii)   then, to the Members in accordance with their Percentage Interests.

(c)     If any assets are distributed in kind, they shall be distributed on the basis of the fair market value thereof, and shall be deemed to have been sold at fair market value for purposes of the allocations under Section 4.

(d)     The Company shall terminate when all assets of the Company have been sold and/or distributed and all affairs of the Company have been wound up.

**8.3     Termination**.  Upon the completion of the distribution of Company assets as provided in Section 8.2, the Company shall be terminated, and the Managers or other Person acting as liquidator shall cause the Certificate of the Company to be canceled and shall take such other actions as may be necessary to terminate the existence of the Company.

## 9.   WITHDRAWAL OF A MEMBER

**9.1   Right to Withdraw**.  The withdrawal of a Member (the "Withdrawn Member") upon the occurrence of a Withdrawal Event, shall only be permitted upon the unanimous written consent of the Members (excluding the vote of the Withdrawn Member); provided that upon the (i) death of a Member, if an individual (ii) Permanent Disability of a Member, if an individual, (iii) Bankruptcy, or (iv) Dissolution of a Member, the Company will permit the withdrawal of such Member without requiring consent.

**9.2   Effect of Withdrawal.**

(a)   Except as otherwise provided in this Agreement, unless the remaining Members elect to dissolve the Company in accordance with this Agreement, the Withdrawn Member shall not be entitled to receive any amount in liquidation of his/her/its Interest until the Dissolution and winding up of the Company, but shall, on and as of the date of Withdrawal Event, become an Assignee of the Economic Interest associated with its former Interest, with no right to participate in the management of the business of the Company or otherwise exercise any of the rights or privileges of a Member hereunder or under the Act.  After any such Withdrawal Event, the relative Percentage Interests of the remaining Members for voting purposes only shall be determined as though the Withdrawn Member's Percentage Interest were zero.

(b)   If the remaining Members do elect to dissolve the Company in accordance with this Agreement after a Withdrawal Event, the Withdrawn Member shall be entitled to receive an amount in liquidation of its Interest determined as set forth in this Agreement.

(c)   If a Withdrawal Event results in the Dissolution of the Company, the Withdrawn Member shall be treated as any other Member in the liquidation of the Company's assets pursuant to Section 8.2.

(d)   Upon the occurrence of any Withdrawal Event, the Company shall have no further obligation or liability to any Assignee of the Withdrawn Member.

**9.3   Rights of a Withdrawn Member**.  In the event of a Withdrawal Event pursuant to Section 9.1(i) or (ii) above prior to the expiration of the Company's term (as set forth in Section 1.6 of this Agreement) the successor in interest to such Withdrawn Member ("Successor in Interest") shall be an Assignee of the Economic Interest of the Withdrawn Member.  In such event, the Successor in Interest shall not become a Member unless and until the admission of the Successor in Interest as a Member is consented to in writing by the unanimous vote or written consent of the Members, and provided further that the Successor in Interest executes and delivers such documents as the Managers may reasonably require to make the Successor in Interest a party to this Agreement.

**9.4   Company to Continue Upon a Withdrawal Event**.  The Company shall not dissolve upon the withdrawal of a Member, but shall continue until dissolved in accordance with Section 8.

**9.5   No Right to Receive Distributions Upon a Withdrawal Event**. No Member shall have the right to receive any distribution, other than pursuant to the express terms of this Agreement, prior to the Company's Dissolution pursuant to Section 8 of this Agreement.

## 10. APPLICABLE LAW

**10.1 Governing Law; Consent to Jurisdiction**. This Agreement and the rights and obligations of the parties hereto shall be interpreted in accordance with the laws of the State of Delaware without giving effect to principles of conflict of laws. Each Member hereby consents to the jurisdiction of any state or federal court located in the Counties of Kings or Nassau, New York for purposes of the enforcement of this Agreement. Each Member hereby waives in advance any objection to venue of any action constituted under this Section 10.1.

## 11. MISCELLANEOUS PROVISIONS

**11.1 No Third Party Beneficiaries**. The covenants, obligations and rights set forth in this Agreement are not intended to benefit any creditor of the Company or of any Member, or any other third Person, and except as permitted by applicable law after the obligation to make an additional Capital Contribution has been fixed, or in connection with certain wrongful distributions, no such creditor or other third Person shall, under any circumstances, have any right to compel any actions or payments by the Managers and/or the Members or shall, by reason of any provision contained herein, be entitled to make any claim in respect of any debt, liability, obligation or otherwise against the Company or any Member.

**11.2 Notices**. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

If to the Company:

FINANCIAL VISION GROUP III LLC



Attention: Managers

If to the Managers:

c/o Alexandr Zaitsev

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five (5) days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer, if sent during

24

normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (iv) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

**11.3    Severability**. If any covenant, condition, term, or provision of this Agreement is illegal, or if the application thereof to any Person or in any circumstance be judicially determined to be invalid or unenforceable, the remainder of this Agreement, or the application of such covenant, condition, term, or provision to Persons or in circumstances other than with respect to which it is held invalid or unenforceable, shall not be affected thereby, and each covenant, condition, term, and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**11.4    Counterparts; Faxed or E-Mailed Signatures**.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  Any executed signature page delivered by facsimile or e-mail transmission shall be binding to the same extent as an original executed signature page, with regard to any agreement subject to the terms hereof or any amendment thereto.

**11.5    Entire Agreement**. This Agreement, together with the Certificate,  constitute the entire agreement of the parties relating to the subject matter hereof, and together they supersede and replace any prior agreement or understanding between some or all of the parties pertaining thereto.  To the extent the Act addresses a matter not otherwise addressed by this Agreement, it is the intention of the Members that the provisions of the Act shall apply, but no such application shall otherwise affect any provision of this Agreement.

**11.6    Amendments**.

(a)    Except as otherwise required by this Agreement or the Act, this Agreement may be amended by the unanimous vote or written consent of the Members.

(b)    Notwithstanding anything to the contrary contained in Section 11.6(a), the Managers may modify the provisions of this Agreement without the consent of the Members if, upon advice of counsel to the Company, the modification is necessary to cause (i) the Company to be or to continue to be classified as a partnership for federal income tax purposes or (ii) the allocations under Section 4 to have substantial economic effect or to be in accordance with the Members' interests under Section 704 of the Code and the Regulations thereunder.  No modification hereunder may alter the limited liability of the Members or have a material effect on amounts distributable to any Member pursuant to this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Section 11.6, any amendment to this Agreement that would adversely affect (i) the federal income tax treatment to be afforded a Member, (ii) the liabilities of a Member, or (iii) the consent and approval rights reserved by the Members, or which would otherwise change the method of calculating allocations or distributions under Section 4, shall require the consent of each Member affected.

**11.7    Amendment by Agreement of Merger**. Notwithstanding anything to the contrary contained in this Agreement, in accordance with the Act, an agreement of merger or consolidation

approved by the Members as required by this Agreement may effect (a) amendments to this Agreement contained in the agreement of merger or consolidation or necessitated thereby or (b) the adoption of a new limited liability company agreement for the Company if it is the surviving or resulting entity, in each case without further action by the Members.

**11.8    Further Assurances**. The Members will execute and deliver such further instruments and do such further acts and things as may be reasonably required to carry out the intent and purposes of this Agreement, including, without limitation, such amendments to this Agreement as the Managers may determine to be reasonably necessary or advisable to ensure that the Company will be classified and treated as a partnership for federal, state and local income tax purposes.

**11.9    Successors and Assigns**. Subject in all respects to the limitations on transferability contained herein, this Agreement shall be binding upon, and shall inure to the benefit of, the heirs, administrators, personal representatives, successors, and permitted assigns of the respective parties hereto.

**11.10   Waiver of Action for Partition**. Each of the parties hereto irrevocably waives, during the term of the Company and during the period of liquidation following any Dissolution, any right that it may have to maintain any action for partition with respect to any of the assets of the Company.

**11.11   Waivers; Rights and Remedies Cumulative**.  The failure of any party to pursue any remedy for breach, or to insist upon the strict performance, of any covenant or condition contained in this Agreement shall not constitute a waiver of any such right with respect to any subsequent breach.  Except as otherwise expressly set forth herein, rights and remedies under this Agreement are cumulative, and the pursuit of any one right or remedy by any party shall not preclude, or constitute a waiver of, the right to pursue any or all other remedies.  All rights and remedies provided under this Agreement are in addition to any other rights the parties may have by law, in equity or otherwise.

**11.12   Agreement Drafted by Counsel**.  Each Member and Manager acknowledges that (i) Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, counsel for the Company, has prepared this Agreement on behalf of and in the course of its representation of the Company and not as counsel for any Member or Manager, (ii) each Member and Manager has been advised of potential conflicts of interest that may exist, now or in the future, between such Member or Manager and those of the Company and the other Members or Managers, and (iii) the Members and Managers have been advised by such law firm to seek independent counsel.

**11.13   Investment Representations**. Each Member hereby represents and warrants to the Company and each other Member as follows:

      (a)    Such Member acknowledges that:

            (i)    the Interest owned by it has not been registered under the Securities Act of 1933, the Delaware State securities laws or any other state securities laws (collectively, the "Securities Acts") because the Company is issuing (or an Member has Transferred) such Interest in reliance upon exemptions from the registration requirements contained in the Securities Acts for issuances not involving a public

offering;

        (ii)   the Company (or the Transferor) has relied upon the fact that the Interest is to be held by such Member for investment purposes only, and not with a view to any resale or distribution thereof; and

        (iii)   the Company is under no obligation to register or qualify the Interest or to assist any Interest Holder in complying with any exemption from registration under the Securities Acts if such Member wishes to dispose of the Interest.

        (b)   Each Member is acquiring the Interest for his/her/its own account, for investment purposes only, and not with a view to the resale or distribution thereof, unless there are effective registrations or other qualifications relating thereto under applicable Securities Acts.

        (c)   Before acquiring the Interest, each Member investigated the Company and its business, and the Company made available to it all information necessary to make an informed decision to acquire the Interest.

**11.14  Managers as Attorney-in-Fact for Members**.

        (a)   Each Member hereby irrevocably constitutes and appoints, with full power of substitution, the Managers as its/his/her true and lawful attorney-in-fact, with full power and authority in its/his/her name, place and stead, to execute, certify, acknowledge, deliver, file and record at the appropriate public offices:

        (i)   all certificates and other instruments, and any amendment thereto, which the Managers deems appropriate to form, qualify or continue the business of the Company as a limited liability company;

        (ii)   any other instrument or document which may be required to be filed by the Company under the laws of any state, or which the Managers deem advisable to file; and

        (iii)   any instrument or document required to continue the business of the Company or dissolve and liquidate the Company (provided that such continuation or Dissolution are consented to in accordance with this Agreement).

