Dr. James Murphy
April 27, 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO
INDEMNITY COMPANY, GEICO GENERAL INSURANCE
COMPANY, AND GEICO CASUALTY COMPANY,

                             PLAINTIFFS,

        vs.               Docket No:
                           20-cv-03495 (FB) (SJB)

ALEXANDR ZAITSEV, M.D., METROPOLITAN INTERVENTIONAL
MEDICAL SERVICES, P.C., ANTHONY BENEVENGA, CHARLES
G. NICOLA, D.C., RIDGEWOOD DIAGNOSTIC LABORATORY,
L.L.C., TRI- STATE MULTI-SPECIALTY MEDICAL SERVICES,
P.C., RIVERSIDE MEDICAL SERVICES, P.C., KRISTAPPA
SANGAVARAM, M.D., EUGENE GORMAN, M.D., BOGDAN
NEGREA, M.D., ANTONIO CICCONE, D.O., STELLA AMANZE,
P.A., FRIDA ISAKOV, P.A., LUCKNIE OVINCY, P.A.,
EMILY BAKERMAN, N.P., MELISSA EVANS, N.P., MINI
MATHEW, N.P., ANGELA PULLOCK, N.P., LINDA SANTA
MARIA, N.P., AND RIVKA WEISS, N.P.,

                             DEFENDANTS.
----------------------------------------X

                   DATE: April 27, 2023

                   TIME: 10:06 A.M.

      ZOOM VIDEO CONFERENCE TRANSCRIPT of the

Rebuttal expert witness, Dr. James Murphy, taken by

the Plaintiff, held via videoconference by all

participants, before Ariella Vasquez, a Stenographic

Court Reporter, and Notary Public of the State of

New York.

Dr. James Murphy
April 27, 2023

```
1    A P P E A R A N C E S:

2

3    RIVKIN RADLER, LLP
          Attorney for Plaintiff
4         926 Rxr Plaza
          Uniondale, New York 11556
5         BY:  STEVE HENESY, ESQ.

6

7    SCHWARTZ, CONROY, & HACK, PC
          Attorney for Defendants
8         ALEXANDR ZAITSEV, M.D., METROPOLITAN
          INTERVENTIONAL MEDICAL SERVICES, P.C., ANTHONY
9         BENEVENGA, CHARLES G. NICOLA, D.C., RIDGEWOOD
          DIAGNOSTIC LABORATORY, L.L.C., EUGENE GORMAN,
10        M.D., BOGDAN NEGREA, M.D., ANTONIO CICCONE,
          D.O., STELLA AMANZE, P.A., FRIDA ISAKOV, P.A.,
11        LUCKNIE OVINCY, P.A., EMILY BAKERMAN, N.P.,
          MELISSA EVANS, N.P., MINI MATHEW, N.P., ANGELA
12        PULLOCK, N.P., and LINDA SANTA MARIA, N.P.
          122 East 42nd Street, Suite 725
13        New York, New York 10168
          BY:  MATTHEW CONROY, ESQ.
14

15

     ALSO PRESENT:  Colleen O'Neil
16

17              *          *          *

18

19

20

21

22

23

24

25
```

Dr. James Murphy
April 27, 2023

1                          I N D E X

2    EXAMINATION BY                                    PAGE
     MR. HENESY                                        5
3

4

                              E X H I B I T S
5

     PLAINTIFF'S
6    EXHIBIT                  DESCRIPTION              PAGE

7    Exhibit 1        Expert disclosure           41
                      document and Dr. Murphy's
8                     report

9

     Exhibit 2        Dr. Gorman's deposition      62
10                    transcript

11

     Exhibit 3        CDC Clinical Practice        76
12                    Guideline for Prescribing
                      Opioid for Pain - United
13                    States, 2022

14

     Exhibit 4        Transcript of the           95
15                    doctor's testimony as
                      part of the Freeda Flynn
16                    case

17

     Exhibit 5        Article                     110
18

19   Exhibit 6        Urine Drug Testing in       112
                      Clinic Practice, the Art
20                    and Science of Patient
                      Care article

21

22   Exhibit 7        Article from the ASIPP      119

23

     Exhibit 8        Medical reports            122
24

25

     EXHIBITS RETAINED BY:  Mr. Henesy

Dr. James Murphy
April 27, 2023

```
1            F E D E R A L   S T I P U L A T I O N

2

3            IT IS HEREBY STIPULATED AND AGREED by and

4       between the counsel for the respective parties

5       hereto, that the filing, sealing, and

6       certification of the within deposition shall be

7       and the same are hereby waived;

8

9            IT IS FURTHER STIPULATED AND AGREED that all

10      objections, except as to the form of the

11      question, shall be reserved to the time of trial.

12

13           IT IS FURTHER STIPULATED AND AGREED that the

14      within deposition may be signed before any Notary

15      Public with the same force and effect as if

16      signed and sworn to before this court.

17

18

19

20

21

22

23

24

25
```

Dr. James Murphy
April 27, 2023

```
 1                       Dr. Murphy

 2    D R.   J A M E S   P A T R I C K   M U R P H Y,

 3    called as a witness, having been first duly sworn by

 4    a Notary Public of the State of New York, was

 5    examined and testified as follows:

 6    BY THE REPORTER:

 7          Q.     Please state your name for the record.

 8          A.     Dr. James Patrick Murphy.

 9          Q.     What is your business address?

10          A.     101 Rolling Creek, New Albany, Indiana.

11    I don't remember the exact address.

12                 THE REPORTER:  Counsel, you may

13    proceed.

14

15    EXAMINATION

16    BY MR. HENESY:

17          Q.     Okay.  Good morning, sir.

18          A.     Good morning.

19          Q.     My name is Steve Henesy.  I'm an

20    attorney at a law firm Rivkin Radler and I represent

21    Geico, the plaintiffs collectively known as Geico,

22    in a lawsuit that's currently pending in the United

23    States District Court for the Eastern District of

24    New York.

25                 That lawsuit is entitled Government
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy

2    Employees Insurance Company, et al. v. Alexandr

3    Zaitsev, M.D., et al.  And we are here today to take

4    your deposition as you have been designated as a

5    rebuttal expert by various defendants in this case.

6                    Before I proceed any further, sir, are

7    you having any difficulty hearing or seeing me?

8         A.    No, I'm not.

9         Q.    If at any point, you have any

10   difficulty hearing me or seeing me, please let me

11   know so we can resolve whatever issue we're having

12   and we don't have to waste time by repeating

13   testimony because one side couldn't hear what the

14   other is saying.

15                   Is there anyone in the room with you

16   right now?

17        A.    No.

18        Q.    And where are you right now?

19        A.    I'm in my office in New Albany,

20   Indiana.

21        Q.    Do you have any written materials in

22   front of you?

23        A.    No.

24        Q.    I'm going to go over some of the ground

25   rules for this deposition.  I understand, sir, that
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2    you have testified before.  However, for the

 3    purposes of the clarity of the record, I want to

 4    advise you of the following:  First, this is going

 5    to be a question and answer session, that you have

 6    just been sworn in under oath.  That oath has the

 7    same legal force and effect as if you were

 8    testifying in a court of law.

 9              Do you understand that?

10         A.    Yes, I do.

11         Q.    The most important person in connection

12    with the deposition is the court reporter, and that

13    is because at some point down the line, we're going

14    to need to read a transcript of today's deposition

15    and understand what happened.

16              To do that, we need to make sure that

17    only one person is speaking at a time.  So I'll ask

18    you to please wait until I finish asking my question

19    before you begin answering it, and I'll reciprocate,

20    I'll wait for you to finish answering my question,

21    in most cases, without interrupting before I ask my

22    next question.

23              If at -- your answers today must be

24    verbal.  Saying mm-hmm or uh-huh or shaking your

25    head or nodding is not sufficient for the purposes
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy
2     of the record.  If at any point today, you want to
3     take a break, you want to use the restroom, you want
4     to stop staring at your computer screen, that's
5     fine.  You can take as many breaks as you'd like.
6                    There is a caveat that to the extent
7     that there is a pending question, there is a
8     question that I asked that you have not yet
9     answered, you must answer that question before we
10    take a break.
11                   Do you understand that?
12         A.    Yes.
13         Q.    Do you understand everything that I've
14    said so far?
15         A.    Yes.
16         Q.    Have you taken any drug, alcohol, or
17    substance that would affect your ability to testify
18    truthfully here this morning?
19         A.    No.
20         Q.    And are you prepared to proceed with
21    this deposition?
22         A.    Yes.
23         Q.    Okay.  In advance of this deposition,
24    did you do anything to prepare?
25         A.    Yes.
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2          Q.     Tell me what you did to prepare.

3          A.     I reviewed the report that I provided

4     counsel and I reviewed some of the materials that I

5     mentioned in my report.  And I had a discussion with

6     counsel yesterday briefly in preparation.  And then

7     there was a brief discussion this morning.

8          Q.     So you said that you reviewed your

9     report and some of the materials.  What materials in

10    particular did you review?

11         A.     The reports from the two experts.  And

12    I'm blanking on their exact names right now, but

13    they're mentioned in my report.  I reviewed those

14    documents and I reviewed my report.

15         Q.     So besides the two expert reports,

16    Geico's experts, and your expert report, did you

17    review any other documents in preparation for this

18    deposition?

19         A.     No.

20         Q.     You previously indicated that you had a

21    conversation with counsel.  Who is counsel?

22         A.     Mr. Conroy.

23         Q.     And you said you spoke to him over

24    the -- you spoke to him yesterday.

25                Was that over the phone?
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2        A.     Yes.

 3        Q.     How long did you speak to Mr. Conroy

 4   for yesterday?

 5        A.     Probably 20 to 30 minutes.

 6        Q.     And you said you spoke to him again

 7   this morning?

 8        A.     Yes.

 9        Q.     How long did you speak to him for this

10   morning?

11        A.     It was anywhere from, like, five to ten

12   minutes.

13        Q.     Prior to the phone call today and the

14   phone call yesterday, had you ever spoken to

15   Mr. Conroy before?

16        A.     Yes.

17        Q.     How many times?

18        A.     That, I don't know.

19        Q.     Aside from Mr. Conroy, have you spoken

20   to any other attorneys you understand to be

21   associated with Mr. Conroy or his law firm?

22        A.     Yes.

23        Q.     Who?

24        A.     Mr. Hewitt.

25        Q.     And how have you communicated with Mr.
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2     Hewitt; in other words, by which means?

 3          A.    Mr. Hewitt, I believe, texted.  We've

 4     talked on the phone and via e-mail.  I don't recall

 5     if we ever had a Zoom conference, but that may have

 6     been the case.  And I want to amend what I said.  I

 7     apologize.  But yesterday, I might have been talking

 8     to both attorneys this -- you know, Mr. Hewitt and

 9     Mr. Conroy on my conversation yesterday.

10          Q.    Besides Mr. Hewitt and Mr. Conroy, do

11     you know if anyone else was on the line?

12          A.    To my knowledge, no one else was on the

13     line.

14          Q.    The times that you had spoken to

15     Mr. Hewitt on the phone prior to yesterday, has

16     anyone else been a party to those conversations?

17          A.    Not to my knowledge.

18          Q.    Who initially contacted you about this

19     litigation?

20          A.    I'm not certain, but I believe it was

21     Mr. Hewitt.  But I'm not certain.

22          Q.    When were you first contacted about

23     this litigation?

24          A.    It was several weeks prior to the day

25     of the report that I submitted.
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy
 2         Q.     So your report is dated March 20th of
 3   this year.  Would the first contact you would have
 4   received been in March or in February?
 5         A.     I don't know.
 6         Q.     So as part of your preparation for your
 7   report -- well, as part of the preparation of the
 8   report, fair to say, Doctor, that you reviewed
 9   certain written materials?
10         A.     Yes.
11         Q.     Who gave you those written materials?
12         A.     It was either Mr. Hewitt, Mr. Conroy,
13   or both of them.
14         Q.     Were they provided by e-mail?
15         A.     I'm not certain.  They may have been
16   provided by a secure link to a Dropbox, or some sort
17   of facility of that nature.
18         Q.     Certainly, they were provided to you
19   electronically?
20         A.     Yes.
21         Q.     What materials were you provided with
22   electronically in advance of the preparation of your
23   report?
24         A.     I had the reports by the experts for
25   Geico.  I had some transcripts of some testimony,
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy
2      and I believe it's by Dr. Zaitsev.  And then I had
3      some records, some medical records to review as
4      well.  And then there was the complaint.  I was able
5      to review that.
6           Q.    All of the materials that you just
7      described, those were the materials that were
8      provided to you electronically by -- we'll just
9      refer to them as counsel?
10          A.    Yes.
11          Q.    Did you make a specific request for any
12     of those materials?
13          A.    Not to my recollection.
14          Q.    When you say you were provided with
15     medical records, can you be a little more specific?
16     What exactly were you provided?
17          A.    I listed this in my report, and I gave
18     initials to certain patients that I had medical
19     records to review.  So it's in the report.
20          Q.    So in other words, there are some
21     patients listed by their initials in your report.
22     You reviewed medical records associated with those
23     patients.  Is that correct?
24          A.    Yes.
25          Q.    Do you know who selected those patients
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    as the ones for whom you reviewed records?

 3         A.    No.

 4         Q.    It certainly wasn't you, right?

 5         A.    Correct.

 6         Q.    Do you know who decided how many

 7    patients' records you would review in connection

 8    with preparation of your report?

 9         A.    No.

10         Q.    It certainly wasn't you, right?

11         A.    Correct.

12         Q.    Do you know how many total patients are

13    at issue in this litigation; in other words, how

14    many claims are at issue in this litigation?

15         A.    No.

16         Q.    Putting aside whether or not you know

17    the specific number, do you have a ballpark, that

18    you're aware of, of how many patient claims are at

19    issue in this litigation?

20         A.    No.

21         Q.    By extension then, you would agree with

22    me that you do not know what percentage of the total

23    patient population at issue in this lawsuit your

24    review represented?

25         A.    I do not know the percentage.
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2           Q.      Did you ever ask anyone at counsels'

3    office how many total patients there were in this

4    case?

5           A.      No.

6           Q.      Did you ever ask anyone at counsels'

7    office what percentage of the total patient

8    population your review represented?

9           A.      No.

10          Q.      Did that matter to you in any way?

11          A.      For the purposes of my report and my

12   opinion, it did not matter.

13          Q.      The medical records that you

14   reviewed -- and I'm talking about the ones that are

15   associated with the patient initials in your

16   report -- do you know how many total pages those

17   records were comprised of?

18          A.      No.

19          Q.      Do you recall if it was more than 500?

20          A.      No.

21          Q.      Do you recall if it was more than

22   1,000?

23          A.      No.

24          Q.      Was it 10,000?

25          A.      I don't know.  I believe it was nowhere
```

Dr. James Murphy
April 27, 2023

```
 1                       Dr. Murphy
 2    near 10,000.
 3          Q.      Was it near 1,000?
 4          A.      I don't recall.
 5          Q.      In addition to the medical records that
 6    you reviewed, you testified that you also reviewed
 7    the transcripts of certain depositions.
 8                  Is that correct?
 9          A.      Yes.
10          Q.      And one of those depositions was with
11    regard to defendant Dr. Zaitsev, right?
12          A.      Yes.
13          Q.      Do you recall how many volumes that
14    transcript was comprised of?
15          A.      No.
16          Q.      In other words, did it appear to you
17    that what you were reviewing was several days worth
18    of testimony or a single day?
19          A.      I can't recall.
20          Q.      Besides Dr. Zaitsev, as you sit here,
21    Doctor, do you recall any other transcripts that you
22    reviewed?
23          A.      Sitting here right now, I can't recall.
24          Q.      Your report indicates that you reviewed
25    the transcript of a Dr. Gorman.  Is that true?
```

Dr. James Murphy
April 27, 2023

```
1                      Dr. Murphy

2         A.      If it's in my report, that's true.

3         Q.      When you were provided these written

4    materials that we've now discussed, which is the

5    complaint, the two deposition transcripts, and the

6    medical records, did you conduct an initial review

7    of those materials?

8         A.      I conducted a review of the materials.

9    I'm not sure if I would categorize it as an initial

10   review.

11        Q.      After you conducted a review of the

12   written materials that we just discussed, did you

13   ever request from counsel any supplemental

14   materials?

15        A.      Well, first of all, I don't have my

16   report in front of me.  And you mentioned a

17   Dr. Gorman's testimony, and I'm going to assume that

18   what you're telling me is true in my report, because

19   I don't recall Dr. Gorman's testimony as I sit here

20   right now.

21               So with the assumption that what you're

22   telling me is the truth, I believe your question is,

23   what else did I review?  Or could you please ask me

24   again?

25        Q.      Yeah.  My question was, you received a
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2    series of written materials electronically from

 3    counsel -- let's break it down.

 4                  You received a series of written

 5    materials electronically from the defendants'

 6    counsel in this case, correct?

 7          A.    Yes.

 8          Q.    After you received -- well, withdrawn.

 9                  Did all of those materials come to you

10    in a single transmission?

11          A.    I don't remember.

12          Q.    Did they all come to you at or around

13    the same time?

14          A.    I don't remember.

15          Q.    After you -- at any point during your

16    involvement in this litigation, have you ever asked

17    counsel for the defendants for additional

18    information?

19          A.    I don't recall whether I did or not.

20          Q.    If you had asked counsel in this case

21    for additional material, would you have done so by

22    e-mail?

23          A.    Not necessarily.

24          Q.    Would it have been by text message?

25          A.    That's a possibility.  Or it could have
```

