UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GOVERNMENT EMPLOYEES INSURANCE
CO., et al.,

                                    Plaintiffs,

        –against–

ALEXANDR ZAITSEV, et al.,

                                    Defendants.

Docket No.: 1:20-cv-003495 (FB)(SJB)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE 56.1

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs") by and through their attorneys, Rivkin Radler, LLP respectfully submit the following Statement of Material Facts Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 as to which there is no genuine issue.

**I.    Background**

1.      Defendant Alexandr Zaitsev, M.D. ("Zaitsev") was, at all relevant times, a resident of New Jersey and licensed to practice medicine in both New York and New Jersey. *See* Zaitsev Deposition ("Zaitsev Dep."), 9:22-25; 67:8-12; 68:21-69:4 (Declaration of Steven T. Henesy ("Henesy Decl."), Ex. "3").

2.      Financial Vision Group, L.L.C. ("Financial Vision") purports to be an accounts receivable advance/funding company whose members were Zaitsev, Daniel Khandarov ("Khandarov"), FHJ Vision Partners, L.L.C. ("FHJ Vision"), and FBH Capital Group, L.L.C. ("FBH Capital"). *See* Zaitsev Responses to Second Set of Interrogatories, No. 4 (Henesy Decl., Ex. "2").

1

3.      FHJ Vision's members were Howard Fensterman, Esq. ("H. Fensterman"), Frank Carone, Esq. ("Carone"), and Jordan Fensterman, Esq. ("J. Fensterman"). *See* Zaitsev 2nd Interrog. Resp. (Henesy Decl., Ex. "2").

4.      Financial Vision Group II, L.L.C. ("Financial Vision II") purports to be an accounts receivable advance/funding company whose members were Zaitsev, Khandarov, FHJ Vision, and FBH Capital. *See* Zaitsev 2nd Interrog. Resp. (Henesy Decl., Ex. "2").

5.      Financial Vision Group III, L.L.C. ("Financial Vision III") purports to be an accounts receivable advance/funding company whose members were Zaitsev, Khandarov, FHJ Vision, and FBH Capital. *See* Zaitsev 2nd Interrog. Resp. (Henesy Decl., Ex. "2").

6.      Financial Vision Group IV, L.L.C. ("Financial Vision IV") purports to be an accounts receivable advance/funding company whose members were Zaitsev, Khandarov, DMC Capital Group, L.L.C. ("DMC Capital"), and FBH Capital. *See* Zaitsev 2nd Interrog. Resp. (Henesy Decl., Ex. "2").

7.      DMC Capital's members were the Frank V. Carone Dynasty Trust, H. Fensterman, J. Fensterman, Rev. Msgr. Jamie J. Gigantiello, WSS Realty, L.L.C., NREG Consulting, L.L.C., Steve Bamundo, and Croton Management, L.L.C. *See* DMC Capital Operating Agreement, p. 45 (Henesy Decl., Ex. "28").

8.      Octagon Partners, L.L.C. ("Octagon") is a limited liability company whose sole member was Zaitsev. *See* Zaitsev 2nd Interrog. Resp. (Henesy Decl., Ex. "2").

**A.      Zaitsev's Work for Comprehensive Multi-Specialty Medical Group**

9.      In or around 2007, Zaitsev began practicing in the subfields of anesthesiology and pain management through a practice called Comprehensive Multi-Specialty Medical Group, P.C. ("Comprehensive"). *See* Zaitsev Dep., 66:19-22; 67:4-7.

2

10.    Comprehensive was owned and run by Richard Lipsky, M.D. ("Lipsky"). *See* Zaitsev Dep., 71:17-20.

11.    While working at Comprehensive, Zaitsev met Defendant Eugene Gorman, M.D. ("Gorman") and former Defendant Allan Weissman, M.D. ("Weissman"). *See* Zaitsev Dep., 73:21-24; 75:22-24.

**B.    Zaitsev Incorporates Highland Medical Group to Replace Comprehensive**

12.    In or around 2010, Lipsky informed Zaitsev that that he no longer wished to continue Comprehensive's operations, and offered Zaitsev the opportunity to take over the medical practice. *See* Zaitsev Dep., 76:9-21.

13.    Thereafter, in 2010, Zaitsev caused Highland Medical Group, P.C. ("Highland") to be incorporated in New Jersey. *See* Zaitsev Dep., 72:20-73:6.

14.    Zaitsev formed Highland for the purpose of replacing Comprehensive. *See* Zaitsev Dep., 77:9-79:5; 80:13-16.

15.    Highland replaced Comprehensive and operated in substantially the same manner as Comprehensive had; for example, Highland operated from the locations Comprehensive had previously operated from, had many of the same employees, and provided similar services. *See* Zaitsev Dep., 77:9-78:19.

16.    In forming Highland to replace Comprehensive, Zaitsev stepped into what was ultimately a turnkey operation. *See* Zaitsev Dep., 80:13-16.

17.    Zaitsev operated Highland, which eventually was replaced by Highland Medical Group of New Jersey, P.C. ("Highland NJ"), as a New Jersey medical practice between 2010 and 2014. *See* Zaitsev Dep., 85:15-20.

**C.    Zaitsev Incorporates Interstate and Metropolitan to Replace Highland**

3

18.     During the period when Zaistev was operating Highland NJ in New Jersey, Zaitsev and Highland NJ performed procedures at multiple locations, including in some hospital settings. *See* Zaitsev Dep., 85:25-87:7.

19.     Highland NJ's reputation with chiropractors and attorneys – who were the primary referral sources for Highland NJ – was damaged by large facility fees being charged by the hospitals at which Highland NJ provided services. *See* Zaitsev Dep., 85:25-87:7.

