UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GOVERNMENT EMPLOYEES INSURANCE
CO., et al.,

                                        Plaintiffs,

        –against–

ALEXANDR ZAITSEV, M.D., et al.,

            Defendants.

Docket No.: 1:20-cv-003495 (FB)(SJB)

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556-0926
Telephone:    (516) 357-3000
Facsimile:    (516) 357-3333

*Counsel for Plaintiffs Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company, and GEICO Casualty Co.*

Of Counsel:
 Barry I. Levy, Esq.
 Michael A. Sirignano, Esq.
 Steven T. Henesy, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 3

  I.   GEICO's Complaint ................................................................................................ 3

ARGUMENT ...................................................................................................................... 5

  I.   Standards on this Motion ........................................................................................ 5

  II.  Relevant New York and New Jersey Law .............................................................. 6

    A.   Relevant Law Regarding No-Fault Insurance and Medical Necessity .......... 6

    B.   Relevant Law Regarding No-Fault Reimbursement Eligibility ..................... 6

    C.   Relevant Law Prohibiting Self-Referrals ...................................................... 7

    D.   Relevant Law Regarding Clinical Laboratory Testing ................................. 8

  III.  GEICO is Entitled to Summary Judgment ........................................................... 9

    A.   Zaitsev's Secret Ownership and Control of Tri-State and Riverside and the Illegal Self-Referrals to Ridgewood ....................................................... 9

      1.   Zaitsev's Admitted History of Installing Nominal "Paper" Owners and of Changing the Names of His Medical Offices to Perpetuate an Ongoing Practice ............................................................................... 9

      2.   Zaitsev is Accused of Insurance Fraud by Four Different Insurance Companies Between 2014 and 2018 .............................................. 11

      3.   Zaitsev Recruits Weissman to Falsely Pose as the Owner of Tri-State and Riverside .................................................................... 12

        a.   Weissman Admits That Tri-State and Riverside Were Controlled by Zaitsev ............................................................... 12

        b.   Weissman Did Not Exercise Any Legitimate Control Over Tri-State or Riverside .................................................... 13

      4.   Zaitsev's Control of Tri-State and Riverside .............................. 14

        a.   The Financial Vision Agreement ...................................... 14

        b.   The Involvement of Zaitsev's Attorneys and Business Partners at Abrams Fensterman ................................................... 16

        c.   Zaitsev's Control of the Tri-State and Riverside's Operations ...................................................................... 17

      5.   Zaitsev Recruits Sangavaram to Replace Weissman as the Fake Owner of Tri-State and Riverside ............................................... 18

a.  The Transition from Weissman to Sangavaram.................................................... 18

b.  The 2019 Sale Agreement.................................................................................... 19

c.  Sangavaram Never Truly Owned or Controlled Tri-State and
    Riverside, and Invoked the Fifth Amendment During his Deposition ................. 21

6.  Zaitsev Caused Hundreds of Tri-State and Riverside Patients to be
    Referred to Ridgewood ........................................................................................ 22

B.  The Unauthorized UDTs................................................................................................ 23

C.  The Medically Unnecessary UDTs ............................................................................... 24

D.  The Undisputed Facts Outlined in GEICO's Rule 56.1 Statement Satisfy
    the Elements of GEICO's Unjust Enrichment, IFPA, and Declaratory
    Judgment Claims.......................................................................................................... 25

1.  Declaratory Judgment ............................................................................................ 25

2.  Unjust Enrichment ................................................................................................. 30

3.  New Jersey IFPA .................................................................................................... 31

IV.  The Court Should Award GEICO Prejudgment Interest ............................................ 35

CONCLUSION................................................................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*21st Century Ins. Co. v. Felipe Express*,
    No. 15-cv-7075, 2018 WL 10335584 (D.N.J. Sept. 11, 2018)................................................34

*Allstate Ins. Co. v. Elzanaty*,
    916 F. Supp. 2d 273 (E.D.N.Y. 2013) .........................................................................................7

*Allstate Ins. Co. v. Northfield Med. Ctr., P.C.*,
    228 N.J. 596, 159 A.3d 412 (2017)...........................................................................................33

*Baker v. Latham Sparrowbush Associates*,
    72 F.3d 246 (2d Cir. 1995)........................................................................................................34

*Cambridge Med., P.C. v. Allstate Ins. Co.*,
    899 F. Supp. 2d 227 (E.D.N.Y. 2012) .....................................................................................7, 8

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
    508 U.S.83 (1993).....................................................................................................................25

*Certain Underwriters at Lloyd's of London v. Alesi*,
    843 F. Supp. 2d 517 (D.N.J. 2011) ...........................................................................................32

*Cont'l Lab'y Inc. v. Perales*,
    188 A.D.2d 767, 591 N.Y.S.2d 558 (3d Dept. 1992) .................................................................8

*E.R. Squibb & Sons, Inc. v. Lloyd's & Co.*,
    241 F.3d 154 (2d Cir. 2001).......................................................................................................25

*Gov't Emps. Ins. Co. v. Jacobson*,
    No. 15-cv-07236, 2021 WL 2589717 (E.D.N.Y. June 24, 2021)................................................8

*Gov't Emps. Ins. Co. v. Mayzenberg*,
    No. 17-cv-2802, 2022 WL 5173745 (E.D.N.Y. Aug. 24, 2022) ...........................................6, 28

*Horizon Blue Cross Blue Shield of N.J. v. Transitions Recovery Program*,
    2015 WL 8345537 (D.N.J. Dec. 8, 2015) ..................................................................................32

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005).......................................................................................................28

*Kaye v. Grossman*,
    202 F.3d 611 (2d Cir. 2000).......................................................................................................30

*Liberty Mut. Ins. Co. v. Healthcare Integrated Servs.,*
  2008 WL 2595922 (N.J. Super. Ct. App. Div. July 2, 2008)....................................................7

*Longobardi v. Chubb Ins. Co. of New Jersey,*
  582 A.2d 1257 (N.J. 1990)....................................................................................................33

*Mandarin Trading Ltd. v. Wildenstein,*
  17 Misc. 3d 1118(A), 851 N.Y.S.2d 71 (Sup. Ct. 2007), aff'd, 65 A.D.3d 448,
  884 N.Y.S.2d 47 (2009), aff'd, 16 N.Y.3d 173, 944 N.E.2d 1104 (2011)..............................31

*Maryland Casualty Co. v. Rosen,*
  445 F.2d 1012 (2d Cir. 1971)................................................................................................25

*Material Damage Adjustment Corp. v. Open MRI of Fairview,*
  352 N.J. Super. 216, 799 A.2d 731 (Law. Div. 2002) ............................................................35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986).................................................................................................................5

*MicroSignal, Corp. v. MicroSignal Corp.,*
  147 Fed. Appx. 227 (3d Cir. 2005)........................................................................................34

*Orion Pictures Corp. v. Showtime Networks, Inc.,*
  4 F.3d 1095 (2d Cir. 1993)....................................................................................................25

*Paramount Film Distrib. Corp. v. State of New York,*
  30 N.Y.2d 415 (1972) ...........................................................................................................31

*Perfect Dental, PLLC v. Allstate Ins. Co.,*
  538 F. Supp. 2d 543 (E.D.N.Y. 2007) .....................................................................................5

*Rand v. Volvo Fin. N. Am.,*
  No. 04-CV-00349, 2007 WL 1351751 (E.D.N.Y. May 8, 2007) ...........................................29

*Residential Fences Corp. v. Rhino Blades Inc.,*
  No. 14-cv-2552, 2024 WL 964681 (E.D.N.Y. Mar. 6, 2024)..................................................35

*State Farm Mut. Auto. Ins. Co. v. Grafman,*
  655 F. Supp. 2d 212 (E.D.N.Y. 2009) ...................................................................................30

*State Farm Mut. Auto. Ins. Co. v. Mallela,*
  372 F.3d 500 (2d Cir. 2004)....................................................................................................6

*State Farm Mut. Auto. Ins. Co. v. Rabiner,*
  749 F. Supp. 2d 94 (E.D.N.Y. 2010) .....................................................................................30

*Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC,*
  419 F. Supp. 3d 490 (E.D.N.Y. 2019) ...................................................................................29

## Statutes and Other Authorities

N.Y. Ins. Law § 5101 et seq ..................................................................................6

N.J.S.A. 17:33A–3 ...............................................................................................32

N.J.S.A. 17:33A–4 ...............................................................................................31

N.J.S.A. 17:33A–7(b) ..........................................................................................32

N.J.S.A. 39:6A–2(m) .............................................................................................6

N.J.S.A. 39:6A–4 ...................................................................................................6

N.J.S.A. 45:9–22.4 ...............................................................................................26

N.J.S.A. 45:9-22.5 ............................................................................................8, 26

N.J.S.A. 45:9-42.42 ...............................................................................................9

N.Y. Pub. Health Law § 238-a ......................................................................7, 8, 26

10 N.Y.C.R.R. § 58-1.7(b) ..................................................................................8, 9

11 N.Y.C.R.R. § 65–3.16(a)(12) .........................................................................6, 7

2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004) at 14 .................................................7

U.S. Const. amend. V ....................................................................................1, 21, 27

Fed. R. Civ. P. 56 ...............................................................................................1, 5

N.J.A.C. 10:61-1.6(a) ............................................................................................9

Pandey, S., Pandey, P., Tiwari, G., & Tiwari, R. (2010), *Bioanalysis in drug discovery and development. Pharmaceutical methods*, 1(1), 14–24 .......................27

## PRELIMINARY STATEMENT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs") respectfully submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 56 for summary judgment against Defendants Alexandr Zaitsev, M.D. and Ridgewood Diagnostic Laboratory, L.L.C. (collectively, the "Ridgewood Defendants").

