UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES<br>INSURANCE COMPANY, et al.,<br><br>Plaintiffs,<br><br>-against-<br><br>ALEXANDR ZAITSEV, M.D., et al.,<br><br>Defendants. | **MEMORANDUM AND ORDER**<br><br>Case No. 1:20-cv-03495-FB-SJB |

*Appearances:*
*For the Plaintiffs:*
MAX GERSHENOFF,
FRANK PETER TISCIONE JR.,
BARRY I. LEVY,
FRANK TISCIONE,
COLLEEN O'NEIL,
STEVEN HENESY,
Rivkin Radler LLP
926 Rexcorp Plaza
Uniondale, NY 11556

*For the Defendants*
MATTHEW J. CONROY,
ROBERT E. B. HEWITT III,
Schwartz, Conroy & Hack, P.C.
666 Old Country Road, Suite 900
Garden City, NY 11530

**BLOCK, Senior District Judge:**

Plaintiffs (collectively "GEICO") bring this action against Alexandr Zaitsev, M.D., Metropolitan Interventional Medical Services, P.C., Anthony Benevenga, Charles G. Nicola, D.C., Ridgewood Diagnostic Laboratory, L.L.C., Eugene Gorman, M.D., Bogdan Negrea, M.D., Antonio Ciccone, D.O., Stella Amanze, P.A., Frida Isakov, P.A., Lucknie Ovincy, P.A., Emily Bakerman, N.P., Melissa Evans, N.P., Mini Mathew, N.P., Angela Pullock, N.P., Linda Santa Maria, N.P., and Rivka Weiss, N.P. (collectively "Defendants").

GEICO contends that Defendants—led by Zaitsev—carried out a large-scale no-fault insurance fraud scheme whereby they defrauded GEICO into paying insurance benefits to which

1

the Defendants were not entitled. In short, GEICO argues that Zaitsev's 2018 attempt to sell his two medical practices was a sham, that he retained control over both practices, and that when those practices referred patients to Zaitsev's laboratory business they were illegal self-referrals. To this effect, GEICO alleges that Defendants committed civil RICO violations, common law fraud, aiding and abetting fraud, unjust enrichment, and New Jersey Insurance Fraud Prevention Act (NJIFPA) violations. Additionally, GEICO seeks a declaratory judgement that defendants may not recover on any of the outstanding bills submitted to GEICO. The Court previously issued a preliminary injunction staying all pending no-fault insurance arbitration proceedings between GEICO and Defendants, and enjoining Defendants from initiating new proceedings "until the resolution of the instant federal court action." *See* Dkt. 134.

GEICO has now moved for Summary Judgement, pursuant to Fed. R. Civ. P. 56, on its unjust enrichment and NJIFPA claims, as well as its request for declaratory judgement. *See* Dkt. 201. For the following reasons, the motion is GRANTED in part and DENIED in part.

## Background

The facts presented here, as well as those in the Discussion section, are taken from the pleadings, the parties' Rule 56.1 statements, and the supporting documentation. The facts are undisputed unless otherwise noted.

In 2013, Defendant Zaitsev incorporated a New Jersey medical practice named Interstate Multi-Specialty Medical Services, P.C. ("Interstate"). Pl's 56.1 ¶ 20, Dkt. 201-1. Defendant Eugene Gorman, M.D. ("Gorman") and former Defendant Allan Weissman, M.D. ("Weissman") worked for Interstate. *Id.* at ¶ 22. In or around 2016, Zaitsev incorporated Defendant Metropolitan Interventional Medical Services, P.C. ("Metropolitan") to provide medical services in New York. *Id.* at ¶ 23. Interstate and Metropolitan performed similar pain management

services in their respective states. *Id.* at ¶ 25. Both Interstate and Metropolitan were headquartered at 126 State Street, Hackensack NJ (although billing and insurance verification for Metropolitan was handled elsewhere). Zaitsev Dep. 253:22–254:24, Dkt. 201-6.