        (b)   Each Member's appointment of the Managers as its/his/her attorney-in-fact shall be deemed to be a power coupled with an interest and shall survive the incompetency, Bankruptcy or Dissolution of the Member giving such power, except that, in the event of a Member's Transfer of an Interest in accordance with this Agreement, this power of attorney shall survive such Transfer only until such time, if any, as the assignee shall have been admitted to the Company as a Member and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution.

11.15  **Attorneys' Fees.**  In the event of any controversy, claim, or dispute between the parties hereto, arising out of or relating to this Agreement or its breach, the prevailing party shall be entitled, in addition to any other relief, to recover reasonable attorneys' fees, expenses, and costs, whether or not the controversy, claim, or dispute results in litigation or arbitration between the parties.

11.16  **Covenant Not To Compete.**  Each Manager, Member and any managers, officers, employees, consultants or agents of such Manager or Member, and any Affiliate of such Manager or Member, covenants and agrees that, so long as such Manager is a manager of the Company or such Member is a Member of the Company, in each case, as applicable, and for a period of one (1) year thereafter, such Manager and/or Member and each of their respective Affiliates, will not, without the unanimous prior written consent of the Members, directly or indirectly, and whether as a principal, agent, officer, manager, employee, consultant, corporation or other business organization: (i) be engaged in, concerned, take part in, render services to, own, share in the earnings of, or invest in the stock, bonds or other securities of any person, firm, corporation or other business organization engaged in a business located in any jurisdiction in which the Company performs its business which is the same, similar to or in competition with any of the business and operations of the Company then or theretofore carried on by the Company, or (ii) directly or indirectly hire, solicit, or recruit employees of the Company to leave employment with the Company, nor contact any employee of the Company, or cause an employee of the Company to be contacted, for the purpose of leaving employment with the Company, or (iii) interfere with the Company's relationship with, or endeavor to entice away from the Company any person, firm, corporation or other business organization who or which, at any time during the term of such Member's membership and/or Manager's engagement by the Company, was an employee, consultant, agent, franchisee, joint venture, supplier, vendor, contractor, supplier or customer of, or in the habit of dealing with, the Company.  Notwithstanding the foregoing, if any provision of this Section 11.16 is held by any court of competent jurisdiction to be unenforceable because of the scope, duration or area of its applicability, the Company shall have the right to modify such scope, duration or area or all of them so as to render them enforceable, and such provision shall then be applicable in such modified form.  If a Manager, Member, or an Affiliate of such Manager or Member, violates this Section 11.16, such Manager, Member and its Affiliates, as applicable, hereby consent to an injunction stopping such Manager's and/or Member's and/or its Affiliates' actions, as applicable.

11.17  **Scope and Duration; Equitable Relief.**  The Managers and Members acknowledge that the restrictions contained in Section 11.16 are reasonable in scope and in duration under the circumstances.  The Managers and Members further acknowledge and agree that such restrictions are necessary to protect the legitimate business interests of the Company and that any violation thereof would result in irreparable harm to the Company.  Accordingly, each Member and Manager agrees that upon the violation or threatened violation by him/her/it of any of the restrictions contained in Section 11.16, the Company shall be entitled to obtain from any court of competent jurisdiction a preliminary and permanent injunction (without the necessity of posting a bond or other security) as well as any other relief provided at law or equity, under this Agreement or otherwise.  In the event any of the foregoing restrictions are adjudged unreasonable in any proceeding, then the parties agree that the period of time or scope of such restrictions (or both) shall be adjusted in such manner or for such a time (or both) as is adjudged to be reasonable.

11.18  **Confidentiality.**  The Members and Managers acknowledge and agree that all information provided to them by or on behalf of the Company concerning the business or assets of the Company (collectively, the "Confidential Information") shall be deemed strictly confidential and the Members and Managers shall not, without the prior written consent of the Company, use for himself/herself/itself, publish, disclose or otherwise reveal or divulge, any Confidential Information (other than to a person or entity bound by confidentiality obligations similar to those contained herein).  Each Member shall (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as they use for their personal confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the Company, and (3) refrain from using or allowing to be used any Confidential Information for their own benefit or for the benefit of any third party, except that disclosure of Confidential Information will be permitted: (a) to the Company; (b) if such Confidential Information has previously become available to the public through no fault of such Member or Manager; (c) is already known to such Member or Manager, on a non-confidential basis at the time of disclosure by the Company, as shown by competent evidence; (d) becomes known to such Member or Manager from a source other than the Company; provided, that, such source has not entered into a confidentiality agreement with the Company with respect to such information or obtained the information from an entity or person who is a party to a confidentiality agreement with the Company, and without a breach of this Agreement or without a breach of duty owed by any other person or entity to the Company; (e) is proven by competent evidence by such Member or Manager that it was independently conceived or discovered by such Member or Manager without reference to or use of the Confidential Information; (f) if required by law or any court or governmental agency or body; provided that in any such case covered by this clause (f) such Member or Manager shall provide the Company, in advance of any such disclosure, with prompt notice of such requirement(s) and shall cooperate fully with the Company to the extent it may seek to limit such disclosure; (g) if necessary to establish or assert the rights of such Member or Manager hereunder; (h) if expressly consented to in writing by the Company.

[*Remainder of Page Blank*]

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP III LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP III LLC as of the date first above written.

MEMBER: _____

Alexander Zaitsev

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP III LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP III LLC as of the date first above written.

MEMBER:

_Daniel_
Daniel Kandhorov

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP III LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP III LLC as of the date first above written.

MEMBER:

FHJ VISION PARTNERS, LLC

By: _____
Howard Fensterman, Manager

By: _____
Frank Carone, Manager

By: _____
Jordan Fensterman, Manager

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP III LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP III LLC as of the date first above written.

MEMBER:

_____

FBH Capital Group, LLC, Member

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP III LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP III LLC as of the date first above written.

MANAGERS:

Alexandr Zaitsev

Daniel Kandhorov

31

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP III LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP III LLC as of the date first above written.

MANAGERS:

_____
Alexandr Zaitsev

_____
Daniel Kandhorov

31

**FINANCIAL VISION GROUP III LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

| Name of Member | Capital Contribution | Number of Units | Percentage Interest |
|---|---|---|---|
| Alexandr Zaitsev | $ | 33.375 | 33.375% |
| Daniel Kandhorov | $ | 33.375 | 33.375% |
| FHJ Vision Partners, LLC | $ | 22.25 | 22.25% |
| FBH Capital Group, LLC | $ | 11 | 11% |
| **TOTAL** | **$** | **100** | **100%** |

## EXHIBIT A

### JOINDER AGREEMENT

### FINANCIAL VISION GROUP III LLC

### LIMITED LIABILITY COMPANY AGREEMENT

The undersigned has read and hereby joins in and agrees to be bound by all of the terms and provisions of that certain Limited Liability Company Agreement of FINANCIAL VISION GROUP III LLC (the "Company"), dated as of September 24, 2018, by and among the Members of the Company (as, or as the same may be, amended, modified, supplemented or restated, the "Agreement"), and shall for all purposes be deemed to be a Member (as such term is contemplated by the Agreement) of the Company, and shall be entitled to all of the rights and entitlements, and subject to and liable for all of the obligations, liabilities and undertakings, of a Member as set forth in or contemplated by the Agreement.

MEMBER:

_____                    _____
Signature                                       Date

_____
Print Name

_____
Social Security Number

_____
Number of Units

_____
Percentage Interest

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**FINANCIAL VISION GROUP IV LLC**

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of FINANCIAL VISION GROUP IV LLC (the "Company") is made and entered into as of the 28th day of February, 2019, by and among the Persons who have executed the signature page(s) hereof as Members and the Persons who from time to time hereafter execute a Joinder Agreement in the form attached hereto as Exhibit A.

WHEREAS, the parties have formed a limited liability company (together with any successor limited liability company, the "Company") under the Delaware Limited Liability Company Act (the "Act") and upon the terms and conditions of this Agreement; and

WHEREAS, the Members wish to set forth their agreement as to how the business and affairs of the Company shall be managed and their rights and obligations with respect to the Company.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the parties hereby agree as follows:

1.    **ORGANIZATION.**

1.1    **Formation**. The Company was organized on February 28, 2019, in accordance with and pursuant to the Act.

1.2    **Name**. The name of the Company shall be "FINANCIAL VISION GROUP IV LLC" or such other name as the Members shall from time to time determine.

1.3    **Principal Office**. The principal office of the Company shall be located at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey 07470 or at such other place as may be designated by the Members.  The Members may provide additional offices for the Company within or outside of the State of Delaware if the same are deemed advisable for the conduct of the Company's business.

1.4    **Filings**.

(a)    The Certificate of Formation of the Company (the "Certificate") was filed with the Secretary of State of the State of Delaware on February 28, 2019; and the Managers shall execute such further documents and take such further action as shall be necessary or appropriate to comply with the requirements of law for the formation and operation of a limited liability company pursuant to the Act.

(b)    The Managers are authorized to execute, file and/or publish, or cause to be filed and/or published, with the proper authorities in each jurisdiction (or subdivision thereof) where the Company conducts business, such certificates or documents in connection with the conduct of business as may be required by applicable law.

(c)    The Members, from time to time, shall execute, acknowledge, verify, file,

1

record and/or publish, or cause to be executed, acknowledged, verified, filed, recorded and/or published, all such applications, certificates and other documents, and do or cause to be done all such other acts, as the Managers may deem necessary or appropriate to comply with the requirements of law for the formation, qualification and operation of the Company as a limited liability company in all jurisdictions in which the Company shall desire to conduct business.

      **1.5**    **Purpose.** The purpose of the Company is to conduct any lawful business or activity whatsoever as permitted by applicable law and as determined from time to time by the Managers. The Company may exercise all powers necessary to or reasonably connected with the Company's business from time to time, and may engage in all activities necessary, customary, related or incidental to any of the foregoing.

      **1.6**    **Term.** The term of the Company shall commence as of the date hereof and shall be of unlimited duration, unless the Company is earlier dissolved in accordance herewith and with the Act.

      **1.7**    **Names and Addresses of Members.** The name, address, Capital Contribution, number of Units, and Percentage Interest of each of the Members of the Company are set forth on Schedule A annexed hereto. If necessary, Schedule A shall be amended by the Managers from time to time to reflect any changes to the information set forth thereon.