Dr. James Murphy
April 27, 2023

```
1                          Dr. Murphy

2     been by phone.

3          Q.     In any event, to the extent that at any

4     point you were provided with additional materials,

5     you would have listed those materials in your

6     report, right, as something that you had reviewed?

7          A.     Not necessarily.  If I had been

8     provided additional materials and I did not review

9     them for the report, I would not have listed them on

10    the report.

11         Q.     Any materials -- let's do it this way.

12    Any materials that you reviewed in connection with

13    the preparation for your report are listed in that

14    report, correct?

15         A.     That's not the most correct way to

16    answer that question.

17         Q.     Well, I'm not answering it; I'm asking

18    it.

19         A.     Well, it's not a yes-or-no answer.

20         Q.     Did you review any materials in this

21    case that form the basis of your opinion that are

22    not listed in your report?

23         A.     No.

24         Q.     Your report indicates that you received

25    and/or invoiced $14,000 in this case.
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2              Is that correct?

 3       A.    Yes.

 4       Q.    And that was for -- your report says

 5   that was for a preliminary review, "my review and

 6   analysis of the documents discussed herein, and the

 7   preparation of your -- of this report."

 8              When you say your preliminary review in

 9   your report, what does that mean?

10       A.    That means the first stages of my

11   looking at the records.

12       Q.    And when you say "the records," do you

13   mean the documents that were transmitted to you

14   electronically by defendants' counsel?

15       A.    Yes.

16       Q.    After "preliminary review" it says, "My

17   review and analysis of the documents discussed

18   herein."  What does that mean?

19       A.    That is my discussions with counsel

20   regarding my findings.

21       Q.    Your findings from your preliminary

22   review?

23       A.    That's not a yes-or-no answer.

24       Q.    What's the answer then?

25       A.    It includes all of my discussion with
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    counsel from all stages of my review, up until and

 3    the completion of my report that I submitted.

 4         Q.    How much time did you spend preparing

 5    the report?

 6         A.    I didn't keep track of an exact time,

 7    but it was probably around 50 hours.  Something in

 8    that range.

 9         Q.    The 50 hours, does that encompass the

10    review that preceded the actual preparation of the

11    report?

12         A.    Yes, I would say that would encompass a

13    great portion of that time.  I did not keep track of

14    the exact number of hours.

15         Q.    The $14,000, was that a flat fee that

16    you were charging?

17         A.    Yes.

18         Q.    You're estimating about 50 hours for

19    the preparation of the report.  Do you have an

20    estimate of the total amount of hours that you have

21    spent up -- that you spent up to the completion of

22    the report?

23              So according to your report, it would

24    be your preliminary review, your review and analysis

25    of the documents discussed in the report, and the
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2     preparation.

3                Do you know what the total amount of

4     time was for those tasks?

5          A.    It was around 50 hours.

6          Q.    Okay.  Do you intend to charge for your

7     time for appearing for this deposition?

8          A.    Yes.

9          Q.    Do you charge an hourly rate?

10         A.    No.

11         Q.    What do you charge?

12         A.    $6,000 for the full day of deposition.

13         Q.    Does that include your preparation for

14    the deposition?

15         A.    Yes.

16         Q.    And how many hours did you spend

17    preparing for the deposition?

18         A.    Probably under two hours.

19         Q.    And besides reviewing documents and

20    speaking with counsel, did you do anything else in

21    preparation for the deposition?

22         A.    No.

23         Q.    Did you do any research -- at any point

24    during your involvement in this case, did you do any

25    research on your own about the case?
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2        A.     No.  I have a pretty in-depth knowledge

 3   of the way these practices -- the way practices run,

 4   and pain practices and drug screens in general.  So

 5   I did not have to do any in-depth or additional

 6   research other than review the records that I

 7   mentioned in my report.

 8        Q.     As I indicated in my initial remarks,

 9   this certainly is not your first time testifying

10   under oath, correct?

11        A.     Correct.

12        Q.     You have, in the past several years,

13   testified in a series of criminal cases.

14               Is that right?

15        A.     Yes.

16        Q.     And in those cases, you have testified

17   in the capacity of a defense expert, right?

18        A.     In almost all of those cases, that

19   would be correct.

20        Q.     Are there cases where you did not

21   testify as a defense expert?

22        A.     Yes.

23        Q.     Which case or cases?

24        A.     It wasn't a criminal case; it was a

25   malpractice case.  And I was on the plaintiff's side
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy
 2     of the equation.  And it was not in defense of the
 3     healthcare team.
 4           Q.      When was that?
 5           A.      Within the last couple of years.  I'm
 6     not sure exactly when that date was.
 7           Q.      As part of your report, you provided us
 8     with a list of the testimony you've given.
 9                   Withdrawn.
10                   Would it be fair to say, Doctor, that
11     many of the criminal cases in which you had
12     testified have involved healthcare professionals who
13     are accused of overprescribing opioids?
14           A.      Yes.
15           Q.      And in many of those cases, the issue
16     of urine drugs testing has come up?
17           A.      Yes.
18           Q.      And in some of those cases, some of
19     those doctors were alleged or accused to have not
20     used urine drug screens frequently enough, right?
21           A.      I don't remember the exact accusations
22     of the cases.
23           Q.      In any of the cases, the criminal cases
24     that you testified in in the last four years, is the
25     issue of urine drug screens being used too
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2      infrequently by the accused physician been something

3      that you have addressed?

4           A.    I don't recall specifically.

5           Q.    Do you -- have you ever issued opinions

6      in a criminal case as an expert that -- defending

7      infrequent use of drug screens?

8           A.    I don't recall the specifics of any

9      testimony like that.

10          Q.    Generally speaking, have you ever given

11     testimony in that -- with that general thrust?

12          A.    I don't recall specifics of my previous

13     testimonies.

14          Q.    I'm stipulating that, Doctor.

15     Generally speaking, do you recall -- as you sit here

16     today -- let's do it this way.

17                As you sit here today, is it your

18     testimony that you do not recall ever testifying to

19     defend infrequent use of drug screens?

20          A.    I don't recall what my -- the specifics

21     of my testimonies.

22          Q.    You testified in a case in Monroe

23     County, New York, earlier this year.

24                Is that correct?

25          A.    I'm not sure where Monroe County, New
```

Dr. James Murphy
April 27, 2023

```
1                           Dr. Murphy
2       York, is.
3              Q.     Have you ever testified in -- well,
4       withdrawn.
5                     This year, did you testify in state
6       court in New York?
7              A.     Yes.
8              Q.     And that was a state level criminal
9       case, right?
10             A.     Yes.
11             Q.     Do you know what the result of that
12      case was?
13             A.     No.
14             Q.     You don't know if the doctor was -- or
15      if there has been a result?
16             A.     I have not been made aware of the
17      result of that case at this point.
18             Q.     Doctor, you are not a toxicologist,
19      correct?
20             A.     Correct.
21             Q.     Do you have any formal training with
22      regards to liquid chromatography-mass spectrometry
23      testing?
24             A.     Yes.
25             Q.     What formal testing do you have with
```

Dr. James Murphy
April 27, 2023

```
 1                         Dr. Murphy

 2    LCMS?

 3         A.      I am a board-certified and

 4    fellowship-trained pain specialist in Mayo Clinic in

 5    Rochester, Minnesota.  During my time there, as part

 6    of my education, I had to be familiar and be,

 7    essentially, well-versed on the different types of

 8    urine drug screens.

 9              And the discussions and understanding,

10    both liquid chromatography and gas chromatography

11    was essential to my fellowship education.

12         Q.      You have a pain practice of your own.

13              Is that right?

14         A.      Yes.

15         Q.      Your -- do you have one office or

16    multiple offices?

17         A.      I have one office.

18         Q.      At your pain practice's office, do you

19    have LCMS instrumentation?

20         A.      No.

21         Q.      At any point during your involvement in

22    this case -- well, withdrawn.

23              As part of your involvement in this

24    case, how many times did you speak to Dr. Zaitsev?

25         A.      To my knowledge, I have never spoken to
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2     the doctor.

 3          Q.     As part of your involvement in this

 4     case, how many times did you speak with Dr. Gorman?

 5          A.     To my knowledge, I have never spoken to

 6     Dr. Gorman.

 7          Q.     And certainly, you have never asked to

 8     speak with either Dr. Zaitsev or Dr. Gorman?

 9          A.     To my knowledge, I have never asked to

10     speak to either of those doctors.

11          Q.     Did you ever want to speak to them?

12          A.     No.

13          Q.     And nothing in your review of the

14     materials that we have previously discussed at any

15     point made you think that it would be best for you

16     to have a discussion with either Dr. Zaitsev or

17     Dr. Gorman?

18          A.     No.

19          Q.     In addition to your medical practice,

20     you're also a -- you're a volunteer assistant

21     clinical professor at the University of Louisville

22     Medical School, right?

23          A.     Yes.

24          Q.     It's not a paid position, right?

25          A.     Correct.
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2        Q.     As part of your medical practice, it

 3   would be fair to say that you regularly prescribe

 4   controlled substances, narcotics and opioids?

 5        A.     Yes.

 6        Q.     The $14,000 that -- your report

 7   indicates you received and/or invoiced $14,000.  Did

 8   you actually receive $14,000 yet?

 9        A.     To the best of my knowledge, yes.  I

10   have received that.

11        Q.     And was that invoiced?  In other words,

12   is there an invoice somewhere with your name at the

13   top of it that says $14,000 listed on it?

14        A.     I'm not certain exactly what the

15   documentation that was requested and what was sent.

16        Q.     But certainly, there was some document

17   that served as a formal request for $14,000?

18        A.     That is my usual practice, to

19   specifically ask for it.  I don't know exactly what

20   form that took in this case.

21        Q.     Aside from the written documents, the

22   written materials, I should say, that were

23   electronically transmitted to you by the defendants'

24   counsel, were you provided with any factual

25   information by the defendant's counsel besides the
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2   written documents?

 3        A.     Not to my knowledge.

 4        Q.     Were you asked to make any assumptions

 5   upon which your opinions would be based in this

 6   case?

 7        A.     Not to my knowledge.

 8        Q.     So then it would be fair to say,

 9   Doctor, that the opinions that are contained within

10   your report are based entirely on your review of the

11   written documentation inasmuch as -- and let me

12   clarify the question.  Inasmuch as the facts that

13   you found to give rise to your opinions?

14        A.     Yes.  It's based upon the written

15   documentation that I've outlined in my report.

16        Q.     When you reviewed Geico's complaint,

17   did you -- and based on that review, did you come to

18   understand that Geico was making allegations

19   concerning, among other things, the ownership of

20   medical practices called Tri-State and Riverside?

21        A.     I don't recall the specifics of what

22   the Geico complaint said.

23        Q.     And were the specifics of Geico's

24   allegations in this case important to you in the

25   context of forming your opinions in this case?
```

```
 1                         Dr. Murphy

 2         A.      Yes.

 3         Q.      And in what way were they important?

 4         A.      Well, Geico was bringing this action

 5    against these -- this group.  So it's important to

 6    know how Geico feels that they were harmed and what

 7    the allegations are so that in my review, I'm

 8    addressing, to the best of my ability and within the

 9    context of my expertise, the concerns that Geico

10    has.

11         Q.      As part of your review of the materials

12    in this case, you learned that there was a

13    laboratory performing urine and drug testing that

14    was one of the defendants in the lawsuit, right?

15         A.      I know there is a lab that is doing, I

16    guess, most of the drug screens.  I'm not sure

17    exactly who owns that or the nature of that.

18         Q.      Okay.  So that's a different question.

19    You know -- my question is, you know that there's a

20    lab who is one of the defendants in the case, right?

21         A.      I don't have the complaint in front of

22    me.  I know that there's a lab involved in this.  I

23    don't recall whether they are one of the defendants.

24    And I say that because I don't have the complaint in

25    front of me.
```

Dr. James Murphy
April 27, 2023

1                    Dr. Murphy

2        Q.    So then you kind of asked my next

3   question -- answered my next question, which is, do

4   you have an understanding as to the ownership of

5   that lab?

6        A.    I don't have an understanding that I

7   would say is -- that I relied upon or that was

8   confirmed to be accurate.

9        Q.    Okay.  But I didn't ask you that.  I

10  asked you if you had an understanding as to the

11  ownership of the lab.

12       A.    Yes, an understanding.

13       Q.    All right.  And what was that

14  understanding?

15       A.    That a doctor or one of the

16  providers -- one of the people at the clinic that

17  was providing clinical care had -- at least had

18  worked there at some point in time and now they were

19  involved in the lab that's in question.  In terms of

20  the exact ownership and how that came about, I don't

21  know the specifics of that.

22       Q.    And again, the specifics of the

23  ownership and affiliation of these entities and the

24  affiliation of the various doctors with the

25  entities, those things were immaterial to you in the

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2     context of forming your opinions?

 3          A.     Yes.

 4          Q.     As part of your review in this case,

 5     did you come across the name Dr. Sangavaram?

 6          A.     I don't recall.

 7          Q.     At any point during your involvement in

 8     this case, were you made aware that a Dr. Sangavaram

 9     was asked during his deposition whether the urine

10     tests ordered through Tri-State and Riverside were

11     medically necessary, and that he invoked the Fifth

12     Amendment privilege against self-incrimination in

13     response to those questions?

14          A.     I'm not aware of that.

15          Q.     Okay.  Hearing me ask you that

16     question, does that give you any cause for concern

17     about this case and the opinions that you've

18     offered?

19          A.     No.

20          Q.     If a doctor in this case was asked

21     whether or not these urine screens were medically

22     necessary and that doctor pleaded the Fifth

23     Amendment in response to those questions, that would

24     be something that would be immaterial to your

25     opinions in this case?
```

Dr. James Murphy
April 27, 2023

1                        Dr. Murphy

2         A.      Yes.

3         Q.      As part of your -- at any point during

4    your involvement in this case, have you taken any

5    notes as part of the preparation of the report, your

6    review of the materials, or your preparation for

7    this deposition?

8         A.      I don't recall what notes I've taken,

9    or if I've taken any that were not in the report.

10        Q.      You don't recall.  So what about this

11   morning?  Did you take any notes this morning before

12   we signed on?

13        A.      No.

14        Q.      Yesterday, did you take any notes?

15        A.      No.

16        Q.      So one of the other things, categories

17   and materials that you reviewed were the reports of

18   Geico's experts, right?

19        A.      Yes.

20        Q.      And one of those reports was from a

21   medical doctor, right?

22        A.      I can't recall exactly the credentials

23   of the experts.

24        Q.      Okay.  Do you know what kind of experts

25   they are?

Dr. James Murphy
April 27, 2023

```
1                         Dr. Murphy

2          A.     I know that one was a toxicologist.

3    And I don't recall the specific credentials of the

4    other expert.

5          Q.     Okay.  The specific credentials.  What

6    about generally?  What do you recall about the other

7    expert?

8          A.     Well, from my memory sitting here right

9    now, I don't recall specifically the credentials or

10   even the name right now of the other expert.  But

11   I've got it in my file and I can look at it or you

12   can show it to me, but I don't recall right now the

13   specifics.

14         Q.     I believe you testified that in

15   preparation for the deposition, that you reviewed

16   these two Geico expert reports, right?

17         A.     Yes.

18         Q.     And you did that yesterday and this

19   morning?

20         A.     I definitely did it this morning.  I'm

21   not sure what I looked at yesterday.  It might have

22   been a couple of days ago I was looking at the

23   expert reports.

24                But it was -- I definitely looked at

25   something this morning and I do recall looking at
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2   some reports last night.  So yes, today and
 3   yesterday for sure.  And I might have looked at some
 4   a couple of days ago.
 5         Q.    Okay.  So you reviewed these materials
 6   multiple times in the last 24 hours.  At any point
 7   during those reviews, did you take note of the
 8   credentials of either of Geico's experts?
 9         A.    Yes.
10         Q.    Including this morning, you took note
11   of the credentials of Geico's experts?
12         A.    I looked at the heading at the end.  I
13   read that briefly.
14         Q.    So that was only just a couple of hours
15   ago, right?
16         A.    Yeah, that was about 8:15 this morning.
17         Q.    8:15 of -- you're Central time?
18         A.    I'm Eastern Time.
19         Q.    Let's talk about the preparation of
20   your report.  Would you agree with me, Doctor, that
21   as part of the preparation of your report, you
22   copied and pasted the language of other people?
23         A.    I don't know exactly where I got all
24   the information in my report.
25         Q.    I didn't ask you if you knew where you
```

Dr. James Murphy
April 27, 2023

```
 1                       Dr. Murphy

 2     got all the information from your report.  My

 3     question was, would you agree with me that at least

 4     portions of your report were copied and pasted from

 5     articles written by other people?

 6          A.    To the best of my knowledge, it was not

 7     taken exactly, but there were some articles, there

 8     were some other reports that I borrowed language

 9     from.

10          Q.    So would the answer to my question then

11     be yes, at least portions of this report were copied

12     and pasted from articles written from other people?

13          A.    To the best of my knowledge, no.

14          Q.    Okay.  So then would your position be

15     that you read articles written by other people and

16     paraphrased their language?

17          A.    Yes.  Some of that language in the

18     report is paraphrased from other sources that I've

19     read.

20          Q.    And when you were deciding to

21     paraphrase language from other sources, some of

22     those sources are, for lack of a better term,

23     scholarly articles written by medical professionals?

24          A.    Yes.

25          Q.    And before you cite to and paraphrase
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    language from articles like that, do you read the
 3    entire article?
 4           A.     Not always.
 5           Q.     Do you read the entire sections of
 6    those articles that will be pertinent to the issues
 7    in front of you?
 8           A.     Not necessarily.
 9           Q.     So you're not concerned about what
10    those articles say generally.  You're just lifting
11    and paraphrasing selections of those articles,
12    correct?
13           A.     No.
14           Q.     So it is important to you what those
15    articles say in the portions that you don't read?
16           A.     No.
17           Q.     It's not important.  Okay.  Who
18    physically typed up your report?
19           A.     It's on a computer that I use -- a Word
20    processer, and it was entirely by me.
21           Q.     It's dated March 20, 2023.  Do you
22    recall when it was actually -- well, withdrawn.
23                  When you completed your report, did you
24    transmit an electronic copy of it to the defendant's
25    counsel?
```

Dr. James Murphy
April 27, 2023

```
1                         Dr. Murphy
2          A.      Yes.
3          Q.      If I wanted to speak not like a lawyer
4     for a second, you e-mailed it to him?
5          A.      Yes.
6          Q.      Do you recall if that was on
7     March 20th?
8          A.      I believe it was.  I have to look at
9     the calendar to be sure.  But I believe the date
10    that I finished the report is the date that I
11    e-mailed it to counsel.
12         Q.      Prior to that date, had you ever
13    transmitted unfinished or earlier versions of the
14    report?
15         A.      Yes.
16         Q.      To defendant's counsel?
17         A.      Yes.
18         Q.      And once you've transmitted those
19    earlier versions of the report to defendant's
20    counsel, did you have any discussions with
21    defendant's counsel about those versions?
22         A.      Yes.
23         Q.      Were those discussions ever in writing?
24         A.      I don't recall them being in writing.
25         Q.      Would it have been over the phone?
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2          A.     It was over the phone.  I sent at least

 3     one draft.  And I don't recall specifically how we

 4     discussed, you know, the content, the final content.

 5     There definitely was a phone call.  There may have

 6     been some writing, but I don't recall exactly how we

 7     worked on the -- what I would find, what I would

 8     submit as my final report.

 9          Q.     Were there -- in connection with this

10     case, were there any issues that you refused or

11     declined to opine on?

12          A.     No, not that I was specifically asked

13     about.  I did say that my expertise is in the

14     clinical aspect of it.  And although I do understand

15     the business aspects of medicine, that I would not

16     be able to be an expert on the coding and billing,

17     and that sort of aspect of it.

18          Q.     So to be clear then, you are not in

19     this case offering an opinion concerning the

20     propriety of the billing submitted by the defendants

21     inasmuch as the coding and the pricing is concerned?

22          A.     I am not offering an opinion on the

23     pricing.  And I am not a coding expert.  However, I

24     do understand how this goes, how these practices are

25     run, and how billing is done for drug screens of
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    this nature.  So I have an opinion.  I am not an

 3    expert, however, in coding and billing for drug

 4    screens.

 5         Q.    Are you -- I understand that you're not

 6    an expert in coding or drug screens.  By extension,

 7    Doctor, you are not here offering an opinion

 8    concerning the coding in this case, correct?

 9         A.    Correct.

10         Q.    Okay.

11              MR. CONROY:  Hey, Steve, can we take

12    five minutes?  I just want to take five minutes and

13    get a refill.

14              MR. HENESY:  Of course.  Five minutes.

15              (Whereupon, a recess from

16              11:03 a.m. to 11:11 a.m. was taken.)

17              MR. HENESY:  Ariella, can you read back

18    the last exchange?

19              (Whereupon, the referred-to question

20    and answer was read back by the Reporter.)

21              MR. HENESY:  So we're going to now mark

22    the first exhibit.

23              (Whereupon, Plaintiff's Exhibit 1,

24    Expert disclosure document and Dr. Murphy's report,

25    was marked for identification as of this date by the
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    Reporter.)

 3    BY MR. HENESY:

 4         Q.    I've marked as Exhibit 1 a 21-page PDF

 5    which I will represent is the expert disclosure

 6    document provided by the defendant's counsel,

 7    attaching as an exhibit Dr. Murphy's report which

 8    goes from Page 4, with the attachments to Page 1.

 9    We're going to start on Page 4.  Let's start there.

10              Doctor, can you see that?

11         A.    Yes.

12         Q.    Is it large enough that you can read

13    it?

14         A.    Yes.

15         Q.    If at any point -- I have the ability

16    to zoom here, so at any point you're looking at

17    something and you need me to zoom in, don't hesitate

18    to ask, and I'd be happy to do so.

19         A.    I can actually zoom on my end.  If you

20    see my hand coming up, I'm zooming in.

21         Q.    Okay.  So certainly, this is the first

22    page of your report, right?

23         A.    Yes.

24         Q.    And I want to go -- I want to start on

25    Page 2.  I'm going to start -- I'll zoom in -- to
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2      the top paragraph starting with -- I'll highlight it

 3      there, "In sum."  Can you see that?

 4             A.    Yes.

 5             Q.    And I'll read it for the purposes of

 6      the record.  It says, "In sum, the defendants'

 7      policies, procedures, and utilization of drug

 8      screens in caring for their patients were

 9      reasonable, medically necessary, in the usual course

10      of professional practice, for a legitimate medical

11      purpose, and consistent with the applicable standard

12      of care."

13                    Did I read that correctly?

14             A.    Yes.

15             Q.    So my first question for you Doctor,

16      is, when you refer to policies and procedures and

17      utilization of drug screens, in your own words,

18      Doctor, what are the policies, procedures, and

19      utilization of drug screens that you're referring to

20      in that sentence?

21             A.    That is how our practice approached

22      drug screens and how they generally did it as a

23      policy across the board.