20.     Therefore, in 2013, Zaitsev caused Interstate Multi-Specialty Medical Services, P.C. ("Interstate") to be incorporated as a replacement professional corporation for and to take over the ongoing operations of Highland NJ. *See* Zaitsev Dep., 87:8-10.

21.     The only difference between Highland NJ and Interstate was the change in the name of the practice. *See* Zaitsev Dep., 233:11-17.

22.     Weissman, Gorman, and Defendant Rivka Weiss, N.P. worked for Zaitsev at Interstate. *See* Zaitsev Dep., 240:18-241:5; 242:3-11.

23.     In 2016, Zaitsev caused Defendant Metropolitan Interventional Medical Services, P.C. ("Metropolitan") to be incorporated as a New York professional corporation, for the purpose of providing medical services in New York. *See* Zaitsev Dep., 252:13-24.

24.     Interstate and Metropolitan both had their headquarters on the first floor of 126 State Street, Hackensack, New Jersey (the "Hackensack Office"). *See* Zaitsev Dep., 253:22-254:4.

25.     Metropolitan provided the same medical services that Interstate had historically provided. *See* Zaitsev Dep., 252:25-253:6.

26.     However, Metropolitan did not provide electromyography and nerve conduction study services at its New York locations because office coordinators and the New York clinic

4

locations told Zaitsev that his practice were not permitted to provide those services there. *See* Zaitsev Dep., 267:23-268:3.

27.      Zaitsev did not refer patients from Interstate to his clinical laboratory, Ridgewood Diagnostic Laboratory, L.L.C. ("Ridgewood"), because he knew that he was legally prohibited from making such a referral. *See* Zaitsev Dep., 248:8-11.

28.      Interstate did not have any treatment and testing protocol requiring that patients undergo toxicological screening. *See* Zaitsev Dep., 249:17-23; 250:12-16.

29.      Metropolitan did not have any treatment and testing protocol requiring that patients undergo toxicological screening. *See* Zaitsev Dep., 278:23-279:12.

30.      Zaitsev knew it was inappropriate to have a treatment and testing protocol requiring urine drug screens without taking into account individual patient circumstances. *See* Zaitsev Dep., 250:24-251:6.

31.      Zaitsev was responsible for selecting the Current Procedural Terminology ("CPT") codes used on Metropolitan bills to GEICO and other insurers. *See* Zaitsev Dep., 290:3-8.

32.      Interstate used the services of receivable funding on only small percentage of its receivables. *See* Zaitsev Dep., 251:21-25; Mark Kaminar Deposition ("Kaminar Dep.") 141:4-10 (Henesy Decl., Ex. "4").

33.      Zaitsev failed to properly supervise the insurance billing procedures at Interstate and Highland. *See* July 10, 2023 Stipulation of Settlement with New Jersey Attorney General (Henesy Decl., Ex. "15").

**D.      Zaitsev and His Practices are Accused of Insurance Fraud by Four Different Insurance Companies**

34.    Between 2014 and 2018, Zaitsev and his medical practices were named as defendants in four separate insurance fraud lawsuits brought by GEICO, Allstate, Travelers, and New Jersey Property and Liability Guarantee Association. *See* Zaitsev Dep., 101:9-102:2.

35.    The insurance fraud lawsuits filed against Zaitsev and his medical practices between 2014 and 2018 had a significant and negative effect on Zaitsev's reputation in the medical community. *See* Zaitsev Dep., 104:3-8.

36.    The insurance fraud lawsuits filed against Zaitsev and his practices between 2014 and 2018 had a significant and negative effect on the name recognition of Highland, Highland NJ, and Interstate. *See* Zaitsev Dep., 104:9-14.

37.    The insurance fraud lawsuits filed against Zaitsev and his practices between 2014 and 2018 generally had a negative effect on Zaitsev's businesses. *See* Zaitsev Dep., 103:18-104:2.

38.    On May 20, 2016, a former chiropractor named Alexander Dimeo ("Dimeo") pleaded guilty to one count of second degree conspiracy to commit commercial bribery in violation of N.J.S.A. 2C:5-2 and N.J.S.A. 2C:21-10(a); (ii) one count of second degree money laundering in violation of N.J.S.A. 2C:21- 25(b)(1); (iii) one count of second degree commercial bribery in violation of N.J.S.A. 2C:21- 10(a)(3); (iv) three counts of third degree commercial bribery in violation of N.J.S.A. 2C:21- 10(a); and (v) one count of third degree failure to pay taxes in violation of N.J.S.A. 54:52-9(a). *See* Plea Allocution, May 20, 2016 (Henesy Decl., Ex. "16").

39.    In his plea allocution, Dimeo testified under oath that he had been paid, through an intermediary, kickbacks in exchange for patient referrals to Zaitsev and Highland. *See* Henesy Decl., Ex. "16", p. 30.

40.    On April 27, 2018, Dimeo signed an affidavit in which he stated that Zaitsev had, through an intermediary, paid him kickbacks in exchange for patient referrals from Dimeo's chiropractic practice to Zaitsev, Interstate, and Highland. *See* Affidavit of Alexander Dimeo, April 27, 2018 (Henesy Decl., Ex. "17").

41.    In May 2018, Zaitsev decided to stop actively practicing medicine in New York and New Jersey. *See* Zaitsev Dep., 80:20-22.

42.    The insurance fraud lawsuits filed against Zaitsev and his practices between 2014 and 2018 factored into Zaitsev's decision to stop practicing medicine in both New York and New Jersey. *See* Zaitsev Dep., 104:15-20.