GEICO has maintained in this case that the Defendants – led by Alexandr Zaitsev, M.D. ("Zaitsev") – carried out a no-fault insurance fraud scheme through which they defrauded GEICO into paying no-fault insurance benefits to which the Defendants were not entitled. GEICO advances several theories in this case for the Defendants' ineligibility to collect no-fault benefits and – by extension – theories of the Defendants' fraudulent submissions.

Two of those theories serve as the bases for this motion.

First, the undisputed evidence establishes that Zaitsev secretly owned and controlled two medical practices, Tri-State Multi-Specialty Medical Services, P.C. ("Tri-State") and Riverside Medical Services, P.C. ("Riverside"), and used those practices to facilitate urine drug testing ("UDT") referrals to his clinical laboratory, Ridgewood. New York and New Jersey law not only prohibit these self-referrals, but also render healthcare providers who engage in this conduct ineligible to collect no-fault benefits. GEICO has amassed a mountain of undisputed evidence in this case to support this finding. Most notably, neither of the putative "owners" of Tri-State and Riverside – former Defendants Allan Weissman, M.D. ("Weissman") and his successor, now-delicensed Kristappa Sangavaram ("Sangavaram") – has claimed, during this lawsuit, that they ever actually owned and controlled those practices. For his part, Weissman has affirmatively stated the opposite: that it was Zaitsev who controlled Tri-State and Riverside. And Sangavaram invoked the Fifth Amendment in response to questions as to whether he agreed with Zaitsev to falsely pose

<u>as the owner of Tri-State and Riverside</u>. In that context, it is also undisputed that Tri-State and Riverside's patients were referred exclusively to Ridgewood practically as a matter of course, and that GEICO paid Ridgewood hundreds of thousands of dollars in reliance on Ridgewood's billing.

<u>Second</u>, there is no genuine dispute that many of the Ridgewood Defendants' bills for UDT misrepresented that they were eligible for reimbursement, when in fact they were not because, among other things, the UDTs were never authorized by a licensed physician. Under New York and New Jersey law, UDTs must be authorized by a licensed healthcare professional, and the Ridgewood Defendants' billing for that unauthorized testing was therefore never compensable. Moreover, the Ridgewood Defendants billed GEICO for medically unnecessary UDT for two specific substances – 6-MAM (a heroin metabolite) and methylenedioxyethylamphetamine ("MDEA") – without any clinical justification to do so.

Indeed, it is undisputed that a large number of the "requisition" forms for Ridgewood Defendants' billed-for UDT were not signed by any licensed practitioner. And both Weissman and Defendant Eugene Gorman, M.D. ("Gorman") – whose names were routinely listed on UDT requisition forms as having "ordered" the UDT from Ridgewood – testified that, if the requisition forms were unsigned, they had <u>not</u> authorized the test. There is no dispute that GEICO paid the Ridgewood Defendants for many of these unauthorized tests. In that context, the Ridgewood Defendants have not retained a toxicology expert and are otherwise not qualified to challenge GEICO's evidentiary showing as it relates to the lack of necessity of their UDT services.

Aside from conclusory and entirely unsupported denials – together with self-serving and contradictory attempts at exculpation – the Ridgewood Defendants have not genuinely contested these facts. Instead, the Ridgewood Defendants have asserted a series of flawed legal arguments to the effect that it was totally appropriate for them to carry out their billing and referral scheme,

which they claim had no effect on their ability to bill for and receive no-fault insurance reimbursement from GEICO. But these legal arguments do not withstand real scrutiny. Indeed, the law is clear that healthcare providers who engage in the conduct established by the evidence presented to the Court on this motion are ineligible to receive no-fault benefits and – to the extent that the Ridgewood Defendants received reimbursement – they must return it to GEICO.

Because there is no genuine dispute as to the facts before the Court, and because the Ridgewood Defendants' legal arguments are unavailing, GEICO seeks summary judgment on its claims against the Ridgewood Defendants for unjust enrichment and under the New Jersey Insurance Fraud Prevention Act. GEICO also seeks summary judgment on its claim for a declaratory judgment to the effect that the Ridgewood Defendants are not entitled to reimbursement on any of their pending billing to GEICO.[1] As outlined in detail below, GEICO's motion for summary judgment should be granted in its entirety.

## BACKGROUND

## I.    GEICO's Complaint

GEICO filed this case against the Defendants in August 2020. On December 17, 2021, GEICO filed an Amended Complaint. *See* ECF No. 141. In its Amended Complaint, GEICO contends that the Defendants – led by Zaitsev – carried out a large-scale no-fault insurance fraud scheme through which they defrauded GEICO into paying no-fault insurance benefits to which the Defendants were not entitled. GEICO asserts several theories for the Defendants' ineligibility to collect no-fault benefits and – by extension – theories of the Defendants' fraudulent submissions.

---

[1] Through this motion, GEICO seeks partial summary judgment on only some of its claims and only some of the various theories of liability in this case. GEICO is prepared to seek judgment on the balance of its claims against the Ridgewood Defendants at trial.

As it relates to this motion, GEICO has alleged that the Defendants submitted millions of dollars in billing for UDT through a clinical laboratory owned by Zaitsev called Ridgewood Diagnostic Laboratories, L.L.C. ("Ridgewood"). GEICO has alleged that those services were, among other things, medical unnecessary, the product of illegal self-referrals, and provided pursuant to a fraudulent, pre-determined treatment protocol designed to enrich the Defendants rather than benefit GEICO's insureds.

More specifically, GEICO alleges that the Ridgewood Defendants' self-referral scheme was carried out in the following way: (i) Zaitsev secretly owned and controlled two medical practices – Tri-State and Riverside – that were, on paper owned by Weissman and, eventually, Sangavaram. But the undisputed evidence in this case demonstrates that it was Zaitsev who owned and controlled Tri-State and Riverside; (ii) under Zaitsev's control, virtually all of Tri-State and Riverside's patients were referred for unnecessary UDT services to be provided by Zaitsev's clinical laboratory, Ridgewood. Because of Zaitsev's control of the referral practices, Tri-State and Riverside, and the laboratory receiving those referrals, Ridgewood, all of the referrals from Tri-State and Riverside to Ridgewood were unlawful self-referrals under both New York and New Jersey law; and (iii) the resulting UDT billing submitted by the Ridgewood Defendants through Ridgewood to GEICO was not compensable as a matter of law, inasmuch as New York and New Jersey law both provide that services that are the result of unlawful self-referrals are not eligible for no-fault insurance reimbursement.

Along similar lines, GEICO alleges that Ridgewood also routinely billed GEICO for UDT services that: (i) were not authorized or ordered by a licensed healthcare practitioner (as both New York and New Jersey law require), and/or (ii) sought reimbursement for clinically useless testing for 6-MAM and MDEA.

At bottom, GEICO alleges that all of the billing submitted through Ridgewood by the Ridgewood Defendants to GEICO contained material misrepresentations – namely, that the services were eligible for reimbursement, when in fact they were not - and that GEICO paid the Ridgewood Defendants pursuant to that billing.

Based on these allegations, GEICO asserts claims against the Defendants for civil RICO violations, common law fraud, unjust enrichment, and a violation of the New Jersey Insurance Fraud Prevention Action, N.J.S.A.17:33A-1 *et seq.*, ("IFPA"). Through these claims, GEICO seeks to recover the payments it has already made to the Ridgewood Defendants pursuant to the Ridgewood Defendants' fraudulent billing. In addition, GEICO asserts a claim for a declaratory judgment to the effect that GEICO is not obligated to remit payment on any of the Ridgewood Defendants' pending billing. This motion seeks summary judgment on its claims for unjust enrichment and violation of IFPA as well as the claim for declaratory judgment.

## ARGUMENT

### I.    Standards on this Motion

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party "may not rely on '[c]onclusory allegations, conjecture, and speculation'" to sustain a factual dispute. *Perfect Dental, PLLC v. Allstate Ins. Co.*, 538 F. Supp. 2d 543, 546 (E.D.N.Y. 2007) (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)). Rather, a party "must affirmatively 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). To establish that a dispute is genuine, a non-movant must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact

and a grant of summary judgment is proper." *Perfect Dental*, 538 F. Supp. 2d at 546 (quoting *Gallo v. Prudential Residential Servs*., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)).