In 2014, Ridgewood Diagnostic Laboratory, L.L.C. ("Ridgewood") was incorporated in New Jersey. See Ridgewood Certificate of Formation, Dkt. 201-27. Zaitsev held an 87% ownership stake in Ridgewood through an LLC named Galuba International, L.L.C.. Pl's 56.1 ¶¶ 62, 65. Ridgewood performed laboratory services, including urine drug testing ("UDT"), from an office located on the second floor of 126 State Street, Hackensack NJ. *Id.* at ¶ 67. Zaitsev never referred patients from his health care practices (Interstate/Metropolitan) to Ridgewood because he knew such referrals were prohibited by both New York and New Jersey law. Zaitsev Dep. 248:8–11. Mark Kaminar, Zaitesev's personal accountant and good friend, served as the accountant for Interstate, Metropolitan, and Ridgewood, as well as Zaitsev's many other companies. Pl's 56.1 ¶¶ 54, 60.

In or around the spring of 2018, Zaitsev began talking with Weissman about his desire to sell Interstate and Metropolitan so that he could focus on Ridgewood's laboratory business. Pl's 56.1 ¶ 74; Zaitsev Dep. 348:11–18. Zaitsev hired a forensic accounting firm to determine the two companies' collective valuation, which they set at $13,600,000.00. Pl's 56.1 ¶¶ 76–77. Although Weissman lacked the capital to purchase the companies outright, he and Zaitsev agreed that he could buy the companies—without a down payment—and pay the purchase price over time with the companies' revenues. Zaitesev Dep. 345–347.

With a handshake, Weissman took over control of Interstate and Metropolitan. *Id.* at 346:6. Kaminar helped Weissman incorporate two new companies—Tri-State and Riverside—to take over Interstate and Metropolitan's operations, including leases, staff, and clients. Pl's 56.1 ¶

3

83. Kaminar served as accountant for the new companies, and the new companies retained the law firm Abrams, Fensterman, Eisman, Formato, Wolf & Carone, L.L.P. ("Abrams Fensterman") to represent them in billing and collection activities. *Id.* at ¶ 109. Certain attorneys at Abrams Fensterman had longstanding relationships with Zaitsev and the law firm also represented (and continues to represent) Ridgewood. Zaitsev Dep. 55:6–9.

    Despite Weissman taking over, Zaitsev retained control over the predecessor companies' accounts receivable. Zaitsev Dep. 356:3–4. Weissman therefore needed funding to manage the companies' collective $200,000 monthly overhead until new revenues could be collected. *Id.* at 356:24–25. From the many ways to fund a new business, Zaitsev and Weissman appear to have sought out the most suspicious. Tri-State initially borrowed $2.5 million, with seven percent interest, from Octagon Partners L.L.C. ("Octagon"). *Id.* at ¶ 132. Zaitsev was Octagon's sole member. *Id.* at ¶ 8. This was enough money to cover Tri-State and Riverside's overhead for more than a year. Nonetheless, two months later, Tri-State entered into another loan Agreement, this time with Financial Vision Group, L.L.C. ("Financial Vision"). *Id.* at ¶ 136. Pursuant to the Financial Vision agreement, Tri-State was allowed to draw from a $2.6 million line of credit, any loans were to be secured by Tri-State's accounts receivable, and Financial Vision was entitled to a fee of "150% of the amount of the advance, plus the principal." *Id.* at ¶¶ 139, 141.[1] Financial Vision's members included Zaitsev as well as three of the partners at Abrams Fensterman. *Id.* at ¶ ¶ 116, 137. Weissman's signature is affixed to a conflict waiver form addressing the conflict of Abrams Fensterman's involvement with the medical practices and the Financial Vision

---

[1] Although Kaminar was Tri-State's accountant, he claims he had no role in drafting the agreement. Nonetheless he conceded that he would only agree to such terms "If I were desperate . . . [if] I had no choice to survive." Kaminar Dep. 164:23–24.

4

agreement. Pl's 56.1 ¶ 117. He says he does not remember signing the waiver, but acknowledges that Kaminar had him sign many documents, and it may have been one of them. Weissman Dep., 219–221, Dkt. 201-10. He also claims he did not know Zaitsev was one of Financial Vision's owners. *Id.* at 269:13-23.