## 2.    DEFINITIONS AND INTERPRETATION

      **2.1**    Definitions. In addition to terms otherwise defined herein, the following terms shall have the following meanings:

      "Accountants" shall have the meaning set forth in Section 7.4(b) of this Agreement.

      "Act" shall have the meaning set forth in the Recitals.

      "Adjusted Capital Account" shall mean, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i)  Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and (ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations. The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

      "Affiliate" or "Affiliated" of a Person shall mean (i) any officer, partner, director, manager, trustee, member, general partner, or controlling shareholder of such Person; (ii) any Person controlling, controlled by or under common control with such Person; (iii) any officer, director, trustee, member, manager, controlling shareholder or general partner of any Person described in (ii) above and (iv) any Person in which such Person serves as an officer, director, trustee, member, manager, shareholder or partner. For purposes of this definition, the term "control" shall mean the right or ability to elect the majority of the directors of a Person, to exercise more than fifty percent (50%) of the voting rights in the Person, the power to direct the management and policies of such Person, directly or indirectly, by or through stock ownership,

agency or otherwise, or pursuant to or in connection with an agreement, arrangement or understanding (written or oral) with one or more other Persons by or through stock ownership, agency or otherwise and the terms "affiliate," "controlling" and "controlled" shall have meanings correlative to the foregoing.

"Assignee" shall mean the holder of an Economic Interest who is not a Member.

"Available Cash" shall mean all Gross Receipts actually received by the Company, less the sum of the following, to the extent paid (in the order of priority listed below) from Gross Receipts received by or on behalf of the Company to third parties in arms-length transactions, or, if otherwise, then not in excess of what third parties would charge in arms-length transactions:

(1)     All principal, interest and other payments due and owing with respect to loans, mortgages and other indebtedness of the Company;

(2)     All cash expenditures then required to be made in connection with the operation of the business of the Company;

(3)     The Tax Distributions paid pursuant to Section 4.4 of this Agreement; and

(4)     Such cash Reserves as the Managers reasonably determine to be necessary or appropriate for the operation of the business of the Company.

"Bankruptcy" of a Member shall mean (a) the entry of an order for relief with respect to that Member in a proceeding under the United States Bankruptcy Code, as amended from time to time, (b) the Member's initiation, whether by filing a petition, beginning a proceeding or in answer to a proceeding commenced by another Person, of any action for liquidation, Dissolution, receivership or other similar relief, (c) the Member's application for, or consent to the appointment of, a trustee, receiver or custodian for its assets, (d) the Member's making of a general assignment for the benefit of creditors or (e) the Member's failure generally to pay its debts as such debts come due or admission in writing of its inability to pay its debts as they come due. For purposes of this definition, a Member's consent shall be deemed to have been given if an order appointing a trustee, receiver or custodian is entered by a court of competent jurisdiction and is not dismissed within ninety (90) days after its entry.

"Capital Account" shall have the meaning set forth in Section 3.8(a) of this Agreement.

"Capital Contribution" shall mean, with respect to any Member, the amount of money and the fair market value of property contributed by such Member to the Company. The Capital Contributions of each Member is set forth on Schedule A.

"Certificate" shall have the meaning set forth in Section 1.4(a) of this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as the same has been or may be amended from time to time.

"Company Minimum Gain" shall mean the amount determined under Treasury Regulation Sections 1.704-2(d) and 1.704-2(i)(3), and shall be computed separately for each

3

Interest holder in a manner consistent with Code Section 704(b) and the Treasury Regulations thereunder.

"<u>Control</u>" or any derivative thereof, when used with respect to a specified Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person

"<u>Dissolution</u>" shall mean, with respect to a legal entity other than a natural person, that such entity has "dissolved" within the meaning of the partnership, corporation, limited liability company, trust or other statute under which such entity was organized.

"<u>Economic Interest</u>" shall mean an interest, as represented by one or more Units, in a holder's share of the Net Profits and Net Losses of, and the right to receive distributions from, the Company.

"<u>Economic Interest Holder</u>" shall mean any Person who holds an Economic Interest, whether as a Member's or an unadmitted Assignee of a Member's Units.

"<u>Entity Member</u>" shall have the meaning set forth in Section 6.1.

"<u>Family Member</u>" shall have the meaning set forth in the definition of Permitted Transferee.

"<u>Gross Receipts</u>" with respect to any period shall mean all gross cash receipts of the Company from any source whatsoever received by the Company during such period, including, without limitation, all payments of principal and interest made with respect to any advance made by the Company, interest income, any compromise or settlement payments (including good faith deposits or escrows when forfeited) received by the Company with respect to any advances, mortgage loans, cash proceeds of the sale or other disposition of any advance, mortgage loan or other asset held by the Company (including amounts paid by any Member in connection with the purchase by it of any asset of the Company), all payments received by the Company in reduction of the outstanding principal balance of any mortgage or other advances held by the Company (whether in the nature of standard amortization, prepayments or special payments of principal), all payments received by Company for the release of collateral from the lien of a mortgage held by Company, cash proceeds of the sale or other disposition of any real property, rental income of any and every nature, condemnation awards or hazard insurance proceeds received by Company and not applied by the Company toward the repayment and/or restoration of the properties which suffered the casualty or condemnation, the net proceeds of any loans borrowed by the Company for which the advances or mortgage loans or other assets of the Company pledged as collateral; <u>but</u> excluding (A) Capital Contributions, (B) Company borrowings and (C) any amounts received by the Company which constitute segregated escrow or similar accounts (until the same are released or forfeited to the Company).

"<u>Interest</u>" shall mean the ownership interest of a Member in the Company represented by one or more Units, consisting of (i) such Member's right to profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act and (iii) such Member's other rights and privileges as herein provided.

"<u>Interested Member</u>" shall mean any Member who is also a Manager or any Entity

Member in which a Manager is a member of such Entity Member or which a Family Member of a Manager is a member of such Entity Member.

"Managers" shall mean the persons appointed pursuant to Section 5.1(b) of this Agreement.

"Members" shall mean each Person who (a) executes a counterpart of this Agreement as a Member or (b) is admitted as a Member in accordance herewith.

"Member Nonrecourse Debt" shall mean nonrecourse debt of the Company under Treasury Regulation Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall have the meaning set forth in Section 4.2(b) of this Agreement.

"Negative Capital Account" shall mean a Capital Account with a balance less than zero and, where the context requires, the negative balance thereof, in each case as of the end of a fiscal year, after giving effect to the following:

(a)     a credit for any amount required to be restored under Treasury Regulation Section 1.704-1(b)(2)(ii)(c), as well as any amounts in addition thereto pursuant to Treasury Regulation Sections 1.704-2(g)(1) and (i)(5), after taking into account any changes during such fiscal year in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and

(b)     a debit of the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Net Losses" shall mean, with respect to any fiscal period of the Company, the net losses of the Company for such period for federal income tax purposes including as appropriate each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"Net Profits" shall mean with respect to any fiscal period of the Company, the net profits of the Company for such period for federal income tax purposes including, as appropriate, each item of income, loss, deduction or credit entering into such determination, as determined by the Accountants of the Company.

"Offered Interest" shall have the meaning set forth in Section 6.3(a) of this Agreement.

"Percentage Interest" of a Member shall mean the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth on Schedule A hereto bears to the total number of Units owned by all Members as of such date. The combined Percentage Interests of all Members shall at all times equal 100%.

"Permitted Transferee" shall mean (A) with respect to a Member who is an individual, such individual's spouse, children (including natural, adopted and/or step children) or grandchildren (natural, adopted and/or step) (a "Family Member"), a trust of which one or more Family Members are the sole beneficiaries; (B) with respect to a Member which is a partnership, corporation or limited liability company, such Member's current partners, shareholders, members,

5

directors and/or executive officers, as the case may be; (C) with respect to a Member which is a trust, the existing beneficiaries of such trust; (D) with respect to any Member, a corporation, partnership, limited liability company or other entity, all of which interests therein are owned by the transferring Member or his/her/its Family Members; or (E) with respect to any Member (or Person comprising such Member), any other Member (or Person comprising such Member).

"Person" shall mean an individual, corporation, limited liability company, limited partnership, general partnership, joint venture, company, trust, bank or other entity.

"Regulations" shall mean the Treasury Regulations promulgated under the Code as such regulations maybe amended from time to time (including the corresponding provisions of succeeding regulations).

"Reserves" shall mean, with respect to any fiscal year (or such shorter period as necessary to take into account the Members' varying interests in the Company), funds set aside or amounts allocated during such period to reserves which will be maintained in amounts deemed necessary, sufficient or appropriate by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transfer" shall mean any sale, assignment, transfer, gift, exchange, bequest or other disposition of an Interest, in any manner, voluntary or involuntary, by operation of law or otherwise, but shall not include a pledge, hypothecation or other contingent transfer of rights unless or until such contingency occurs.

"Transfer Date" shall have the meaning set forth in Section 4.1(b) of this Agreement.

"Transferor" shall have the meaning set forth in Section 6.3(a) of this Agreement.

"Treasury Regulations" shall mean the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time.

"Unit" shall mean a unit of ownership interest in the Company and shall represent an undivided interest in the holder's Capital Account balance.

"Withdrawn Member" shall have the meaning set forth in Section 9.1 of this Agreement.

"Withdrawal Event" with respect to any Member, shall mean his/her/its (a) death, revocation of its certificate of incorporation/articles of organization/certificate of formation, Dissolution, expulsion as a Member or adjudication of incompetency, as applicable; (b) Bankruptcy; (c) voluntary retirement or withdrawal from the Company; (d) except as otherwise provided herein, breach of any of his/her/its material obligations under this Agreement, or (e) any other event that terminates a Member's membership in the Company or otherwise causes the Dissolution of the Company under the Act.

"Wrongful Act" shall mean an act of fraud, deceit, gross negligence, willful misconduct, breach of fiduciary duty or a wrongful taking by any Manager.

6

**2.2   Captions**. The captions used in this Agreement are inserted for convenience and identification only and are in no way intended to define or limit the scope, extent or intent of this Agreement or any of the provisions hereof.

**2.3   Construction**. Whenever the singular number is used herein, the same shall include the plural, and the masculine, feminine and neuter genders shall include each other. Unless the context clearly requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision hereof. If any language is stricken or deleted from this Agreement (or any prior draft thereof), such language shall be deemed never to have appeared herein and no other implication shall be drawn therefrom.