24             Q.    Okay.  Right.  So what was the policy

25      that you're referring to?
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2          A.     The practice of general screening and

 3     doing drug screens on most of the patients that came

 4     in in a universal precautions sort of approach, and

 5     getting both a large number of presumptive testing,

 6     the screening examination, and then a -- going onto

 7     the definitive testing in what appeared to be most

 8     of the cases.

 9          Q.     Okay.  When you say "most of the

10     cases," what does that mean?  Because most could be

11     51 percent, right?  So what does most mean to you?

12          A.     In the records that I reviewed, and in

13     the context of the other materials that I read,

14     including what the experts had said from Geico, it

15     appeared that a large number -- and I don't know the

16     exact percentage -- but almost all of them went on

17     to the definitive testing, from my understanding.

18          Q.     So when -- to be clear then, when you

19     refer to the defendants' policies and procedures,

20     what you're referring to is your perception that the

21     defendants had a policy of utilizing presumptive and

22     definitive drug testing on almost every patient?

23          A.     Yes.

24          Q.     Are you aware or were you made aware of

25     any formal written policies to that effect generated
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy
2    in connection with the defendants' testing?
3         A.    I don't recall seeing any of those.
4         Q.    As you sit here, Doctor, do you know or
5    were you made aware of who it was that instituted
6    the policy or procedure that you just referred to?
7         A.    No.
8         Q.    So when you say -- you go on to say
9    that the policies, procedures, and utilization of
10   drug screens were medically necessary, what is your
11   definition of medically necessary, Doctor?
12        A.    The definition that I use is that the
13   patient has a medical issue, and then the treatment
14   or test, in this instance, is in order to benefit
15   and help the patient get well.
16              So if the patient has a medical need
17   and the treatment or procedure or test is designed
18   to benefit that patient to get well, then it is
19   satisfying a medical necessity.
20        Q.    Using that definition where the
21   procedure or testing is provided in order to or
22   designed to help the patient, is the subjective
23   intent of the healthcare provider relevant to you?
24        A.    Yes.
25        Q.    And so by saying that these services
```

1                  Dr. Murphy

2    were medically necessary, using your definition, are

3    you opining, Doctor, that it was the intent of the

4    defendants in this case to help their patients?

5         A.    I cannot comment on the intent, because

6    I can't get in their brains and know what they're

7    thinking.  But I can comment on the behavior that I

8    review and tell you that in my experience it's

9    consistent with what I've seen and what I've

10   experienced when physicians are trying to help their

11   patients.

12        Q.    Certainly, if the subjective intent was

13   a component of your definition of medical necessity,

14   would you agree that it would have made sense then

15   to ask Dr. Zaitsev or Dr. Gorman or any of the other

16   healthcare practitioners in this case what their

17   intent was in order to reach your opinion?

18        A.    I can't answer your question because

19   you asked me a question that was -- is incorrect

20   from the beginning.  Your premise is incorrect.

21        Q.    Why is my premise incorrect?

22        A.    Because I did not base my opinion on

23   the physicians.  I based my opinion on the records

24   that I reviewed and the behaviors that I saw.  And

25   so it was consistent with what I had come to

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy
2    understand with is the behavior of physicians trying
3    to help their patients, with the intent to help
4    their patients so --
5         Q.    So let me ask it a different way,
6    Doctor.  Do you think it would have been different
7    to hear it from the horse's mouth?
8         A.    I don't know.
9         Q.    You can't say whether or not it would
10   have been helpful to identify the subjective intent
11   of the healthcare practitioners in this case by
12   asking the healthcare practitioners in this case
13   what their subjective intent was?
14        A.    As a review -- or looking at the facts
15   in this case as were presented to me, the subjective
16   intent is possibly helpful, but not necessarily.
17   So -- and it can also be if the physician doesn't
18   understand a question properly, it can also detract
19   from what the truth factually is.  So it could be
20   helpful.  It's not always helpful.  It wasn't
21   necessary for me in this case.
22        Q.    Because you could tell what their
23   subjective intent was from their behavior?
24        A.    No, I could not.  What I said was the
25   behavior is consistent with what I understand to be
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy
 2    beneficial to patients.  What I have seen in other
 3    physicians in my experience as being activities and
 4    actions that are intending to benefit patients.  I
 5    don't know what was in the doctors' heads who were
 6    prescribing these treatments and these tests.
 7          Q.    So when you reviewed the materials in
 8    this case, Doctor, you -- and as you have now
 9    testified that the defendants in this case routinely
10    conducted both a presumptive and confirmatory urine
11    drug test on virtually every patient, right?
12          A.    In my understanding, it's that it was
13    almost all of the patients.  That was correct.  But
14    not every patient.
15          Q.    Okay.  As part of your review, did you
16    see any document that would suggest that it was not
17    every patient?
18          A.    I think in the expert -- one of the
19    expert reports that I read, there was mention that
20    it was not every patient.
21          Q.    So you're accepting that as true for
22    the purposes of your own opinion?
23          A.    No, but I took that into consideration.
24          Q.    So you're not accepting that as true,
25    then?  You have some reason to doubt that?
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2        A.      Yes.

 3        Q.      What is your reason to doubt that?

 4        A.      Because people make mistakes and your

 5   expert -- the Geico expert could have made a

 6   mistake.

 7        Q.      But you don't have any actual evidence

 8   that they made a mistake, right?

 9        A.      No.

10        Q.      Okay.  And of the patient files that

11   you specifically reviewed, did they all get urine

12   drug tests, both definitive and presumptive?

13        A.      I don't recall the specifics of the --

14   all the cases that I reviewed.

15        Q.      Okay.  You also say that your opinion

16   is that -- you say that your opinion is that the

17   urine drug tests were provided for a legitimate

18   medical purpose.  Is that your opinion?

19        A.      Yes.

20        Q.      What was the legitimate medical purpose

21   for which the urine drug tests in this case were

22   administered?

23        A.      Well, first and foremost, to provide

24   therapeutic benefit to the patient.  And these were

25   patients that had pain.  And a lot of the
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    medications that you would discover in a drug screen
 3    can impact the care of patients.  So they were
 4    gathering information that would help them in
 5    decision making going forward in caring for these
 6    patients.
 7         Q.     When you say that they were gathering
 8    information to assist in their decision making going
 9    forward, did anybody tell you that's why they were
10    doing the urine drug screens?
11         A.     I don't recall that.
12         Q.     Did you see in any document it said
13    that the urine drug screen was being ordered for the
14    purpose of assisting medical decision making?
15         A.     I don't recall that.
16         Q.     Did you see in any document that there
17    was any justification at all given for why the urine
18    drug screen was being ordered?
19         A.     There are requisition forms that
20    sometimes people can document the medical necessity
21    and the reason for them.  I don't -- and I know I
22    looked at some of them, maybe a lot of them.  I
23    don't recall an exact number, but I don't remember
24    specifically what was written on those lines or if
25    it was written elsewhere.
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2       Q.    My question to you, Doctor, was, did
 3   you see any written documentation as part of your
 4   review in this case setting forth a specific
 5   justification for the ordering of a urine drug
 6   screen?
 7       A.    Yes.
 8       Q.    You did.  What did it say?
 9       A.    That the patients had pain.  They were
10   seeking pain care.  And that is one of the most
11   common things that pain clinics do, is drug screen
12   their patients.  And that's the reason why we do it.
13   So it's -- that's the specific reason.  They were
14   seeking pain care.
15       Q.    But you are assuming that as the
16   reason.  Isn't that right, Doctor?
17       A.    Yes.
18       Q.    This opinion that's listed at the top
19   of Page 2 where you say, "In sum, the defendants'
20   policies, procedures, and utilization of drug
21   screens in caring for their patients were
22   reasonable, medically necessary, in the usual course
23   of professional practice, for a legitimate medical
24   purpose, and consistent with the applicable standard
25   of care."  Which patients are you talking about
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy
2   where you reach that opinion?
3        A.     Every patient that I reviewed and every
4   instance that I saw applies to that statement.
5        Q.     Okay.  So if we then go back up --
6   excuse me, to Page 4, to materials reviewed.  Okay.
7   In materials reviewed, it says, "From counsel, I was
8   provided files containing medical records,
9   prescription data, and other items related to
10  patients of the defendants with the initials WV, IE,
11  MR, SA."
12              Did I read that correctly?
13       A.     Yes.
14       Q.     Okay.  So there were four patient
15  initials listed here, right?
16       A.     Yes.
17       Q.     Are you offering an opinion concerning
18  the propriety of the testing in this case concerning
19  those four patients?
20       A.     Yes.
21       Q.     Are you offering an opinion concerning
22  the propriety of the testing with regard to any
23  other patients besides those four?
24       A.     Yes.
25       Q.     Which patients are you offering an
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy

2     opinion about?

3          A.    I can't tell you specifically because I

4     don't know.  But there are -- there was multiple

5     mentions of drug screens in the records that I

6     reviewed.  So I'm making a general statement about a

7     large population of patients.

8                    I'm pointing out those four patients

9     because I was specifically given items that relate

10    directly to those four patients as examples.  And

11    that's why I mentioned those, because those are four

12    examples of patients that typify, in my opinion, how

13    late drug screens were utilized by this clinic.

14         Q.    What are you basing that opinion on,

15    that those four files typify how this lab did its

16    testing?

17         A.    Well, the materials that I received.

18    And as I mention in my report what I reviewed, that

19    includes the expert reports from the Geico experts.

20    And they talk about the practice in general and

21    things of that nature.  So in looking at the records

22    in total, I was able to draw a conclusion that I

23    believe is applicable to the entire practice.

24         Q.    Okay.  So this -- the answer to my

25    question then is you are here offering an opinion in
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    this case concerning every patient that received

 3    drug testing from the lab in this case?

 4         A.    No.

 5         Q.    Okay.  I'll ask you again then.  Which

 6    are the patients about whom you are offering an

 7    opinion?

 8         A.    Specifically, those four patients right

 9    there.  And then generally, the majority of patients

10    that would attend the clinic, but not -- I cannot

11    generalize my comment to specifically include every

12    single patient that attends that clinic.

13         Q.    Okay.  Which clinic are you talking

14    about?

15         A.    The pain clinic that treats -- treating

16    the patient.

17         Q.    Do you know -- what's the name of the

18    pain clinic that you're referring to?

19         A.    It's probably in the report somewhere.

20    It's certainly in the complaint, but I don't have it

21    in front of me.  I have -- I'm looking at right now

22    what you're giving me, which is like a paragraph.  I

23    can't see the page number, so -- but it's been

24    provided and it's in the -- clearly, it's in the

25    complaint.  So it's documented.  And I'll be glad to
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy
 2      look at it if you show it to me as well.
 3           Q.     The complaint has nothing to do,
 4      Doctor -- our complaint, Geico's complaint, has
 5      nothing to do with the universe of patients about
 6      which you are offering an opinion.  So I need a
 7      specific answer to this question.
 8                  So do I understand your testimony
 9      correctly that you are offering an opinion about the
10      majority of the patients that were treated at a pain
11      clinic, the name of which you do not know?
12           A.     Yes.
13           Q.     Okay.  And when you say majority, do
14      you mean 51 percent?  Do you mean 80 percent?  What
15      does a majority mean?
16           A.     I think almost all of the patients.
17           Q.     Okay.
18           A.     I am not --
19           Q.     So you are --
20           A.     I can't remember.
21           Q.     You are here to offer an opinion
22      concerning almost all of the patients at issue in
23      this litigation.  Is that what you're saying?
24           A.     No.
25           Q.     What are you saying?
```

Dr. James Murphy
April 27, 2023

```
 1                       Dr. Murphy

 2          A.      I'm offering an opinion based on the

 3   practices of the drug screening and again, the

 4   medical necessity of this practice.  And my opinions

 5   would be related to the majority of the patients

 6   that the practice saw.

 7                  Because my understanding, from

 8   reviewing the records and the expert reports, is

 9   that this was the general policy of how they

10   approached their patients.  Therefore, my opinion,

11   based upon the entirety of the circumstances, is

12   applicable to the practice as a whole, and from what

13   I perceive to be, and what my assumption is, the

14   majority of patients that went there.

15          Q.      So if I understand your testimony

16   correctly, Doctor, based on your review of the four

17   files, the initials which are listed in your report,

18   and the expert reports for Geico's expert, based on

19   your review of those materials, you believe you can

20   then extrapolate your opinion that you've reached to

21   almost all of the patients treated at the clinic

22   whose name you do not know?

23          A.      No.

24          Q.      What did I get wrong?

25          A.      I -- my opinion is based upon
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    everything I mentioned in my report.  So it's more
 3    than what you just said.
 4         Q.    Okay.  So it's based upon your review
 5    of the complaint, the four files that you were
 6    provided with, the transcripts of two doctors.
 7              Anything else?
 8         A.    Okay.  I was reading my paragraph
 9    again.  Would you ask me the question again, please?
10         Q.    Yeah, sure.
11              MR. HENESY:  Would you mind reading
12    back the question for me, please?  Thank you.
13              (Whereupon, the referred-to question
14    was read back by the Reporter.)
15    BY MR. HENESY:
16         Q.    I'll add to the question, the expert
17    reports, Geico's expert reports.
18         A.    Okay.  So the answer is, in addition to
19    what you just mentioned, also the complaint, the
20    amended complaint, as I indicated there.  And I
21    also -- I list a cite of references as included in
22    my report.  So I base my opinions on references in
23    my report as well.
24         Q.    But factually, those listed references
25    did not influence your opinion, correct?
```

Dr. James Murphy
April 27, 2023

```
1                       Dr. Murphy

2          A.      No, they did.

3          Q.      The listed references added additional

4    facts upon which you based your opinion?

5          A.      Of course they did, yes.

6          Q.      What facts did your listed references

7    add?

8          A.      They informed me medically about how to

9    view the practice of medicine that was being done by

10   the defendants.  So that information does matter in

11   terms of my opinion.

12         Q.      I'm going to stay on Page 4 now and I'm

13   going to highlight this sentence here, the last

14   sentence of this paragraph.  It's the second-to-last

15   paragraph in Page 4.  And it begins, "The defendants

16   use of drug testing (UDT) was clearly aimed at

17   providing therapeutic benefit to their patients."

18                 Did I read that correctly?

19         A.      Yes.

20         Q.      And is that your opinion?

21         A.      Yes.

22         Q.      And again, when you say that the use of

23   the UDT was clearly aimed at providing therapeutic

24   benefit to their patients, you mean almost all of

25   the patients at the pain clinic, right?
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2          A.      Yes.

3          Q.      Do you believe, Doctor, that it's

4    important that urine drug testing must be ordered by

5    a qualified healthcare professional, correct?

6          A.      No.

7          Q.      You don't believe that it's important

8    that urine drug testing be ordered by a qualified

9    healthcare professional?

10         A.      I think to get paid, sometimes they

11   require that.

12         Q.      Okay.  But you don't think from just

13   your medical necessity perspective that it would be

14   important in the context -- and let me narrow it.

15              In the context of a pain management

16   practice, do you think it's important that a drug

17   test be ordered by a qualified healthcare

18   professional?

19         A.      I think that is important.

20         Q.      And because, ultimately, it will be the

21   doctor's decision on what's medically necessary for

22   the patient, right?

23         A.      Not necessarily.

24         Q.      It would be the doctor or another

25   qualified healthcare professional's decision on what
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy
 2   is medically necessary for the patient, right?
 3        A.      Not necessarily.
 4        Q.      So an unqualified person can make a
 5   determination of a medical necessity of a urine drug
 6   screen, in your opinion?
 7        A.      Not necessarily.
 8        Q.      Well, if it's not necessarily for
 9   either then, isn't it the doctor who decides how
10   frequently the tests should be given?
11        A.      Not necessarily.
12        Q.      Well, can the owner of the lab make the
13   decision about the medical necessity of a urine drug
14   screen?
15        A.      I do not consider the opinion of the
16   owner of a lab a medical necessity.
17        Q.      So I'm a lawyer.  Would you consider my
18   opinion?
19        A.      Would I consider your opinion?  It
20   depends.
21        Q.      Well, assume for the purposes of this
22   discussion that I am a lawyer and only a lawyer, and
23   I am not a qualified healthcare practitioner.  Would
24   you take my -- would you find my opinion to be
25   persuasive?
```

Dr. James Murphy
April 27, 2023

```
1                      Dr. Murphy

2        A.      It -- that would depend.

3        Q.      On what?

4        A.      On whether you have a valid argument

5    and can present facts that would be -- that would

6    support the medical necessity of a test.

7        Q.      And my licensure or lack of licensure

8    or qualifications as a healthcare professional would

9    be irrelevant?

10       A.      No, it would be relevant.

11       Q.      In this case, Doctor, did you see any

12   evidence that the urine drug screens were being

13   ordered by someone other than a licensed healthcare

14   professional?

15       A.      I did not see -- I do not recall seeing

16   any evidence that they were ordered by other than a

17   licensed healthcare professional.

18       Q.      Do you recall reading any testimony

19   concerning -- well, withdrawn.

20               Do you recall Dr. Gorman giving

21   testimony concerning his signature of the lab

22   requisition forms?

23       A.      I read his testimony.  I don't recall

24   the specifics about that as I sit here right now.

25       Q.      Do you recall Dr. Gorman testifying
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2      that if a lab referral doesn't have his signature on

3      it, then he didn't order it?

4           A.    I don't recall that testimony

5      specifically.

6           Q.    Sure.  Let's see if we can refresh your

7      recollection.

8                MR. HENESY:  This is Exhibit 2, which

9      is Dr. Gorman's deposition transcript.  It's a

10     239-page PDF.

11               (Whereupon, Plaintiff's Exhibit 2,

12     Dr. Gorman's deposition transcript, was marked for

13     identification as of this date by the Reporter.)

14     BY MR. HENESY:

15          Q.    I'm going to go to Page 42.  On

16     Page 42, I'm on Line 14.

17               "QUESTION:  Just so that I understand

18     your testimony, if a lab referral doesn't have your

19     signature on it, you would deem that to be

20     unauthorized?

21               "ANSWER:  If a lab referral doesn't

22     have my signature, then I didn't order it.

23               "QUESTION:  Even if at the top of the

24     referral, it has your name on it?

25               "ANSWER:  No.  Prescriptions have to be
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    signed."

 3              Did I read that correctly, Doctor?

 4       A.    I think so.

 5       Q.    And do you recall reading that

 6    testimony when you reviewed this transcript?

 7       A.    I read the transcript.  I don't

 8    remember the details that I read as I sit here right

 9    now.

10       Q.    What's described in that testimony

11    there -- a lab referral form that doesn't have a

12    signature even if it has Dr. Gorman's name on top --

13    did you see any instances of that in the records

14    that you reviewed?

15       A.    I don't remember the specifics of the

16    records that I reviewed and what was on the forms.

17    I'd be glad to look at some if you want to show me,

18    but I don't recall the records that I reviewed in

19    specificity.

20       Q.    If there were instances of unauthorized

21    urine drug screens being performed by the lab in

22    this case, would that have influenced your opinion

23    at all in this case?

24       A.    I have to know what the word

25    "unauthorized" means.
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2          Q.     Not ordered by the doctor.

 3          A.     Again, I -- a lot of times, there are

 4     standing orders and policies that practices will do,

 5     and it's -- it can be done for medical necessity in

 6     the best interest of the patient and in a

 7     therapeutic manner, and the doctors don't sign

 8     those.  And that's still --

 9          Q.     Right.  But a standing order, Doctor,

10     would be authorized, wouldn't it?

11          A.     Not always -- oh, authorized?  A

12     standing order would be -- I would consider that

13     authorized.

14          Q.     Okay.  I'm not talking about

15     authorized.  I'm talking about unauthorized.  If you

16     had evidence that there were unauthorized urine drug

17     screens being tested, being performed by the lab,

18     unauthorized, not authorized by the doctor, would

19     that have influenced your decision -- withdrawn --

20     influenced your opinion in this case?

21          A.     Again, I'm not sure what you mean by

22     "unauthorized."

23          Q.     Not ordered by the doctor.  Not

24     authorized by the doctor.

25          A.     Not necessarily.
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2          Q.      That wouldn't matter to you?

 3          A.      It would matter.

 4          Q.      But it wouldn't influence your opinion?

 5          A.      Perhaps.

 6          Q.      So in what way would it matter?

 7          A.      Well, I have to understand what the

 8    doctor meant by didn't sign.  Sometimes doctors

 9    don't understand that -- you know, that labs are

10    things that we do on a regular basis, get it done,

11    by the clinic in its policy.  And it's done in a

12    universal precautions manner.  And it ends up being

13    medically necessary and in the patient's best

14    interest.

15               And whether or not the doctor signed

16    the requisition or not, that may have some bearing

17    on whether the lab ultimately will pay for it.  It

18    doesn't necessarily have bearing on whether it was

19    an appropriate test ordered or whether it was

20    actually in the patient's best interest.

21          Q.      I'm not asking you about signed versus

22    unsigned.  Okay.  You're drawing a distinction in

23    that answer between signed and unsigned.  I'm -- and

24    by the way, for the record, I removed the exhibit

25    from the screen.
```

Dr. James Murphy
April 27, 2023

1            Dr. Murphy

2            I'm drawing a distinction in my

3    question, Doctor, between authorized and

4    unauthorized.  Sanctioned by the doctor and

5    unsanctioned by the doctor.