**E.    Zaitsev's Installation of His Mother-in-Law as the Nominal Owner and Operator of a Series of Companies**

43.    Zaitsev installed his mother-in-law, Lyubov Gatilova ("Gatilova"), as the "president" of a series of companies that he, in actuality, controlled – and did so in order to protect himself and his assets from exposure to liability. *See* Zaitsev Dep., 138:8-24; 140:8-14.

44.    Zaitsev was the true controller of an entity called Streamline Management, Inc. ("Streamline"). *See* Zaitsev Dep., 138:3-5.

45.    Despite the fact that Zaitsev was Streamline's true controller, Zaitsev installed Gatilova, as the "president" of Streamline. *See* Zaitsev Dep., 137:18-20.

46.    Besides being the nominal "president" of Streamline, Gatilova had no involvement in Streamline's operations. *See* Zaitsev Dep., 137:21-24.

47.    Zaitsev was the true controller of an entity called 2598 3rd Avenue, Inc. *See* Zaitsev Dep., 140:15-19.

48.    Zaitsev was the true controller of an entity called 3250 Westchester Avenue Rentals, Inc. *See* Zaitsev Dep., 142:7-19.

7

49.     Zaitsev was the true controller of an entity called 194-13 Northern Boulevard, Inc. *See* Zaitsev Dep., 148:10-20.

50.     Zaitsev was the true controller of an entity called 800 SaintAnns Rentals, Inc. *See* Zaitsev Dep., 158:5-15.

51.     Zaitsev installed Gatilova as the "president" of a series of companies that he, in actuality, controlled in order to protect himself and his assets from exposure to liability. *See* Zaitsev Dep., 138:8-24; 140:8-14.

52.     Gatilova did not know the names of the companies for which she served as "president". *See* Lyubov Gatilova Deposition ("Lyubov Dep.")., 16:10-12 (Henesy Decl., Ex. "5").

53.     To open bank accounts for the companies for which Gatilova was listed as "president", Zaitsev would drive Gatilova to the bank and instruct Gatilova as to what to do. *See* Gatilova Dep., 17:7-15.

**F.     Kaminar Served as Zaitsev's CFO**

54.     Mark Kaminar ("Kaminar") served as Zaitsev's personal accountant, as well as the accountant for all of Zaitsev's businesses, dating back to Zaitsev's opening of Highland. *See* Zaitsev Dep., 176:5-8; 177:13-17.

55.     Kaminar also served as the accountant for Financial Vision, Financial Vision II, Financial Vision Group III, and Financial Vision Group IV (collectively the "Financial Vision Entities"). *See* Zaitsev Dep., 182:2-16.

56.     Zaitsev and Kaminar communicated with each other on a daily basis, often several times each day. *See* Zaitsev Dep., 19:9-15; 382:8-10.

57.    Kaminar executed day-to-day transactions on behalf of Zaitsev's businesses. *See* Zaitsev Dep., 177:18-22.

58.    Zaitsev considered Kaminar to be the Chief Financial Officer of his companies. *See* Zaitsev Dep., 177:23-178:5.

59.    Kaminar was in possession of a facsimile of Zaitsev's signature. *See* Zaitsev Dep., 179:3-5.

60.    Zaitsev and Kaminar have been personal friends for many years. *See* Zaitsev Dep., 176:5-9.

## II.    <u>Ridgewood Diagnostic Laboratory</u>

61.    Ridgewood was organized as a limited liability company in New Jersey in July of 2014. *See* Ridgewood Certificate of Formation (Henesy Decl., Ex. "24").

62.    Zaitsev held his membership in Ridgewood through another LLC called Galuba International, L.L.C. ("Galuba").    *See* Zaitsev Dep., 291:7-12.

63.    Besides Zaitsev, the only other member of Galuba was his mother-in-law, Gatilova. *See* Zaitsev Dep., 291:13-16.

64.    Zaitsev initially installed Gatilova as a member of Galuba in order to facilitate his "silent" ownership interest in Ridgewood. *See* Zaitsev Dep., 291:17-292:17.

65.    Through Galuba, Zaitsev held an 87% ownership interest in Ridgewood. *See* Amended and Restated Operating Agreement for Ridgewood dated January 1, 2017 (Henesy Decl., Ex. "26").

66.    Zaitsev made an initial $600,000.00 investment in Ridgewood. *See* Zaitsev Dep., 298:19-22.

67.    Ridgewood's laboratory services were performed on the second floor of the Hackensack Office. *See* Zaitsev Dep., 247:15-20.

68.    Ridgewood employed "collectors" who would travel to medical offices and collect samples to be tested through Ridgewood. *See* Zaitsev Dep., 324:19-325:5.

69.    Ridgewood would provide medical offices with a stack of blank requisition forms which providers would use to refer patients to Ridgewood for urine drug screens. *See* Zaitsev Dep., 340:9-17.

70.    The requisition forms were delivered to the various medical offices by drivers who were employed by Ridgewood, and who would also deliver urine collection cups to the same medical offices. *See* Zaitsev Dep., 340:18-22.

71.    Between 2018 and 2019, Ridgewood received referrals for urine drug testing ("UDT") for patients treating with Tri-State Multi-Specialty Medical Services, P.C. ("Tri-State") and Riverside Medical Services, P.C. ("Riverside"). *See* Zaitsev Dep., 477:15-478:2.

72.    If a Ridgewood UDT requisition form was not signed by the provider listed at the top of the form, that meant that the test was not authorized by a licensed healthcare provider. *See* Gorman Dep., 42:14-22; Affirmation of Allan Weissman ("Weissman Aff."), ¶ 31 (Henesy Decl., Ex. "8").

73.    Ridgewood's day to day operations were carried out in New Jersey, on the second floor of the Hackensack Office. *See* Zaitsev Dep., 207:20-208:17; 247:15-20.