## II.    Relevant New York and New Jersey Law

### A.    Relevant Law Regarding No-Fault Insurance and Medical Necessity

In New York, the Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law § 5101 et seq., "supplant[s] the state's common law tort remedies for most injuries associated with automobile accidents with a no-fault insurance scheme." *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 502 (2d Cir. 2004). The statute requires automobile insurance companies to reimburse insureds for "basic economic loss" due to personal injuries "arising out of the use or operation of a motor vehicle," without regard to fault. *See* N.Y. Ins. Law § 5102(b). "A 'basic economic loss' is defined as up to $50,000 of, *inter alia*, necessary 'professional health services.'" *Gov't Emps. Ins. Co. v. Mayzenberg*, No. 17-cv-2802, 2022 WL 5173745, at *2 (E.D.N.Y. Aug. 24, 2022) (quoting § 5102(a)).

Similarly, in New Jersey, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services. *See* N.J.S.A. 39:6A–4. Pursuant to N.J.S.A. 39:6A–2(m):

> "Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury (i) is not primarily for the convenience of the injured person or provider; (ii)is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols …; and (iii) does not involve unnecessary diagnostic testing.

### B.    Relevant Law Regarding No-Fault Reimbursement Eligibility

In New York, healthcare providers are not eligible to bill for or collect no-fault benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12). That regulation's purpose is "to assure

that all providers rendering care under the No-Fault system are properly licensed in conformity with all applicable laws" and to "enhance the quality of care provided to eligible injured parties by insuring that those delivering reimbursable services are held to the appropriate professional standards." *See* 2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004) at 14; *see also Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 297 (E.D.N.Y. 2013) ("Certainly, the broad language of 11 N.Y.C.R.R. § 65–3.16(a)(12) contemplates ineligibility if the provider fails to meet any New York State or local licensing requirements, not only those requirements subject to a one-time inspection.").

Along similar lines, in New Jersey, healthcare providers are not eligible to receive no-fault insurance reimbursement unless the provider of the service is in compliance with all relevant laws and regulations. *See*, *e.g.*, *Liberty Mut. Ins. Co. v. Healthcare Integrated Servs.*, 2008 WL 2595922, at *2 (N.J. Super. Ct. App. Div. July 2, 2008) ("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations.").

### C.    Relevant Law Prohibiting Self-Referrals

New York Public Health Law § 238-a "prohibits certain health care service providers… from referring the performance of services such as laboratory tests and physical therapy, to those with whom they have financial relationship." *Cambridge Med., P.C. v. Allstate Ins. Co.*, 899 F. Supp. 2d 227, 232 (E.D.N.Y. 2012) (citing N.Y. Pub. Health Law § 238–a(1)(a)). This prohibition applies not only to direct self-referrals, but to schemes or arrangements designed to circumvent the ban on self-referrals:

> Subdivision one of this section shall apply to an arrangement or scheme, such as a cross-referral arrangement, which the practitioner or health care provider knows or should know has a principal purpose of assuring referrals by the practitioner for clinical laboratory services…to a particular health care provider which, if the practitioner directly made

referrals to such health care provider, would be in violation of subdivision one of this section.

*See* N.Y. Pub. Health Law § 238-a(9). In that context, § 238-a(7) provides that:

> If a referring practitioner or a health care provider furnishing clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services or any other person or entity collects any amounts that were billed in violation of this section, such referring practitioner and health care provider and other person or entity shall be jointly and severally liable to the payor for any amounts so collected.

*See* N.Y. Pub. Health Law § 238-a(7). Moreover, "[i]n the event that Section 238–a is violated, neither the referring provider nor the provider of the service are entitled to payment from a third-party insurer…". *Cambridge Med., P.C.*, 899 F. Supp. 2d 227, 232; *see also Gov't Emps. Ins. Co. v. Jacobson*, No. 15-cv-07236, 2021 WL 2589717, at *1 (E.D.N.Y. June 24, 2021) ("A practitioner is not eligible for PIP benefits arising from an illegal referral through an entity in which he has a financial interest.")(citing *Fair Price Med. Supply Corp. v. ELRAC Inc.*, 12 Misc. 3d 119, 121–22 (N.Y. App. Term 2006)).

Similarly, under New Jersey law, "[a] practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . .." *See* N.J.S.A. 45:9-22.5. "Like in New York, [practitioners] who engage in unlawful self-referrals are ineligible for PIP benefits in New Jersey." *See Jacobson*, 2021 WL 2589717, at *2 (citing *Allstate Ins. Co. v. Scott Greenberg, D.C.*, 871 A.2d 171, 179 (N.J. Super. Ct. Law Div. 2004)).

### D.    Relevant Law Regarding Clinical Laboratory Testing

In New York, with limited exceptions not applicable here, "a clinical laboratory shall examine specimens only at the request of licensed physicians or other persons authorized by law to use the findings of laboratory examinations in their practice or the performance of their official

duties." *See* 10 N.Y.C.R.R. § 58-1.7(b); *see also Cont'l Lab'y Inc. v. Perales*, 188 A.D.2d 767, 767–68, 591 N.Y.S.2d 558, 558 (3d Dept. 1992) ("investigation disclosed that [laboratory]'s services had not been ordered by a licensed physician or other qualified professional, in violation of 10 NYCRR 58–1.7(b)….").

Similarly, in New Jersey, clinical laboratories shall not "[a]ccept specimens for tests from and make reports to persons who are not legally qualified or authorized to submit specimens to clinical laboratories and to receive such reports…." *See* N.J.S.A. § 45:9-42.42(c). In that context, in New Jersey, "[a]ll orders for clinical laboratory services shall be in the form of an explicit order personally signed by the physician or other licensed practitioner requesting the services…." *See* N.J.A.C. 10:61-1.6(a).

## III.    GEICO is Entitled to Summary Judgment

### A.    Zaitsev's Secret Ownership and Control of Tri-State and Riverside and the Illegal Self-Referrals to Ridgewood

As discussed in detail below, Zaitsev carried out a scheme in which he secretly owned and controlled Tri-State and Riverside during a period when virtually all of Tri-State and Riverside's patients were referred only to his laboratory, Ridgewood, for UDT services. Zaitsev carried out this scheme by installing nominal "owners" for Tri-State and Riverside – first Weissman and then Sangavaram – to create the false appearance that the referrals from Tri-State and Riverside to Ridgewood were lawful. In reality, the referrals from Tri-State and Riverside to Ridgewood were unlawful self-referrals and rendered Ridgewood ineligible for the reimbursement it sought from GEICO.

### 1.    Zaitsev's Admitted History of Installing Nominal "Paper" Owners and of Changing the Names of His Medical Offices to Perpetuate an Ongoing Practice

Zaitsev has a clear and admitted pattern of incorporating new medical professional corporations in order to perpetuate an existing practice under a new name. For instance, in or around 2007, Zaitsev began practicing in the fields of anesthesiology and pain management through a practice called Comprehensive Multi-Specialty Medical Group, P.C. ("Comprehensive"). *See* Plaintiffs' Rule 56.1 Statement ("R. 56.1 Stmt."), ¶ 9. When Comprehensive's owner wanted to wind down his practice, Zaitsev simply incorporated a professional corporation, Highland Medical Group, P.C. ("Highland"), which served as Comprehensive's replacement. *See* R. 56.1 Stmt., ¶¶ 12-14. Highland then operated in substantially the same manner as Comprehensive had; Highland operated from the locations Comprehensive had previously operated from, had many of the same employees, and provided similar services. *See id.*, ¶ 15. Zaitsev later replaced Highland with Highland Medical Group of New Jersey, P.C. ("Highland NJ"). *See id.*, ¶ 17.

Then, when Highland NJ's reputation was damaged by large fees being charged by hospitals at which Highland NJ was operating, Zaitsev caused Interstate Multi-Specialty Medical Services, P.C. ("Interstate") to be incorporated as a replacement professional corporation for and to take over the operations of Highland NJ. *See* R. 56.1 Stmt., ¶¶ 18-20. The only difference between Highland NJ and Interstate was the change in the name of the practice. *See id.*, ¶ 21.

Zaitsev also has an admitted history of controlling companies with which he has no public affiliation, and for which he arranged for the installation of a phony nominal owner. In particular, Zaitsev was secretly the true controller of more than a half dozen companies, including Streamline Management, Inc., 2598 3rd Avenue, Inc., 3250 Westchester Avenue Rentals, Inc., 194-13 Northern Boulevard, Inc., 800 SaintAnns Rentals, Inc. *See* R. 56.1 Stmt., ¶¶ 44-51. To conceal his affiliation with these companies, Zaitsev installed his mother-in-law, Lyubov Gatilova

("Gatilova") as the "President" of each company. *See id*. But Gatilova had absolutely no involvement in the operations of any of these companies and, in fact, could not even name them during her deposition. *See id*., ¶¶ 44-52. Zaitsev's testimony, on the other hand, was clear: he had installed Gatilova as the "President" of the companies he controlled to protect himself and his assets from liability. *See id*., ¶ 51.

2.    **Zaitsev is Accused of Insurance Fraud by Four Different Insurance Companies Between 2014 and 2018**

Between 2014 and 2018, Zaitsev and his medical practices were named as defendants in four separate insurance fraud lawsuits brought by GEICO, Allstate, Travelers, and New Jersey Property and Liability Guarantee Association. *See* R. 56.1 Stmt., ¶ 34.