Weissman claims ignorance as to much of the business he was supposed to have purchased. In addition to not remembering signing the conflict waiver, he does not remember signing documents to incorporate a company called Riverside Management Group, Inc. ("Riverside Management"), which was incorporated in his name and which received more than $1,000,000.00 from Tri-State and Riverside during Weissman's brief ownership of those companies. *Id.* at 287:7–10; Andrew Ross Expert Report, p. 9, Dkt. 201-33. In his sworn affirmation he asserts that "in practice, I continued to work for Dr. Zaitsev because he and Mr. Kaminar controlled all of the financial and operational decision-making with respect to Tri-State and Riverside. . . . I did not hire, fire, or set the salary of any of the professional or non-professional staff at Tri-State and Riverside." Weissman Aff. ¶ 26, Dkt. 201-11. This claim, however, is contradicted by his deposition testimony, wherein he conceded that he alone discussed the financial status of the companies with Kaminar, made the staffing, scheduling, hiring, and firing decisions, and was a signatory on the accounts from which bills and payroll were paid. Weissman Dep. 224–229. Most importantly, Weissman conceded that Zaitsev's only interaction with the companies was "peripheral" and that he did not report to Zaitsev. *Id.* at 225:6–17.

In summary, Zaitsev (through Octagon and Financial Vision) loaned money to Weissman's new medical practices. In the case of the Financial Vision agreement, the loan may have been usurious. *See e.g.* NJ Rev Stat § 2C:21-19. GEICO claims that through these financial

5

arrangements Zaitsev retained actual control over the companies, but Weissman's own deposition testimony suggests that, for all intents and purposes, he was the exclusive owner and controller of Tri-State and Riverside.

In or around October 2018, less than six months after his handshake with Zaitsev, Weissman changed his mind and decided he no longer wished to purchase the companies. Zaitsev Dep., 444:13–445:2. As Weissman had never paid a cent for them, this was rather easy to effectuate. Zaitsev just needed to find a different doctor to take over the practices. Enter Dr. Kristappa Sangavaram, a New Jersey physician who had repeatedly been sanctioned by the New Jersey State Board of Medical Examiners, and who was permitted to practice medicine only with a practice monitor overseeing his medical practices and billing records. *See* April 19 2007 Consent Order, Dkt. 201-21; July 23, 2014 Consent Order, Dkt. 201-22. Unfortunately, Sangavaram had over $4.5 million in open and unsatisfied money judgements entered against him, so he could not pay for the medical practices either. *See* NJ Division of Taxation Judgement, Dkt. 201-23; Prudential Judgement, Dkt. 201-24. But like Weissman he could use the businesses' revenues to pay Zaitsev over time. The record indicates Zaitsev "sold" the businesses to Sangavaram—a feat that would be difficult if Weissman had been the true owner—but that Weissman also "assigned" Tri-State and Riverside to Sangavaram for free. *See* Asset Purchase Agreement, Dkt. 201-42; Assignment and Assumption Agreement, Skt. 201-37.

The Court is unable to make much sense of the timeline of Dr. Sangavaram's tenure as owner of the two practices because he invoked his Fifth Amendment right against self-incrimination in response to almost every question in his deposition. The only facts the Court can determine for certain are that Sangavaram "purchased" the businesses in early 2019 and GEICO initiated this action in 2020.

## II

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (A dispute as to a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). The movant bears the burden of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

GEICO seeks summary judgement on three of its claims: unjust enrichment, NJIFPA violations, and its request for a declaratory judgement. GEICO's motion hinges on the Court determining that there are no genuine issues of dispute as to the following issues. First, Zaitsev was the secret owner of Tri-State and Riverside and the businesses were not legally permitted to refer patients to Ridgewood for laboratory services. Second, that Ridgewood conducted medically unnecessary UDT services (specifically, testing for 6-MAM (a heroin metabolite) and methylenedioxyethylamphetamine ("MDEA")), and pursuant to New Jersey law, GEICO is not required to pay for unnecessary diagnostic testing. *See* N.J.S.A. 39:6A–2(m). And third, Tri-State and Riverside referred patients for UDT services without any doctors signing the requisition forms, and accordingly the tests were unauthorized.

As there are serious lingering questions of material fact, the Court is unable to make any summary judgement determinations as to the first issue. The second and third, however, are essentially undisputed. GEICO is therefore entitled to summary judgement insofar as its claims relate to the medically unnecessary and unauthorized UDTs. The Court will address the factual disputes before applying the law to GEICO's claims.