## 3.   CAPITAL; CAPITAL ACCOUNTS

**3.1   Capital Contributions; Interests.**

(a)   <u>Capital Accounts</u>. The initial Capital Contributions that have been made by the Members to the Company are set forth on <u>Schedule A</u> annexed hereto.

(b)   <u>Percentage Interests</u>. Notwithstanding each Member's initial Capital Contribution, each Member shall have the number of Units and the Percentage Interest set forth on <u>Schedule A</u> annexed hereto.

(c)   <u>Additional Contributions</u>. There shall be no requirement of the Members to make additional capital contributions to the Company except upon the unanimous vote or written consent of the Members.

**3.2   No Withdrawal of Capital Contributions**. Except upon Dissolution and liquidation of the Company or as otherwise set forth herein, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contributions, or any part thereof, or any distribution thereon. Except as otherwise provided herein, no Member shall have the right to receive assets other than cash in connection with a distribution or return of capital.

**3.3   Return of Capital Contributions.**

(a)   <u>No Fixed Time</u>. Except upon Dissolution and liquidation of the Company, or pursuant to Section 6.8 of this Agreement, there is no agreement, nor time set, for the return of any Capital Contribution to any Member.

(b)   <u>No Personal Liability of Member</u>. Except as otherwise required by the Act, the Members shall not be personally liable for the return or repayment of any Capital Contribution.

**3.4   Liability of Members and Their Affiliates**. Except as otherwise provided by applicable law or herein, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; no Member or Person Affiliated with a Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or being a Person Affiliated with a Member.

**3.5   No Priority**. Except as otherwise expressly provided for in this Agreement, no

Member shall have priority over another Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

**3.6    No Interest**. Except as expressly provided for by this Agreement, no interest shall be paid on all or any part of a Member's Capital Account.

**3.7    No Obligation to Restore Negative Balances in Capital Accounts**.  No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

**3.8    Capital Accounts**.

(a)    The Company shall maintain a separate capital account ("Capital Account") for each Member and his/her/its legal representatives, successors and permitted assigns.

(b)    The Capital Account of each Member shall be maintained in accordance with Section 1.704-1(b) of the Regulations as in effect on the date of this Agreement and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with Regulation Section 1.704-1(b), the Managers may make such modifications, provided that such changes have no financial impact on the amount distributable to a Member under Sections 4.3 and 8.2.

(c)    The Capital Account of each Member shall consist of the amount of cash and the fair market value of the property (as determined in good faith by the Managers) contributed by such Member to the Company (net of liabilities securing such contributed property assumed by the Company or subject to which the Company takes the contributed property) increased by allocations of Net Profits, and of tax-exempt income, if any, and decreased by allocations of Net Losses, by distributions and withdrawals of cash and property (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property) and by expenditures defined in Section 705(a)(2)(B) of the Code (or which are treated as Section 705(a)(2)(B) expenditures under Regulation 1.704-1(b)(2)(iv)(i)).

(d)    In the event of a transfer of a Unit or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the person or entity so acquiring such Unit or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Unit, adjusted for distributions of Available Cash theretofore made and allocations of Net Profits and Net Losses through the effective date of the transfer.  The cost of computing such adjustment shall be borne by the Member disposing of such Unit.

**4.    PROFITS, LOSSES AND DISTRIBUTIONS**

**4.1    General**.

(a)    The Net Profits and Net Losses of the Company shall be determined for each fiscal year in accordance with the accounting method followed by the Company for federal income tax purposes. Except as otherwise provided herein, whenever a proportionate part of the Net Profit or Net Loss is credited or charged to a Member's Capital Account, every item of income,

gain, loss, deduction or credit entering into the computation of such Net Profit or Net Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Net Profit or Net Loss and applicable to the period during which such Net Profit or Net Loss was realized shall be allocated to such Member in the same proportion.

(b)     On the last day of the month in which a new Member is admitted to the Company, or a valid transfer of all or a portion of a Member's Units is consummated (the "Transfer Date"), the books of the Company shall be closed in accordance with Section 706(d) of the Code, and consistent therewith: (i) items of income, deduction, gain, loss and/or credit of the Company that are recognized prior to the Transfer Date shall be allocated among those Persons who were Members in the Company prior to the Transfer Date in accordance with their respective Interests prior to the Transfer Date; and (ii) items of income, deduction, gain, loss and/or credit of the Company that are recognized after the Transfer Date shall be allocated among the Persons who were Members in the Company after the Transfer Date.

**4.2**     **Allocation of Net Profits and Net Losses**.

(a)     After giving effect to the special and curative allocation provisions set forth in this Section 4.2, the Net Profits and Net Losses of the Company for each taxable year (or portion thereof) shall be allocated among the Members in such amounts as are necessary to cause the positive balance in each Member's Adjusted Capital Account to equal, to the greatest extent possible, the amount that would be distributed to each Member were the Company to dissolve and terminate at the end of the taxable year in question, assuming for this purpose that the Company's assets are liquidated for their fair market value and that the net proceeds of such liquidation, after the payment of all Company debts and liabilities, are distributed to the Members in accordance with Section 4.3 of this Agreement, taking into account Section 4.4 of this Agreement.

(b)     Special Allocation Provisions.

(i)     Notwithstanding anything to the contrary contained in Section 4.2 hereof, any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as such term is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Section 1.752-2(b) of the Regulations for such Member Nonrecourse Debt. If more than one Member bears such economic risk of loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such economic risk of loss. If more than one Member bears such economic risk of loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(ii)     Minimum Gain.

(A)   Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Company Minimum Gain (as such term is defined in Sections 1.704-2(b)(2) and (d) of the Regulations), there shall be allocated to each Member, before any other allocation pursuant to Section 4.2 hereof is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain.  A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)   Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any fiscal year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as defined in Section 1.704-2(1)(2) of the Regulations), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such fiscal year before any other allocation pursuant to Section 4.2 hereof (other than an allocation required pursuant to Section 4.2(b)(ii)(A)) is made under Section 704(b) of the Code of Company items for such fiscal year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain.  The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations.  The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.2(b)(ii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iii)   In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Adjusted Capital Account in excess of the amount such Member is required to restore upon a liquidation of the Company (or of such Member's interest in the Company), then, after any allocations required by Section 4.2(b)(ii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible.  To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 4.2(b)(iii) shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to this Section 4.2, so that the net amount of any items so allocated and the subsequent Net Profits and Net Losses allocated to the Members pursuant to Section 4.2 shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of Section 4.2 if such unexpected adjustments, allocations or distributions had not been made.

10

(iv)   Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(v)   Notwithstanding the other provisions of this Section 4.2 to the contrary, Net Losses shall not be allocated to a Member to the extent the allocation would create or increase a negative balance in such Member's Capital Account if at that time any other Member has a positive Capital Account; in such event, Net Losses shall be allocated only to Members with positive Capital Accounts until all Members' Capital Accounts have been reduced to zero or are negative, and thereafter all Net Losses shall be allocated to the Members in the ratio of their Percentage Interests or as otherwise provided herein. Notwithstanding the other provisions of this Section 4.2, in the event that at any time any Net Loss has been allocated to any Member pursuant to this clause (v), all Net Profits arising thereafter shall first be specially allocated to the Members who received allocations of Net Losses pursuant to this clause(v) (in proportion to the maximum allocation to which each such Member is then entitled under this clause (v)) until the aggregate amount of Net Profits specially allocated to each such Member pursuant to this clause (v) equals the aggregate amount of Net Losses theretofore allocated to such Member pursuant to clause (v).

**4.3     Distributions of Available Cash**.  Except as otherwise provided in this Agreement, including without limitation as provided in Section 8.2 with respect to the liquidation of the Company, Distributions of Available Cash shall be made to the Members, at least annually, upon the unanimous consent of the Managers and DMC Capital Group, LLC, as follows:

(a)    *first,* to any Member who has made a loan to the Company, until such loan, together with all interest thereon, has been paid in full; and

(b)    *second,* pari passu, to the Members in accordance with their Percentage Interests.

**4.4     Tax Distribution.**

(a)    Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each fiscal year, an amount of cash equal to the product of the Tax Percentage (as defined below) for such fiscal year and such Member's allocated share of the Company's net taxable income and gain for such fiscal year as shown on the Company's federal income tax return (the "Tax Distribution").  If the Company is not required to file a federal income tax return for a fiscal year or the Company's federal income tax return for such fiscal year has not been completed by the close of business on the 85th day after the close of such fiscal year, the amounts to be shown on such return for purposes of this Section 4.4(a) shall be determined in good faith by the Managers.

(b)      For purposes of this Section 4.4, "Tax Percentage" shall equal the highest marginal effective rate of federal, state and local income tax in effect for the fiscal year in respect of which the Tax Distribution is made applicable to individuals resident in Delaware or New York, whichever is higher, taking account of any difference in rates applicable to ordinary income and capital gains and any allowable deductions in respect of such state and local taxes in computing the Members' liability for U.S. federal income tax purposes, and assuming that the items of income, gain, deduction, loss and credit in respect of the Company were the only items entering into the computation of tax liability of the Members for the fiscal year in respect of which the Tax Distribution is made.

(c)      For purposes of determining whether the Company has satisfied its distribution obligation under Section 4.4(a), all cash distributions made during a fiscal year shall be treated as distributions made to satisfy Section 4.4(a) in respect of such fiscal year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 4.4(a) in respect of one or more prior fiscal periods, in which case such distributions shall be treated as having been made pursuant to Section 4.4(a) in respect of such prior fiscal period or periods).

(d)      No distribution shall be required to be made pursuant to this Section 4.4 to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(e)      The Company shall not make a distribution under this Section 4.4 to a Member to the extent such Member's Interest is being redeemed or in connection with a liquidation of the Company.

**4.5      Incorrect Distributions**. To the extent distributions pursuant to this Section 4 were incorrectly made or were in violation of any applicable law, as determined by the Managers in good faith and based upon financial statements of the Company or such other relevant information, the recipients shall promptly repay all incorrect payments and/or the Company shall have the right to set off any current or future amounts owing to such recipients against any such incorrectly paid amounts.

**4.6      Distributions in Kind**. In the event any proceeds available for distribution consist of items other than cash (including, but not limited to notes, mortgages and payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amounts of proceeds due them, respectively. In determining the Capital Accounts of the Members for purposes of Section 3.8, the amount by which the fair market value of any property to be distributed to the Members exceeds or is less than the tax basis of such assets, to the extent not otherwise recognized by the Company shall be taken into account as if such gain or loss were recognized by the Company.

**4.7      Limitation on Distributions**.  No distribution shall be declared and/or paid unless, after giving effect thereto, the assets of the Company exceed the Company's liabilities.