6            MR. CONROY:  Objection as to form.

7            MR. HENESY:  Okay.

8    BY MR. HENESY:

9        Q.    You can answer it.  With that

10   clarification then, Doctor, not signed [sic] versus

11   unsigned.  I'm talking authorized versus

12   unauthorized.  Would that have been something that

13   would be important to you if that were the case

14   here?

15       A.    It depends.

16       Q.    So not necessarily, that would be

17   important?

18       A.    I've answered it depends.

19       Q.    Okay.  What would it depend on, Doctor?

20       A.    Whether or not that the clinic as a

21   whole, which is to take care of patients, whether or

22   not that was their usual and customary practices to

23   order those drug screens.  And whether or not the

24   drug screens were ordered in effort to benefit the

25   patient and -- who has a medical problem.

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2              Then that would be a -- whether or not

 3    the doctor signed that requisition.  A signature on

 4    a form is not a patient.  A signature on a form is

 5    simply a piece of paper.  And we treat people, we

 6    treat people that have diseases, that have medical

 7    needs.

 8              We don't treat forms or requisitions,

 9    but I understand that that's important to get paid

10    and it's important for documentation for legal

11    reasons.

12              But what you're asking me about whether

13    or not it would be okay to do a test on somebody

14    because it's the usual course of the practice, even

15    if the doctor forgot to sign it or didn't sign it

16    for some reason, yeah, it could certainly be

17    reasonable and appropriate for a test to be done.

18         Q.    I'm not talking -- and I'm going to

19    repeat myself, Doctor.  I understand your position,

20    that from a paperwork perspective, signed versus

21    unsigned may not have a material effect.

22              I'm talking about an unauthorized test,

23    a test that is not pursuant to a standing order and

24    is not authorized by the doctor.  Assume those two

25    facts for the purposes of my questions, the doctor
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy

2     didn't order it and there was no standing order.

3     Assume those two facts.

4              If those two facts were true in this

5     case, would a bunch of blank prescription forms that

6     didn't have signatures on them, and with that

7     testimony from Dr. Gorman that if he didn't sign it,

8     he didn't order it, would that have influenced your

9     opinion in this case?

10        A.     Your question is not an accurate

11    question.  I can't answer it the way you asked it.

12    It's -- it doesn't make sense.

13        Q.     Okay.  You can't answer the question on

14    whether or not that would be appropriate or if it

15    would influence your decision.  Okay.

16        A.     I can't -- I can't answer the question

17    in the way you asked it because it was a nonsensical

18    sort of question.  It didn't make sense.

19        Q.     Okay.  Let's go back to your report on

20    Page 2.  At the bottom of Page 2, there's a sentence

21    that begins, "I continue to practice full time."  It

22    says, "I continue to practice full time, and, like

23    the defendants in this case, I utilize drug

24    screening as a risk mitigation strategy in caring

25    for my patients."
```

Dr. James Murphy
April 27, 2023

```
1                      Dr. Murphy

2            Did I read that correctly?

3      A.     Yes.

4      Q.     Does -- that seems to suggest to me,

5    Doctor, that it is your belief that the defendants

6    in this case were using the drug screens as a risk

7    mitigation strategy.  Is that your opinion?

8      A.     Yes.

9      Q.     And of course, there is no document in

10   this case that you reviewed that specifically says

11   that the urine drug screen was being ordered as a

12   risk mitigation strategy, right?

13     A.     I don't recall.

14     Q.     Okay.  You're assuming that it was a

15   risk mitigation strategy?

16     A.     I may have read it somewhere.  There's

17   a lot of documents.  I don't recall right now

18   exactly what -- the specifics of what I read.

19     Q.     So my -- so the question before you,

20   Doctor, is -- or the question I'm asking you now is,

21   when you say that the defendants were using the

22   urine drug screens as a risk mitigation strategy,

23   was that based on something you read, or are you

24   just assuming that's why they were doing it?

25     A.     I don't recall.
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2        Q.     Okay.  On Page 4, it says on the last

 3   paragraph, the first sentence says, "Our nation's

 4   expanding overdose crisis mandates increased caution

 5   when prescribing controlled substances for pain or

 6   any other condition."  Do you see that?

 7        A.     Yes.

 8        Q.     In the records that you reviewed in

 9   this case, were any of the patients prescribed a

10   controlled substance?

11        A.     I don't recall specifically.  There may

12   have been, but I -- sitting here right now, I can't

13   tell you specifically if -- if or who was.

14        Q.     In the records that you reviewed, were

15   any of the patients -- was there a notation that a

16   controlled substance prescription was being

17   considered for any of the patients?

18        A.     I don't recall the specifics of what I

19   reviewed right now.

20        Q.     But in order to include -- the

21   reason -- well, withdrawn.

22               Was the reason that this sentence was

23   included in your report about the nation's expanding

24   overdose crisis and the prescription of controlled

25   substances is that you believe that a pain
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2    management practice that utilizes the prescription

 3    of controlled substances might have more of a

 4    justification for ordering urine drug screens like

 5    the defendants did?

 6         A.     No.

 7         Q.     That's not why you included it there?

 8         A.     Correct.

 9         Q.     Did you include -- so I guess, what

10    does that have to do with this case?  "Our nation's

11    expanding overdose crisis mandates increased caution

12    when prescribing controlled substances for pain..."

13    How is that relevant to this case?

14         A.     Overdose is a tragic outcome sometimes

15    to people that have chronic pain, and many people

16    have pain that's not well-controlled by the

17    non-controlled substances or procedures or things of

18    that nature, and they will then either misuse their

19    medications or get medications from the street.  And

20    sometimes the medications from the street can be

21    tainted with fentanyl or other substances, and they

22    can harm themselves or die.

23               And any patient who presents that has

24    chronic pain is at risk for, at some point -- even

25    if maybe at the presentation, but they're at risk
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2      for being exposed to opioids or other controlled

 3      substances or even illicit drugs.

 4                      They're just -- it's a risk.  It's like

 5      when somebody has diabetes.  I mean, they come to

 6      see your office, they may be stable at that point,

 7      but there is a risk at some point that their disease

 8      could get out of hand and they could be in crisis.

 9                      So it's important that any time you're

10      dealing with somebody with chronic pain or with

11      acute pain, pain of any nature, that as much

12      information as we can learn about the patient, it

13      can be beneficial in treating them, even if I'm not

14      the one prescribing the controlled substance,

15      because I might in the future do it, or some other

16      doctor who is getting my reports could see the

17      records from my office and use my reports in the

18      care going forward.

19                      So yes, it's important that we consider

20      the necessity of the use of drug screens for any

21      patient that has chronic pain.  And basically, the

22      office seeing the patient can utilize those drug

23      screens in the manner that they feel is the best for

24      their patients.

25              Q.      Okay.  But this sentence says "when
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy

2     prescribing controlled substances."  As you sit here

3     today, Doctor, increased -- it says, "Increased

4     caution when prescribing controlled substances."

5               As you sit here today, Doctor, do you

6     have any knowledge of whether or not the pain

7     practice at issue in this case ever prescribed a

8     controlled substance?

9          A.    I don't have any specific knowledge

10    right now, as I sit here right now.

11         Q.    Let's go to Page 5 -- Page 6, excuse

12    me.  At the top of Page 6, there's a sentence that

13    starts "Ideally, clinicians..."

14              And it says, "Ideally, clinicians would

15    only test for substances for which results could

16    affect pain management; however, it can be

17    challenging for clinicians in many settings to

18    tailor widely used toxicology panels to include the

19    specific substances most relevant to clinical

20    decisions for their patient."

21              Do you see that?

22         A.    Yes.

23         Q.    Okay.  There is no evidence that you're

24    aware of in this case that it was challenging for

25    the clinicians in this case to tailor the toxicology
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy
2     panels to just those substances that would be most
3     relevant to the clinical decisions, correct?
4            A.      It's always challenging.
5            Q.      Okay.  So it's never not challenging?
6            A.      It's always challenging.
7            Q.      This says it can be challenging, right?
8     So do you want to amend that to say it is always
9     challenging?
10           A.      It can be challenging is a correct
11    statement.
12           Q.      Okay.  So it can be challenging.  It is
13    not necessarily challenging?
14           A.      I just said it is always challenging.
15           Q.      Okay.  But that's not what your report
16    says, so I'm trying to square what you're saying to
17    me now versus what's in your report.  Your report
18    says it can be challenging.  Now you're saying --
19                   MR. CONROY:  Objection as to form.
20    BY MR. HENESY:
21           Q.      Sure.  Now you're saying it's always
22    challenging.  Which is it, Doctor?  Is it always
23    challenging or it can be challenging?
24           A.      They are both correct statements.
25           Q.      Okay.  So in your mind, those two
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    statements, do they mean the same thing?

 3         A.    No.

 4         Q.    Okay.  They are two statements that

 5    mean something different from one another.  They're

 6    both true?

 7         A.    Yes.

 8         Q.    Okay.  I understand that you believe it

 9    is always challenging for clinicians --

10    notwithstanding what your report says, you believe

11    that it is always challenging for clinicians to

12    tailor toxicology panels to the specific substances

13    most relevant to the clinical decisions.

14              Did you see any specific evidence in

15    this case that that was a challenge that the

16    practitioners faced?

17         A.    Yes.

18         Q.    What specific evidence did you see that

19    that was a challenge the practitioners in this case

20    faced?

21         A.    Patient had pain.

22         Q.    Okay.  So any patient that has pain --

23    if a patient has pain, it's automatically going to

24    be challenging for the clinician to tailor the

25    toxicology panel?
```

Dr. James Murphy
April 27, 2023

```
1                          Dr. Murphy

2          A.    Yes.

3          Q.    Let's take that off the screen.  So

4    we're back to Exhibit 1, the report.  The rest of

5    this paragraph reads, "Toxicology testing costs are

6    not always covered fully by insurance and can be a

7    burden for patients, and clinician time is needed to

8    interpret, confirm, and communicate results."

9                So I'm now going to show you

10   Exhibit 3 -- the end of that paragraph, by the way,

11   there's a reference to CDC 22, which is the 2022

12   guidelines that were put out by the CDC, right?

13         A.    I list what that means at the end of my

14   report, so you would have to look at that.

15         Q.    Sure.  Why don't we do that.  We're on

16   Page 15 of the report.  CDC 22 is listed under

17   references as CDC Clinical Practice Guidelines for

18   Prescribing Opioids for Pain - United States 2022,

19   correct?

20         A.    Yes.

21         Q.    Okay.  So I'll take that off.

22               MR. HENESY:  And now we're going to go

23   to what's going to be marked as Exhibit 3.

24               (Whereupon, Plaintiff's Exhibit 3, CDC

25   Clinical Practice Guideline for Prescribing Opioid
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2     for Pain - United States, 2022, was marked for
 3     identification as of this date by the Reporter.)
 4     BY MR. HENESY:
 5          Q.    Okay.  I've marked as Exhibit 3 a
 6     100-page PDF.  The first page says "CDC Clinical
 7     Practice Guidelines for Prescribing Opioids for
 8     Pain - United States, 2022."
 9               Doctor, is this the report that you
10     were citing to in your own report?
11          A.    Yes.
12          Q.    Okay.  I want to go to Page 53.  And
13     I'll zoom in on the right-hand side where it says,
14     "However, it can be challenging for clinicians in
15     many settings to tailor widely used toxicology
16     panels to include the specific substances most
17     relevant to clinical decisions for their patient.
18               "Toxicology testing costs are not
19     always covered fully by insurance and can be a
20     burden for patients, and clinician time is needed to
21     interpret, confirm, and communicate results."
22               Do you see that?
23          A.    Yes.
24          Q.    Okay.  So this is language you cut and
25     pasted out of the CDC guidelines into your own
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    report, right?

 3              MR. CONROY:  Objection.

 4         A.    I'm not sure how I put it in there.

 5    But I -- I do like the way it was worded so I wanted

 6    to use that.  I'm not sure how it ended up in my

 7    report.

 8         Q.    Okay.  But if we go back to your

 9    report, and we go down to where you cite to this on

10    Page 6, you have to agree with me, Doctor, that it's

11    word for word what's in your report versus what's in

12    the CDC guidelines?

13         A.    I have to see it side by side.  And if

14    it is, that's why I referenced it.

15         Q.    Okay.  Let's do it side by side.  Okay.

16    So on the screen now, we have side by side,

17    Exhibit 1, Page 6 of the report, and Page 53 of the

18    CDC 22 guidelines.

19              Compare those two and tell me when

20    you're done, please.

21         A.    I don't see the CDC guideline.

22         Q.    Oh, you're right.  Did I not share two

23    screens at once?  How about now?

24         A.    Yes.

25         Q.    Okay.
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2          A.      Yes.

 3          Q.      They're identical, right?

 4          A.      Yes.

 5          Q.      Okay.  So this isn't paraphrasing,

 6   right?  This is you just using the exact language

 7   from the CDC guidelines and putting it in your own

 8   report, right?

 9          A.      I clearly used the exact language in

10   the CDC report.

11          Q.      Right, okay.  And you would agree with

12   me that that wouldn't be paraphrasing, right?

13          A.      Correct.

14          Q.      Okay.  Besides that language that you

15   used word for word from the CDC guidelines, do you

16   generally consider -- the 2022 CDC guidelines that

17   we just had up on the screen, do you generally

18   consider them an authority in the field of pain

19   management?

20          A.      Yes.

21          Q.      And do you agree with the CDC

22   guidelines?

23          A.      Not in everything.

24          Q.      Okay.  And certainly, there are

25   portions of -- you would -- I assume that you would
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    agree with me, Doctor, that there are portions of
 3    the CDC guidelines which contravene some of the
 4    opinions contained in your report in this case,
 5    right?
 6           A.     I don't think so.
 7           Q.     Would you agree with me that there are
 8    portions of the 2022 CDC guidelines that are
 9    inconsistent with what you're saying in your report
10    in this case?
11           A.     Not really.
12           Q.     Is it your opinion -- in connection
13    with this case, is it your opinion that the
14    defendants' ordering of both a presumptive and
15    definitive drug screen on almost every patient was
16    entirely appropriate?
17           A.     Yes.
18           Q.     Based on your review of the records in
19    this case, did you come to an understanding as to
20    the timing of the defendants' presumptive and
21    definitive testing and the results of those tests?
22    And when I say the "timing," I mean the timing in
23    relation to one another, each test.
24           A.     My understanding is that for the most
25    part, they were ordered at the same time.
```

Dr. James Murphy
April 27, 2023

1              Dr. Murphy

2         Q.     And what about the results?  What is

3    your understanding concerning the timing of the

4    results of the tests and the report generated that

5    is communicating the results of those tests?

6         A.     Okay.  Two parts to that question.

7    Presumptive results almost always come back or are

8    available quicker than the definitive results.  So

9    it would be expected, and it -- I assume that

10   presumptive results were done and were available

11   sooner than the definitive results.

12        Q.     What are you basing that assumption on?

13        A.     The way that the labs operate.  The way

14   the tests are done.

15        Q.     The tests in this case?

16        A.     In every case.  That's the way --

17   presumptive tests are done with a technology that is

18   faster and less precise.  And the specimens and the

19   time it takes to do the definitive testing is

20   longer.

21        Q.     Did you see any evidence in this case

22   that a separate report was generated in connection

23   with the IA presumptive screening?

24        A.     I don't recall any right now.  There

25   may have been, but I don't recall any.

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2        Q.    Isn't it true that the reports that

 3   were generated by the lab in this case recorded the

 4   results of both the IA screen and the confirmatory

 5   test in a single report?

 6        A.    I don't recall.  But that wouldn't

 7   surprise me if that was the case.

 8        Q.    Do you think, in your opinion as a

 9   general matter, Doctor, that the results of an IA

10   ought to be reviewed before a confirmatory test is

11   run?  And when I say "reviewed," I mean reviewed by

12   the ordering practitioner.

13        A.    Not necessarily.

14        Q.    So you think the inverse of that?  You

15   think it is entirely appropriate to run an IA

16   screen, and before the results of that IA screen are

17   communicated to the ordering physician, the

18   confirmatory test in the same sample is run?

19        A.    It can be.

20        Q.    Do you think that is always

21   appropriate?

22        A.    No.

23        Q.    Okay.  What are the circumstances in

24   which that would not be appropriate?

25        A.    Depending on individual circumstances
```