**III.    The Transition from Interstate and Metropolitan to Tri-State and Riverside**

74.    Zaitsev first discussed the possibility of stepping away from Interstate and Metropolitan with Weissman in the spring of 2018. *See* Zaitsev Dep., 354:25-355:6.

75.     At the time Zaitsev decided to step away from Interstate and Metropolitan, he was earning approximately $4,000,000.00 per year in income. *See* Zaitsev Dep., 353:8-10.

76.     Before stepping away from Interstate and Metropolitan, Zaitsev hired a forensic accounting firm to perform a valuation of Interstate and Metropolitan. *See* Zaitsev Dep., 349:10-20.

77.     The forensic accounting firm Zaitsev hired valued Interstate and Metropolitan at a combined $13,600,000.00. *See* Zaitsev Dep., 349:21-25.

78.     At the time Zaitsev  was stepping away from his practices, he knew that Weissman did not have the financial means to purchase Interstate and Metropolitan. *See* Zaitsev Dep., 345:21-25.

79.     As of 2018, besides an anesthesia practice in a hospital setting, Weissman had never owned or managed a medical practice of his own. *See* Weissman Dep., 202:8-12.

80.     Zaitsev did not want to allow Weissman to take over Interstate and Metropolitan without Zaitsev's supervision, because Zaitsev believed that Weissman did not even know how to open an email. *See* Zaitsev Dep., 377:3-21.

81.     Zaitsev told Weissman that, if Weissman agreed to take over Interstate and Metropolitan, those practices would not engage in any referrals to the Zaitsev owned laboratory, Ridgewood. *See* Weissman Aff., ¶ 14.

82.     After Weissman informed Zaitsev that he was interested in Zaitsev's offer to take over Interstate and Metropolitan, Zaitsev arranged for Weissman to meet with Kaminar. *See* Weissman Aff., ¶¶ 14-15.

83.     During Kaminar's meeting with Weissman, Kaminar explained that he would arrange for two new professional corporations to be incorporated in Weissman's name. *See* Weissman Aff., ¶ 15(i).

84.     During Kaminar's meeting with Weissman, Kaminar explained that these two new professional corporations would take over all of Interstate and Metropolitan's operations, including all leases at clinic locations, and would retain all of Interstate and Metropolitan's professional and administrative staff. *See* Weissman Aff., ¶ 15(ii).

85.     During Kaminar's meeting with Weissman, Kaminar explained that the two new professional corporations would receive advance funding payments. *See* Weissman Aff., ¶ 15(iii).

86.     Weissman did not consult with an attorney concerning his affiliation with Tri-State and Riverside because Kaminar informed him that it was not necessary. *See* Weissman Aff., ¶ 16.

87.     Tri-State was incorporated on April 13, 2018. *See* Certificate of Incorporation for Tru-State (Henesy Decl., Ex., "22").

88.     As of March 7, 2024, Zaistev was listed as the registered agent for Tri-State. *See* Henesy Decl., Ex. "22".

**A.     Weissman's Service as the Nominal Owner of Tri-State and Riverside**

89.     Weissman never paid Zaitsev a single dollar in furtherance of any purchase of either Interstate or Metropolitan. *See* Zaitsev Dep., 347:11-15.

90.     Weissman never signed any agreement memorializing any alleged purchase of either Interstate or Metropolitan. *See* Zaitsev Dep., 347:23-348:6; Weissman Dep., 264:16-23.

91.     Weissman did not select the names "Tri-State" or "Riverside". *See* Weissman Dep., 17:17-22.

92.     A company called Green Bills provided billing services to Tri-State and Riverside. *See* Weissman Dep., 90:3-14.

93.     Weissman did not select Green Bills as Tri-State and Riverside's billing company. *See* Weissman Dep., 270:22-25.

94.     Weissman did not know anyone associated with Green Bills. *See* Weissman Dep., 271:2-4.

95.     Weissman never spoke to anyone associated with Green Bills. *See* Weissman Dep., 271:5-8.

96.     Although Tri-State and Riverside entered into a series of lease agreements for the locations from which they operated, Weissman did not negotiate the terms of those agreements. *See* Weissman Dep., 271:13-23.

97.     Unbeknownst to Weissman, some of the lease agreements entered into by Tri-State and Riverside were with companies for which Zaitsev's mother-in-law, Gatilova, was the nominal "president", but which were beneficially owned and actually controlled by Zaitsev. *See* Weissman Dep., 272:3-13.

98.     Weissman did not have any direct involvement in the billing for Tri-State and Riverside. *See* Weissman Dep., 273:9-12.

99.     Weissman did not have any direct involvement in the collections for Tri-State and Riverside. *See* Weissman Dep., 273:13-16.

100.    Weissman did not have any direct involvement in the payment of expenses for either Tri-State and Riverside. *See* Weissman Dep., 273:17-20.

101.    Weissman did not have any direct involvement in the accounting for either Tri-State and Riverside. *See* Weissman Dep., 273:21-24.

102.    Weissman did not have any direct involvement in the payroll for Tri-State and Riverside. *See* Weissman Dep., 273:25-274:4.

103.    The billing, collections, expenses, accounting, and payroll services for Tri-State and Riverside were carried out by (i) Zaitsev's attorneys at Abrams, Fensterman, Eisman, Formato, Wolf & Carone, L.L.P. ("Abrams Fensterman") and (ii) Kaminar, who was Zaitsev's accountant, personal friend, and chief financial officer. *See* Weissman Dep., 274:9-19.

104.    Weissman never intended to own or control a management company, nor did he ever speak to anyone about opening a management company. *See* Weissman Dep., 287:7-10.

105.    Even so, a company called Riverside Management Group, Inc. ("Riverside Management") was incorporated in Weissman's name. *See* Riverside Management Group, Inc. Certificate of Incorporation (Henesy Decl., Ex. "27").