Moreover, on May 20, 2016, a former chiropractor named Alexander Dimeo ("Dimeo") pleaded guilty to a series of felonies arising from a scheme in which he had accepted kickbacks in exchange for patient referrals to medical practices and diagnostic imagining facilities. *See* R. 56.1 Stmt., ¶ 38. In his plea allocution, Dimeo testified under oath that he had been pa*id*., through an intermediary, kickbacks in exchange for patient referrals to Zaitsev and Highland:

> Q:    Okay. But, at some point, did -- did Sam Davit approach you on behalf of Dr. Zaitsev?
> A:    Yes
> Q:    And, at that point, did he approach you again in reference to referrals, in exchange for payments?
> A:    For -- for neurological referrals, yes.
> ***
> Q:    Okay. And after that meeting did you, in fact, refer patients to Dr. Zaitsev?
> A:    Yes.
> ***
> Q:    And were you paid for those referrals?
> A:    Yes.

*See* R. 56.1 Stmt., ¶ 39; Henesy Decl., Ex. "16", pp. 19-22.

Zaitsev conceded that the insurance fraud lawsuits filed against him had a negative effect on his reputation in the medical community, on Highland, Highland NJ, and Interstate's name

recognition, on his businesses generally, and contributed to his decision to stop practicing medicine in May 2018 – shortly after Dimeo signed his affidavit. *See* R. 56.1 Stmt., ¶¶ 35-37, 41-42.

### 3.    Zaitsev Recruits Weissman to Falsely Pose as the Owner of Tri-State and Riverside

By the Spring of 2018, Zaitsev had already started a new clinical laboratory venture, Ridgewood, that was becoming profitable. However, Zaitsev knew that direct referrals from a medical practice he publicly owned to Ridgewood would violate the laws prohibiting self-referrals. *See* R. 56.1 Stmt., ¶ 27.

Therefore, in the Spring of 2018, Zaitsev approached Weissman – who, at the time, was Zaitsev's employee at Interstate and Metropolitan and had never before owned medical practices of the size and scope of Interstate and Metropolitan[2] – with an opportunity to take over a turnkey operation with Zaistev's practices. *See* R. 56.1 Stmt., ¶¶ 74, 79. Prior to approaching Weissman, Zaitsev had hired a forensic accounting firm to conduct a valuation of Interstate and Metropolitan. That firm valued Zaitsev's practices at a combined $13.6 million. *See id*., ¶¶ 76-77.

Although Zaitsev claims to have to attempted to "sell" the medical practices operating as Interstate and Metropolitan (for Weissman to then operate those practices at Tri-State and Riverside), Weissman never paid Zaitsev a single dollar for the supposed "purchase" of the practices and never signed any purchase and sale agreement. *See* R. 56.1 Stmt., ¶¶ 89-90. And Zaitsev was aware that Weissman did not have the financial means to purchase Interstate and Metropolitan. *See id*., ¶ 78.

### a.    Weissman Admits That Tri-State and Riverside Were Controlled by Zaitsev

---

[2] Indeed, Zaitsev testified that Weissman did not know how to "even open an email", much less operate a large organization. *See* R. 56.1 Stmt., ¶ 80.

Weissman executed a declaration in this action in which <u>he admitted that it was Zaitsev – and not himself – who truly controlled Tri-State and Riverside during the time that he was the supposed "owner" of those practices</u>. A copy of Weissman's declaration is attached to the Henesy Decl. as Exhibit "8".

> **b.      Weissman Did Not Exercise Any Legitimate Control Over Tri-State or Riverside**

In keeping with the fact that it was Zaitsev – and not Weissman – who was the beneficial owner and controller of Tri-State and Riverside – Weissman did not engage in any of the activities one would expect from a legitimate owner of a medical business. For example, Weissman did not choose the names Tri-State or Riverside. *See* R. 56.1 Stmt., ¶ 91. Nor did he select Tri-State or Riverside's billing company, law firm, or accounting firm. *See id.*, ¶¶ 92-95, 112. Along similar lines, Weissman did not have any direct involvement in Tri-State or Riverside's billing, collections, expense payments, accounting, or payroll activities. *See id.*, ¶¶ 98-102. Instead, the billing, collections, expenses, accounting, and payroll services for Tri-State and Riverside were carried out by Zaitsev's attorneys at Abrams, Fensterman, Eisman, Formato, Wolf & Carone, L.L.P. ("Abrams Fensterman") and Zaitsev's accountant, Mark Kaminar ("Kaminar"). *See id.*, ¶ 103.

Moreover, although Tri-State and Riverside entered into a series of lease agreements for the locations from which they operated, Weissman did not negotiate the terms of those agreements. *See* R. 56.1 Stmt., ¶ 96. In fact, unbeknownst to Weissman, some of the lease agreements entered into by Tri-State and Riverside were with companies for which Gatilova (Zaitsev's mother-in-law) was the "President", but which were actually controlled by Zaitsev. *See id.*, ¶ 97.

In further keeping with the fact that Weissman did not truly own or control Tri-State or Riverside, Weissman was unaware that a company called Riverside Management Group, Inc.

13

("Riverside Management") had been incorporated, that he was supposedly the president of that company, or that more than $1,000,000.00 was transferred from Tri-State and Riverside to Riverside Management. *See* R. 56.1 Stmt., ¶¶ 104-105, 108. Indeed, although Weissman never authorized Kaminar to make expenditures out of an account held by Riverside Management, an electronic facsimile of Weissman's signature appeared on checks issued out of an account held by Riverside Management, and Kaminar (who acted at the behest of Zaitsev) was the only person in possession of Weissman's electronic signature stamp. *See id.*, ¶¶ 106-107, 119.

### 4.    Zaitsev's Control of Tri-State and Riverside

#### a.    The Financial Vision Agreement

In keeping with the fact that Zaitsev never intended to permit Weissman to truly own and control the medical practices that would continue under the names Tri-State and Riverside, Zaitsev concealed and/or failed to disclose critical facts to Weissman about the level of what Zaitsev's ongoing involvement in the practices would be. For instance, although Zaitsev indicated that Tri-State and Riverside would receive advance funding, he never disclosed that those funding companies – the Financial Vision Entities – were actually owned and controlled by Zaitsev, together with several of his attorneys at Abrams Fensterman. *See* R. 56.1 Stmt., ¶ 137. Moreover, Zaitsev never disclosed that he was the secret owner or controller of many of the companies to which Tri-State and Riverside paid supposed "rent". *See id.*, ¶¶ 96-97.

The timing and terms of the funding/loan agreements that Tri-State entered into demonstrate their true purpose: to permit Zaitsev and his associates to control the flow of money in and out of Tri-State and, eventually, Riverside. For example, during the time when Interstate and Metropolitan – which were replaced by Tri-State and Riverside, respectively – were actively treating patients, their total annual operating expenses were approximately $2,400,0000.00. *See* R. 56.1 Stmt., ¶ 126. On May 1, 2018, Tri-State entered into a loan agreement with Zaitsev's

company, Octagon Partners, L.L.C. ("Octagon") whereby Octagon agreed to loan Tri-State $2,500,000.00 and Tri-State agreed to repay that loan plus seven percent interest, which would have covered Tri-State's operating expenses for an entire year, even if Tri-State did not generate any revenue that year. *See id.*, ¶¶ 132-133. The Octagon loan was not secured by a personal guarantee from Weissman, and did not require Tri-State or Weissman to post collateral. *See id.*, ¶¶ 134-135.

Even so, less than two months later, Tri-State entered into a Revolving Advance and Security Agreement with Financial Vision, which allowed Tri-State to draw up to $2,600,000.00 against a line of credit secured by its receivables. *See* R. 56.1 Stmt., ¶¶ 136-138. There was simply no legitimate business reason for Tri-State to enter into this second agreement, especially given that the Octagon agreement would have covered its operating expenses for an entire year. In keeping with that fact, while the Octagon agreement called for payment of just 7% interest on the loaned principal, the Financial Vision agreement provided that, upon collection on accounts receivable posted as collateral for draws on the line of credit, Financial Vision was entitled to a fee of 150% of the amount of the advance, plus the principal of the advance. *See id.*, ¶ 141.

Without a legitimate business justification, it is clear that the Financial Vision agreement – compete with its extortionate repayment terms[3] – was designed to allow Zaitsev and his associates to maintain control over Tri-State and, eventually, Riverside. Beyond the financial terms, the Financial Vision agreements provided, among other things, that Tri-State and Riverside were required to hire "collection counsel" who would be responsible for maintaining the bank account into which all funded reimbursement checks would be deposited. *See* R. 56.1 Stmt., ¶ 142.

---

[3] Indeed, Kaminar's deposition testimony indicated that he would enter into this sort of arrangement if he were "desperate", to avoid bankruptcy, or to "survive". *See* Kaminar Dep., 167:5-168:5.

From there, the Financial Vision agreement provided that the "collection counsel" was thereafter authorized to distribute the collected money to Tri-State or Riverside, but only after the law firm paid itself and Financial Vision (for its principal advance and 150% advance fee). *See id*., ¶ 143.