7

**Unlawful Self-Referrals**

GEICO's asks the Court to find that Defendants engaged in unlawful self-referrals. To this end, GEICO repeatedly claims that Zaitsev was the secret owner of Tri-State and Riverside. While the Court agrees with GEICO that the facts suggest that Zaitsev (and others) undertook suspicious actions suggesting a coordinated attempt to sidestep New York and New Jersey's self-referral laws, the Court cannot conclude that there are no material questions of fact regarding whether he was the secret owner of the two practices. The record contains sufficient evidence to support a reasonable jury finding that Zaitsev was earnestly trying to sell the businesses and that he did not retain control over them while they were owned by Weissman and Sangavaram. The Court cannot grant summary judgement insofar as GEICO's claims relate to this alleged self-referral scheme.

This is a classic case where a jury is needed to decide which witnesses are credible and which narrative is believable. GEICO claims Zaitsev was in control of everything. Defendants say that Weissman, and later Sangavaram, was in control.[2] GEICO claims Weissman knew nothing about the companies' finances. Pl's 56.1 ¶ 149. Defendants say Weissman knew exactly what was going on, as evidenced by actions like asking Kaminar to incorporate the companies, reviewing the bank accounts on his phone, pre-signing checks for vendors, and speaking with the accountant once a week. Def's 56.1 ¶ 149 Response. GEICO claims Weissman had no role in

---

[2] Dr. Sangavaram pled the fifth as to every question during his deposition, but district courts may not draw negative inferences at summary judgement based on an individual's invocation of Fifth Amendment protections. See *650 Fifth Ave. v. Alavi Found.*, 830 F.3d 66, 93 n.25 (2d Cir. 2016) (*citing Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005)). The Court is therefore unable to make any substantive determinations about who was in control of Tri-State and Riverside during Sangavaram's ownership. At trial, however, the jury will be free to draw any negative inferences they wish from Sangaravam's reticence.

running the companies, including staffing decisions, and that Zaitsev was still involved in hiring after the companies changed hands. Pl's 56.1 ¶¶ 152–159. Defendants argue that Weissman admitted that he made all the hiring and firing decisions, assigned someone to handle scheduling decisions, discussed financial matters with Kaminar alone, and (most importantly) said that he did not report to Zaitsev after the sale of the companies. Weissman Dep. 224–228. It is not clear who was in control of Tri-State and Riverside in 2018 and 2019, and the Court is unable to settle the issue today. A jury will need to decide whether Defendants engaged in unlawful self-referrals and whether GEICO is entitled to judgement on its claims.

### 6-MAM and MDEA Testing

The Court encounters a very different credibility issue when it comes to the question of whether Ridgewood billed GEICO for medically unnecessary UDT analysis. GEICO's forensic toxicology expert, Dr. Elizabeth Spratt, submitted a sworn report attesting to the fact that 6-MAM and MDEA testing serve no medical purpose. Spratt Report, Dkt. 201-32. Dr. Spratt's report explains concisely why these two chemicals are not typically included in UDT and why they would provide a doctor with no meaningful medical information. *Id.* at 13 (e.g., of 6-MAM, "this is one of the active metabolites of heroin. There is no reason to test for 6-MAM as a matter of course, especially when the opiate testing was negative. 6-MAM is only seen when heroin is consumed. . . . There is also a screening test for this metabolite.") In response to this report, Defendants submitted an unsworn report from rebuttal expert Dr. James Murphy which does not make any mention of 6-MAM or MDEA testing. Murphy Report, Dkt. 175-1.

While the Court previously denied GEICO's motion to exclude Dr. Murphy's testimony, *see* ECF Entry June 3, 2024, that does not necessarily mean that the report is sufficient to overcome summary judgement. *See Est. of Detwiler v. Offenbecher*, 728 F. Supp. 103, 140

(S.D.N.Y. 1989) (Ruling on admissibility does not mean "summary judgment [is] impossible whenever a party has produced an expert to support its position."). First of all, "[c]ourts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used [on] a motion for summary judgment without additional affidavit support." *Condoleo v. Guangzhou Jindo Container Co.*, 427 F. Supp. 3d 316, 330 (E.D.N.Y. 2019) (collecting cases). However, even if the Court ignores this threshold issue and considers Dr. Murphy's report, it is entirely unresponsive to issue raised by GEICO's expert, and therefore unresponsive to the current motion.