**4.8      Additional Allocations**.  Notwithstanding anything in this Agreement to the contrary, the Managers may, in their reasonable discretion, allocate Net Profits and Net Losses for any fiscal year in a manner that the Managers deem necessary or appropriate in order to effectuate

any intended economic sharing arrangement or understanding of the Members.

**4.9      Reserves**.      The Managers shall establish and set aside such Reserves as the Managers deem to be in the best interests of the Company.

## 5.      MANAGEMENT OF THE COMPANY; MEMBERS

**5.1      Management Powers of the Managers; Managers.**

(a)      Except as set forth in Section 5.8 below, and except as expressly limited by the provisions of this Agreement or by the Act, the management and control of the business of the Company shall rest exclusively with the Managers, who shall have the full, exclusive and absolute right, power and authority to manage and control each and every aspect of the business of the Company and its property, assets and affairs.  The scope of the Managers' power and authority shall encompass all matters connected or incident to the business of the Company.  The Managers shall be agents of the Company for its business purposes and the Managers may bind the Company in the ordinary course, provided that the Managers have approved such action in accordance with this Agreement or the Act.  Unless otherwise expressly authorized by this Agreement or the Members as set forth herein, any acts of the Managers that are not apparently for carrying on the Company's business in the ordinary course shall not bind the Company.  All decisions made by the Managers, pursuant to this Agreement, shall be made upon the unanimous written consent of the Managers.

(b)      The Company shall have two (2) managers who may, but need not be, Members of the Company.  The initial Managers shall be Alexandr Zaitsev and Daniel Kandhorov.  Alexandr Zaitsev and Daniel Kandhorov shall serve as Managers until their death, resignation or removal in accordance with this Agreement.  Should Alexandr Zaitsev and/or Daniel Kandhorov die, resign or be removed as a Manager pursuant to this Agreement, the Members will appoint a successor Manager in accordance with Section 5.8(b) below.

(c)      The Managers shall be entitled to receive, solely out of the Company's positive net proceeds, reimbursements of all reasonable costs and expenses incurred in connection with the business of the Company.

**5.2      Resignation.** A Manager of the Company may only resign upon the unanimous written consent of the Members. The resignation of a Manager who is also a Member will not affect his/her/its rights as a Member.

**5.3      Removal**.  A Manager may be removed by the Members in accordance with Section 5.8 below if such Manager (a) commits a Wrongful Act; or (b) suffers a Permanent Disability (which shall mean a disability that causes the inability of such Manager to provide services to the Company for 90 consecutive days).  The removal of a Manager who is also a Member will not affect his/her/its rights as a Member except as otherwise set forth herein.

**5.4      Liability for Certain Acts**.  Each Manager shall perform his duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.  A Manager who so performs his/her/its duties shall not have any liability by reason of being or having been a Manager.  A Manager shall not be liable to the Company or to any Member for any loss or damage unless a judgment or other final adjudication adverse to such Manager establishes that such loss or damage was the result of fraud, gross negligence, willful

misconduct, bad faith or a wrongful taking by such Manager.

**5.5**    **Delegation to Agents and Officers**.   The Managers may delegate functions relating to the day-to-day operations of the Company to such officers, agents, consultants or employees as they may from time to time designate.   Such officers, agents, consultants and employees need not be Members, and shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Managers and may be removed at any time, with or without cause, by the Managers.

**5.6**    **Other Duties of the Managers**.  In addition to their other duties set forth herein, the Managers:

       (a)    may make, on behalf of the Company, the election permitted by Code Section 754 with respect to adjustments to the basis of the Company property,

       (b)    shall, promptly following receipt thereof, give notice to the Members of any proposed audit or adjustments of any Company tax returns; and

       (c)    shall serve as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

**5.7**    **No Other Management Powers by Members**. Except as expressly provided in this Agreement or as otherwise required by law, no Member, by reason of his/her/its status as such, shall have any voice or participation in the management of the Company's business or to act for or bind the Company but shall have only the right to vote on or approve the actions, if any, specified herein to be voted on or approved by the Members.

**5.8**    **Member Rights of Approval**.

       (a)    The Members will have such rights with respect to the management of the property, business and affairs of the Company, and such other powers, as are expressly set forth in this Agreement or under the Act.

       (b)    Notwithstanding anything herein to the contrary, the Members, acting independently of the Managers, shall take and/or authorize the following acts or transactions by the unanimous vote or written consent of the Members; provided, however, with respect to the removal of a Manager (as provided in Section 5.8(b)(iii)), and with respect to the election of a successor Manager (as provided in Section 5.8(b)(ii) following such Manager's removal pursuant to Section 5.3), or with respect to any matters specified in 5.8(x), the vote or written consent of sixty-five percent (65%) of the Members shall be required (not unanimous) and such sixty-five percent (65%) vote or written consent of the Members shall exclude the vote or written consent of any Interested Member and the relative Percentage Interests of the remaining Members for voting purposes only shall be determined as though the Interested Member's Percentage Interest were zero:

              (i)    the sale, exchange or other disposition of all or substantially all of the Company's assets, whether in a single transaction or series of related transactions, or the merger or consolidation of the Company with or into another Person;

(ii)    the election of a Manager;

(iii)    the removal of a Manager pursuant to Section 5.3;

(iv)    the amendment of the Certificate or this Agreement in any respect, except as provided in Sections 11.6 and 11.7;

(v)    voting to dissolve, wind up and liquidate the Company;

(vi)    to require the Members to make additional capital contributions to the Company pursuant to Section 3.1(b);

(vii)    entering into any agreement or series of related agreements, including any agreement to borrow money that, either individually or collectively, (1) creates a monetary obligation of the Company equal to or greater than $10,000, or (2) grants a mortgage on, a security interest in, or otherwise encumbers any material asset of the Company;

(viii)    entering into any agreement or series of related agreements, including any agreement to advance money from the Company to any Person, either individually or collectively, equal to or greater than $10,000;

(ix)    capital expenditures by the Company in excess of $10,000, whether in a single transaction or series of related transactions;

(x)    the making of any decisions concerning matters where a Manager has a direct or indirect economic interest.

**5.9     Meetings of Members.**  Except as otherwise provided in this Agreement, there shall be no requirement of annual or periodic meetings of the Members.

**5.10     Transactions between Company and Members.**  Each Member, including a Manager, has the right to engage in business transactions with the Company, including, but not limited to, providing goods and\or services to the Company, and be compensated accordingly, provided that any such transaction be entered into in good faith and at arms length.  Any such transaction will not affect such Member's Capital Account.  If a Member loans any monies to the Company pursuant to a debenture or other lending agreement or arrangement, the Managers shall use commercially reasonable efforts to ensure that the Company shall abide by the terms and obligations of the Company under such debenture or other lending agreement or arrangement.

**5.11     Outside Interests; Conflicts.**  Subject to Section 11.16 of this Agreement, any Member, Manager or Affiliate of any Member or Manager shall have the right to engage in and/or possess an interest in any other business of every kind, nature and description, independently or with other Persons, irrespective of whether competitive with any property or business directly or indirectly owned or engaged in by the Company. Neither the Company nor any Member or Manager shall have or be entitled to any rights, solely by virtue of this Agreement, in and to such independent ventures or to the income and profits derived therefrom, nor shall any such Member, Manager or such Affiliated Person have any obligation whatsoever to offer, share or offer to share any business opportunity of any kind to or with the Company or any other Member or Manager.

15

The Members hereby waive any and all rights and claims which they may otherwise have against such other Member, Manager and their Affiliated Person.

      **5.12**    **Indemnification.** To the fullest extent permitted by applicable law from time to time in effect:

      (a)    The Company shall indemnify and hold harmless the Managers, Members, officers, agents and employees of the Company and their respective directors, trustees, shareholders, members, partners, officers, employees, agents and other Affiliates, against all costs, liabilities, claims, expenses, including reasonable attorneys' fees and disbursements, and damages (collectively, "Losses") paid or incurred by any such Person in connection with the conduct of the Company's business; and

      (b)    The Company shall indemnify, defend and hold the Managers harmless from and against, and may indemnify, defend and hold the Company's and the Managers' respective Affiliates, agents, employees, consultants and other independent contractors (collectively, "Indemnitees"), harmless from and against, all Losses arising from any demands, claims or lawsuits against any of the Indemnitees in connection with or resulting from their acts or omissions in their capacities as the Managers, or as such an Affiliate, agent, employee, consultant or other independent contractor of the Company or the Managers, or in connection with, arising from or relating to, business or activities undertaken on behalf of the Company, including, without limitation, any demands, claims or lawsuits initiated by a Member, unless a judgment or other final adjudication adverse to such Indemnitee establishes that (i) such acts or omissions were committed in bad faith, or were the result of active and deliberate dishonesty, (ii) such Indemnitee personally gained a financial profit or other advantage to which he or she was not legally entitled or (iii) such acts or omissions violated such lesser standard of conduct as under applicable law affirmatively prevents indemnification hereunder. The termination of any action, suit or proceeding by judgment, order, settlement, plea of nolo contendere or its equivalent or conviction shall not, of itself, create a presumption that an Indemnitee shall not be entitled to indemnification hereunder or that the Indemnitee did not act in good faith and in a manner which it reasonably believed to be in or not opposed to the best interests of the Company.

      (c)    The rights of an Indemnitee set forth in this Section 5.12 shall not be exclusive of any other rights to which it may be entitled, whether by separate agreement or otherwise, nor shall such rights limit or affect any other such rights. All rights of an Indemnitee under this Section 5.12 shall survive the Dissolution of the Company and any Withdrawal Event with respect to such Indemnitee, and shall inure to the benefit of his/her/its heirs, personal representatives, successors and assigns.

      (d)    Notwithstanding anything contained herein to the contrary, any amount to which an Indemnitee may be entitled under this Section 5.12 shall be paid only out of the assets of the Company and any insurance proceeds available to the Company for such purposes. No Member shall be personally liable for any amount payable pursuant to this Section 5.12, or to make any Capital Contribution, return any distribution made to it by the Company, or restore any Negative Capital Account balance to enable the Company to make any such payment.