Dr. James Murphy
April 27, 2023

```
 1                         Dr. Murphy

 2    of the patient.  And I can give an example:  If a

 3    patient could not afford to have the definitive

 4    tests run, because they can be quite expensive, then

 5    it would be -- it could possibly be inappropriate to

 6    go ahead and send it for the definitive treatment in

 7    that case, because the benefit might not outweigh

 8    the harm to that patient.  And by "harm," I mean

 9    financial harm of the patient.

10                   So you have to take into consideration,

11    who's paying for the test, whether it's the patient

12    and whether that can be a hardship, or whether it's

13    a third-party payer where it's going to be covered.

14         Q.     So in your opinion, to the extent that

15    a third-party payer is going to be responsible for

16    paying for the drug screens, it is never

17    inappropriate to order and simultaneously report an

18    IA and LCMS test on the same sample?

19         A.     Correct.

20         Q.     And you say as much in your report,

21    right?  In your report -- let me go back to it.

22    It's Exhibit 1.  I'm now on Page 6 of the report.

23    There's a sentence, the last full paragraph on the

24    paragraph.

25                   The last sentence says, "Thus, it is
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy
 2     never wrong to send a presumptive screening test on
 3     to the lab for definitive confirmatory
 4     testing - assuming cost to the patient is not a
 5     barrier that merits consideration, which it would
 6     not be in the No-Fault setting."
 7                 Did I read that correctly?
 8          A.    Yes.
 9          Q.    So when you say that it would not be in
10     the No-Fault setting, what do you mean by that?
11          A.    That means that the cost is not going
12     to come back on the patient.  It's covered.  And
13     therefore, the potential harm or the financial harm
14     would not be something that would overcome the
15     potential benefits.
16          Q.    What is your level of familiarity with
17     No-Fault insurance benefits in the state of New
18     York?
19          A.    My understanding is what I was told by
20     counsel, is that there is a sum of money and it can
21     go toward healthcare costs in the event of an
22     accident, and it can include the drug screens.
23     That's certainly healthcare.  So it would fall under
24     the category of No-Fault insurance.  It would be
25     covered after an auto accident in the state of New
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    York.

 3         Q.     Okay.  You say a "sum of money."  Were

 4    you told what the sum of money is?

 5         A.     A number was given to me.

 6         Q.     What is it?

 7         A.     I can't recall.

 8         Q.     Okay.  Do you recall how much the

 9    defendants in this case were charging for a single

10    instance of an IA and LCMS screen?  In other words,

11    the combined report that had an IA and the LCMS

12    results on it, what that test was -- what was being

13    charged for that test?

14         A.     No.

15         Q.     If I told you it was in excess of

16    $4,000, would that refresh your recollection?

17         A.     I don't remember being told what it

18    was, the cost was.

19         Q.     Okay.  Does $4,000 strike you as high

20    for that kind of testing?

21         A.     It depends on the extent of the

22    testing.  Different labs charge different amounts.

23         Q.     All right.  But the extent of the

24    testing in this case, you are familiar with,

25    considering you reviewed the records in this case.
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2     So given the scope of the testing in this case, does

 3     $4,000 based on your experience strike you as high?

 4          A.    I don't know what the average or what

 5     would constitute a high charge for that type of test

 6     in this industry.  It's going to vary from lab to

 7     lab and from place to place.

 8          Q.    Let's go back to Exhibit 3.  Exhibit 3

 9     is the CDC guidelines that we have been reviewing.

10     I'm going to Page -- sorry, one second.  I've been

11     using the PDF numbers for Exhibit 3 rather than the

12     page numbers at the bottom of the form, so I'm going

13     to continue to do that for purposes of clarity.

14               We're on Page 87 of the PDF AB5 of the

15     report.  In the CDC guidelines here, do you see the

16     highlighted sentence that says, "One study estimates

17     the costs of urine toxicology testing (including

18     screening and confirmatory tests) at $211 to $363

19     per test."

20               Do you see that?

21          A.    Yes.

22          Q.    And certainly, you -- would it be fair

23     to say, Doctor, that you've read the CDC guidelines

24     from front to back?

25          A.    No.
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2          Q.     Oh, you haven't?

 3          A.     I have not read every word in the

 4     guideline, no.

 5          Q.     It's not important for you to read

 6     them?

 7          A.     It can be.

 8          Q.     Okay.  But it's not important for you

 9     to read every word in these guidelines?

10          A.     It depends.

11          Q.     Well, it either it is or it isn't.  I'm

12     talking about every word.

13                 Withdrawn.

14                 Okay.  So now that you see that the CDC

15     is -- you don't have any reason to doubt, by the

16     way, what the CDC is saying here about the estimated

17     cost of urine toxicology testing?

18          A.     Oh, I have reason to doubt that.

19          Q.     You do.  What is the reason upon which

20     you are basing your reason to doubt this?

21          A.     Well, I would have to look at 74, what

22     that means.  That's a reference to an article.  I

23     would have to go to the article and see what that

24     article says.  Or maybe the article is incorrect or

25     has a problem with it.  That's why they give the
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2    reference there, so --

 3         Q.     Right.  But that's not a reason to

 4    doubt.  That's you assuming that there could be

 5    something wrong with the citation.  I'm asking you

 6    if you have an actual reason, evidence-based reason

 7    to doubt.

 8         A.     Oh, yeah.  Absolutely.

 9         Q.     What is your evidence?

10         A.     Well, the CDC, it says that its

11    recommendations are based upon poor quality

12    insurance.  And I think actually, in their

13    recommendation, they talk about, it's based on level

14    four evidence, I believe was the drug screens.

15              And that's evidence where they expect

16    the outcome to actually be -- likely to be different

17    than what the estimated would be.  So they're really

18    saying they're basing their recommendations on low

19    quality evidence that might be the opposite of what

20    it says.  So that tells me --

21         Q.     Does that apply to the paragraph that

22    you cut and pasted out of these guidelines into your

23    report in this case?

24         A.     I'm sorry.  I was still talking.  Can I

25    finish my statement?
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2         Q.     Once you answer that question.

 3         A.     I -- I forgot my question.

 4         Q.     Sure.

 5                MR. HENESY:  Can you read it back for

 6      me, please, Ariella?  Thank you.

 7                (Whereupon, the referred-to question

 8      was read back by the Reporter.)

 9                THE WITNESS:  I'm sorry.  Does what

10      apply?

11      BY MR. HENESY:

12         Q.     The poor quality of evidence upon which

13      these guidelines are based.

14                MR. CONROY:  Objection.  That's not

15      what he testified.

16                MR. HENESY:  Well, the record will

17      speak for itself, what he testified.

18                THE WITNESS:  The recommendation itself

19      is based upon poor quality evidence.  The wording

20      that I lifted from the guideline, which I liked,

21      was, I thought, a very accurate statement, that's

22      why I used those words.  So some of the phrases that

23      they used, I'm very happy with, and they expressed

24      the meaning very, very well.

25                But the evidence and the authority of
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2      some of these recommendations, the specific

 3      recommendations, by the CDC's own admission, are

 4      based on low quality evidence.  So what you're

 5      asking me to do is to compare apples to oranges, and

 6      I can't do that.

 7                    The statement that I used in my report

 8      is a very good statement, and I stand by that,

 9      the -- it stands on its own.  But the evidence and

10      the studies that they point to are not necessarily

11      good studies or studies that I would put hope,

12      tremendous stock in.  Sometimes they're wrong.

13                    And if you read the studies themselves,

14      the authors are very candid that these studies don't

15      prove anything.  They maybe show a possibility.  But

16      the studies themselves are very candid about the

17      lack of convincing evidence.

18           Q.     Based on your own experience, Doctor,

19      that highlighted sentence that's on the screen about

20      the estimated cost in urine toxicology testing, in

21      your experience, does that statement appear accurate

22      to you?

23           A.     It's across the board.  It varies, what

24      labs will charge.  It varies.  Some will be in the

25      lower end, and I've seen tests that come back in the
```

Dr. James Murphy
April 27, 2023

```
1                     Dr. Murphy
2    thousands.
3         Q.     Would you consider the thousands the
4    higher end?
5         A.     In my personal experience?
6         Q.     Yes, sir.
7         A.     Yeah.  In my personal experience, I
8    would consider it in the higher end.  Personally.
9         Q.     Doctor, in your own pain practice, you
10   do not order simultaneous reporting -- you do not
11   order drug screens where the results will be
12   reported to you simultaneously for both an IA and an
13   LCMS, correct?
14        A.     I don't know.  I might.  Some of the
15   labs might do that.
16        Q.     Do you, as a matter of practice,
17   Doctor, order presumptive and definitive drug
18   screens on the same samples simultaneously?
19        A.     I have in the past.
20        Q.     How often would you say you do that?
21        A.     Currently, I don't think it's very
22   often anymore.  I used to do it on a more frequent
23   basis.
24        Q.     You believe, Doctor, that decisions
25   regarding
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    the -- whether and to what extent urine drug screens
 3    should be ordered should be based on the particular
 4    circumstances of the patient, right?
 5         A.    I think that is the overriding and most
 6    important determination.
 7         Q.    Doctor, you believe that -- it's your
 8    opinion that urine drug screens are not proven to
 9    benefit patient care, correct?
10         A.    Not in every circumstance.
11         Q.    For instance, you believe that urine
12    drug screens do not provide accurate information
13    about how much or what dose of a drug a patient
14    took?
15         A.    Correct.
16         Q.    You believe that evidence demonstrating
17    the effectiveness of urine drug tests for risk
18    mitigation during opioid prescribing for pain is
19    lacking, correct?
20         A.    Yes.
21         Q.    You agree that the CDC does not
22    recommend a one size fits all approach for urine
23    drug testing, correct?
24         A.    Yes.
25         Q.    You believe that the CDC says that the
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2     urine drug testing should be a product of individual

3     decision making, correct?

4          A.    Yes.

5          Q.    You believe that the CDC says that

6     urine drug testing -- that in the context of urine

7     drug testing, different choices will be appropriate

8     for different patients, correct?

9          A.    Yes.

10         Q.    You also know that urine drug testing

11    can be the subject of misinterpretation and might

12    sometimes be associated with practices that might

13    harm patients, correct?

14         A.    Yes.

15         Q.    You agree, Doctor, that drug screens

16    should be done in consideration of the circumstances

17    and unique needs of each patient, correct?

18         A.    Yes.

19         Q.    You believe that drug screen results

20    can be misleading, correct?

21         A.    Yes.

22         Q.    You believe that while drug screens are

23    important in the care of patients, of pain patients

24    who use opioids to control their pain, to use drug

25    screen data beyond their legitimate capacity is to
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy
 2      be both scientifically and ethically dishonest,
 3      correct?
 4             A.     Yes.
 5             Q.     In your own practice, it is your
 6      practice to utilize random urine drug testing,
 7      correct?
 8             A.     Yes.
 9             Q.     You agree, Doctor, that it is important
10      for a doctor to document what happens on any given
11      patient visit, correct?
12             A.     Yes.
13             Q.     You agree it's important to be complete
14      in those records, correct?
15             A.     Not necessarily.
16             Q.     Earlier this year, you testified in a
17      criminal case against an individual named Freeda
18      Flynn, correct?
19             A.     Yes, I testified in that case.
20             Q.     And you testified on -- as an expert
21      for the defense.  Is that correct?
22             A.     Yes.
23             Q.     Do you recall being asked these
24      questions and giving these answer?
25                    "QUESTION:  It's important to document
```

Dr. James Murphy
April 27, 2023

1                      Dr. Murphy

2    what happens on any given patient visit, right?

3              "ANSWER:  Yes.

4              "QUESTION:  And as you discussed

5    before, it's important to be complete, right?

6              "ANSWER:  Yes.

7              "QUESTION:  It's important to be

8    accurate?

9              "ANSWER:  Yes."

10             Do you recall being asked those

11   questions and giving those answers?

12        A.    No.  I was asked a lot of questions.

13   But if you want to show me the transcript, I'll be

14   happy to look at it.  I don't recall specifically

15   what I was asked.

16        Q.    Sure.

17             MR. HENESY:  We'll mark this as

18   Exhibit 4.

19             (Whereupon, Plaintiff's Exhibit 4,

20   Transcript of the doctor's testimony as part of the

21   Freeda Flynn case, was marked for identification as

22   of this date by the Reporter.)

23   BY MR. HENESY:

24        Q.    Okay.  I've highlighted -- I'm on

25   Page 155 of Exhibit 4.  Let me go back to the top

Dr. James Murphy
April 27, 2023

```
1                       Dr. Murphy

2      for a second.  For the record, this is a transcript

3      of the doctor's testimony as part of the Freeda

4      Flynn case which was in the U.S. District Court for

5      the Southern District of Ohio on January 6, 2023.

6                       And again, going down to Page 155,

7      Doctor, I've highlighted those questions and answers

8      I've just read to you.  Please read those.  And then

9      let me know when you're done.

10          A.     Okay.

11          Q.     Okay.  Having read that -- read those

12     highlighted portions of the transcript, does it

13     refresh your recollection that that's the testimony

14     you gave in the Freeda Flynn case in January of this

15     year?

16          A.     I don't remember being asked those

17     specific questions, but I do recognize that

18     transcript.

19          Q.     Okay.  You were asked under oath in

20     this trial in this course of questions concerning

21     documentation of patient visits whether or not it's

22     important to be accurate, and you testified under

23     oath that it was important to be accurate in this

24     trial, did you not?

25          A.     I -- it says here, the question:  "It's
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy
 2      important to be accurate?"  And my answer was "Yes."
 3            Q.    Okay.  You don't deny that you gave
 4      that testimony, correct?
 5            A.    I stand by that statement.  I'm not
 6      sure if that's exactly what I said.  But I -- I will
 7      verify that that's truth.
 8            Q.    But now you're not sure.  And now when
 9      I ask you the question of whether or not it's
10      important to be accurate, your testimony is not
11      necessarily?
12            A.    No, it's important to be accurate.
13            Q.    Okay.  That was my question.  Then if
14      your answer is yes, it's important to be accurate,
15      we can move on.
16                  Doctor, you agree that individual
17      confirmatory testing can be expensive, correct?
18            A.    Yes.
19            Q.    And you agree with me that a common
20      practice in testing is to first screen samples using
21      an inexpected [sic] presumptive test to rule out
22      likely negative samples and then confirm potential
23      positive results using a highly specific definitive
24      test?
25            A.    I think you misspoke a word.  So you
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    may want to ask that again.

 3                    MR. HENESY:  Can you read it back for

 4    me?  I'm happy to ask the question again, but let's

 5    see if I misspoke.

 6                    You know what, I'll withdraw it and

 7    I'll say it again.

 8    BY MR. HENESY:

 9         Q.     You agree, Doctor, that common practice

10    in testing is to first screen samples using an

11    inexpensive presumptive test to rule out likely

12    negative samples and then confirm potential positive

13    results using a highly specific definitive test?

14         A.     Yes.

15         Q.     Or you agree, Doctor, that for routine

16    clinical use, point of care testing is efficient and

17    economical?

18         A.     It depends.

19         Q.     You don't agree with the statement that

20    for routine clinical use, point of care testing is

21    efficient and economical?

22         A.     It depends on the circumstances.

23         Q.     Okay.  So as of -- you don't agree with

24    that statement as a general rule?

25         A.     Can I hear the statement again?
```

Dr. James Murphy
April 27, 2023

1                    Dr. Murphy

2        Q.    Sure.  For routine clinical use, point

3    of care testing is efficient and economical.

4        A.    It depends.

5        Q.    Okay.  And so you would never write

6    that in a report as a general rule, right?

7        A.    I didn't say that.

8        Q.    Okay.  But if it depends, you don't

9    think it's a general rule, right?

10       A.    It could be a general rule.  But not in

11   every case.

12       Q.    Okay.  Well, my definition of a general

13   rule is that it's true in every case.  So using that

14   definition, then you don't think that this is a

15   general rule?

16            MR. CONROY:  Objection as to form.  I'm

17   not going to let him answer a question where you

18   make a definition that's completely subjective on

19   your part.  That's not an appropriate question,

20   Steve.  You've got to rephrase it.

21   BY MR. HENESY:

22       Q.    You can answer the question, Doctor.

23       A.    I can't answer the question the way

24   that it's asked.

25       Q.    Okay.  Do you believe that it's true in

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    every case that for routine clinical use, point of
 3    care testing is efficient and economical?
 4         A.    No.
 5         Q.    And you certainly have never presented
 6    that as a rule of general applicability in an expert
 7    report, right?
 8         A.    I have no idea.
 9         Q.    So you're not -- why would you present
10    something in an expert report that you don't believe
11    to be true?
12         A.    I would never do that.
13         Q.    Okay.  So you don't think it's true
14    that that's a rule of general applicability, so you
15    would never present it as such in an expert report,
16    right?
17         A.    Would you ask me that a little more
18    slowly?
19         Q.    Sure.
20              MR. HENESY:  Ariella, would you mind
21    reading it back, and do me a favor, read it slower
22    than how I said?
23              (Whereupon, the referred-to question
24    was read back by the Reporter.)
25              THE WITNESS:  Okay.  I'm not going to
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2   answer that question because there are too many

 3   negatives and noes.  I will give you a statement,

 4   but I can't answer it the way it's worded to me.  I

 5   think it's a very difficult question to answer, and

 6   I would ask that it either be broken down or asked

 7   again.

 8   BY MR. HENESY:

 9        Q.    Why don't we move on.  You think,

10   Doctor, that it's irrational to place too much

11   clinical confidence in drug testing, don't you?

12        A.    Yes.

13              MR. HENESY:  We can go off the record

14   for a second.

15              (Whereupon, an off-the-record

16              discussion was held.)

17   BY MR. HENESY:

18        Q.    Have you ever presented -- so I'm going

19   to read you a sentence:  "Urine drug screens are not

20   proven to benefit patient care."  Have you ever made

21   that assertion as an expert, that urine drug screens

22   are not proven to benefit patient care?

23        A.    I don't recall specifically what I said

24   in -- previously.  However, I agree with that

25   statement.
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2         Q.    Okay.  You're aware, Doctor, that as a

 3    general matter, a definitive confirmatory test can

 4    test for different numbers of substances?

 5         A.    Yes.

 6         Q.    And you know that a definitive drug

 7    test can test for one substance, 10 substances, or

 8    even 40 substances, right?

 9         A.    My assumption is that is correct.

10         Q.    In your practice, when you're doing --

11    when you're ordering urine drug testing, you first

12    do an in-office IA test, right?

13         A.    No.

14         Q.    Whether you're asking -- in your own

15    practice, whether you're asking a lab to do a

16    confirmatory test depends on the circumstances of

17    each patient, right, in your own practice?

18         A.    Yes.

19         Q.    And you agree that most times, using a

20    less expensive and readily available screening test

21    will be sufficient when coupled with other relevant

22    data?  Most important would be a direct interview

23    with the patient, right?

24         A.    I think generally speaking, that is

25    correct.
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2          Q.     As a general matter, Doctor -- and I

3    think you used this phrase before -- you consider

4    patient care to be both an art and a science, right?

5          A.     I think that patient care is a

6    combination of art and science.  Not two different

7    things, it's a combination of art and science.

8          Q.     Fair enough.  Did you see any evidence

9    in the records that you reviewed in this case of any

10   of the practitioners making a notation that they

11   suspected that the results of the IA screen

12   contained a false positive?

13         A.     Again, I can't remember the specifics

14   of the report, so I don't recall any.

15         Q.     Certainly, there's nothing in your

16   report indicating that you identified any such

17   instance, correct?

18         A.     I don't believe there is.

19         Q.     There is, however, a discussion in your

20   report concerning your concern about potential false

21   positives in the context of IA screening, right?

22         A.     Yes.

23         Q.     But you were noting that in there as a

24   general matter.  You weren't linking that to any

25   specific evidence in this case, right?  And when I
```

Dr. James Murphy
April 27, 2023

```
 1                  Dr. Murphy
 2    say "specific evidence," I mean specific evidence of
 3    a potential false positive.
 4          A.    Correct.
 5                MR. HENESY:  You know what, this is a
 6    good time to take a break.  I'm going to leave it to
 7    the group.  We can poll the audience on how much
 8    time everyone would like.  I'm happy to take
 9    45 minutes and come back at 1:30.
10                MR. CONROY:  1:30?  Sounds good.
11                MR. HENESY:  Is that reasonable?
12                MR. CONROY:  How much time?
13                MR. HENESY:  About 45 minutes, so 1:30.
14    Is that fine?
15                THE WITNESS:  That would be perfectly
16    fine with me, yes.
17                MR. HENESY:  Okay.  See everybody at
18    1:30.  Thanks.
19                MR. CONROY:  Sounds good.
20                (Whereupon, a recess from
21                12:48 p.m. to 1:50 p.m. was taken.)
22                MR. HENESY:  Back on the record.
23    BY MR. HENESY:
24          Q.    Doctor, this is a phrase that you have
25    used on several occasions when we were talking this
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2      morning.  And you believe that the defendants in
 3      this case were utilizing what you termed as
 4      universal precautions, right?
 5          A.    Yes.
 6          Q.    Okay.  The term "universal
 7      precautions," would you agree with me, has often
 8      been used in the context of risk mitigation in
 9      opioid pain management?
10          A.    It's been used.  I don't think a lot of
11      people know about it.
12          Q.    Mm-hmm.
13          A.    But those of us who are experts in this
14      field, many of us know about it.  I certainly know
15      about it.
16          Q.    And would you agree that it's primarily
17      applicable in the context of opioid pain management?
18          A.    Yes.
19          Q.    Certainly, you would agree that a
20      physician does not have to have a diagnostic test
21      result before they issue an opioid prescription?
22          A.    Correct.
23          Q.    Now, there's -- and we're going to talk
24      about standing orders in a little while.  But in
25      your own words, can you -- as these terms are used
```

Dr. James Murphy
April 27, 2023

```
 1                       Dr. Murphy
 2    in your report, please articulate the difference
 3    between a standing order and universal precautions.
 4          A.     Yes.
 5          Q.     Please do so.
 6          A.     A standing order is one means by with
 7    you -- by which you can practice universal
 8    precautions.  A standing order, however, is also
 9    something that is used for efficiency and to
10    standardize a group's approach to caring for
11    patients, especially when there's more than one
12    practitioner involved.  So they're kind of reading
13    off the same page.
14                 And a standing order is an activity or
15    something that is done in the practice.  It could be
16    a -- taking vital signs, it could be a test you can
17    run, it can be a prescription, it can be any number
18    of things.
19                 But it has to do with the group is
20    going to do this and they don't need a specific
21    order each time they do it.  This is our policy.
22    We're going to go ahead and do this.
23                 Universal precautions is a policy or a
24    belief that you can reduce the stigma and increase
25    the sensitivity of the tests or the therapy that
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy
 2    you're giving if you apply it evenly to the whole
 3    population.
 4                     And an example that's pretty obvious to
 5    people is in the HIV epidemic.  When HIV was
 6    becoming known and it was not sure exactly how it
 7    was transmitted, it was initially thought to be
 8    primarily in the gay community.  And we found out,
 9    over time, obviously, that it was in other
10    bloodborne products, transfusions, whatever.  And
11    you couldn't really tell by looking at somebody or
12    interviewing somebody whether they were infectious.
13    We saw that with the COVID as well.
14                     Because with COVID, a lot of times, you
15    would be infectious and have no symptoms, yet we
16    would universally ask you to wear masks.  Again,
17    there's a universal precautions approach.  So
18    it's -- it can have not only beneficial effect
19    across the population, but also can reduce the
20    stigma, and particularly associated with pain
21    management and addiction as well.
22                     Whereas, you know, the individuals that
23    would come to a practice might feel that they are
24    singled out or looked down upon because they are
25    taking opioids and they're having a drug screen.  A
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    drug screen, although we can say it's therapeutic as

 3    long as we want; for the patient, oftentimes, it

 4    feels like punitive or a police sort of activity.