106.    Weissman never authorized Kaminar to make expenditures out of an account held by Riverside Management. *See* Weissman Dep., 287:20-23.

107.    An electronic facsimile of Weissman's signature appeared on checks issued out of an account held by Riverside Management. *See* Henesy Decl., Ex. "35".

108.    Riverside Management received more than $1,000,000.00 from Tri-State and Riverside. *See* Declaration of Andrew Ross, CPA, CFE, CVA, PFS ("Ross Decl."), Ex. "A", p. 9 (Henesy Decl., Ex. "30").

**B.    The Involvement of Zaitsev's Attorneys at Abrams Fensterman**

109. Tri-State and Riverside retained the law firm Abrams Fensterman to represent them in connection with certain billing and collection activities. *See* Abrams Fensterman Retainer Letters (Henesy Decl., Ex. "36").

110. Weissman was not presented the Abrams Fensterman retainer agreements by anyone associated with Abrams Fensterman. *See* Weissman Aff., ¶ 25.

111. Zaitsev's accountant Kaminar provided Weissman with the retainer agreements for Abrams Fensterman. *See* Weissman Aff., ¶ 25.

112. Weissman did not select Abrams Fensterman as Tri-State and Riverside's law firm. *See* Weissman Aff., ¶¶ 15, 25.

113. Instead, Zaitsev chose Abrams Fensterman as Tri-State and Riverside's law firm. *See* Weissman Aff., ¶¶ 15, 25.

114. In 2018 and 2019, Carone, H. Fensterman, and J. Fensterman were partners at the Abrams Fensterman law firm. *See* Henesy Decl., Ex. "38".

115. At the same time Abrams Fensterman was representing Tri-State and Riverside, Abrams Fensterman was <u>also</u> representing Financial Vision. *See* Waivers of Conflict for Advance Clients (Henesy Decl., Ex. "37").

116. And, at the same time that Abrams Fensterman was representing Tri-State, Riverside, and Financial Vision, Carone, H. Fensterman, and J. Fensterman were – through FHJ Vision – members of Financial Vision. *See* Zaitsev 2nd Interrog. Resp. (Henesy Decl., Ex. "2").

117. An electronic facsimile of Weissman's signature was placed on a "Waiver of Conflict for Advance Clients" document addressing the conflict in Abrams Fensterman's involvement with the medical practices and the Financial Vision Entities. *See* Weissman Decl., 282:9-13; Henesy Decl., Ex. "37".

118.    Weissman did not place the electronic facsimile of his signature on the "Waiver of Conflict for Advance Clients" document. *See* Weissman Dep., 283:8-15.

119.    The only person in possession of the electronic facsimile of Weissman's signature was Kaminar. *See* Weissman Dep., 283:4-7.

120.    No one from Abrams Fensterman ever explained the contents of the "Waiver of Conflict for Advance Clients" document to Weissman. *See* Weissman Dep., 281:22-25.

121.    No one from Abrams Fensterman ever informed Weissman that he should seek his own counsel given the information in the "Waiver of Conflict for Advance Clients" document. *See* Weissman Dep., 282:2-5.

122.    Abrams Fensterman represented Weissman in connection with an examination under oath ("EUO") to be conducted by National Interstate Insurance Company. *See* Weissman Dep., 94:18-20; 97:3-11; 98:20-23.

123.    Weissman attended a meeting at Abram Fensterman's offices on Long Island to prepare for the National Interstate EUO of Tri-State. *See* Weissman Dep., 99:2-8.

124.    Weissman met with J. Fensterman and a junior attorney at Abrams Fensterman named Anthony DiChiara, Esq. to prepare for the National Interstate EUO of Tri-State *See* Weissman Dep., 99:2-8.

125.    In addition to Weissman, J. Fensterman, and Mr. DiChiara, Zaitsev also attended and participated in the meeting at Abram Fensterman's offices on Long Island to prepare for the National Interstate EUO of Tri-State. *See* Weissman Dep., 101:7-102:7.

**C.    Zaitsev's Use of the Financial Vision Entities to Facilitate His Control of Tri-State and Riverside**

**1.    The Octagon/Tri-State Loan Agreement**

126.    During the time when Interstate and Metropolitan were actively treating patients, their total monthly operating expenses waere approximately $200,000.00. *See* Zaitsev Dep., 356:16-25.

127.    Kaminar accompanied Weissman to Chase Bank in New Jersey to open up bank accounts for Tri-State and then Riverside. *See* Weissman Aff., ¶¶ 22-23.

128.    The bank account for Riverside was opened by a Chase banker named Carmen Bonicos. *See* Riverside Business Depository Certificate (Henesy Decl., Ex. "31").

129.    Carmen Bonicos was Zaitsev's personal banker at Chase and had been for at least 10 years. *See* Zaitsev Dep., 28:7-11; 29:13-18.

130.    Once the bank accounts were opened for Tri-State and Riverside, Kaminar was in possession of blank checks drawn on the Tri-State and Riverside accounts that had been pre-signed by Weissman. *See* Kaminar Dep., 199:20-200:8.

131.    Kaminar was also in possession of an electronic facsimile of Weissman's signature. *See* Kaminar Dep., 200:13-24.

132.    On May 1, 2018, Tri-State entered into a loan agreement with Octagon (the "Octagon/Tri-State Loan Agreement") whereby Octagon agreed to loan Tri-State $2,500,000.00 and Tri-State agreed to repay that loan plus seven percent interest. *See* Octagon/Tri-State Loan Agreement (Henesy Decl., Ex. "32").