The terms of the Financial Vision agreements resulted in large sums of revenue being sent to Tri-State and Riverside not from insurance companies or other payer systems, but through Financial Vision and the law firm Abrams Fensterman – a law firm that included at least three partners who were also owners of Financial Vision. As a result, a company owned, in part, by Zaitsev and Zaitsev's lawyers and business partners at Abrams Fensterman, was in control of the flow of funds and the amount of Tri-State and Riverside's revenue (if any) that actually made it to those practices.

b.    **The Involvement of Zaitsev's Attorneys and Business Partners at Abrams Fensterman**

Tri-State and Riverside retained Abrams Fensterman to represent them in connection with certain billing and collection activities. *See* R. 56.1 Stmt., ¶ 109. However, Weissman was not presented the Abrams Fensterman retainer agreements by anyone associated with Abrams Fensterman and, instead, received those documents from Zaitsev's accountant, Kaminar. *See id*., ¶ 110. And it was Zaitsev – not Weissman – who selected Abrams Fensterman as Tri-State and Riverside's counsel. *See id*., ¶ 112-113.

Not only did Abrams Fensterman purport to simultaneously represent Tri-State and Financial Vision (not to mention Zaitsev), partners at Abrams Fensterman – namely, Howard Fensterman, Jordan Fensterman, and Frank Carone – were, through holding LLCs, members and owners of Financial Vision. *See* R. 56.1 Stmt., ¶¶ 2-7. And while Abrams Fensterman appears to have generated a conflict waiver form for Weissman's signature, that document was presented to Weissman by <u>Kaminar</u> – not anyone associated with Abrams Fensterman – and was never

16

explained to Weissman by any attorney associated with Abrams Fensterman. *See id.*, ¶¶ 117. In fact, on one such conflict waiver, the electronic facsimile of Weissman's signature – which was only in Kaminar's possession – was placed on the waiver form without Weissman's knowledge. *See id.*, ¶¶ 118-119.

Moreover – and in further keeping with the fact that Zaitsev used his relationship with Abrams Fensterman as a means of perpetuating his secret control over Tri-State and Riverside and to use Weissman as a cover for that control – Abrams Fensterman represented Weissman and Tri-State in connection with an examination under oath ("EUO") requested by National Interstate Insurance Company. *See* R. 56.1 Stmt., ¶ 122. Weissman attended a meeting at Abrams Fensterman's offices on Long Island to prepare for the EUO. *See id.*, ¶ 123. Despite the fact that, at that time, Zaitsev claimed to have absolutely no involvement with Tri-State, Zaitsev actually attended – and participated in – the EUO preparation meeting with Weissman and the attorneys from Abrams Fensterman in advance of the National Interstate Insurance EUO. *See id.*, ¶ 125.

### c.   Zaitsev's Control of the Tri-State and Riverside's Operations

As set forth above, through Financial Vision, his CFO, Kaminar, and his law firm, Abrams Fensterman, Zaitsev was able to control all of the revenue that was generated by the insurance claims submitted through Tri-State and Riverside. *See* R. 56.1 Stmt., ¶ 150. In further keeping with the fact that Zaitsev was in control of Tri-State and Riverside's operations, Tri-State and Riverside's own employees believed that it was Zaitsev – and not Weissman – that was in control.

For example, a nurse practitioner named Emily Bakerman, N.P. ("Bakerman") was contacted by Gorman through Indeed for a job with Tri-State. *See* R. 56.1 Stmt., ¶ 152. Bakerman first interviewed with Gorman and then, eventually, with Zaitsev, with whom she discussed how much money she would be paid for working for Tri-State with Zaitsev. *See id.*, ¶ 153. By contrast,

Bakerman did not ever know Weissman owned Tri-State, and considered Weissman to be an employee of Tri-State. *See id.*, ¶ 154.

Along similar lines, a nurse practitioner named Rivka Weiss, N.P. ("Weiss") interviewed with Zaitsev before beginning to work for Tri-State, and she discussed compensation during her meeting with Zaitsev. *See* R. 56.1 Stmt., ¶ 155. And between 2017 and 2019, Weiss believed that her boss – and the head of the practices she worked for – was Zaitsev, not Weissman. *See id.*, ¶ 156. Similarly, a nurse practitioner named Linda Santa Maria, N.P. ("Santa Maria") was contacted by Gorman through Indeed for a job with Tri-State. *See id.*, ¶ 157. And it was Zaitsev – not Weissman – who interviewed Santa Maria and offered her the job. *See id.*, ¶ 158.

In keeping with the fact that it was Zaitsev – and not Weissman – who was in control of the operations of Tri-State and Riverside, once Tri-State and Riverside were operational, Weissman's job responsibilities remained substantially the same as they had been when he was Zaitsev's employee at Interstate and Metropolitan. *See* R. 56.1 Stmt., ¶ 159.

### 5.    Zaitsev Recruits Sangavaram to Replace Weissman as the Fake Owner of Tri-State and Riverside

#### a.    The Transition from Weissman to Sangavaram

In the Fall of 2018, Weissman informed Zaitsev that he no longer wished to be affiliated with Tri-State. *See* R. 56.1 Stmt., ¶ 160. In response, Zaitsev told Weissman that he needed time to find a physician to replace Weissman at Tri-State and Riverside. *See id.*, ¶ 161. Despite the fact that Weissman was supposedly the "owner" of Tri-State and Riverside, Weissman had absolutely no involvement in the selection of his successor. *See id.*, ¶ 162-163. Instead, it was Zaitsev who selected Sangavaram as Weissman's successor. *See id.*

Zaitsev's selection of Sangavaram as Weissman's replacement was indicative of Zaitsev's desire to continue his control of Tri-State and Riverside. Indeed, at the time Zaitsev approached

Sangavaram, Sangavaram's ability to practice medicine in New Jersey was subject to restrictions as the result of professional misconduct, including the requirement that Sangavaram have a practice monitor oversee his work. *See* R. 56.1 Stmt., ¶ 166. Moreover, at the time Zaitsev approached Sangavaram, Sangavaram was already in dire financial straits. In June 2014, the New Jersey Division of Taxation filed a tax judgment against Sangavaram in the amount of $264,439.63. *See id.*, ¶ 169. Then, in August 2016, Prudential Healthcare, L.L.C. obtained a judgment against Sangavaram in the amount of $4,350,000.00. *See id.*, ¶ 170. Both judgments were open and outstanding at the time Zaitsev approached Sangavaram about Tri-State and Riverside. *See id.*, ¶¶ 169-170. It was therefore clear that Sangavaram could never legitimately become – through any legitimate sale – the owner of Tri-State and Riverside. But his history of professional discipline – coupled with his crippling debt – made Sangavaram a logical choice for Zaitsev to continue his secret ownership and control over Tri-State and Riverside.

### b.    The 2019 Sale Agreement

But even if Zaitsev had actually intended to allow Sangavaram to be the true owner and control of Tri-State and Riverside, the sale documents drafted at Zaitsev's direction serve as admissions that Zaitsev was the true owner of those practices all along – and, because the sale to Sangavaram never actually took place, Zaitsev remains the owner of those practices to this day.

At the time Zaitsev attempted to sell Interstate and Metropolitan to Sangavaram, neither Interstate nor Metropolitan was an active medical practice with any assets beyond residual accounts receivable. *See* R. 56.1 Stmt., ¶¶ 173-174. Even so, Zaitsev offered to sell Interstate and Metropolitan to Sangavaram for the same $13.6 million price that he had proposed to Weissman one year earlier. *See id.*, ¶ 172.

When Zaitsev presented Sangavaram with a purported "sale" agreement in 2019, that agreement purported to offer the sale of certain of Interstate and Metropolitan's assets to Tri-State

and Riverside, specifically: "[Interstate and Metropolitan] own[] the assets of the medical practices at the locations more specifically set forth in Exhibit "1"". *See* R. 56.1 Stmt., ¶ 173. The 2019 sale agreement defined the assets being sold as the "medical practices" at the following locations:

> **EXHIBIT 1**
> ("The Practice")
>
> Locations:
>
> - 126 State Street, Hackensack, New Jersey 07601
> - 207 Livingston Avenue, New Brunswick, New Jersey 08902
> - Accelerated Surgery Center, 680 Broadway, Paterson, New Jersey 07514
> - 596 Anderson Avenue, Suite 104, Cliffside Park, New Jersey 07010
> - 123 Clifford Street, Suite 104, Newark, New Jersey 07105
> - 611 Van Houten Avenue, Clifton, New Jersey 07013
> - 28-18 31st Street, Astoria, New York 11102

At the time Zaitsev presented Sangavaram with the purported sale agreement, neither Interstate nor Metropolitan were operating from any of these locations. *See* R. 56.1 Stmt., ¶ 174. Instead, it was the medical practices operating as "Tri-State" and "Riverside" that operated from these locations. *See id*., ¶ 175. In other words, the "medical practices" identified in the sale agreement as the "assets" being sold were not Interstate or Metropolitan, but instead were the medical practices that had been operating under the names "Tri-State" and "Riverside".

Sangavaram never signed the 2019 sale agreement, nor did he pay any money toward that purchase. But the structuring of this supposed "sale" is proof positive: if Zaitsev, Interstate, and Metropolitan were in a position to sell the medical practices operating from these locations in 2019 – nearly one year after Tri-State and Riverside began operating from those very locations – then Zaitsev was the owner of those practices (regardless of their names) all along. And because Sangavaram never signed the 2019 agreement and never paid Zaitsev a single dollar for these "medical practices", Zaitsev is, to this day, still the owner of the medical practices that operated under the names Tri-State and Riverside.[4]

---

[4] In keeping with the fact that Zaitsev is still the true owner and controller of Tri-State, in a 2024 filing with the New Jersey Department of the Treasury, Zaitsev listed himself as Tri-State's registered agent. *See* R. 56.1 Stmt., ¶ 88.