As previously mentioned, Dr. Murphy's report does not include any mention of 6-MAM or MDEA. Instead, it consists largely of conclusory statements regarding the general appropriateness of any testing done for a reasonable medical purpose, ultimately concluding: "The urine drug screens ordered by the Defendants were medically necessary, for a legitimate medical purpose, in the usual course of professional practice, and consistent with the applicable standard of care." Murphy Report at 14. While this sounds very nice, the report makes no indication that Dr. Murphy reviewed any of Defendants' medical records or even considered the specific chemicals at issue. *See Est. of Detwiler*, 728 F. Supp. at 140 ("[S]ummary judgment is appropriate where the nonmoving party relies solely on an expert opinion that is not based upon specific facts."). Without specifically explaining why 6-MAM or MDEA testing was necessary, Murphy's report is unresponsive to the issue currently before the court; as such, the issue is essentially undisputed. *See Zsa Zsa Jewels, Inc. v. BMW of N. Am.*, LLC, 419 F. Supp. 3d 490, 501, fn. 3 (E.D.N.Y. 2019) ("[S]tatements of fact by an expert may be deemed undisputed where the non-movant has failed to counter them with specific evidence."). The Court therefore concludes that Ridgewood's testing for 6-MAM and MDEA was medically unnecessary, and

10

pursuant to both New York and New Jersey law GEICO is not required to reimburse unnecessary medical expenses. *See* N.Y. Ins. Law § 5102(b); N.J.S.A. 39:6A–2(m).

### Unauthorized UDTs

The record indicates that Ridgewood conducted UDT services for Tri-State and Riverside after receiving unsigned requisition forms from those practices. Ridgewood then sought, and received, reimbursement from GEICO for those UDT services. *See* Asmus Decl., Ex. 4, Dkt. 201-47. New York and New Jersey law requires that any and all clinical laboratory testing, including UDTs, be ordered and authorized by a qualified medical professional. See 10 N.Y.C.R.R. § 58-1.7(b) ("a clinical laboratory shall examine specimens only at the request of licensed physicians or other persons authorized by law"); N.J.A.C. 10:61-1.6(a) ("[a]ll orders for clinical laboratory services shall be in the form of an explicit order personally signed by the physician or other licensed practitioner"). Furthermore, both Dr. Gorman and Dr. Weissman acknowledged that if a UDT requisition form did not bear their signatures, it was unauthorized. *See* Gorman Dep., 42:14-22; Weissman Aff., ¶ 31, Dkt. 201-11. In both New York and New Jersey, insurers are only required to reimburse *authorized* professional medical services. *See e.g.* 11 NYCRR 65-3.11 [a].

Defendants do not contest that Ridgewood submitted UDT reimbursements to GEICO for unauthorized testing. Instead, they simply contend that "GEICO cannot prove the requisite knowledge that any statement to GEICO contained any false or misleading information." Def. Mem. at 2, Dkt. 202. While this may relevant to some of GEICO's claims—including the NJIFPA claims—it is not a defense to the unjust enrichment or declaratory judgement claims at issue in this motion for summary judgement. As the matter is undisputed, the Court concludes that Ridgewood billed GEICO for unauthorized UDTs.

11

Having resolved these factual issues, the Court will now turn to the three claims for which GEICO seeks summary judgement.

### III.

**Unjust Enrichment**

Recovery for unjust enrichment requires facts establishing that: (i) the Defendants were enriched; (ii) at GEICO's expense; and (iii) that equity and good conscience require restitution. *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Id.* (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 685 N.Y.S.2d 381, 381 (4th Dep't 1999)).

GEICO reimbursed Defendants for medically unnecessary and unauthorized UDT services, so there is no dispute that Defendants were enriched at GEICO's expense. Therefore, the only question is whether equity and good conscience require restitution.