**6.**    **RESTRICTIONS ON THE DISPOSITION OF AN INTEREST**

      **6.1**    **Generally**. Except as otherwise expressly provided for in this Agreement, no

Member may, directly or indirectly, Transfer all or any portion of his/her/its Units or Interests in the Company without the prior written consent of the Managers, which consent shall not be unreasonably withheld, conditioned or delayed. Any attempt to Transfer in violation of this Agreement shall be of no force or effect and shall not be recognized by the Company. For the purposes hereof, a direct or indirect Transfer by a Member shall include a Transfer of interests (including any interest as a trustee) in any entity which is a Member (each, an "Entity Member") other than a redemption or repurchase of interests by such Entity Member of one or more of its member's interests or transfers of interests among the members of such Entity Member. Notwithstanding anything herein to the contrary, any transfers or assignments of the membership interests within DMC Capital Group, LLC ("DMC") whether among the members of DMC or to non-members of DMC are hereby expressly permitted by the Company and the Managers, and are subject solely to the requirements set forth in the Operating Agreement of DMC.

**6.2    Permitted Transfers**. After compliance with Section 6.4 below only, a Member may Transfer all or a portion of his/her/its Units or Interests or allow the Transfer of direct or indirect ownership interests in such Member or in the partners, members or shareholders thereof, as follows, in each case, without the consent of the Managers:

(a)    if the proposed transferor is a natural Person, by succession or testamentary disposition upon his/her death, provided that such Transfer is to a Person that is otherwise a Permitted Transferee; or

(b)    to any Permitted Transferee.

**6.3    Right of First Refusal**.

(a)    Except as otherwise provided herein, and for all Transfers that are not to a Permitted Transferee, and subject in all events to Sections 6.4, 6.5, 6.6 and 6.7 below, no Member may Transfer any Units or Interests in the Company unless the Member desiring to make the Transfer (the "Transferor") first obtains a bona fide written offer from a third party to purchase all, or portion, of such Member's Interest in the Company and first offers to sell such Interests (the "Offered Interest") to the Company and the other Members in accordance with this Section 6.3. The offer to the Company and the other Members, must include all of the Offered Interest held by the Transferor. The bona fide offer must state (x) the name and address of the transferee, (y) the consideration that will be received by the Transferor for the transfer and (z) the payment terms of the consideration and other material terms and conditions of the proposed Transfer.

(b)    Within ten (10) days of the receipt of the bona fide offer, the Transferor shall furnish the Company and the non-transferring Members with a copy of such offer. Within sixty (60) days of the receipt of the offer by the Company and the non-transferring Members, each non-transferring Member may elect to purchase all, but not less than all, of a portion of the Offered Interest in proportion to such non-transferring Member's Percentage Interests in the Company (excluding for purposes of this Section 6.3 any Units or Interests being sold) on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within such sixty (60) day period. If the non-transferring Members, in the aggregate, do not elect to purchase all of the Offered Interest within such sixty (60) day period, the Company may elect, in the reasonable discretion of the Managers, to purchase all, but not less than all, of the remaining Offered Interest on the same terms and conditions set forth in the bona fide offer, exercisable by delivery of written notice to the Transferor within thirty (30) days following the

17

expiration of such sixty (60) day period.

(c)     In the event the Company or the non-transferring Members, as applicable, elect to purchase, in the aggregate, all of the Offered Interest, the closing of the purchase will take place on the first business day following the end of a period of ninety (90) days after exercise of the Company's or the Members' options to purchase, as applicable, by delivery of the last written notice thereof to the Transferor, or on such other date as mutually agreed upon by the parties.

(d)     In the event neither the Company nor the non-transferring Members elect to purchase, in the aggregate, all of the Offered Interest, the Transferor may transfer the remaining Offered Interest to the transferee named in, and on the terms and conditions set forth in, the notice. If the Transferor fails to conclude such sale of the Offered Interest within fifteen (15) days after the expiration of all applicable time periods set forth herein, the Offered Interest will again become subject to all of the restrictions of this Section 6.

(e)     A Member who has assigned such Member's entire Interest in the Company pursuant to this Section 6.3, whether or not the assignee has become a substituted Member, shall not thereafter be entitled to exercise any of the rights of a Member with respect to such transferred Interest (and the Units associated therewith) nor have any other rights as a Member with respect to such transferred Interest except as otherwise provided by the Act.

(f)     Any Interest transferred pursuant to this Section 6.3 will remain subject to all of the provisions of this Agreement. Any Member that Transfers its Interest in accordance with this Section 6.3 to an Assignee or transferee which is not a Member may grant to that Assignee or transferee the right to become a Member; provided, however, that such Assignee or transferee will not become a substitute Member unless and until the admission of such Assignee or transferee is consented to by the unanimous vote or written consent of the Members.

**6.4     Other Conditions to Permitted Transfers**.

(a)     As conditions to recognizing the effectiveness of any Transfer permitted under this Section 6, and the admission of a transferee as a new Member, the Transferor and the proposed transferee shall execute, acknowledge and deliver to the Company, at the Transferor's (and/or the transferee's) expense, such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all other acts necessary or desirable, in the opinion of counsel to the Company, to:

(i)     constitute such transferee a Member, if applicable;

(ii)     confirm that the Person desiring to be admitted as a Member, has accepted, assumed, and agreed to be bound by, all of the terms, obligations and conditions of this Agreement, as in effect at the time of the Transfer;

(iii)     preserve the Company after such Transfer under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(iv)     assure compliance with all applicable state and Federal laws, including, without limitation, securities laws; and

18

(v)     constitute the Company a third-party beneficiary of the rights of the Transferor and the obligations of the transferee under any arrangements or agreements to Transfer an Interest hereunder, with full power to enforce such rights and obligations directly against the transferee.

(b)     All transferees hereunder shall execute the Joinder Agreement in the form attached hereto as **Exhibit A** agreeing to be bound by the terms of this Agreement in the same manner as the transferors and any Units so transferred shall continue to be subject to the restrictions, liabilities and benefits associated therewith.

(c)     Notwithstanding compliance with the other provisions of this Section 6, no Transfer of a Unit or Interest may be made to a minor or incompetent individual except by will, intestate succession or gift under applicable uniform transfers to minors acts or pursuant to the terms of an inter vivos trust.

**6.5     Effective Date**.

(a)     Any Transfer of a Unit or Interest or admission of a Member in accordance with this Agreement shall be effective as of the last day of the calendar month in which all of the conditions thereto were satisfied.  No Transfer of a Unit or Interest shall be effective unless and until the Company has received notice of the name and address of the transferee and the date of such Transfer, and shall then be effective only to the extent set forth in this Agreement.

(b)     No new Member shall be entitled to any retroactive allocation of Net Profits or Net Losses or other allocable items incurred by the Company.  The Managers may, in their discretion, at the time a new Member obtains a Unit or Interest, close the Company books (as though the fiscal year had ended) or make pro rata allocations of such items to a new Unit or Interest holder for that portion of the fiscal year in which it holds a Unit or Interest, in accordance with Code Section 706(d) and the Regulations promulgated thereunder.

**6.6     Pledge or Encumbrance of Interests**.  No Member may pledge or encumber a Unit or Interest, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise, without the consent of the Managers.

**6.7     Restrictions on Transfers/Impermissible Transferees.**

(a)     All Transfers, directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company, including without limitation Transfers to Permitted Transferees or pursuant to the procedures in Section 6.3, shall be subject to the following restrictions:  (i) no Transfer shall be made to any Person who is not reputable and financially able to perform the obligations of a Member hereunder (including any indemnity obligations contained herein); (ii) no Transfer of Units or Interests shall be made which results, or would result upon a foreclosure of any security interest or in a termination of the Company within the meaning of the Act; (iii) no Transfer of Units or Interests shall be made which violates any provision of this Agreement; and (iv) no change in ownership of any Units or Interests shall be binding against the other Member unless approved in accordance with this Agreement. All Transfers, whether directly or indirectly, of all or any portion of a direct or indirect legal or beneficial interest in the Company in contravention of this Agreement shall be void.

19

(b)      In the event any Member shall Transfer any of its Units or Interests in the Company in contravention of the express terms of this Agreement, the Member Transferring any such Units or Interests shall indemnify and hold the Company and other Members harmless from and against any and all loss, cost, claim, liability, damage or expense which it or they may incur or suffer (including attorneys' fees and disbursements) in enforcing or attempting to enforce the provisions hereof. Any Member who makes a Transfer in contravention of the express terms of this Agreement, shall have no right to vote on any matters that may be brought before the Members nor shall such persons be counted for purposes of a quorum.

## 7.      BOOKS, RECORDS AND REPORTS

**7.1      Books and Records**. The Company shall keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records shall be otherwise kept in accordance with the provisions of the Act. Any Member or its designated representative shall have the right, at any reasonable time and upon reasonable notice, to have access to and to inspect and copy the contents of such books or records.

**7.2      Financial Books**. The Managers shall keep or cause to be kept complete and accurate financial books with respect to the Company's business.

**7.3      Bank Accounts**. The funds of the Company shall be deposited in such amounts in such bank account or accounts as shall be designated by the Managers. All withdrawals from any account established by the Managers may be made by the Managers (or a specific designee(s) of the Managers which designation has been made in writing and provided to the Members). The funds of the Company shall be maintained in a segregated account(s) and shall not be commingled with the funds of any other Person, including, without limitation, the Managers, and, if not immediately required for Company business, may be temporarily invested in such liquid, non-equity assets as the Managers shall determine. The Managers shall promptly provide each Member with written notice of any investment of the Company funds into such liquid, non-equity assets.

**7.4      Reports**. The Managers, at the expense of the Company, shall use commercially reasonable efforts to cause to be prepared and distributed to each Person who was a Member or Economic Interest Holder during any fiscal year of the Company:

(a)      within one hundred-twenty (120) days after the end of each fiscal year of the Company, all information relating to the Company that is necessary for the preparation of the Member's federal, state and local income tax returns;

(b)      within sixty-five (65) days after the end of each of the first three (3) quarters of each fiscal year of the Company, a quarterly unaudited financial statement of the Company prepared on a federal income tax basis or reviewed by independent public accountants selected by the Managers (the "Accountants");

(c)      within one hundred-twenty (120) days after the end of each fiscal year of the Company, an annual unaudited financial statement of the Company prepared on a federal income tax basis compiled or reviewed by the Accountants; and

(d)      any other information that may be reasonably requested by any Member.

20

**7.5    Tax Returns**. The Managers shall, at the expense of the Company, retain the Accountants and cause to be prepared all tax returns for the Company and shall further cause such returns to be timely filed with the appropriate authorities.  It is contemplated that the Company will be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, and as determined by the Managers, including the amendment of this Agreement to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

**7.6    Fiscal Year and Accounting Method**. The Company shall adopt a fiscal year ending on the last day of such month of each year and a method of accounting selected by the Managers with the advice of the Accountants for the Company; provided, however, that the Managers in their reasonable discretion may, subject to any approval required by the Internal Revenue Service and the applicable state taxing authorities, at any time change the Company's method of accounting.