 5    So they feel stigmatized.  When the patient feels

 6    stigmatized, it can end up having a bad therapeutic

 7    outcome.

 8                    And, in fact, patients can end up not

 9    coming back to treatment because they feel ashamed

10    or they do feel there is a stigma or a bias

11    associated with that.

12                    So applying these policies universally

13    across everybody that comes into the clinic can

14    decrease those barriers, improve patient care, and

15    increase safety and diminish the barriers that get

16    in the way of people having effective care.

17         Q.     You would agree that best practice

18    would be to have your standing orders in writing?

19         A.     Yes.

20         Q.     And to your knowledge, there were no

21    written standing orders in this case, correct?

22         A.     I don't -- I don't recall seeing any.

23    I don't know if they existed or not.  I don't recall

24    seeing it.

25         Q.     You're not aware of the existence of a
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy
 2    written standing order in this case?
 3          A.      As I sit here now, I don't recall of
 4    any.
 5          Q.      Certainly, if you had seen a formal
 6    written standing order in the records that you were
 7    provided with, you would have included or at least
 8    made note of that in your report, right?
 9          A.      Well, I would have hoped to have done
10    that.  That would have been, again, an important
11    thing to put in my report.
12          Q.      So speaking of your report, in
13    Exhibit 1, you have this language here.  We're on
14    Page 12 of Exhibit 1.  I'm going to share my screen.
15    And I'm focusing on this paragraph here that I've
16    highlighted.
17                  And it's the -- and for your reference,
18    Page 11, this is under the section called Universal
19    Precautions of Pain Management beginning on Page 11
20    and ending on Page 12.  The last paragraph of it is
21    a -- begins with a sentence "By adopting a universal
22    precautions
23    approach..."
24                  Please read that up to and including
25    the reference citation at the end of it, and then
```

Dr. James Murphy
April 27, 2023

```
1                          Dr. Murphy
2      let me know when you're done.
3              A.      I'm done.
4              Q.      Okay.  Now, the reference at the end of
5      it is UNI.  You see that, right?
6              A.      Yes.
7              Q.      So if we go to Page 15, which was the
8      citations and we do the UNI citation, it's citing to
9      a 2005 article by Drs. Gourley and Heit, correct?
10             A.      Yes.
11             Q.      Am I saying those names correctly,
12     Gourley and Heit?
13             A.      I believe so.
14             Q.      So if we go now --
15             MR. HENESY:  And this is going to be
16     Exhibit 5.
17             (Whereupon, Plaintiff's Exhibit 5,
18     Article, was marked for identification as of this
19     date by the Reporter.)
20     BY MR. HENESY:
21             Q.      So if we go back to that language we
22     just read on Page 12, Exhibit 1.  And on the
23     left-hand side is Exhibit -- of the screen is
24     Exhibit 5.
25                     Doctor, is this the article that you
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2      were citing to in your report?

 3           A.      Yes.

 4           Q.      Okay.  And this is by Drs. Gourley,

 5      Heit, and another doctor, Almahrezi, right?

 6           A.      Yes.

 7           Q.      And if we go down to Page 5 of the PDF,

 8      it says Page 111 at the top of this page.  In the

 9      conclusion of this report, I've highlighted some

10      language.  Please read that and let me know when

11      you're done.

12           A.      I'm done.

13           Q.      Okay.  So I've put these side by side.

14      And I'm sure you know why at this point.  But you

15      would agree with me that the language that appeared

16      in your report on Page 12 that we just looked at is

17      lifted word for word from the conclusion section of

18      this article by Dr. Gourley, right?

19           A.      If not, it's very close to it.

20           Q.      You -- in reading both of these, you

21      didn't identify any differences between the

22      language, right?

23           A.      It looks to be word for word.

24           Q.      Okay.  It's certainly not paraphrased,

25      right?
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2        A.     No.  I don't think this -- this looks

 3   word for word.

 4        Q.     Okay.  Now, you consider Drs. Gourley

 5   and Heit to be renowned pain and addiction

 6   specialists.  Is that right?

 7        A.     Yes.

 8        Q.     Do you consider Dr. Gourley to be a

 9   colleague of yours?

10        A.     Yes.

11        Q.     And you've cited their work not only in

12   this report here, but in other expert reports you've

13   generated over the years, correct?

14        A.     Yes.

15        Q.     And by "their," I mean Drs. Gourley and

16   Heit.

17               MR. HENESY:  So I want to mark this as

18   Exhibit 6.

19               (Whereupon, Plaintiff's Exhibit 6,

20   Urine Drug Testing in Clinic Practice, the Art and

21   Science of Patient Care article, was marked for

22   identification as of this date by the Reporter.)

23   BY MR. HENESY:

24        Q.     Okay.  I've marked as Exhibit 6 a

25   32-page PDF document, the title being Urine Drug
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2     Testing in Clinical Practice, the Art and Science of

 3     Patient Care.

 4                  Have you ever seen this before, Doctor?

 5          A.    It does look familiar to me.  But I --

 6     yeah, I can't tell you that I've seen it before, but

 7     I may have.

 8          Q.    So if we go down to Page 2, do you see

 9     in the top left-hand corner here, the authors of

10     this are Drs. Gourley, Heit, and one other doctor,

11     Caplan.  Do you see that?

12          A.    Yes.

13          Q.    Okay.  Are you familiar with

14     Dr. Caplan?

15          A.    No, I'm not, that I'm aware of.

16          Q.    All right.  I'm going to show you some

17     language in this report, in the introduction section

18     on Page 4 of the PDF, Page 2 of the article.  And it

19     says -- here, I've highlighted it.  It says, "Any

20     test, including UDT, must meet the basic standards

21     of medical necessity if it is to be a credible

22     element of clinical care."

23                  Do you see that?

24          A.    Yes.

25          Q.    And do you agree with that?
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2         A.     I think that is a correct statement.

 3         Q.     Let's go to Page 3.  On the bottom of

 4   Page 3 of the article, Page 5 of the PDF, I've

 5   highlighted a sentence that says, "However, the aim

 6   is not to test for every drug that is available for

 7   analysis, but to do medically necessary and reliable

 8   testing for those drugs that are most likely to

 9   impact clinical decisions."

10              Do you see that?

11         A.     Yes.

12         Q.     And do you agree with that statement?

13         A.     Almost.  I would be very close to

14   agreeing with that.

15         Q.     Further down, or on the next column

16   over, still on Page 3 of the article, Page 5 of the

17   PDF, it says, "The UDT method chosen should be a

18   function of the questions that need to be answered.

19   It is important that clinicians understand the

20   methods for UDT in order to rationalize --

21   rationally order and interpret tests."

22              Do you see that?

23         A.     Yes.

24         Q.     There's two sentences.  So in fairness,

25   let's take the first sentence.  "The UDT method
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2      chosen should be a function of the questions that

 3      need to be answered."

 4                   Do you agree with that?

 5      A.      Yes.

 6      Q.      Okay.  The second sentence:  "It is

 7      important that clinicians understand the methods for

 8      UDT in order to rationally order and interpret

 9      results."

10                   Do you agree with that?

11      A.      Yes.

12      Q.      Let's go down to Page 4.  Page 4 of the

13      article, Page 6 of the PDF, under the section called

14      Laboratory-Based Specific Drug Identification.  I'm

15      going to read this into the record.

16                   "Generally, a more definitive

17      laboratory-based procedure (eg, GC/MS, LC/MS) to

18      identify specific drugs and/or their metabolites is

19      needed in three instances:

20                   "(1) to specifically identify the drug

21      where class alone is insufficient; for example, that

22      is actually is prescribed morphine that is

23      accounting for the positive immunoassay class

24      response (rather than some other opioid or

25      cross-reacting substance).
```

Dr. James Murphy
April 27, 2023

```
 1                         Dr. Murphy

 2                "(2) to identify drugs not otherwise

 3      included in other tests."

 4                And "(3) when results are disputed by

 5      the patient (ie, contested results)."

 6                Do you see that?

 7      A.      Yes.

 8      Q.      Okay.  Do you agree with that?

 9      A.      I'm close to an agreement with how

10      that's written.

11      Q.      Okay.  What about it would you change?

12      A.      Well, I would change -- in the first

13      sentence, I would change the word "is" to "may be

14      needed."

15                "Is" is -- to me, it denotes absolute,

16      and I think there is some gray area there.

17      Q.      Okay.  So if we changed this to, "to

18      identify specific drugs and/or their metabolites may

19      be needed" in three instances, you would otherwise

20      adopt this?

21      A.      Yes.  I would add one more word,

22      though, or two more words.  May be needed in three

23      instances, and I would say "for example."  Or I

24      would say get rid of the word "three."  For example,

25      these three instances.  Because I think those are
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy

2     three very appropriate instances where you would do

3     that, but there are more as well.

4          Q.    Okay.  So you -- to the extent that

5     this sentence is saying that these are the three

6     instances in which a confirmatory test is going to

7     be necessary, you disagree with it?

8          A.    Well, there are more instances than

9     just these three, yes.  And I would be surprised if

10    somewhere in this article, there wasn't some

11    disclaimer that says this is not standard of care,

12    this is their recommendations, something of that

13    nature.  So this is not a clinical guideline.  This

14    is, I think, an opinion piece by these three

15    doctors.  So it's not hard and fast rules.

16         Q.    Right.  But it's an opinion piece --

17    you're saying it's an opinion piece by two doctors

18    who you respect and who you have previously referred

19    to as renowned pain and addiction specialists,

20    right?

21         A.    Absolutely.

22         Q.    Okay.  If we go down to -- okay.

23               You previously agreed with the

24    assertion, which is the first highlighted portion of

25    these materials, that said that any test including
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    UDT must meet the basic standards of medical

 3    necessity if it is to be a credible element of

 4    clinical care.

 5                    Here on Page 9 of the article and

 6    Page 11 of the PDF, I've highlighted a sentence that

 7    says, "To meet the basic standards of medical

 8    necessity, it is important to ask, answer, and

 9    document why the test was ordered, what results were

10    obtained, and what changes in clinical course were

11    made (if any) as a result of the test results."

12                    Do you see that?

13         A.    Yes.

14         Q.    Do you agree with that?

15         A.    Yes.

16         Q.    Let's talk about standing orders.

17    We'll go back to your report.  We'll go back to

18    Exhibit 1.  We're on Page 12 of Exhibit 1, which is

19    the beginning of the Standing Orders section.

20                    If we go back -- sorry, hang on one

21    second.  Let me just take a minute.  Let's go back

22    to Page 11 of your report.  And we're in the

23    Universal Precautions in Pain Management.

24                    And I want you to read from "Creating a

25    UDT policy that is applicable universally" -- it's
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2      the beginning of this paragraph -- all way through
 3      this citation here that says "AROP."  So please read
 4      that first section of this paragraph, and let me
 5      know when you're done.
 6           A.    I'm done.
 7           Q.    Okay.  So AROP, if we go down to
 8      Page 15, which is the citation there on Page 11,
 9      AROP is a citation to the American Society of
10      Interventional Pain Physicians, (ASIPP) Guidelines
11      For Responsible Opioid Prescribing in Chronic
12      Non-Cancer Pain:  Part 2:  Guidance Pain Physician.
13      It's a long title.
14                    Do you see that?
15           A.    Yes.
16                    (Whereupon, Plaintiff's Exhibit 7,
17                    Article from the ASIPP, was marked for
18                    identification as of this date by the
19                    Reporter.)
20      BY MR. HENESY:
21           Q.    I have marked now Exhibit 7 which is --
22      if you take a look at this, Doctor, this is the
23      article we just looked at, right, from the ASIPP?
24           A.    Yes.
25           Q.    And if we go down -- and this is a
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    50-page PDF, but we're going to look at particular

 3    sections of it.  If you go to Page 10, the bottom of

 4    Page 10, and I'm going to put this -- what I'll do

 5    is I'll put this side by side.  It's our previous

 6    article.

 7                    We're back on Page 11 of your report in

 8    Exhibit 1 with the language you just read, beginning

 9    "Creating a UD- -- PT policy [sic]," ending in what

10    is -- "It is also a monitoring tool for safety."

11    I've highlighted in the ASIPP article language that

12    I'd like you to read.

13                    And when you read it, please see if

14    it's the same language that appears in your report.

15         A.    I'm done.

16         Q.    Okay.  It is the same language, right?

17         A.    It's very close.  It's almost exactly

18    the same language.

19         Q.    Okay.  And so did you read this whole

20    ASIPP article?

21         A.    No, I haven't read the entire article.

22         Q.    Okay.  It wasn't important to you?

23         A.    Well, I didn't need it to find that

24    language that I really liked and agreed with.

25         Q.    Right, because you found language in
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2   here that supported your position in this case, so
 3   that was what you read?
 4        A.    I found language that -- that I felt
 5   properly conveyed my opinions, and then I provided
 6   the reference to where it came from so that anybody
 7   can go back, like you did, and see where it came
 8   from.
 9        Q.    Let's take a look at some other
10   language in this report.  If you go down to Page 11,
11   on the left-hand side here, it says -- I've
12   highlighted, "If a patient admits that they have
13   used an licit or illicit drug other than
14   prescriptions, and if that drug is testing positive,
15   there is no need to confirm this with laboratory
16   testing."
17             Do you agree with that statement?
18        A.    Not always.  Not in every case.
19        Q.    Oftentimes, that can be true, right?
20        A.    It depends on the circumstances.
21   That -- it depends on the physician's decision on
22   whether or not they want to accept that and how
23   they're using the drug screen in the context of
24   taking care of that patient.
25        Q.    All right.  I'm going to go back to
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2      Page 4 of your report where you list the patients

 3      you reviewed, the patient files you reviewed.  And

 4      we'll take it in order, what's in here.

 5                    The first patient you see on Page 4 is

 6      WV, right?

 7           A.    Yes.

 8           Q.    Okay.  Why don't we take a look at --

 9      okay.  So what I've marked here is -- I'll state for

10      the record that this is a 100-page PDF that was

11      provided to me from Mr. Hewitt and was represented

12      to me as the materials reviewed by the witness

13      inasmuch as patient files are review -- were

14      concerned, and in particular, the patient files that

15      were referenced in the witness's report.

16                    So I'll zoom in a little bit.  Doctor,

17      can you see what I've marked here as --

18                    MR. HENESY:  This is Exhibit 8.

19                    (Whereupon, Plaintiff's Exhibit 8,

20      Medical reports, was marked for identification as of

21      this date by the Reporter.)

22           A.    I see a record in front of me.

23           Q.    I just want to make sure that you see

24      it in front of the screen clearly.  I'm going to ask

25      you specific questions about it.  I'm going to
```

```
 1                      Dr. Murphy
 2   direct your attention to the middle of the page
 3   here.  It's listing a patient name W██████ V███,
 4   right?
 5         A.    Yes.
 6         Q.    And that's the WV that you reference in
 7   your report, right?
 8         A.    I don't know.
 9         Q.    Let's go back to your report,
10   Exhibit 1, Page 4.  Do you know the names of the
11   patients that you reviewed?
12         A.    Not as I sit here now, I don't know
13   their names.
14         Q.    Is there a document that might refresh
15   your recollection as to the names of the patients
16   that you reviewed?
17         A.    Possibly.  I don't know.
18         Q.    Let's look at W██████  V███ anyway,
19   since we're here.  So what I want to show you here
20   on Page 2 of this PDF is there's a series of CPT
21   codes with a description of what was provided, and
22   the date of service, and the location of the
23   service, and the amount that was charged.
24               Do you see that?
25         A.    Yes.
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2        Q.     Okay.  By the way, we've looked now at

 3   Page 1 and Page 2.  Have you ever seen this before?

 4        A.     I don't know.

 5        Q.     Doctor, there was a question I

 6   neglected to ask you.  During our lunch break today,

 7   did you discuss -- did you speak with anybody during

 8   our lunch break today?

 9        A.     Yes.

10        Q.     Who did you speak to?

11        A.     Mr. Conlin [sic].  And I also spoke

12   with my wife.

13        Q.     Do you mean Mr. Conroy?

14        A.     Mr. Conroy, sorry.

15        Q.     Okay.  And did you discuss your

16   testimony with Mr. Conroy?

17        A.     I didn't discuss it.  He said something

18   to me.

19        Q.     What did he say?

20        A.     He said something to the effect of

21   you're doing okay, or something like that.

22        Q.     And what did you say in response?

23        A.     I just -- I think I just said thanks.

24   I'm just telling the truth.  Something like that.

25        Q.     Did you ask any questions?
```

```
1                        Dr. Murphy
2        A.      No, I don't think I asked any
3   questions.  Oh, I think I asked him -- I think I
4   said, can I -- can we talk?  Can I speak with you?
5   And he said yes, it's fine.  So, you know, I know
6   that there's different rules and different lawyers
7   have different things.
8                I know enough not to talk about any
9   specifics of the case or even look things up while
10  I'm still on the stand, so there was nothing
11  material other than what I just mentioned discussed.
12       Q.      Okay.  I'm going to scroll down in
13  these records.  Let's look at these records.  We're
14  back -- I need a five-minute break.
15               MR. HENESY:  Let's take a five-minute
16  break and we'll come back just after 2:30.
17               (Whereupon, a recess from
18                2:26 p.m. to 2:33 p.m. was taken.)
19               MR. HENESY:  Back on.
20  BY MR. HENESY:
21       Q.      Back on Exhibit 8, which is this
22  100-page PDF with this patient W██████ V██.  We're
23  on Page 2.  Okay.
24               Do you see, Doctor, that on Page 2 of
25  this document, it indicates that this -- that a
```

```
 1                        Dr. Murphy
 2    trigger point injection, a lumbar ESI,
 3    epidurography, and a separate line item for
 4    fluoroscopic guidance were provided to this patient
 5    on April 3, 2019, correct?
 6         A.    Yes.
 7         Q.    Okay.  So if we go down, it says
 8    "Treating Provider's Name" on Page 3.  It says Allan
 9    Weissman.  Do you see that?
10         A.    Yes.
11         Q.    If we go down even further, okay.  So
12    now we're on Page 5 of the 100-page PDF.  At the
13    top, it says, "Accelerated Surgical Center of North
14    Jersey, LLC."  And it says "Procedure Report."
15              Do you see that?
16         A.    Yes.
17         Q.    And would you -- taking a look at this,
18    Doctor, would you agree with me that this is a
19    procedure report from a lumbar ESI under fluoroscopy
20    provided to this patient, W███████ V███?
21         A.    Yes.
22         Q.    And do you see at the top here where it
23    says "Physician," it says "Allan Weissman," right?
24         A.    Yes.
25         Q.    And it says the anesthesiologist was
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2     someone named a Marsha Copeland, right?

 3          A.    Yes.

 4          Q.    Okay.  And that the procedure report is

 5     signed towards the -- have the signature of Allan

 6     Weissman on it, right?

 7          A.    Yes.

 8          Q.    And if we go to the next page, Page 6,

 9     generally speaking, Doctor, reviewing this, this

10     appears to be the epidurography procedure report

11     from that same day, again listing Dr. Weissman as

12     the surgeon and Dr. Copeland as the

13     anesthesiologist, right?

14          A.    Yes.

15          Q.    Page 7, another procedure report.  This

16     one for bilateral trigger point injections on the

17     cervical paraspinal muscles, right?

18          A.    Yes.

19          Q.    And again listing Dr. Weissman as the

20     physician and listing Marsha Copeland as the

21     anesthesiologist, correct?