133.    The $2,500,000.00 loan from Octagon to Tri-State would, in and of itself, have been sufficient to cover the monthly expenses for Tri-State and Riverside for approximately one year. *See* Zaitsev Dep., 356:16-25.

134.    The Octagon/Tri-State Loan Agreement did not require Weissman to personally guarantee repayment of the loan. *See* Octagon/Tri-State Loan Agreement (Henesy Decl., Ex. "32").

135.    The Octagon/Tri-State Loan Agreement did not require Tri-State or Weissman to post any collateral to secure the loan. *See* Octagon/Tri-State Loan Agreement (Henesy Decl., Ex. "32").

### 2.    The Financial Vision/Tri-State Agreement

136.    Less than two months after entering into the Octagon/Tri-State Loan Agreement, on June 12, 2018, Tri-State entered into a Revolving Advance and Security Agreement with Financial Vision Group, L.L.C. (the "June 2018 Financial Vision/Tri-State Agreement"). *See* June 2018 Financial Vision/Tri-State Agreement (Henesy Decl., Ex. "33").

137.    At the time Tri-State entered into the June 2018 Financial Vision/Tri-State Agreement, Weissman was not aware, and Zaitsev had not disclosed, that Zaitsev was one of the owners of Financial Vision. *See* Weissman Dep., 269:13-23.

138.    The June 2018 Financial Vision/Tri-State Agreement allowed Tri-State to draw from what operated as a revolving line of credit from Financial Vision, up to $2,600,000.00. *See* June 2018 Financial Vision/Tri-State Agreement, p. 1 (Henesy Decl., Ex. "33").

139.    Tri-State's draws on the $2,600,000.00 line of credit from Financial Vision were to be secured by the posting of collateral in the form of Tri-State's accounts receivable. *See* June 2018 Financial Vision/Tri-State Agreement, § 2.01(a)-(b) (Henesy Decl., Ex. "33").

140.    For example, in order to receive funding of $100 pursuant to the 2018 Financial Vision/Tri-State Agreement, Tri-State was required to post at least $250 in accounts receivable. *See* Deposition of Financial Vision, 96:14-22 (Henesy Decl., Ex. "14").

141.    Pursuant to the 2018 Financial Vision/Tri-State Agreement, upon collection on accounts receivable posted as collateral for draws on the line of credit, Financial Vision was entitled to a fee of 150% of the amount of the advance, plus the principal of the advance. *See* 2018 Financial Vision/Tri-State Agreement, § 2.03 (Henesy Decl., Ex. "33"); Financial Vision Dep., 100:20-101:4.

142.    The 2018 Financial Vision/Tri-State Agreement required Tri-State to retain collection counsel and allow that to receive its insurance reimbursement directly from insurance companies and other payers. *See* 2018 Financial Vision/Tri-State Agreement, § 2.02(b)(ii) (Henesy Decl., Ex. "33").

143.    Pursuant to the 2018 Financial Vision/Tri-State Agreement, the money collected by Tri-State's collection counsel could be distributed to Tri-State only after that counsel paid itself and paid Financial Vision both its principal advance amount and the additional 150% advance fee. *See* 2018 Financial Vision/Tri-State Agreement, § 2.02(b)(ii) (Henesy Decl., Ex. "33").

144.    Between June 2018 and March 2019, the various Financial Vision Entities transferred more than $2,200,000.00 to Tri-State. *See* Ross Decl., Ex. "A", p. 6.

145.    Between June 2018 and March 2019, Octagon transferred more than $1,400,000.00 to Tri-State. *See* Ross Decl., Ex. "A", p. 6.

146.    Between February 2019 and May 2020, the various Financial Vision Entities transferred more than $1,300,000.00 to Riverside. *See* Ross Decl., Ex. "A", p. 7.

147.    Between February 2019 and May 2020, Octagon transferred more than $160,000.00 to Riverside. *See* Ross Decl., Ex. "A", p. 7.

148.    Zaitsev's intention in having Financial Vision enter into a funding agreement with Tri-State was for Zaitsev to personally profit. *See* Zaitsev Dep., 405:22-25.

149.    Weissman had no knowledge of the actual finances of Tri-State or Riverside. *See* Weissman Aff., ¶ 27.

**D.    Zaitsev's Control of the Day-to-Day Operations of Tri-State and Riverside**

150.    Through his funding company, Financial Vision, his CFO, Kaminar, and his law firm, Abrams Fensterman, Zaitsev was able to control the revenue that was generated by the insurance claims submitted through Tri-State and Riverside. *See* Weissman Dep., 227:16-24; 2018 Financial Vision/Tri-State Agreement, § 2 (Henesy Decl., Ex. "33").

151.    And neither Weissman, Tri-State, nor Riverside ever actually purchased Interstate or Metropolitan – or any of Interstate or Metropolitan's assets – from Zaitsev. *See* Assignment and Assumption Agreement dated March 1, 2019 (Henesy Decl., Ex. "34").

152.    A nurse practitioner named Emily Bakerman, N.P. ("Bakerman") was contacted by Gorman through Indeed for a job with Tri-State. *See* Deposition of Emily Bakerman, 23:20-23 (Henesy Decl., Ex. "9").

153.    Bakerman first interviewed with Gorman and then, eventually, with Zaitsev, with whom she discussed how much money she would be paid for working for Tri-State with Zaitsev. *See* Bakerman Dep., 24:4-10; 26:6-12.

154.    Bakerman did not ever know Weissman to own Tri-State, and considered Weissman to be an employee of Tri-State. *See* Bakerman Dep., 35:6-12.

155.    Like Bakerman, a nurse practitioner named Rivka Weiss, N.P. ("Weiss") interviewed with Zaitsev before beginning to work for Tri-State, and she discussed compensation

during her meeting with Zaitsev. *See* Deposition of Rivka Weiss ("Weiss Dep."), 45:6-15 (Henesy Decl., Ex. "10").