At the same time that Zaitsev purported to propose the "sale" of Interstate and Metropolitan, Weissman and Sangavaram entered into an agreement whereby Weissman "assigned" Tri-State and Riverside to Sangavaram <u>for free</u>. *See* R. 56.1 Stmt., ¶ 186. This, despite the fact that Tri-State and Riverside supposedly had valuable assets, including an electronic medical records system, computers, office staff, administrative staff, professional staff, lease agreements, referral sources, accounts receivable, and a patient base. *See id.*, ¶¶ 176-185. But those assets – *i.e.*, the medical practices operating under the names Tri-State and Riverside – were, pursuant to the terms of Zaitsev's own sale agreement to Sangavaram, owned by <u>Zaitsev</u> through Interstate and Metropolitan.

> **c.    Sangavaram Never Truly Owned or Controlled Tri-State and Riverside, and Invoked the Fifth Amendment During his Deposition**

Like Weissman before him, Sangavaram never owned or controlled Tri-State and Riverside. And because Zaitsev was always the true owner and controller of Tri-State and Riverside, the operations of those practices did not change with the supposed change in "ownership" from Weissman to Sangavaram.

For example, Kaminar testified that the change in supposed "ownership" of Tri-State and Riverside did not affect his operations as far as the finances of the practices were concerned, and that his services would have been the same if "Jesus Christ" was listed as Tri-State and Riverside's "owner". *See* R. 56.1 Stmt., ¶ 194.

For his part, Sangavaram invoked the Fifth Amendment in response to virtually all of the substantive questions posed to him during his deposition in this matter, including:

- Did you enter into an agreement with Dr. Zaitsev to falsely pose as the owner of Tri-State? (Sangavaram Dep., 18:10-14)
- Did you ever enter into an agreement with Dr. Zaitsev to falsely pose as the owner of Riverside? (Sangavaram Dep., 20:22-25)

- Did you enter into this Assignment and Assumption Agreement for the purpose of falsely posing as the owner of Tri-State and Riverside? (Sangavaram Dep., 37:17-22)

- Was the purpose of this asset purchase agreement to create the appearance that you were legitimately purchasing a medical practice from Alexandr Zaitsev? (Sangavaram Dep., 38:7-12)

On the other hand, Zaitsev provided contradictory testimony concerning the transition from Weissman to Sangavaram. For instance, during his deposition, Zaitsev claimed that he (*via* Interstate and Metropolitan) entered into a sale agreement with Sangavaram to facilitate the transition from Weissman to Sangavaram. However, Zaitsev provided the following response to one of GEICO's interrogatories, contradictorily indicating that it was (supposedly) <u>Weissman</u> who attempted to sell the practices:

2.     Identify and describe the nature and terms of any agreement for the purchase or transfer of any healthcare practice, patient files, equipment, or accounts receivables involving You or the Entity Defendants.

**RESPONSE: I sold the Interstate Medical P.C. practice to Tristate Multi-Specialty which was owned by Dr. Allan Weissman. <u>It is my understanding that Dr. Weissman subsequently sold the practice to Dr. Kristappa Sangavaram.</u>**

*See* Henesy Decl., Ex. "1" (emphasis added). Of course, neither of Zaitsev's contradictory contentions is true: Zaitsev never sold anything to Weissman, nor did Weissman "sell" anything to Sangavaram. And Zaitsev's attempted sale to Sangavaram was never completed. Instead, Zaitsev owned and controlled the practices all along.

### 6.     Zaitsev Caused Hundreds of Tri-State and Riverside Patients to be Referred to Ridgewood

The Ridgewood Defendants cannot plausibly dispute that Zaitsev was the true owner and controller of Tri-State and Riverside. And, in that context, they do not dispute that, between 2018 and 2020, Zaitsev caused hundreds of patients to be referred from Tri-State and Riverside to Ridgewood for UDT services.

In fact, Tri-State and Riverside executed a treatment protocol whereby virtually all of their patients were referred to Ridgewood for UDT services. In particular, between 2018 and 2020, Zaitsev-controlled Tri-State and Riverside referred more than 900 GEICO insureds to Ridgewood for UDT. *See* R. 56.1 Stmt., ¶ 195. GEICO paid Ridgewood at least $519,529.97 as the result of the UDT claims generated through referrals from Tri-State and Riverside to Ridgewood. *See id*.

### B.    The Unauthorized UDTs

As set forth above, both New York and New Jersey law require that clinical laboratory testing – including UDTs – must be ordered and authorized in writing by a qualified healthcare professional. Even so, the undisputed evidence clearly shows that the Ridgewood Defendants routinely billed for – and were paid for – unauthorized UDT services.

In particular, in the claims identified in the Declaration of Kathy Asmus (the "Asmus Decl."), no licensed healthcare provider ever signed the "Toxicology Test Requisition":



In that context, both Gorman and Weissman agreed that, if a test requisition form was unsigned, the test was not authorized. *See* Gorman Dep., 42:14-22; Weissman Aff., ¶ 31.

Between 2019 and 2020, GEICO voluntarily paid the Ridgewood Defendants at least $26,840.51 as reimbursement for UDT despite the fact that those UDT services were not authorized by a licensed or qualified healthcare provider. *See* R. 56.1 Stmt., ¶ 201-202. Moreover, the Ridgewood Defendants billed GEICO for dozens of other UDT services despite the fact that those UDT services were not authorized by a licensed or qualified healthcare provider. *See id*.

C.      **The Medically Unnecessary UDTs**

As set forth above, both New York and New Jersey allow for no-fault reimbursement only where the billed-for services are medically necessary. Even so, it is undisputed that the Ridgewood Defendants consistently billed for – and were paid for – medically unnecessary UDT services.

In particular, the Ridgewood Defendants billed, as a matter of course, for 6-MAM and MDEA testing. This testing was plainly unnecessary, and none of the Ridgewood Defendants are qualified to speak to its propriety.

By contrast, as GEICO's forensic toxicology expert, Elizabeth Spratt, M.S., F-ABFT, outlined in her report:

- <u>6-MAM</u>: this is one of the active metabolites of heroin. There is no reason to test for 6-MAM as a matter of course, especially when the opiate testing was negative. 6-MAM is only seen when heroin is consumed. And, in the testing I reviewed, when a person was positive for 6-MAM, the patient also had morphine and codeine present along with other drugs. There is also a screening test for this metabolite. Even so, Ridgewood tested for 6-MAM as a matter of course under billing code 80356, resulting in a separate line-item charge of $109.00.

- <u>MDEA (methylenedioxyethylamphetamine)</u>: this was suggested in the toxicology industry many years ago as a contaminant in MDMA (known colloquially as ecstasy or molly) production. It was not seen in drug testing, especially workplace drug testing, and was removed from panels more than 5 years ago. Even so, Ridgewood tested for MDEA as a matter of course under billing code 80353, resulting in a separate line-item charge of $100.00.

The Ridgewood Defendants cannot refute these opinions, much less actually substantiate the supposed medical necessity of their 6-MAM and MDEA testing. All told, the Ridgewood Defendants submitted hundreds of thousands of dollars in billing to GEICO for UDT for unnecessary 6-MAM and MDEA screens. Of that amount, GEICO voluntarily paid the Ridgewood Defendants at least $120,144.43 as reimbursement for the unnecessary 6-MAM and at least $92,115.43 for the unnecessary MDEA screens. *See id*., ¶¶ 197-200.

**D. The Undisputed Facts Outlined in GEICO's Rule 56.1 Statement Satisfy the Elements of GEICO's Unjust Enrichment, IFPA, and Declaratory Judgment Claims**

**1. Declaratory Judgment**

Based on the undisputed facts set forth in GEICO's Rule 56.1 Statement, the Court should grant GEICO summary judgment on its First Cause of Action for a Declaratory Judgment to the effect that GEICO is not obligated to remit payment on any of the Ridgewood Defendants' pending and outstanding UDT billing to GEICO.

Where, as here, a party seeks a declaratory judgment from a district court, it must show the existence of an "actual case or controversy". *See Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S.83, 95 (1993); (citing 28 U.S.C. § 2201(a)). Declaratory relief is appropriate where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or where it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings. *See Maryland Casualty Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir. 1971); *E.R. Squibb & Sons, Inc. v. Lloyd's & Co.*, 241 F.3d 154, 175 (2d Cir. 2001). A court has broad discretion to decide whether to render a declaratory judgment. *See Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1100 (2d Cir. 1993).

There is a case or controversy regarding the compensability of the Ridgewood Defendants' pending billing. The Ridgewood Defendants have maintained, in this litigation, that they are entitled to collect on that billing. Moreover, the Ridgewood Defendants have numerous pending state court lawsuits and collection arbitrations against GEICO, seeking to collect on the same billing that is the subject of the declaratory judgment claim here (*i.e.*, the pending and outstanding billing.).