Defendants argue GEICO's unjust enrichment claim is duplicative of its fraud claim, and as such that it should be dismissed, or at least left for trial. "Courts will routinely dismiss an unjust enrichment claim that simply duplicates, or replaces, a conventional contract or tort claim." *Warren v. Coca-Cola Co.*, 670 F. Supp. 3d 72, 89 (S.D.N.Y. 2023) (quotation omitted). An unjust enrichment claim can survive alongside a fraud claim where the Court can conceive of a set of facts upon which the fraud claim would fail but the unjust enrichment claim could succeed. *See Silva v. Smucker Nat. Foods, Inc.*, No. 14-cv-6154, 2015 WL 5360022, at *12 (E.D.N.Y. Sept. 14, 2015). Here it is conceivable that GEICO will fail to prove that Defendants intended to defraud, while still succeeding in proving that they paid Defendants for medically unnecessary or unauthorized UDT services. In such event, GEICO's fraud claim would fail

despite proving that Defendants' were unjustly enriched. The claim is therefore not duplicative of GEICO's fraud claim.

However, this is an issue best left for trial. As GEICO's

> "unjust enrichment claims arise from the same factual predicates as [its] other claims, it is unnecessary to explore the unjust enrichment claim at length. If one of a number of integrally related causes of action must be tried, it makes little sense to grant a motion for summary judgment as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion for summary judgment was improperly granted."

*Eviner v. Eng*, 2015 WL 4600541, at *13 (E.D.N.Y Jul. 29, 2015). Indeed, in *Corsello v. Verizon New York, Inc.*, the New York Court of Appeals explained that unjust enrichment "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." 18 N.Y.3d 777, 790–91 (2012). As GEICO has not moved for summary judgement on its fraud claims, the Court cannot say that there is no other cause of action available to remedy the alleged injury. Therefore summary judgement on the unjust enrichment claim is inappropriate; equity and good conscience do not *require* restitution at this stage.

**NJIFPA**

A person violates the IFPA if he or she "[p]resents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim." N.J. Stat Ann. § 17:33A-4(a)(1). The elements of such a claim are therefore: (1) knowingly, (2) submitting an insurance claim, (3) containing false or misleading information (4) material to the claim.

13

GEICO has presented no evidence that Defendants *knowingly* requested medically unnecessary or unauthorized reimbursements for UDT services. They therefore cannot prove that there is no material dispute as to this element of the claim. They will need to convince a jury that the alleged actions were undertaken *knowingly* in order to prevail at trial. The motion is denied as to the NJIFPA claim.

### Declaratory Judgement

"Declaratory relief is proper" whenever "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" or "when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings." *Maryland Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir. 1971). Furthermore, a party seeking a declaratory judgment must allege that there is a "substantial controversy, between parties with adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996).

There is an actual controversy here because the Ridgewood Defendants have maintained throughout this litigation that they are entitled to payment for certain categories of billing that they submitted to GEICO. GEICO seeks a declaratory judgement stating that "GEICO is not obligated to remit payment on any of the Ridgewood Defendants' pending and outstanding UDT billing to GEICO." Pl's Mem., 25. As the Court has determined that Ridgewood submitted billing to GEICO for unauthorized and medically unnecessary UDT services—and that both categories of claims were not authorized by law—GEICO is entitled to a limited declaratory judgment as to these two categories of claims.

The motion is denied, however, insofar as it seeks a declaratory judgement with regard to Defendants' alleged self-referral scheme. As the Court explained previously, there are too many unanswered questions of material fact to warrant the issuance of a declaratory judgement as to the self-referral scheme. Whether or not GEICO is required to pay the rest of Ridgewood's no-fault insurance claims is a question best settled at trial where a jury will be able to review all the evidence and develop a full picture of this complicated situation. In the meantime, the Court's preliminary injunction will protect GEICO's rights and maintain the status quo until the jury can resolve the factual disputes.

## CONCLUSION

GEICO's motion for summary judgement is GRANTED IN PART and DENIED IN PART. The Clerk of the Court will issue a declaratory judgement clarifying that GEICO is not obligated to remit payment for Ridgewood's billing for unauthorized or medically unnecessary UDT services. The motion is denied in all other regards. A jury must decide whether or not the Defendants engaged in an unlawful self-referral scheme, whether they were unjustly enriched, and whether they violated the NJIFPA.

**SO ORDERED.**

    /S/ Frederic Block

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
February 3, 2026