**7.7    Tax Elections**. The Tax Matters Partner shall have the authority to cause the Company to make any election required or permitted to be made for income tax purposes.  The Tax Matters Partner may cause the Company to make, in accordance with Section 754 of the Code, a timely election to adjust the basis of Company property as described in Sections 734 and 743 of the Code in the sole discretion of the Tax Matters Partner.

**7.8    Title to Company Assets**.  Title to, and all right and interest in, the Company's assets, shall be acquired in the name of and held by the Company, or, if acquired in any other name, be held for the benefit of the Company.

## 8.    DISSOLUTION AND TERMINATION OF THE COMPANY

**8.1    Dissolution**.  The Company shall be dissolved and terminated and its affairs shall be wound up upon the earliest to occur of the following:

(a)    the unanimous vote or written consent of the Members;

(b)    the sale or other disposition of all or substantially all of the business or assets of the Company; or

(c)    the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**8.2    Winding up of the Company**.

(a)    If the Company is to be dissolved in accordance with Section 8.1, then the Managers or other Person selected by the Managers (the "Liquidator") shall wind up the affairs of the Company, including by selling or otherwise liquidating the Company assets in a bona fide sale or sales to third Persons at such prices and upon such terms as they may determine.  If the Liquidator determines that an immediate sale would be financially inadvisable, it may defer sale of the Company assets for a reasonable time, or distribute the assets in kind.  During the winding up period, the Liquidator may exercise all powers granted to the Managers under this Agreement, and may adopt such plan, method or procedure as may be reasonable to effect an orderly winding up.

(b)    The proceeds of any liquidation of the Company shall be distributed in the

following order of priority (to the extent that such order of priority is consistent with the laws of the State of Delaware):

> (i)    first, to the payment of the debts and liabilities of the Company and the expenses of Dissolution and liquidation;

> (ii)   then, to the establishment of any Reserves which the Liquidator shall deem reasonably necessary for payment of such other debts and liabilities of the Company (contingent or otherwise), as are specified by the Liquidator, such Reserves to be held in escrow by a bank or trust company selected by the Liquidator and to be disbursed as directed by the Liquidator in payment of any of the specified debts and liabilities or, at the expiration of such period as the Liquidator may deem advisable, to be distributed in the manner hereinafter provided; and

> (iii)  then, to the Members in accordance with their Percentage Interests.

(c)    If any assets are distributed in kind, they shall be distributed on the basis of the fair market value thereof, and shall be deemed to have been sold at fair market value for purposes of the allocations under Section 4.

(d)    The Company shall terminate when all assets of the Company have been sold and/or distributed and all affairs of the Company have been wound up.

**8.3    Termination**.  Upon the completion of the distribution of Company assets as provided in Section 8.2, the Company shall be terminated, and the Managers or other Person acting as liquidator shall cause the Certificate of the Company to be canceled and shall take such other actions as may be necessary to terminate the existence of the Company.

## 9.    WITHDRAWAL OF A MEMBER

**9.1    Right to Withdraw**.  The withdrawal of a Member (the "Withdrawn Member") upon the occurrence of a Withdrawal Event, shall only be permitted upon the unanimous written consent of the Members (excluding the vote of the Withdrawn Member); provided that upon the (i) death of a Member, if an individual (ii) Permanent Disability of a Member, if an individual, (iii) Bankruptcy, or (iv) Dissolution of a Member, the Company will permit the withdrawal of such Member without requiring consent.

**9.2    Effect of Withdrawal.**

(a)    Except as otherwise provided in this Agreement, unless the remaining Members elect to dissolve the Company in accordance with this Agreement, the Withdrawn Member shall not be entitled to receive any amount in liquidation of his/her/its Interest until the Dissolution and winding up of the Company, but shall, on and as of the date of Withdrawal Event, become an Assignee of the Economic Interest associated with its former Interest, with no right to participate in the management of the business of the Company or otherwise exercise any of the rights or privileges of a Member hereunder or under the Act.  After any such Withdrawal Event, the relative Percentage Interests of the remaining Members for voting purposes only shall be

determined as though the Withdrawn Member's Percentage Interest were zero.

(b)     If the remaining Members do elect to dissolve the Company in accordance with this Agreement after a Withdrawal Event, the Withdrawn Member shall be entitled to receive an amount in liquidation of its Interest determined as set forth in this Agreement.

(c)     If a Withdrawal Event results in the Dissolution of the Company, the Withdrawn Member shall be treated as any other Member in the liquidation of the Company's assets pursuant to Section 8.2.

(d)     Upon the occurrence of any Withdrawal Event, the Company shall have no further obligation or liability to any Assignee of the Withdrawn Member.

**9.3     Rights of a Withdrawn Member**.  In the event of a Withdrawal Event pursuant to Section 9.1(i) or (ii) above prior to the expiration of the Company's term (as set forth in Section 1.6 of this Agreement) the successor in interest to such Withdrawn Member ("Successor in Interest") shall be an Assignee of the Economic Interest of the Withdrawn Member.  In such event, the Successor in Interest shall not become a Member unless and until the admission of the Successor in Interest as a Member is consented to in writing by the unanimous vote or written consent of the Members, and provided further that the Successor in Interest executes and delivers such documents as the Managers may reasonably require to make the Successor in Interest a party to this Agreement.

**9.4     Company to Continue Upon a Withdrawal Event**.  The Company shall not dissolve upon the withdrawal of a Member, but shall continue until dissolved in accordance with Section 8.

**9.5     No Right to Receive Distributions Upon a Withdrawal Event**. No Member shall have the right to receive any distribution, other than pursuant to the express terms of this Agreement, prior to the Company's Dissolution pursuant to Section 8 of this Agreement.

## 10.     APPLICABLE LAW

**10.1     Governing Law; Consent to Jurisdiction**.  This Agreement and the rights and obligations of the parties hereto shall be interpreted in accordance with the laws of the State of Delaware without giving effect to principles of conflict of laws. Each Member hereby consents to the jurisdiction of any state or federal court located in the Counties of Kings or Nassau, New York for purposes of the enforcement of this Agreement. Each Member hereby waives in advance any objection to venue of any action constituted under this Section 10.1.

## 11.     MISCELLANEOUS PROVISIONS

**11.1     No Third Party Beneficiaries**. The covenants, obligations and rights set forth in this Agreement are not intended to benefit any creditor of the Company or of any Member, or any other third Person, and except as permitted by applicable law after the obligation to make an additional Capital Contribution has been fixed, or in connection with certain wrongful distributions, no such creditor or other third Person shall, under any circumstances, have any right to compel any actions or payments by the Managers and/or the Members or shall, by reason of any provision contained herein, be entitled to make any claim in respect of any debt, liability,

23

obligation or otherwise against the Company or any Member.

**11.2    Notices.** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

If to the Company:

FINANCIAL VISION GROUP IV LLC



Attention: Managers

If to the Managers:

c/o Alexandr Zaitsev

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five (5) days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day, or (iv) if sent via electronic mail, upon its delivery, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

**11.3    Severability.** If any covenant, condition, term, or provision of this Agreement is illegal, or if the application thereof to any Person or in any circumstance be judicially determined to be invalid or unenforceable, the remainder of this Agreement, or the application of such covenant, condition, term, or provision to Persons or in circumstances other than with respect to which it is held invalid or unenforceable, shall not be affected thereby, and each covenant, condition, term, and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**11.4    Counterparts; Faxed or E-Mailed Signatures.** This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  Any executed signature page delivered by facsimile or e-mail transmission shall be binding to the same extent as an original executed signature page, with regard

to any agreement subject to the terms hereof or any amendment thereto.

**11.5   Entire Agreement**. This Agreement, together with the Certificate,  constitute the entire agreement of the parties relating to the subject matter hereof, and together they supersede and replace any prior agreement or understanding between some or all of the parties pertaining thereto.  To the extent the Act addresses a matter not otherwise addressed by this Agreement, it is the intention of the Members that the provisions of the Act shall apply, but no such application shall otherwise affect any provision of this Agreement.

**11.6   Amendments**.

(a)   Except as otherwise required by this Agreement or the Act, this Agreement may be amended by the unanimous vote or written consent of the Members.

(b)   Notwithstanding anything to the contrary contained in Section 11.6(a), the Managers may modify the provisions of this Agreement without the consent of the Members if, upon advice of counsel to the Company, the modification is necessary to cause (i) the Company to be or to continue to be classified as a partnership for federal income tax purposes or (ii) the allocations under Section 4 to have substantial economic effect or to be in accordance with the Members' interests under Section 704 of the Code and the Regulations thereunder.   No modification hereunder may alter the limited liability of the Members or have a material effect on amounts distributable to any Member pursuant to this Agreement.

(c)   Notwithstanding anything to the contrary contained in this Section 11.6, any amendment to this Agreement that would adversely affect (i) the federal income tax treatment to be afforded a Member, (ii) the liabilities of a Member, or (iii) the consent and approval rights reserved by the Members, or which would otherwise change the method of calculating allocations or distributions under Section 4, shall require the consent of each Member affected.

**11.7   Amendment by Agreement of Merger**.  Notwithstanding anything to the contrary contained in this Agreement, in accordance with the Act, an agreement of merger or consolidation approved by the Members as required by this Agreement may effect (a) amendments to this Agreement contained in the agreement of merger or consolidation or necessitated thereby or (b) the adoption of a new limited liability company agreement for the Company if it is the surviving or resulting entity, in each case without further action by the Members.

**11.8   Further Assurances**. The Members will execute and deliver such further instruments and do such further acts and things as may be reasonably required to carry out the intent and purposes of this Agreement, including, without limitation, such amendments to this Agreement as the Managers may determine to be reasonably necessary or advisable to ensure that the Company will be classified and treated as a partnership for federal, state and local income tax purposes.

**11.9   Successors and Assigns**. Subject in all respects to the limitations on transferability contained herein, this Agreement shall be binding upon, and shall inure to the benefit of, the heirs, administrators, personal representatives, successors, and permitted assigns of the respective parties hereto.

**11.10   Waiver of Action for Partition**. Each of the parties hereto irrevocably waives, during the term of the Company and during the period of liquidation following any Dissolution,

any right that it may have to maintain any action for partition with respect to any of the assets of the Company.