22          A.    Yes.

23          Q.    Again, all of this happening on

24     April 3, 2019, right?

25          A.    Yes.
```

```
 1                        Dr. Murphy
 2         Q.      Next page.  Certainly, Doctor, you've
 3    seen pages that look like this before, right?
 4         A.      Yes.
 5         Q.      This is, you know, a very standard
 6    looking anesthesia record, right?
 7         A.      Yes.
 8         Q.      And you see that it's dated April 3rd
 9    of 2019 with respect to this patient W████ V██.
10    Do you see that at the top right-hand corner, right?
11         A.      Yes.
12         Q.      Okay.  Do you see on this report
13    there's a section on the right-hand side for a
14    preanesthesia evaluation, right?
15         A.      Yes.
16         Q.      And you see that there's a section to
17    list any medication the patient is taking, right?
18         A.      Yes.
19         Q.      And there's nothing listed, right?
20         A.      It's -- the line is blank.
21         Q.      Okay.  There are certainly other
22    markings in the preanesthesia evaluation section,
23    right?
24         A.      Yes.
25         Q.      And so if we continue down, I want to
```

```
1                         Dr. Murphy

2    show you now, starting on Page 15, this is another

3    bill, again, with respect to W███████ V██.

4                Do you see that?

5         A.    Yes.

6         Q.    Okay.  Have you ever seen this before?

7         A.    I don't recall.  I don't recall seeing

8    it.

9         Q.    Do you recall seeing any of the pages

10   that we've looked at so far?

11        A.    I mean, not specifically.  I looked at

12   a lot of pages so I don't specifically remember

13   those pages.

14        Q.    Okay.  Now, Page -- we're going to

15   scroll down now.  Okay.  Now we're on Page 20.  And

16   do you see on Page 20 there's a toxicology test

17   requisition form?

18        A.    Yes.

19        Q.    Okay.  And at the top of the toxicology

20   test requisition form, it says Gorman, right?

21        A.    Yes.

22        Q.    Next to provider, right?

23        A.    Yes.

24        Q.    And this toxicology requisition form

25   actually indicates a number of things.  The first
```

```
 1                      Dr. Murphy
 2     thing it indicates is that -- if you look on the
 3     right-hand side here, that a point of care screening
 4     test appears to have been provided to this patient,
 5     W███████ V███, right?
 6          A.    Yes.
 7          Q.    Okay.  And you see that this is dated
 8     April 3, 2019, right?
 9          A.    Yes.
10          Q.    The same day as that procedure, or that
11     series of procedures for the report that we just
12     looked at earlier in this PDF, right?
13          A.    Yes.
14          Q.    And you see that the -- that for this
15     point of care test, it tested for 14 different
16     categories of drugs, right?
17          A.    Yes.
18          Q.    And it was negative for all 14?
19          A.    Yes.
20          Q.    And you -- we've touched on this
21     throughout our discussion today, you understand that
22     a point of care test is going to use IA technology
23     that's similar to an IA test that's done in a lab,
24     right?
25          A.    Yes.
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2        Q.      And it's going to give you a binary

 3   positive/negative reading for classifications of

 4   drugs rather than specific drugs, right?

 5        A.      It can give you specific drugs.

 6        Q.      Okay.  For instance, this is listing --

 7   well, give me an example of what you see on here of

 8   what you would say is a specific drug result.

 9        A.      BUP, buprenorphine.

10        Q.      THC?

11        A.      THC is -- is just the chemical THC.  So

12   it would not be a specific drug.

13        Q.      Certainly, it's oftentimes indicative

14   of marijuana, but I take your point.  Fine.

15               But as a general matter, the point of

16   care test is certainly less precise than an LCMS

17   test?

18        A.      Correct.

19        Q.      Now, you see that this patient was

20   given a point of care test and it was negative

21   across the board, but it's checked off in Section B

22   on the left-hand side for the lab to do a screen

23   qualitative testing for, depending on how you're

24   defining it, either nine or ten drug categories,

25   right?
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2        A.     Yeah.  There's a check mark there to --

 3   it says screening all with validity.  And then it

 4   gives the medications there.  And they're slightly

 5   different than on the POCT screening.

 6        Q.     Certainly significant overlap, though?

 7        A.     Yes.

 8        Q.     In addition, this toxicology test

 9   requisition form indicates that a confirmation for

10   quantitative results is being requested as well.

11   And it says -- next to it, it says "confirm all."

12               You see that, right?

13        A.     Yes.

14        Q.     Okay.  You also see that the individual

15   filling out this form has the ability to check off

16   individual drug categories in the confirmation

17   section of the form, right?

18        A.     Yes.

19        Q.     They could ask for a confirmation of

20   just amphetamines, right?

21        A.     Yes.

22        Q.     They could ask for a confirmation of

23   just opioids and opiates, right?

24        A.     Yes.

25        Q.     And so on and so forth.  They could
```

Dr. James Murphy
April 27, 2023

```
1                        Dr. Murphy

2      also ask for a confirmation of just those substances

3      that come up positive on the screen, right?

4              A.     It's not exactly the same.  For

5      example, I don't see cocaine metabolite down on the

6      confirmation.  I just see illicits.  So that could

7      be what it is, but it's -- they're not exactly the

8      same, but they're close.

9              Q.     Well, so -- but you see on the

10     left-hand side, the first box on the top left-hand

11     corner of the confirmation of the form says "Confirm

12     positive screening results."  You see that, right?

13             A.     Yes.

14             Q.     Have you ever seen one of these forms

15     before we started looking at it just now?

16             A.     Do you mean this exact form?

17             Q.     Let's talk about this first.  Have you

18     ever seen this exact form before?

19             A.     I don't remember if I saw this exact

20     form or not.  I probably did.  It's in the records,

21     but I don't recall seeing it.

22             Q.     Okay.  But you had seen forms in --

23     that look like this?

24             A.     In general?  In my practice?

25             Q.     No, in connection with this case.
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2        A.     I am assuming I did.  I looked at the

 3   records.  If they're in the records, I saw them,

 4   probably.  I don't remember exactly what I looked at

 5   sitting here right now.

 6        Q.     Okay.  So there's a box on the

 7   right-hand side here that says "Medical

 8   necessity," and it gives four different

 9   justifications and then a line to fill in another

10   justification that isn't listed.

11               Do you see that?

12        A.     Yes.

13        Q.     You see that's completely blank, right?

14        A.     Yes.

15        Q.     So looking at just this form -- well,

16   let's do it this way.  Looking at this form, you're

17   unable to tell why this patient was getting both a

18   qualitative and quantitative urine screen, right?

19        A.     I can't see a specific reason except

20   that the practitioner ordered it.

21        Q.     Okay.  Well, let's talk about that.  At

22   the bottom here, there's a section E that says

23   "Practitioner Authorization."  Can you see that?

24        A.     Yes.

25        Q.     Okay.  And it says -- a line that says
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2      "Ordering Physician Signature."  Do you see that?

 3           A.    Yes.

 4           Q.    And you see that it is blank, right?

 5           A.    Yes.

 6           Q.    And so refreshing your recollection

 7      that it's Dr. Gorman's name at the top of the form,

 8      do you recall earlier this morning, we looked at

 9      some testimony from Dr. Gorman or we discussed some

10      testimony from Dr. Gorman wherein he indicated that

11      if a requisition form wasn't signed, that he did not

12      order the test, right?

13           A.    I remember you saying that.

14           Q.    Well, I mean, I'm saying it to you

15      today.  But you remember that Dr. Gorman testified

16      to that under oath, right?

17           A.    Only that you told me today.  I mean, I

18      don't remember -- I looked at his -- the testimony,

19      but I don't remember exactly what it was sitting

20      here today.

21           Q.    Sure, let's go back.  Exhibit 2.  I'm

22      going to highlight in Exhibit 2.  We're on Page 42,

23      Lines 14 to 22.

24                "QUESTION:  Just so that I understand

25      your testimony, if a lab referral doesn't have your
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2      signature on it, you would deem that to be

 3      unauthorized?

 4                  "ANSWER:  If a lab referral doesn't

 5      have my signature, then I didn't order it.

 6                  "QUESTION:  Even if at the top of the

 7      referral, it had your name on it?

 8                  "ANSWER:  No.  Prescriptions have to be

 9      signed."

10                  You see that, right?

11          A.    Yes.

12          Q.    So now going back to this document, we

13      have Dr. Gorman's name at the top of a toxicology

14      test requisition, but he didn't sign it.  And he

15      said under oath that if he didn't sign it, he didn't

16      order it.  He didn't authorize it.  This is an

17      unauthorized test, isn't it?

18          A.    No, not necessarily.

19          Q.    So you believe that Dr. Gorman

20      authorized this test?

21          A.    No, I don't know whether he authorized

22      it or not.

23          Q.    Well, based on his testimony -- assume

24      for a second that Dr. Gorman was telling the truth

25      when he said if his signature wasn't on the form, he
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2   didn't authorize it.  I'll ask my question again.

 3              Assuming that is true, this is an

 4   unauthorized test?

 5        A.     Not necessarily.

 6        Q.     Okay.  So you see evidence on this form

 7   before you that Dr. Gorman authorized this test?

 8        A.     Yes.

 9        Q.     What -- show me the evidence on this

10   form that Dr. Gorman authorized the test.

11        A.     His name under "Provider."

12        Q.     Let's go back to his testimony.

13              "QUESTION:  Even if at the top of the

14   referral, it had your name on it?

15              "ANSWER:  No.  Prescriptions have to be

16   signed."

17              Okay.  Let's go back.  His name is on

18   the top of the form and it is not signed, and your

19   evidence that this is an authorized test was that

20   his name is at the top of the form?

21        A.     I believe that is evidence that it's

22   authorized, yes.

23        Q.     Okay.  Besides his name being on the

24   top of the form, tell me the other evidence you see

25   on this document to indicate to you that this is an
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2   authorized test.
 3        A.    There's a diagnosis code on the top
 4   right, and I'm not sure what they mean, but they
 5   probably mean something that helps with the
 6   diagnosis.  So that would be part of the
 7   authorization.
 8        Q.    Okay.  So because there are two check
 9   boxes under diagnosis codes, that indicates to you
10   that Dr. Gorman authorized this test?
11        A.    No.
12        Q.    All right.  I'm asking you, Doctor --
13   let's make sure that my question is clear.  I'm
14   asking you, looking at this document, to tell me the
15   evidence that you see -- besides his name being at
16   the top of the form, the evidence you see that this
17   test was authorized by Dr. Gorman.
18        A.    By Dr. Gorman, the evidence that I see
19   that -- by Dr. Gorman is his name at the top.
20        Q.    Right.  And besides that, there is no
21   evidence on this document that Dr. Gorman authorized
22   this test?
23        A.    No, not on this document.
24        Q.    Let's go to the next page.  The next
25   page is the first page of -- well, do you recognize
```

Dr. James Murphy
April 27, 2023

```
 1                         Dr. Murphy

 2    this?  What's on Page 21 here?

 3            A.     It's a lab report, a drug screen

 4    report.

 5            Q.     Have you ever seen it before?

 6            A.     Possibly.  I don't recall specifically

 7    seeing it.

 8            Q.     Do you see that the collection date

 9    listed on the top of this report is listed as

10    April 3, 2019, right?

11            A.     Yes.

12            Q.     And that was the date of those

13    procedures that we just looked at, right?  The ESI,

14    the TPI, the epidurography, the fluoroscopy, that

15    was all April 3rd, right?

16            A.     Yes.

17            Q.     Do you see that under "Collection

18    Date," it says "Receive Date" of April 4, 2019,

19    right?

20            A.     Yes.

21            Q.     And that indicates to you that's the

22    date the lab received the sample, right?

23            A.     That's how I interpret that.

24            Q.     And then the next line is "Test Report

25    Date":  April 5, 2019, right?
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy

2         A.    Yes.

3         Q.    Now, on this report, two sets of

4    results are listed.  You would agree with me that

5    the first set of results that are listed are the

6    qualitative screen -- the IA screen results that

7    were on the requisition form.  You see that, right?

8         A.    To answer your question, do I see that,

9    I see what you just pointed out to me.

10        Q.    Okay.  Do you interpret that as the

11   results of the IA screen?

12        A.    I don't see where it says what it is.

13        Q.    Okay.  So as you sit here, you don't

14   know what this is?

15        A.    It says "Drug Screen Result."

16        Q.    Okay.  But I'm asking you, does this

17   look like the results of an IA screen?

18        A.    It looks like the results of an IA

19   screen.

20        Q.    But you're not sure?

21        A.    Based on what I'm reading here, I'm not

22   sure.

23        Q.    If we go down, on the next page, it's

24   Page 22.  And I'll scroll through it quickly just to

25   show you what I'm talking about.  Page 22, 23, and
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy
2    24.  Those are -- do you recognize what those
3    results are?
4         A.    It's more drug screen results.
5         Q.    Okay.  Do you know what kind of screen
6    it was?
7         A.    Yes.  It's LCMS.
8         Q.    I just want to talk about a couple of
9    these categories.  The category that's on Page 24
10   here that I'm highlighting is SSRI confirmation.
11              You see that, right?
12        A.    Yes.
13        Q.    You know SSRIs to be, you know, some of
14   the commonly prescribed antidepressants that are
15   available by prescription, right?
16        A.    Yes.
17        Q.    And you -- and if we go to the bottom
18   of Page 23 where it says "sleep aids confirmation"
19   and then the next line down, there's two more lines
20   of "sleep aid confirmation."  These are commonly
21   prescribed sleep aids, Zolpidem probably being the
22   most common, right?
23        A.    Yes.
24        Q.    When you order a drug screen at your
25   practice, do you order a confirmation screen for
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    SSRIs and sleep aids every time?

 3         A.    No.

 4         Q.    You make that determination based on

 5    the circumstance of every patient, right?

 6         A.    Yes, and my personal clinical judgment

 7    as well.

 8         Q.    Actually, do you recall ever ordering a

 9    drug screen, an LCMS drug screen, for sleep aids or

10    SSRIs?

11         A.    Yes.

12         Q.    How frequently do you do that?

13         A.    I haven't done it in a while.  But I

14    think I recall that back a few years ago, they kind

15    of included them in the panel that they were

16    running.  And I'm not sure I even specifically

17    remember ordering them, but I order a panel that has

18    a number of drugs on there.

19              And they have a -- the companies have

20    it set up to run these -- you know, a certain panel

21    of them.  And so it's added on with the panel.  It's

22    for completeness sake.

23              So I'm certain -- because I remember

24    seeing reports of SSRIs and things of that on

25    patients in the past the tests that I've ordered.
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2     But it's not something that I tend or I can even

 3     remember specifically ordering as individual drugs.

 4          Q.     When you order your drug screens and

 5     your lab-based drug screens like LCMS or gas

 6     chromatography, do you order them from one of the

 7     larger commercial labs?

 8          A.     It depends on the patient's insurance

 9     and their preference and where they're located.  It

10     varies.  I try to work with the patients to make

11     sure it's convenient for them, if I can, to have it

12     done.  And if the insurance can cover it, if

13     possible.  It varies.

14          Q.     You're cognizant of not, you know,

15     causing the patient to incur an expense in this

16     regard?

17          A.     It's important to me that they can

18     afford it or that -- we factor that in to my

19     decision making, yes.

20          Q.     All right.  So the reason I asked you

21     about this test report date is that it's April 5,

22     2029 [sic], which is two days after the procedure

23     that was done.

24                    That timing, Doctor, that the results

25     were not made available until two days after the
```

Dr. James Murphy
April 27, 2023

```
1                     Dr. Murphy
2     procedure is done, wouldn't you agree that that --
3     in reviewing these documents, that rules out as a
4     possible justification for the urine screen, that
5     the urine screen was done to see if the patient was
6     a candidate for the procedure?
7          A.     If the results are not available to --
8     after the procedure, then you can't use those
9     results to determine if a patient is a candidate for
10    that procedure.  But you can use them going forward
11    in case of future procedures.
12               And oftentimes, these procedures are
13    done in procedures of two or three, so it would
14    helpful to understand.  Also, if a patient were to
15    have a reaction at some point to maybe a local
16    anesthetic that I gave during the procedure or the
17    anesthesia they got, in determining why they had the
18    reaction, understanding what the drug screen showed
19    would help in that determination as well.
20          Q.     Okay, fine.  But my question
21    specifically was the April 3rd procedure, the fact
22    that that patient was getting a procedure that
23    specifically happened on April 3rd could not
24    possibly serve as a justification for this urine
25    screen where the results were not available until
```

Dr. James Murphy
April 27, 2023

```
1                    Dr. Murphy
2      April 5th.  We can agree on that?
3           A.     No, no.  There could be a very good
4      reason why they got the drug screen on that day.
5           Q.     You think there's a good reason that
6      a -- results that were available on April 5th can
7      determine whether or not a patient was retroactively
8      a good candidate for a procedure that happened two
9      days earlier?
10          A.     No.
11          Q.     Okay.  Thank you.  I also want to show
12     you on Page 25, 26, and 27 -- do you recognize these
13     pages?  25, 26, and 27?
14          A.     Not specifically, no.
15          Q.     Do you see here, though, that there's a
16     section of this document that says "Historical
17     Results Confirmation"?  Do you see that?
18          A.     Yes.
19          Q.     And you see that approximately two
20     weeks before the April 5th results were reported for
21     this patient, another set of -- another confirmatory
22     panel of all of these same drugs was run on the same
23     patient, right?
24          A.     It seems to be that is the case, yes.
25          Q.     So I want to show you -- and you can
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2      look, but I'm going to represent to you that next to

 3      each one of these drugs for both the March 18th

 4      confirmatory and the April 5th confirmatory panel,

 5      negative for every single drug across the board.

 6                    So I want to freeze a moment in time

 7      then.  If we go back to the requisition form, right,

 8      I want to freeze it a couple of moments in time.

 9      This requisition form is dated April 3rd.  At this

10      point, the March 18th report -- the March 18th

11      confirmation test has been run and the patient was

12      negative for every single drug that was tested for

13      on the highly sensitive and accurate LCMS test.  The

14      patient gets another point of care test that's

15      negative across the board.

16                    At that point, it certainly seems like

17      this patient is not on any medications or drugs,

18      right?

19            A.      Not necessarily.

20            Q.      Okay.  Then in the April 3rd -- in the

21      April 5th report, it's another test across the

22      board.  And another full confirmatory test across

23      the board, negative across the board.

24                    Okay.  And at this point, certainly,

25      you would agree with me that there's no reason to
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2   believe that this patient is on any drugs or

 3   medication?  Or let me rephrase that, any drugs or

 4   medication that were tested for?

 5        A.     There's no evidence here that they were

 6   on those drugs.

 7        Q.     And certainly no reason to suspect it

 8   if you were reviewing this, right?

 9        A.     Correct.

10        Q.     Okay.  Let's go to this page here,

11   which is Page 37 of this PDF.

12               Can you see that clearly, Doctor?

13        A.     Yes.

14        Q.     Okay.  Do you recognize this form?

15   When I say "recognize this form," do you recognize

16   the health insurance claim form 1500?

17        A.     Yes.

18        Q.     Okay.  Is this the form you use for

19   your billing?

20        A.     I used to use this form.  We've used it

21   many, many times.

22        Q.     Clearly, this is the form that you're

23   going to use for a federal payer, right?

24        A.     I believe that is correct, yes.

25        Q.     So do you see on the top left-hand
```

```
1                          Dr. Murphy
2      corner here, there's a patient named J███ V███?
3           A.    Yes.
4           Q.    Do you see that?
5           A.    I do, yes.
6           Q.    Is this one of the records that you
7      reviewed as part of your review in this case?
8           A.    I don't know.
9           Q.    So I want to go down and just scroll
10     through this.  So it starts on Page 37.  38 is an
11     additional claim form.  39 is an additional claim
12     form.  I'll represent to you that these are all the
13     same dates of service of November 20, 2018.  Okay.
14               And so now we go to another one of
15     these Ridgewood Diagnostic Laboratory reports,
16     right?  This looks like the one we just looked at.
17          A.    Yes.
18          Q.    And this is another one ordered by
19     Dr. Gorman?
20          A.    It says the provider is Dr. Gorman.
21          Q.    Right.  Okay.  Certainly, if we look
22     through this -- that's the end of the record, on
23     Page 47.
24               So from Page 34 to 47 -- excuse me, 37
25     to 47, are these -- is bills and then a toxicology
```

```
 1                       Dr. Murphy

 2   report from Ridgewood Diagnostic Laboratory for J█████

 3   V█████.  Test report -- collection date of

 4   November 20th, test report date of November 27,

 5   2018.