156.    Between 2017 and 2019, Weiss believed that her boss was Zaitsev, not Weissman. *See* Weiss Dep., 50:22-51:13.

157.    Like Bakerman, a nurse practitioner named Linda Santa Maria, N.P. ("Santa Maria") was contacted by Gorman through Indeed for a job with Tri-State. *See* Deposition of Lina Santa Maria ("Santa Maria Dep."), 13:25-14:2-10 (Henesy Decl., Ex. "11").

158.    Santa Maria interviewed with Zaitsev, and it was Zaitsev who offered her the job with Tri-State. *See* Santa Maria Dep., 15:5-13.

159.    Once Tri-State and Riverside were operational, Weissman's job responsibilities remained substantially the same as they had been when he was Zaitsev's employee at Interstate and Metropolitan. *See* Weissman Aff., ¶ 26.

**E.    Zaitsev's Selection of Sangavaram to Replace Weissman as Tri-State and Riverside's Nominal Owner**

160.    In or around October 2018, Weissman had a meeting with Zaitsev at Zaitsev's office in Hackensack and informed Zaitsev that he no longer wanted to be affiliated with Tri-State and Riverside. *See* Zaitsev Dep., 442:12-21.

161.    During the October 2018 meeting when Weissman told Zaitsev that he no longer wanted to be affiliated with Tri-State and Riverside, Zaitsev told Weissman that he needed time to find a physician to replace Weissman at Tri-State and Riverside. *See* Zaitsev Dep., 444:13-445:2.

162.    Zaitsev then sought out Kristappa Sangavaram ("Sangavaram") to replace Weissman at Tri-State and Riverside. *See* Zaitsev Dep., 456:5-457:12.

163.    Weissman was not involved in the selection of Sangavaram as his replacement at Tri-State and Riverside. *See* Zaitsev Dep., 456:9-457:12.

164.    Once Zaitsev had selected Sangavaram to replace Weissman, Zaitsev contacted Weissman and informed him that his services were no longer needed and, as of two days later, that Weissman would be "on vacation". *See* Weissman Dep., 230:2-23.

165.    Zaitsev attempted to sell Interstate and Metropolitan to Sangavaram in early 2019. *See* Zaitsev Dep., 464:6-8.

166.    At the time Zaitsev approached Sangavaram regarding the sale of Interstate and Metropolitan, Sangavaram's ability to practice medicine in New Jersey was subject to restrictions as the result of professional misconduct. *See* April 19, 2007 Consent Order (Henesy Decl., Ex. "18").

167.    Pursuant to the terms of a 2007 Consent Order filed by the New Jersey State Board of Medical Examiners, Sangavaram was required to have a practice monitor, who would, among other things: (i) conduct on-site reviews of Sangavaram's practice; and (ii) review Sangavaram's medical records for accuracy and appropriateness of billing. *See* April 19, 2007 Consent Order (Henesy Decl., Ex. "18").

168.    In 2014, Sangavaram was disciplined by the New Jersey State Board of Medical Examiners for failure to cure deficiencies in his practice that had been identified by his practice monitor. *See* July 23, 2014 Consent Order (Henesy Decl., Ex. "19").

169.    In June 2014, the New Jersey Division of Taxation filed a tax judgment against Sangavaram in the amount of $264,439.63, and that judgment has been open and unsatisfied since its entry. *See* June 12, 2014 Judgment (Henesy Decl., Ex. "20").

170.    In August 2016, Prudential Healthcare, L.L.C. filed a judgment against Sangavaram in the amount of $4,350,000.00, and that judgment has been open and unsatisfied since its entry. *See* August 16, 2016 Judgment (Henesy Decl., Ex. "21").

171.    At the time Zaitsev attempted to sell Interstate and Metropolitan to Sangavaram, neither Interstate nor Metropolitan was an active medical practice with any assets beyond residual accounts receivable. *See* Zaitsev Dep., 207:8-12.

**1.    The 2019 Sale Agreement**

172.    In 2019, Zaitsev presented Sangavaram with an offer to sell Interstate and Metropolitan for $13,600,000.00. *See* Asset Purchase Agreement (Henesy Decl., Ex. "39") (the "2019 Sale Agreement").

173.    In the 2019 Sale Agreement, Zaitsev represented that he was the owner of medical practices operating from the following locations: (i) 126 State Street, Hackensack, New Jersey; (ii) 207 Livingston Avenue, New Brunswick, New Jersey; (iii) 680 Broadway, Paterson, New Jersey; (iv) 596 Anderson Avenue, Suite 104, Cliffside Part, New Jersey; (v) 123 Clifford Street, Suite 104, Newark, New Jersey; (vi) 611 Van Houten Avenue, Clifton, New Jersey; and (vii) 28-18 31st Street, Astoria, New York (collectively, the "Sale Practice Locations"). *See* 2019 Sale Agreement, Exhibit 1, "The Practice" (Henesy Decl., Ex. "39").

174.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, neither Interstate nor Metropolitan were operating from any of the Sale Practice Locations, as Zaitsev had stopped actively practicing medicine in May 2018. *See* Zaitsev Dep., 80:20-81:14.

175.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, it was Tri-State and Riverside that were operating from the Sale Practice Locations. *See* Henesy Decl., Ex. "39").

176.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had been actively providing and billing for medical services for more than six months. *See* Weissman Dep., 291:2-4.

177.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had an electronic medical records system. *See* Weissman Dep., 291:5-8.

178.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside owned computers. *See* Weissman Dep., 291:9-10.

179.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had office staff. *See* Weissman Dep., 291:13-14.