In that context, because there is no genuine issue of material fact as to whether Zaitsev secretly owned and controlled Tri-State and Riverside at the time those practices referred hundreds

of patients to Ridgewood, between 2018 and the present, Ridgewood was ineligible to collect on its pending and outstanding claims to GEICO. New York Public Health Law § 238-a(1)(a) provides as follows:

> A practitioner authorized to order clinical laboratory services… may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.

Zaitsev, as a licensed physician, is a "practitioner" pursuant to § 238-a. *See* PHL § 238(11). Moreover, the UDTs purported provided and billed through Ridgewood were "clinical laboratory services" as that term is defined by the statute. *See* § 238(1). Moreover, Ridgewood, as a licensed clinical laboratory, was a "health care provider" as that term is defined by § 238. *See* § 238(6). Further, it is undisputed that, as an owner of Ridgewood, Zaitsev had a "financial relationship" with Ridgewood. *See* § 238(3).

Moreover, § 238-a(9) prohibits schemes to circumvent § 238-a(1)(a)'s prohibition against referrals to clinical laboratories in which the practitioner has an ownership interest:

> Subdivision one of this section shall apply to an arrangement or scheme, such as a cross-referral arrangement, which the practitioner or health care provider knows or should know has a principal purpose of assuring referrals by the practitioner for clinical laboratory services…to a particular health care provider which, if the practitioner directly made referrals to such health care provider, would be in violation of subdivision one of this section.

Along similar lines, New Jersey's Codey Law provides – in pertinent part – that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest … .

N.J.S.A. 45:9-22.5(a).

Zaitsev, as a licensed physician, was a "practitioner" for the purposes of the Codey Law. *See* N.J.S.A. 45:9–22.4. Moreover, Ridgewood, as a clinical laboratory that provided toxicological

analysis of, among other things, urine samples, was a "health care service" for the purposes of the Codey Law[5]. *Id*. And there is no dispute that Zaitsev had a "significant beneficial interest" in Ridgewood. *See* 45:9–22.4 (defining "significant beneficial interest" as "any financial interest").

In that context, the undisputed evidence establishes that Zaitsev installed Weissman, and then Sangavaram, as the fake, nominal owners of Tr-State and Riverside, but that Zaitsev was the true owner and controller of the medical practices operating as Tri-State and Riverside. This conclusion is fortified by the evidence summarized above and outlined in GEICO's Rule 56.1 Statement, including – but certainly not limited to – that:

- Weissman has affirmatively stated that it was Zaitsev who was in control of Tri-State and Riverside during Weissman's affiliation with those entities.

- Weissman was not involved in any of the functions that would be fulfilled by the legitimate owner of a medical practice. He did not have any direct involvement in Tri-State or Riverside's billing, collections, expense payments, accounting, or payroll activities. Instead, all of those functions were carried out by Zaitsev's hand-selected billing company, Zaitsev's attorneys, and Zaitsev's accounting firm.

- When Weissman's tenure ended with Tri-State and Riverside, it was Zaitsev who selected Weissman's replacement, Sangavaram, and it was Zaitsev who informed Weissman when his affiliation with Tri-State and Riverside was over. At that point, Zaitsev presented Sangavaram with a sale agreement that purported to sell the assets of the by then-defunct Interstate and Metropolitan, which were identified in the 2019 Sale Agreement as the medical practices that had been operating under the names "Tri-State" and "Riverside".

- Sangavaram invoked the Fifth Amendment during his deposition, including in response to questions that he entered into an agreement with Zaitsev whereby he would falsely pose as the owner of Tri-State and Riverside in order to conceal Zaitsev's true ownership and control of those entities.

---

[5] Specifically, "health care service" is defined as including, but not limited to "a bioanalytical laboratory." The UDT services provided by Ridgewood qualify as "bioanalytical" laboratory services. *See* Pandey, S., Pandey, P., Tiwari, G., & Tiwari, R. (2010), *Bioanalysis in drug discovery and development*. *Pharmaceutical methods*, 1(1), 14–24, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3658019/pdf/PMeth-1-14.pdf ("Bioanalysis is a term generally used to describe the quantitative measurement of a compound (drug) or their metabolite in biological fluids, primarily blood, plasma, serum, urine or tissue extracts.").

There is no genuine dispute concerning Zaitsev's ownership and control over Tri-State and Riverside. Indeed, besides an entirely self-serving and conclusory denial, Zaitsev has provided contradictory sworn statements concerning the circumstances surrounding Tri-State and Riverside's ownership. For instance, in his responses to GEICO's Interrogatories, Zaitsev swore under oath that he had sold Interstate to Weissman *via* Tri-State, and that it was his "understanding" that Weissman subsequently sold the practice to Sangavaram. This sworn statement has been contradicted multiple times over during this litigation. For example:

- During his deposition, Zaitsev conceded that Weissman never signed the sale agreement Zaitsev had presented him with (despite Zaitsev requesting that he do so), nor did Weissman ever pay Zaitsev even one dollar in connection with the supposed "purchase".

- The "Assignment and Assumption Agreement" between Weissman and Sangavaram – whereby Weissman gave Tri-State and Riverside to Sangavaram for free – explicitly stated that Tri-State and Riverside "operated prior to the consummation of a contract for the sale Interstate and Metropolitan [sic]" and that "[Weissman] has decided not to pursue the acquisition of Interstate and Metropolitan".

- At the time of the transition from Weissman to Sangavaram, Zaitsev presented the 2019 Sale Agreement to Sangavaram, whereby he purported to sell Interstate and Metropolitan to Sangavaram and identified the assets of Interstate and Metropolitan as the medical practices that had been operating under the names "Tri-State" and "Riverside".

Against this backdrop, no reasonable jury could credit Zaitsev's shifting, contradictory accounting of the ownership of Tri-State and Riverside, and GEICO should be granted summary judgment. *See*, *e.g.*, *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (affirming summary judgment where the nonmoving party's "testimony—which was largely unsubstantiated by any other direct evidence—was 'so replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit [it]."); *Mayzenberg*, 2022 WL 5173745, *6 (citing *Jeffreys*, and noting that "[s]uch testimony cannot

create a genuine issue of material fact where, as here, no other evidence does so, even when all evidence is drawn in the light most favorable to Defendants.").

Along similar lines, GEICO is entitled to summary judgment on its declaratory judgment claim because Ridgewood's UDT billing was not compensable inasmuch as it sought reimbursement for medical unnecessary and/or unauthorized services. The evidence outlined above and set forth in greater detail in GEICO's Rule 56.1 Statement, establishes that the Ridgewood Defendants billed GEICO for: (i) UDT services for 6-MAM and MDEA, without any clinical justification to do so; and (ii) UDT services that had not been authorized by a qualified and licensed healthcare provider.

The Ridgewood Defendants have not presented – and cannot present – any evidence to contradict GEICO's factual showing. For example, with regard to the Ridgewood Defendants' 6-MAM and MDEA testing, this is not a case in which the Court is presented with conflicting expert opinions that "merely create a credibility question for the jury to resolve." *Rand v. Volvo Fin. N. Am.*, No. 04-CV-00349, 2007 WL 1351751 (E.D.N.Y. May 8, 2007) (cleaned up). Instead, while GEICO's toxicology expert, Ms. Spratt, provides a specific opinion and finding on this point, the Ridgewood Defendants do not have a toxicology expert. Nor does their medical expert address the efficacy of the 6-MAM and MDEA testing. And none of the Ridgewood Defendants is competent or qualified to offer evidence to the contrary – nor have they attempted to.[6]

Finally, there are no factual issues surrounding the Ridgewood Defendants' billing for unauthorized UDT services. Indeed, GEICO has attached, as Exhibit "4" to the Declaration of

---

[6] In that context, "statements of fact by an expert may be deemed undisputed where the non-movant has failed to counter them with specific evidence." *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 501, fn. 3 (E.D.N.Y. 2019) (Glasser, J.) (internal citations and quotations omitted).

Kathy Asmus, copies of the bills and corresponding unsigned requisition forms for the unauthorized UDT billing. None of the Defendants has disputed – or could dispute – this evidence.

### 2.    Unjust Enrichment

Recovery for unjust enrichment requires facts establishing that: (i) the Defendants were enriched; (ii) at GEICO's expense; and (iii) that equity and good conscience require restitution. *See Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000). There are no factual disputes about any of these elements here.

First, it is undisputed that the Ridgewood Defendants were enriched and that that enrichment was at GEICO's expense. The Ridgewood Defendants billed GEICO for millions of dollars' worth of UDT services, and GEICO voluntarily paid Ridgewood at least $776,730.87 in reliance on that billing. *See* R. 56.1 Stmt., ¶ 196. Moreover, GEICO voluntarily paid Ridgewood at least: (i) $120,144.43 as reimbursement for 6-MAM UDT; (ii) $92,115.43 as reimbursement for MDEA UDT; and (iii) $26,840.51 as reimbursement for UDT despite the fact that those UDT services were not authorized by a licensed or qualified healthcare provider. *See id.*, ¶ 198-202.

Second, Courts in this District have repeatedly held that evidence that a healthcare provider received no-fault insurance benefits to which they were not entitled has been "unjustly" enriched. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 103 (E.D.N.Y. 2010) (sustaining unjust enrichment claim where plaintiff-insurer alleged that healthcare provider received no-fault insurance benefits to which it was not entitled); *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 222 (E.D.N.Y. 2009) (same).