**11.11   Waivers; Rights and Remedies Cumulative.**  The failure of any party to pursue any remedy for breach, or to insist upon the strict performance, of any covenant or condition contained in this Agreement shall not constitute a waiver of any such right with respect to any subsequent breach.  Except as otherwise expressly set forth herein, rights and remedies under this Agreement are cumulative, and the pursuit of any one right or remedy by any party shall not preclude, or constitute a waiver of, the right to pursue any or all other remedies.  All rights and remedies provided under this Agreement are in addition to any other rights the parties may have by law, in equity or otherwise.

**11.12   Agreement Drafted by Counsel.**  Each Member and Manager acknowledges that (i) Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, counsel for the Company, has prepared this Agreement on behalf of and in the course of its representation of the Company and not as counsel for any Member or Manager, (ii) each Member and Manager has been advised of potential conflicts of interest that may exist, now or in the future, between such Member or Manager and those of the Company and the other Members or Managers, and (iii) the Members and Managers have been advised by such law firm to seek independent counsel.

**11.13   Investment Representations.**  Each Member hereby represents and warrants to the Company and each other Member as follows:

(a)   Such Member acknowledges that:

(i)   the Interest owned by it has not been registered under the Securities Act of 1933, the Delaware State securities laws or any other state securities laws (collectively, the "Securities Acts") because the Company is issuing (or an Member has Transferred) such Interest in reliance upon exemptions from the registration requirements contained in the Securities Acts for issuances not involving a public offering;

(ii)   the Company (or the Transferor) has relied upon the fact that the Interest is to be held by such Member for investment purposes only, and not with a view to any resale or distribution thereof; and

(iii)   the Company is under no obligation to register or qualify the Interest or to assist any Interest Holder in complying with any exemption from registration under the Securities Acts if such Member wishes to dispose of the Interest.

(b)   Each Member is acquiring the Interest for his/her/its own account, for investment purposes only, and not with a view to the resale or distribution thereof, unless there are effective registrations or other qualifications relating thereto under applicable Securities Acts.

(c)   Before acquiring the Interest, each Member investigated the Company and its business, and the Company made available to it all information necessary to make an informed decision to acquire the Interest.

26

**11.14  Managers as Attorney-in-Fact for Members**.

(a)     Each Member hereby irrevocably constitutes and appoints, with full power of substitution, the Managers as its/his/her true and lawful attorney-in-fact, with full power and authority in its/his/her name, place and stead, to execute, certify, acknowledge, deliver, file and record at the appropriate public offices:

(i)     all certificates and other instruments, and any amendment thereto, which the Managers deems appropriate to form, qualify or continue the business of the Company as a limited liability company;

(ii)    any other instrument or document which may be required to be filed by the Company under the laws of any state, or which the Managers deem advisable to file; and

(iii)   any instrument or document required to continue the business of the Company or dissolve and liquidate the Company (provided that such continuation or Dissolution are consented to in accordance with this Agreement).

(b)     Each Member's appointment of the Managers as its/his/her attorney-in-fact shall be deemed to be a power coupled with an interest and shall survive the incompetency, Bankruptcy or Dissolution of the Member giving such power, except that, in the event of a Member's Transfer of an Interest in accordance with this Agreement, this power of attorney shall survive such Transfer only until such time, if any, as the assignee shall have been admitted to the Company as a Member and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution.

11.15  **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the parties hereto, arising out of or relating to this Agreement or its breach, the prevailing party shall be entitled, in addition to any other relief, to recover reasonable attorneys' fees, expenses, and costs, whether or not the controversy, claim, or dispute results in litigation or arbitration between the parties.

11.16  **Covenant Not To Compete**.  Each Manager, Member and any managers, officers, employees, consultants or agents of such Manager or Member, and any Affiliate of such Manager or Member, covenants and agrees that, so long as such Manager is a manager of the Company or such Member is a Member of the Company, in each case, as applicable, and for a period of one (1) year thereafter, such Manager and/or Member and each of their respective Affiliates, will not, without the unanimous prior written consent of the Members, directly or indirectly, and whether as a principal, agent, officer, manager, employee, consultant, corporation or other business organization: (i) be engaged in, concerned, take part in, render services to, own, share in the earnings of, or invest in the stock, bonds or other securities of any person, firm, corporation or other business organization engaged in a business located in any jurisdiction in which the Company performs its business which is the same, similar to or in competition with any of the business and operations of the Company then or theretofore carried on by the Company, or (ii) directly or indirectly hire, solicit, or recruit employees of the Company to leave employment with the Company, nor contact any employee of the Company, or cause an employee of the Company

27

to be contacted, for the purpose of leaving employment with the Company, or (iii) interfere with the Company's relationship with, or endeavor to entice away from the Company any person, firm, corporation or other business organization who or which, at any time during the term of such Member's membership and/or Manager's engagement by the Company, was an employee, consultant, agent, franchisee, joint venture, supplier, vendor, contractor, supplier or customer of, or in the habit of dealing with, the Company. Notwithstanding the foregoing, if any provision of this Section 11.16 is held by any court of competent jurisdiction to be unenforceable because of the scope, duration or area of its applicability, the Company shall have the right to modify such scope, duration or area or all of them so as to render them enforceable, and such provision shall then be applicable in such modified form. If a Manager, Member, or an Affiliate of such Manager or Member, violates this Section 11.16, such Manager, Member and its Affiliates, as applicable, hereby consent to an injunction stopping such Manager's and/or Member's and/or its Affiliates' actions, as applicable.

11.17 **Scope and Duration; Equitable Relief.**  The Managers and Members acknowledge that the restrictions contained in Section 11.16 are reasonable in scope and in duration under the circumstances. The Managers and Members further acknowledge and agree that such restrictions are necessary to protect the legitimate business interests of the Company and that any violation thereof would result in irreparable harm to the Company. Accordingly, each Member and Manager agrees that upon the violation or threatened violation by him/her/it of any of the restrictions contained in Section 11.16, the Company shall be entitled to obtain from any court of competent jurisdiction a preliminary and permanent injunction (without the necessity of posting a bond or other security) as well as any other relief provided at law or equity, under this Agreement or otherwise. In the event any of the foregoing restrictions are adjudged unreasonable in any proceeding, then the parties agree that the period of time or scope of such restrictions (or both) shall be adjusted in such a manner or for such a time (or both) as is adjudged to be reasonable.

11.18 **Confidentiality.**  The Members and Managers acknowledge and agree that all information provided to them by or on behalf of the Company concerning the business or assets of the Company (collectively, the "Confidential Information") shall be deemed strictly confidential and the Members and Managers shall not, without the prior written consent of the Company, use for himself/herself/itself, publish, disclose or otherwise reveal or divulge, any Confidential Information (other than to a person or entity bound by confidentiality obligations similar to those contained herein). Each Member shall (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as they use for their personal confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the Company, and (3) refrain from using or allowing to be used any Confidential Information for their own benefit or for the benefit of any third party, except that disclosure of Confidential Information will be permitted: (a) to the Company; (b) if such Confidential Information has previously become available to the public through no fault of such Member or Manager; (c) is already known to such Member or Manager, on a non-confidential basis at the time of disclosure by the Company, as shown by competent evidence; (d) becomes known to such Member or Manager from a source other than the Company; provided, that, such source has not entered into a confidentiality agreement with the Company with respect to such information or obtained the information from an entity or person who is a party to a confidentiality agreement with the Company, and without a breach of this Agreement or without a breach of duty owed by any other person or entity to the Company; (e) is proven by competent evidence by such Member or Manager that it was independently conceived or discovered by such Member or

28

Manager without reference to or use of the Confidential Information; (f) if required by law or any court or governmental agency or body; provided that in any such case covered by this clause (f) such Member or Manager shall provide the Company, in advance of any such disclosure, with prompt notice of such requirement(s) and shall cooperate fully with the Company to the extent it may seek to limit such disclosure; (g) if necessary to establish or assert the rights of such Member or Manager hereunder; (h) if expressly consented to in writing by the Company.

[*Remainder of Page Blank*]

Counterpart signature page for the Limited Liability Company Agreement of

## FINANCIAL VIS' N GROUP IV LLC

IN WITNESS WHEREOF, the under ned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROU IV LLC as of the date first above written.

MEMBER:

_Alexander Zaitsev_

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP IV LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP IV LLC as of the date first above written.

MEMBER:

Daniel Kandhorav

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP IV LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP IV LLC as of the date first above written.

MEMBER:  DMC Capital Group, LLC

Frank Cavene, Manager

Jordan Fensterman, Manager

Howard Fensterman, Manager

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP IV LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP IV LLC as of the date first above written.

MEMBER:

FBH Capital Group, LLC

30

Counterpart signature page for the Limited Liability Company Agreement of

FINANCIAL VISION GROUP IV LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP IV LLC as of the date first above written.

MANAGERS:

_____

Alexandr Zaitsev

_____

Daniel Kandhorov

31

Counterpart signature page for the Limited Liability Company Agreement of

### FINANCIAL VISION GROUP IV LLC

IN WITNESS WHEREOF, the undersigned has executed this Limited Liability Operating Agreement of FINANCIAL VISION GROUP IV LLC as of the date first above written.

MANAGERS:

_____
Alexandr Zaitsev

_____
Daniel Kandhorov

31

**FINANCIAL VISION GROUP IV LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

## SCHEDULE A

| Name of Member | Capital Contribution | Number of Units | Percentage Interest |
|---|---|---|---|
| Alexandr Zaitsev | 16.67 | 16.67 | 16.67% |
| Daniel Kandhorov | 16.67 | 16.67 | 16.67% |
| DMC Capital Group, LLC | 33.33 | 33.33 | 33.33% |
| FBH Capital Group, LLC | 33.33 | 33.33 | 33.33% |
| **TOTAL** | **$100** | **100** | **100%** |

## EXHIBIT A

### JOINDER AGREEMENT

### FINANCIAL VISION GROUP IV LLC

### LIMITED LIABILITY COMPANY AGREEMENT

The undersigned has read and hereby joins in and agrees to be bound by all of the terms and provisions of that certain Limited Liability Company Agreement of FINANCIAL VISION GROUP IV LLC (the "Company"), dated as of February 28, 2019, by and among the Members of the Company (as, or as the same may be, amended, modified, supplemented or restated, the "Agreement"), and shall for all purposes be deemed to be a Member (as such term is contemplated by the Agreement) of the Company, and shall be entitled to all of the rights and entitlements, and subject to and liable for all of the obligations, liabilities and undertakings, of a Member as set forth in or contemplated by the Agreement.

MEMBER:

_____                    _____
Signature                                           Date

_____
Print Name

_____
Social Security Number

_____
Number of Units

_____
Percentage Interest