 6                  Looking at this document, Doctor,

 7   there's certainly no indication in this document as

 8   to why this test was ordered, right?

 9        A.      Can I see the very bottom of it there?

10   Scroll up.

11        Q.      Tell me -- here?  (Indicating.)

12        A.      Yes, thank you.  Yes, I don't see an

13   indication on this form as to why the test was run.

14        Q.      And so to the -- you know, even if this

15   were one of the records that you reviewed as part of

16   your analysis, it would not be enlightening inasmuch

17   as giving you information about why this test was

18   ordered and the circumstances under which the test

19   was ordered, right?

20        A.      This one piece of paper would not.

21        Q.      Well, I mean, I'm talking about this

22   whole report.  You can look at all the pages if you

23   think there is something in here.  We just scrolled

24   from Page 42 to 43.

25        A.      I see nothing on that page.
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2         Q.     Okay.  Next page, 44.

 3         A.     I see nothing on that page.

 4         Q.     Okay.  45.

 5         A.     I see nothing on that page.

 6         Q.     46.

 7         A.     I see nothing on that page.

 8         Q.     47.

 9         A.     I see nothing on that page.

10         Q.     Okay.  All right.  So Page 50 is a very

11   faded document, but it's a faded version of the

12   health insurance claim form 1500.  But I want to go

13   down.  You recognize the boxes on the bottom of the

14   1500 form list the service provider and the billing

15   provider for the particular service.

16                You're generally familiar with that?

17         A.     Yes.

18         Q.     Okay.  And it's listing an entity

19   called Metropolitan INT Medical Services PC.

20                Do you see that?

21         A.     Yes.

22         Q.     Are you familiar with Metropolitan?

23         A.     I don't recall what Metropolitan is.

24         Q.     Are you offering an opinion in this

25   case concerning any of the services provided or
```

```
1                        Dr. Murphy
2      billed through Metropolitan?
3            A.    I'm sorry.  I'm offering services --
4      I'm offering opinions on the medical necessity and
5      appropriateness of the drug screens.
6            Q.    Right.  So I'm just making sure, you're
7      not offering an opinion about services provided
8      through an entity called Metropolitan Intervention
9      Medical Services PC, correct?
10           A.    Well, I was given a group of records
11     and I looked through them.  And in that group, I did
12     not see any drug screenings that I felt were not
13     medically necessary.  So whatever ones were in
14     there, I don't recall specifically seeing
15     Metropolitan Internal Medicine Services on there,
16     but they may have been.
17           Q.    This particular page, 5, of this
18     document, have you ever seen this before?
19           A.    I don't recall seeing that faded
20     document, no.
21           Q.    Well, do you recall reviewing records
22     with respect to a patient named I█ E█████?
23           A.    I don't recall their specific names.
24           Q.    Okay.  Now we are on Page 60.  Page 60
25     is a document where, at the top, it says Riverside
```

```
 1                          Dr. Murphy
 2      Medical Services, and it says "Initial Comprehensive
 3      Medical Examination."  Do you see that, Doctor?
 4              A.      Yes.
 5              Q.      And it lists a patient M████  R███████?
 6              A.      Yes.
 7              Q.      Have you ever seen this document
 8      before?
 9              A.      I don't know.
10              Q.      All right.  Was M████  R███████  one of
11      the patients you reviewed medical records for?
12              A.      It could have been.  I don't
13      specifically recall right now.
14              Q.      So I want to go through just a few
15      things on this document, Doctor.  Do you see it
16      says, "Initial Comprehensive Medical Examination"?
17      And generally speaking, you see that this document
18      includes some handwritten notations on what appears
19      to be a template for a patient exam, right?
20              A.      Yes.
21              Q.      Okay.  For this patient M████
22      R█████.  And you see here it's listed as May 30,
23      2019, next to date of initial examination, right?
24              A.      It could be 31 or 35.  It's 5/3,
25      something, 19.
```

Dr. James Murphy
April 27, 2023

```
 1                     Dr. Murphy

 2        Q.     I think we can probably agree it's not

 3   May 35th, right?

 4        A.     Well, I see a squiggle there.  So I

 5   would be -- it would be a mistake if it said May

 6   35th.

 7        Q.     That was a joke that does not translate

 8   well on transcripts.  So that was a poor attempt at

 9   a joke.

10             So -- and you see here DOA.  You know

11   that's date of accident.  And that says May 29,

12   2019, right?

13        A.     Well, there's two dates there.  One

14   looks like it's 5/29/19, and then below it, 5/20 --

15   it looks like it was 5/28 and then changed to 5/29.

16   It would appear -- I would interpret that as

17   5/29/19.

18        Q.     Okay.  So if we're -- if you're

19   assuming for purposes of this discussion that that

20   says May 30, 2019, as the date of the exam, this is

21   an exam that was done the day after or maybe even

22   two days after an accident, right?

23        A.     Yes.

24        Q.     Okay.  Do you see that there's some

25   patient history listed here, right?
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2        A.    Yes.

 3        Q.    And then you see some subjective

 4   complaints, right?

 5        A.    Yes.

 6        Q.    Additional subjective complaints on the

 7   next page, 61, right?

 8        A.    Yes.

 9        Q.    Okay.  We're on Page 62.  Do you see

10   the beginning of a past medical history, right?

11        A.    Yes.

12        Q.    And do you see there are two diseases

13   listed on past medical history?  Do you see that?

14        A.    Yes.

15        Q.    It certainly looks like -- well, let me

16   tell you what it looks like to me and you tell me if

17   you agree.  It looks to me like hypertension and

18   diabetes.  Do you agree?

19        A.    Yeah, HTM to me means hypertension.

20   And it appears to me it says DM, like a little two.

21   So probably Type 2 diabetes.

22        Q.    And then it lists two medications,

23   which might actually inform our interpretation of

24   diseases, because there's a medication called

25   metformin and a medication called losartan.
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy
 2              Do you recognize those as diabetes and
 3      hypertension drugs?
 4          A.    Yes.
 5          Q.    Okay.  So now, given those two points,
 6      it certainly looks like diabetes and hypertension
 7      for this patient, right?
 8          A.    Yes.
 9          Q.    Okay.  Let me go further down.  We see
10      some objective findings here, right?
11          A.    Yes.
12          Q.    Okay.  We'll go down onto Page 64, some
13      more objective findings and measurements, right?
14          A.    Yes.
15          Q.    65, more objective findings and
16      measurements, right?
17          A.    Yes.
18          Q.    Okay.  66, we see a series of diagnoses
19      that are checked off, right?
20          A.    Yes.
21          Q.    Okay.  67, we get a treatment plan.
22      That includes physical therapy, physical capacity
23      evaluation, computerized range of motion, manual
24      muscle testing, an outcome assessment test, and
25      MRIs, right?
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2        A.    That would appear to be the case.  I'm

 3    not sure what MMT means, but everything else sounds

 4    reasonable.

 5        Q.    Number 8, you also see that it looks

 6    like the practitioner doing this exam is

 7    recommending -- "because of the persistence of

 8    symptoms despite any active treatment, it's

 9    recommended that the patient get electrodiagnostic

10    testing on the upper and lower extremities and the

11    paraspinal."  (As read.)

12              You see that, right?

13        A.    Yes.

14        Q.    Okay.  Finally, on Page 68, you see

15    that in addition to all of the services recommended,

16    this patient is prescribed a cervical collar, a

17    cervical pillow, a lumbar support orthosis, a

18    heating pad, an orthopedic lumbar cushion, an

19    orthopedic car seat, a TENS unit, and a massager.

20              You see all that, right?

21        A.    Yes.

22        Q.    I hope they have a big trunk in their

23    car.  And after that, it says "Medications

24    Prescribed."  Do you see that it says

25    over-the-counter acetaminophen, 650 milligrams every
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    six hours as needed, right?
 3         A.    Yes.
 4         Q.    So we have a patient who is examined
 5    between 24 and 48 hours after their accident who is
 6    prescribed a course of conservative therapy, and is
 7    prescribed an over-the-counter -- well, not
 8    prescribed.  They were really recommended to get
 9    over-the-counter Tylenol, 650-miligram Tylenol, and
10    to take it as needed.
11              Certainly on this form, Doctor, you
12    haven't seen anything to suggest that the individual
13    performing this examination was considering
14    prescribing an opioid?
15         A.    I didn't see anything.
16         Q.    You -- we didn't see anything on this
17    exam report that would indicate that the
18    practitioner performing the examination was
19    requesting a urine toxicology screen, right?
20         A.    I didn't see anything.
21         Q.    Much less any reason why the toxicology
22    screen would need to be ordered, right?
23         A.    Well, there is reason.
24         Q.    No, no.  As noted -- is there, I am
25    ordering a urine toxicology screen because?  It
```

```
1                     Dr. Murphy
2    doesn't say anything like that, right?
3         A.      Correct.
4         Q.      Okay.  Now, the next page is Page 70
5    that we're looking at.  And this is a May 30th
6    toxicology test requisition form for M█████
7    R██████, right?
8         A.      Yes.
9         Q.      And despite the fact that the
10   patient -- that there's no indication that a course
11   of opioid was being considered, despite the fact
12   that this patient was between 24 hours and 48 hours
13   after the accident, despite the fact that they were
14   not reported as taking any controlled substances,
15   and despite the fact that they were not prescribed
16   any controlled substances, do you see that this
17   toxicology test requisition requests an IA
18   qualitative screen and an LCMS confirmation for all
19   of the drug categories listed on the form, right?
20        A.      Yes.
21        Q.      And again, nothing listed on this form
22   to indicate to you why the practitioner ordered that
23   testing?
24        A.      Well, there's diagnosis codes.  And I'm
25   not sure.  I would need to look those up to see what
```

Dr. James Murphy
April 27, 2023

```
1                   Dr. Murphy
2      they mean.  But the diagnosis codes are there,
3      generally, to explain why they're getting the test.
4      So we'd have to look up those codes.
5           Q.    So you think the diagnosis codes with
6      respect to, you know, an injury that was, at most,
7      48 hours old would justify, for instance, a
8      quantitative LCMS test or SSRIs?
9           A.    I have to see what those codes say.
10     I'm not saying those codes would.  But generally --
11     they checked those codes, so that's usually why they
12     check them.  But there's no -- nothing written on
13     this form other than that that would tell me on this
14     form why they're having the drug screening.
15          Q.    Pages 71 through 77 are the results of
16     the drug screen.  All right?
17               MR. HENESY:  Okay.  Let's take five
18     minutes.  We will come back.  We have got just a
19     little bit more to go, okay?
20               (Whereupon, a recess from
21               3:24 p.m. to 3:39 p.m. was taken.)
22     BY MR. HENESY:
23          Q.    We're still on Exhibit 8 on Page 80.
24     Doctor, do you see on Page 80 here, we have a
25     Riverside Medical Services initial comprehensive
```

```
 1                        Dr. Murphy
 2    medical exam for a different patient.  It looks --
 3    if we go down, it looks a little unclear.
 4                   It looks like S█████ A█████, right?
 5         A.    Yes.
 6         Q.    Okay.  Is this one of the patients
 7    whose files you reviewed?
 8         A.    Again, I don't know the names of the
 9    specific patients right now.
10         Q.    So this is an example that looked like
11    it happened on September 3, 2019, right?
12         A.    Yes.
13         Q.    Okay.  From an accident of August 30,
14    2019, right?
15         A.    Yes.
16         Q.    I'm going to skip through the
17    subjective and objective findings.  I want to focus
18    on the past medical history here on Page 82.  This
19    is a patient who you see denies any history of
20    disease, right?
21         A.    Yes.
22         Q.    Is taking Advil as needed, right?
23         A.    That's Motrin, ibuprofen.
24         Q.    Ibuprofen.
25         A.    Generic, yeah.
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2          Q.     Generic Motrin as needed, right?

 3          A.     Yes.

 4          Q.     Denies smoking, alcohol, or drug abuse,

 5   right?

 6          A.     It just says "denies smoking."  I think

 7   it says "denies."  It says -- it looks like

 8   occasional ETOH for alcohol.

 9          Q.     Right.

10          A.     And denies drug abuse.

11          Q.     Right.  And if we go down through this,

12   under additional objective findings and diagnoses,

13   and if we get down to Page 88, do you see that

14   there's a recommendation that this patient

15   essentially continue to take over-the-counter Motrin

16   as needed, right?

17          A.     Yes.

18          Q.     So no -- they didn't come in to present

19   to the doctor or examining practitioner taking any

20   controlled substances and is not prescribed any

21   controlled substances, right?

22          A.     Correct.

23          Q.     And it doesn't say anything on here

24   that the patient is being considered as a candidate

25   for a controlled substances prescription, right?
```

```
                              Dr. Murphy
1
2          A.      I didn't see anything.
3          Q.      All right.  In your opinion, Doctor --
4    when is pain chronic, in your opinion?
5          A.      In my opinion, it's when the pain
6    persists -- either two things, either beyond the
7    healing process or more than three months.  And I
8    think that would depend upon the circumstances what
9    I would ascribe to a patient.  But those are the two
10   descriptive elements that I look at in determining
11   chronic pain.
12         Q.      Certainly, we see this exam happened
13   within a week of the underlying accident.
14   Certainly, this is not a person who is -- at this
15   point, you would characterize this as being chronic,
16   right?
17         A.      Not from the accident, no.
18         Q.      Right.  Okay.  To the extent that we're
19   talking about injuries causally related to the
20   accident.  Okay.  So if we go down, do you see --
21   we're now on Page 90.  We've got another toxicology
22   test requisition form for this patient S███████
23   A█████.  And do you see up here on the left-hand
24   side, there's a date of September 3, 2019, right?
25         A.      Yes.
```

Dr. Murphy

1

2       Q.      Okay.  This patient gets that same full

3    IA screen and full LCMS test that we've now seen

4    repeatedly on these forms, right?

5       A.      Yes.

6       Q.      And we see, again, there's a box for

7    medical necessity to the ordering practitioner -- or

8    really, anyone -- to check off or indicate the

9    justification that they see for ordering testing of

10   this breadth and scope, and you see that it's blank,

11   right?

12      A.      Yes.

13      Q.      There was no indication in anything

14   that we just saw where the practitioner, with

15   respect to S████ A████, indicated that they were

16   ordering a urine drug screen for a specific reason?

17      A.      Again, the only place I could see

18   something like that would be under the diagnosis

19   codes.  In this case, there's four that are on the

20   form.  It would appear that all four of them have

21   been checked on this patient.

22      Q.      Besides that, though, nothing else,

23   right?

24      A.      I didn't see anything else.

25      Q.      And certainly, in any of the documents

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    that we've looked at, there would be no explicit

 3    notation in any of these records, a spelled out

 4    reason of why the urine screens were ordered in the

 5    first place, right?

 6         A.    In the records we've just gone over,

 7    those patients, I didn't see anything, except for

 8    the diagnosis codes that we talked about being

 9    checked on the top right-hand corner of the

10    toxicology test requisition.

11         Q.    The other thing that we didn't see in

12    those records that I just showed you was anything

13    beyond a single date of service during which the

14    patient would have been with a practitioner.

15              So in other words, we saw records where

16    -- you know, in the last two that we looked at, we

17    saw two records, two sets of records for two

18    patients who received an initial exam.  And at the

19    conclusion of the official exam or on the day of the

20    initial exam, there's a toxicology test requisition

21    form that's filled out for a urine screen for an IA

22    and LCMS screen.

23              Certainly, we haven't seen any

24    documentation here in these records that we just

25    looked at to indicate that the results of these
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy

 2    urine screens were reviewed by the ordering

 3    practitioner, correct?

 4         A.     Not in what you just showed me.  I

 5    didn't see anything.

 6         Q.     We didn't see anything in what we just

 7    looked at in that Exhibit 8 that would indicate that

 8    the results of the urine drug screens that were

 9    ordered were ever discussed with the patient, right?

10         A.     I did not see that in these notes.

11         Q.     We didn't see anything in those records

12    that would indicate that -- we didn't see anything

13    in those records to indicate that the results of the

14    urine drug screens were incorporated into a

15    treatment plan in any way, right?

16         A.     I did not see language to that effect.

17         Q.     In any of the materials that you

18    reviewed in connection with this case, did you see

19    an indication -- a notation in any medical records

20    that the results of a urine screen were discussed

21    with the patient?

22         A.     I can't recall right now if I saw

23    anything like that.  So I can't recall.

24         Q.     Did you see anything in any of the

25    records you reviewed in connection with this case
```

Dr. James Murphy
April 27, 2023

```
 1                    Dr. Murphy
 2    that a notation that the ordering practitioner
 3    reviewed the results of the ordered urine drug
 4    screen?
 5         A.    As I sit here now, I can't recall any
 6    documentation like that.
 7         Q.    In connection with this case, did you
 8    review any documents that stated that the results of
 9    the urine drug screen were being incorporated into
10    the treatment plan for the tested patient?
11         A.    Again, I can't remember all of the
12    charts and all of the specific documents, but I
13    cannot recall seeing that.
14         Q.    And certainly, your report does not
15    indicate or reflect that in the course of your
16    review, you identified anything along the lines of
17    what we just discussed?
18         A.    I don't believe that I put that in my
19    report.
20              MR. HENESY:  Okay.  I don't have any
21    other questions for the witness.
22              Matt?
23              MR. CONROY:  No questions for me.
24    Thank you, Doctor.
25              MR. HENESY:  Thank you, Doctor.  Thank
```

Dr. James Murphy
April 27, 2023

```
1                          Dr. Murphy
2    you, Mr. Conroy.  We're reserving our rights to seek
3    additional discovery, as always.  Everyone have a
4    nice afternoon.
5
6                  (Whereupon, at 3:50 p.m., the
7    Examination of this witness was concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Dr. James Murphy
April 27, 2023

```
 1                        Dr. Murphy

 2                E R R A T A   S H E E T

 3

 4      CORRECTION        REASON FOR CHANGE        PAGE    LINE

 5      ------------------------------------------------------

 6      ------------------------------------------------------

 7      ------------------------------------------------------

 8      ------------------------------------------------------

 9      ------------------------------------------------------

10      ------------------------------------------------------

11      ------------------------------------------------------

12      ------------------------------------------------------

13      ------------------------------------------------------

14      ------------------------------------------------------

15      ------------------------------------------------------

16      ------------------------------------------------------

17      ------------------------------------------------------

18      ------------------------------------------------------

19      ------------------------------------------------------

20      ------------------------------------------------------

21      ------------------------------------------------------

22      ------------------------------------------------------

23      ------------------------------------------------------

24      ------------------------------------------------------

25      ------------------------------------------------------
```

Dr. James Murphy
April 27, 2023

```
 1                      Dr. Murphy

 2              DEPOSITION ERRATA SHEET

 3                   J U R A T

 4

 5     I declare that I have read the entire transcript of

 6     my deposition taken in the captioned matter or the

 7     same has been read to me, and it is true and

 8     accurate, save and except for changes and/or

 9     corrections, if any, as indicated by me on the

10     Errata Sheet hereof.

11

12

13

14

15     _____
                        Dr. James Murphy
16

17     Subscribed and sworn to before me

18     This_____day of_____, 2023.

19

20     NOTARY PUBLIC

21     In and for the State of_____

22

23

24

25
```

Dr. James Murphy
April 27, 2023

```
 1                       Dr. Murphy

 2                  C E R T I F I C A T E

 3
       STATE OF NEW YORK       )
 4                        :  SS.:
       COUNTY OF NEW YORK      )
 5

 6

 7         I, Ariella Vasquez, a Notary Public for and

 8    within the State of New York, do hereby certify:

 9         That the witness whose examination is

10    hereinbefore set forth was duly sworn and that such

11    examination is a true record of the testimony given

12    by that witness.

13         I further certify that I am not related to any

14    of the parties to this action by blood or by

15    marriage and that I am in no way interested in the

16    outcome of this matter.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18    this 27th day of April, 2023.

19

20                    _____

21                         Ariella Vasquez

22

23

24

25
```