180.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had administrative staff. *See* Weissman Dep., 291:15-16.

181.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had professional staff. *See* Weissman Dep., 291:17-18.

182.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had lease agreements allowing Tri-State and Riverside to operate at medical offices in New York and New Jersey. *See* Weissman Dep., 291:19-20.

183.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had patient referral sources. *See* Weissman Dep., 291:21-22.

184.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had accounts receivable. *See* Weissman Dep., 291:23-24.

185.    At the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had a patient base. *See* Weissman Dep., 291:25-292:2.

186.    Despite the fact that, at the time Zaitsev presented the 2019 Sale Agreement to Sangavaram, Tri-State and Riverside had an electronic medical records system, computers, office staff, administrative staff, professional staff, lease agreements, referral sources, accounts receivable, and a patient base, Weissman "assigned" Tri-State and Riverside to Sangavaram for free. *See* Weissman Dep., 292:3-5; 2019 Assignment and Assumption Agreement (Henesy Decl., Ex. "34").

### 2.    Zaitsev's Continued Control

187.    Kaminar was in possession of an electronic facsimile of Sangavaram's signature. *See* Sangavaram EUO, 134:24-135:5.

188.    Sangavaram had no involvement in the billing process for Riverside at all. *See* Sangavaram EUO, 138:11-13.

189.    Sangavaram did not review Riverside's bills before they were sent to insurers. *See* Sangavaram EUO, 138:19-139:2.

190.    Sangavaram did not participate in the operation or management of Tri-State. *See* Sangavaram Dep., 16:20-25; 17:24-18:3; 19:18-21; 53:10-14.

191.    Sangavaram did not participate in the operation or management of Riverside. *See* Sangavaram Dep., 18:23-19:4; 20:2-5; 53:15-19.

192.    Zaitsev owned and controlled the medical practices operating as Tri-State and Riverside. *See* Mathew Dep., 60:2-14; Weiss Dep., 46:46:14-18; 2019 Sale Agreement, "Recitals" (Henesy Decl., Ex. "39"); Sangavaram Dep., 16:20-25; 17:24-18:3; 18:23-19:4; 19:18-21; 20:2-5; 53:10-19; Weissman Dep., 273:9-274:4; Ross Decl., Ex. "A", pp. 3-4; Henesy Decl., Ex. "33"; Henesy Decl., Ex. "34"; Zaitsev Dep., 377:3-21.

193.    Neither Weissman nor Sangavaram ever truly owned or controlled Tri-State and Riverside. *See* Mathew Dep., 60:2-14; Weiss Dep., 46:46:14-18; 2019 Sale Agreement, "Recitals" (Henesy Decl., Ex. "39"); Sangavaram Dep., 16:20-25; 17:24-18:3; 18:23-19:4; 19:18-21; 20:2-5; 53:10-19; Weissman Dep., 273:9-274:4; Ross Decl., Ex. "A", pp. 3-4; Henesy Decl., Ex. "33"; Henesy Decl., Ex. "34"; Zaitsev Dep., 377:3-21.

194.    As far as Kaminar's involvement was concerned, the identity of the person listed as the "owner" of Tri-State or Riverside was not relevant, and Kaminar's services would have been the same if Jesus Christ was listed as Tri-State and Riverside's "owner". *See* Kaminar Dep., 220:22-221:8.

## F.    The Ridgewood Defendants' Billing to GEICO and GEICO's Payments to the Ridgewood Defendants

195.    Between 2018 and 2020, Zaitsev-controlled Tri-State and Riverside referred more than 900 GEICO insureds to Ridgewood for UDT. *See* Asmus Decl., ¶ 9 and Ex. "2". GEICO paid Ridgewood at least $519,529.97 as the result of the UDT claims generated through referrals from Tri-State and Riverside to Ridgewood. *See id*., ¶ 10 and Ex. "3".

196.    Between June 2018 and August 2020, GEICO voluntarily paid Ridgewood at least $776,730.87 in reliance on Ridgewood's billing for UDT. *See* Asmus Decl., ¶ 6.

197.    Zaitsev and Ridgewood (the "Ridgewood Defendants") submitted numerous bills to GEICO seeking reimbursement for 6-MAM UDT under CPT code 80356. *See* Asmus Decl., ¶ 11.

198.    Between 2018 and August 2020, GEICO voluntarily paid the Ridgewood Defendants at least $120,144.43 as reimbursement for 6-MAM UDT. *See* Asmus Decl., ¶ 12.

199.    The Ridgewood Defendants submitted numerous bills to GEICO seeking reimbursement for MDEA UDT under CPT code 80353. *See* Asmus Decl., ¶ 13.

200.    Between 2018 and August 2020, GEICO voluntarily paid the Ridgewood Defendants at least $92,115.43 as reimbursement for MDEA UDT. *See* Asmus Decl., ¶ 14.

201.    Between 2018 and 2020, the Ridgewood Defendants billed GEICO for dozens more UDTs despite the fact that those UDT services were not authorized by a licensed or qualified healthcare provider. *See* Asmus Decl., ¶ 15.

202.    Between 2019 and 2020, GEICO voluntarily paid the Ridgewood Defendants at least $26,840.51 as reimbursement for UDT despite the fact that those UDT services were not authorized by a licensed or qualified healthcare provider. *See* Asmus Decl., ¶ 16.

Dated: October 11, 2024
      Uniondale, New York

                  RIVKIN RADLER LLP

                  By:   /s/ *Steven T. Henesy*
                      Barry I. Levy
                      Michael A. Sirignano
                      Steven T. Henesy
                  926 RXR Plaza
                  Uniondale, New York  11556
                  (516) 357-3000

                  *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

4891-8473-5118, v. 1