As set forth above, Ridgewood was ineligible to receive no-fault benefits from GEICO because: (i) Zaitsev was the secret owner and controller of Tri-State and Riverside and, therefore, all of the referrals from Tri-State and Riverside were unlawful self-referrals under New York and New Jersey law, thereby rendering Ridgewood ineligible to collect no-fault benefits; (ii)

Ridgewood billed GEICO for – and was paid for – unauthorized UDT; and (iii) Ridgewood billed GEICO – and was paid for – medically unnecessary UDT for 6-MAM and MDEA.

In this context, the issue of whether it is "against equity and good conscience to permit the defendant to retain what is sought to be recovered" (*Paramount Film Distrib*. *Corp. v. State of New York*, 30 N.Y.2d 415, 421 (1972)) is for the Court to decide, not a jury. *See Mandarin Trading Ltd*. *v. Wildenstein*, 17 Misc. 3d 1118(A), 851 N.Y.S.2d 71 (Sup. Ct. 2007), aff'd, 65 A.D.3d 448, 884 N.Y.S.2d 47 (2009), aff'd, 16 N.Y.3d 173, 944 N.E.2d 1104 (2011) ("The court must decide whether the facts as alleged bring the case within the legal definition of unjust enrichment, as the jury determines only whether the facts are as claimed.") (internal citation omitted). Because the facts outlined above are not in dispute, GEICO should be granted summary judgment on its claim for unjust enrichment against Defendants Zaitsev and Ridgewood.

### 3.    New Jersey IFPA

A healthcare services provider violates the Insurance Fraud Prevention Act if, among other things, it:

> Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

*See* N.J.S.A. 17:33A–4. A healthcare services provider also violates the Insurance Fraud Prevention Act if it either: (i) "knowingly assists, conspires with or urges any person or practitioner

to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." *Id*.

A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. *See* N.J.S.A. 17:33A–7(b). The IFPA defines a pattern as five or more "related violations". *See* N.J.S.A. 17:33A–3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. *See* N.J.S.A.17:33A–3.

To state an IFPA claim "[a] [p]laintiff must essentially [allege] (1) knowledge, (2) falsity, and (3) materiality." *Horizon Blue Cross Blue Shield of N.J. v. Transitions Recovery Program*, 2015 WL 8345537, at *4 (D.N.J. Dec. 8, 2015). "Unlike common law fraud, <u>proof of fraud under the IFPA does not require proof of reliance on the false statement or resultant damages ... nor proof of intent to deceive</u>." *Id*. (citation omitted, emphasis added). The burden of proof to show a violation of the IFPA is preponderance of the evidence, which is lower than the "clear and convincing evidence" standard required to prove common law fraud. *See Certain Underwriters at Lloyd's of London v. Alesi*, 843 F. Supp. 2d 517, 530 (D.N.J. 2011).

The falsity and materiality elements are discussed at length above. To summarize, however, because of the conduct outlined above, the Ridgewood Defendants were ineligible to collect no-fault benefits. And the representations in the Ridgewood Defendants' billing that they <u>were</u> entitled to no-fault benefits were therefore false.

As to materiality, the Supreme Court of New Jersey has stated as follows:

An insured's misstatement is material if when made a reasonable insurer would have considered the represented fact relevant to its concerns and important in determining its course of action. In effect, materiality should be judged according to a test of prospective reasonable relevancy.

*Longobardi v. Chubb Ins. Co. of New Jersey*, 582 A.2d 1257, 1263 (N.J. 1990). In that context, clearly, misrepresentations by the Ridgewood Defendants regarding their eligibility to be paid at all for their UDT billing were "material" to GEICO's decision as to how to proceed with the claims.

Finally, there is no dispute that the Ridgewood Defendants' misrepresentations were made "knowingly." At the outset, "[h]ealth care services are highly regulated, and professionals engaged in the provision of health care…are on notice of the legal requirements applicable to their practice and operations." *Allstate Ins. Co. v. Northfield Med. Ctr., P.C.*, 228 N.J. 596, 622, 159 A.3d 412, 428 (2017). Therefore, Zaitsev and Ridgewood were, as a matter of law, charged with knowledge of the laws governing their practice, including those with regard to self-referrals, unnecessary services, and authorization of UDT.

However, this case does not require circumstantial analysis. Zaitsev's testimony made clear that he was aware of the prohibitions against self-referrals, and cited those prohibitions as why Interstate – which was the predecessor to Tri-State, and for which Zaitsev openly held himself out as owner – did not refer patients to Ridgewood:

| | |
|---|---|
| **Q**: | Did Interstate ever refer its patients for toxicology screening to be performed through Ridgewood? |
| **A**: | No. |
| **Q**: | Why not? |
| **A**: | What do you think? |
| **Q**: | What I think – |
| **A**: | I'm sorry it's just such an ambiguous question. How can I be the owner of the laboratory and the Interstate, send something for myself? |
| **Q**: | So you believe that you were prohibited from making such a referral? |
| **A**: | I not just believe, I know that. |

*See* Zaitsev Dep., 247:21-248:11.

There is also no genuine dispute as to Zaitsev's knowledge of the underlying acts which rendered Ridgewood ineligible. For example, it was Zaitsev who hand-selected Weissman and, eventually, Sangavaram, as the nominal "owners" of Tri-State and Riverside. It was Zaitsev who

hand-selected the accounting, billing, funding, and legal service providers for Tri-State and Riverside. And it was Zaitsev and his business partners who controlled the accounts receivable for Tri-State and Riverside.

Moreover, Zaitsev admitted his awareness of the referrals from Tri-State and Riverside to Ridgewood. *See*, *e.g.*, Zaitsev Dep., 477:15-478:2 (wherein Zaitsev acknowledged that the practice of referrals from Tri-State and Riverside continued from when Weissman was the "owner" to when Sangavaram was the "owner"); 478:15-21 (wherein Zaitsev testified that he thanked Sangavaram for the referrals from Tri-State and Riverside to Ridgewood). And, because Zaitsev was Ridgewood's controlling member, his knowledge is imputable to Ridgewood. *See*, *e.g.*, *Baker v. Latham Sparrowbush Associates*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation."); *MicroSignal, Corp. v. MicroSignal Corp.*, 147 Fed. Appx. 227, 231 (3d Cir. 2005) ("It is well-settled that ... acts of a corporate agent which are performed within the scope of his authority are binding upon the corporate principle.").

In this context, all that is required to establish "knowledge" for the purposes of an IFPA claim is that Zaitsev had "awareness or knowledge of the illegality of one's act". Because Zaitsev was aware of the circumstances of the referrals from Tri-State and Riverside, and because he admitted that he was aware of the legal prohibitions against self-referrals, there is no genuine issue of fact as to Zaitsev's knowledge of the Ridgewood Defendants' IFPA violations.

Finally, "the [IFPA] states that a pattern exists where a party commits 'five or more related violations' of the IFPA and violations are related 'if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating' the [IFPA]." *See 21st Century Ins. Co. v. Felipe Express*, No. 15-cv-7075, 2018 WL 10335584, at *1 (D.N.J. Sept.

11, 2018). Because the Ridgewood Defendants submitted <u>hundreds</u> of claims that mispresented their ability to receive no-fault benefits, and those submissions constituted "similar actions on the part of" the Ridgewood Defendants, and involved the same victim, GEICO, the Ridgewood Defendants' unlawful submissions were a "pattern" under the IFPA. *See*, *e.g.*, *Material Damage Adjustment Corp. v. Open MRI of Fairview*, 352 N.J. Super. 216, 233, 799 A.2d 731, 742 (Law. Div. 2002) (finding a pattern under IFPA where "Open MRI's fraudulent claims and receipt of insurance payments all involved the same victim, plaintiff NCIC. During the relevant time period, September 1997 to June 1999, Open MRI submitted hundreds of claims and received thousands of dollars from the plaintiff as payment for these claims."). Upon this showing of a "pattern" under IFPA, GEICO is entitled to treble damages from the Ridgewood Defendants, in an amount of at least $2,899,299.93 (representing three times the $776,730.87 paid by GEICO to Ridgewood).

## IV.    The Court Should Award GEICO Prejudgment Interest

As outlined in detail in the Henesy Decl., GEICO submits that it is entitled to $304,426.49 in prejudgment interest, which was calculated using a method less advantageous to GEICO. *See*, *e.g.*, *Residential Fences Corp. v. Rhino Blades Inc.*, No. 14-cv-2552, 2024 WL 964681, at *8 (E.D.N.Y. Mar. 6, 2024).

## <u>CONCLUSION</u>

For the reasons stated herein, GEICO's motion should be granted in its entirety, together with such other and further relief as to the Court may seem just and proper.

Dated: October 11, 2024
      Uniondale, New York

                        RIVKIN RADLER LLP

           By:    /s/ *Steven T. Henesy*
                Barry I. Levy, Esq.
                Michael A. Sirignano, Esq.
                Steven T. Henesy, Esq.
           926 RXR Plaza
           Uniondale, New York 11556
           (516) 357-3000

           *Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co.*

4880-8172-8397, v. 8